## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNUM HUNTER RESOURCES | ) | Case No. 15-12533 (KG) |
| CORPORATION, *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN BOTH SENIOR AND JUNIOR SECURED POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) AUTHORIZING REPAYMENT OF THE PREPETITION FIRST LIEN FACILITY IN FULL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (V) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES, (VI) MODIFYING THE AUTOMATIC STAY, (VII) SCHEDULING A FINAL HEARING, AND (VIII) GRANTING RELATED RELIEF

Magnum Hunter Resources Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors")[2] respectfully submit this motion for the relief set forth herein. In support of this motion, the Debtors

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Magnum Hunter Resources Corporation (9278); Alpha Hunter Drilling, LLC (7505); Bakken Hunter Canada, Inc. (7777); Bakken Hunter, LLC (3862); Energy Hunter Securities, Inc. (9725); Hunter Aviation, LLC (8600); Hunter Real Estate, LLC (8073); Magnum Hunter Marketing, LLC (2527); Magnum Hunter Production, Inc. (7062); Magnum Hunter Resources GP, LLC (5887); Magnum Hunter Resources, LP (5958); Magnum Hunter Services, LLC (5725); NGAS Gathering, LLC (2054); NGAS Hunter, LLC (3737); PRC Williston LLC (1736); Shale Hunter, LLC (1952); Triad Holdings, LLC (8947); Triad Hunter, LLC (5830); Viking International Resources Co., Inc. (0097); and Williston Hunter ND, LLC (3798). The location of the Debtors' service address is: 909 Lake Carolyn Parkway, Suite 600, Irving, Texas 75039.

[2]   A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Gary C. Evans, Chairman and Chief Executive Officer of Magnum Hunter Resources Corporation, in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on December 15, 2015 (the "Petition Date").

respectfully proffer the *Declaration of Peter Laurinaitis in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Both Senior and Junior Secured Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Granting Liens and Providing Superpriority Administrative Expense Status, (III) Authorizing Repayment of the Prepetition First Lien Facility in Full Pursuant to Section 363 of the Bankruptcy Code, (IV) Authorizing the Debtors to Use Cash Collateral, (V) Granting Adequate Protection to the Prepetition Secured Parties, (VI) Modifying the Automatic Stay, (VII) Scheduling a Final Hearing, and (VIII) Granting Related Relief* (the "Laurinaitis Declaration"), attached hereto as **Exhibit B**, and the First Day Declaration.  In further support of this motion, the Debtors respectfully state the following:

**Preliminary Statement**[3]

1.     In the face of the significant and prolonged downturn in the oil and gas industry, against the backdrop of several recent large chapter 11 cases of the Debtors' peer companies that have dragged on for months (and in some cases more than a year), the Debtors are not only pleased to present the Court with this motion requesting access to $200 million in post-petition financing, but are cautiously optimistic about the potential to restructure their balance sheet during these chapter 11 cases.

2.     Specifically, this motion requests that the Court approve $200 million in both senior and junior DIP Financing provided by ***both*** an ad hoc group of the Debtors' unsecured noteholders (who will backstop 65% of the DIP Financing Facility) (the "Ad Hoc Group of Unsecured Noteholders") ***and*** an hoc group of the Debtors' second lien lenders (who will backstop the remaining 35% of the DIP Financing Facility) (the "Ad Hoc Group of Second Lien

---

[3]    Capitalized terms used but not defined in this section have the meanings ascribed to such terms further below in this motion or in the Interim DIP Order, as applicable.

Lenders").[4]  Together, these two groups of stakeholders currently hold 100% of the Debtors'

$70 million face amount of the Debtors' first lien debt, approximately 66% of the Debtors' $340

million face amount of second lien debt, and approximately 80% of the Debtors' $600 million

face amount of the senior unsecured notes.  In short, this motion requests approval of a

post-petition financing facility that is being backstopped by holders of more than 75% of the

Debtors' funded debt obligations.

3.      If approved, the Debtors will use the proceeds of the $200 million to, among other

things:  (a) fund the Debtors' general and corporate operating needs during the contemplated

time period of these chapter 11 cases; (b) provide a substantial and meaningful recovery to

non-issued debt unsecured creditors—*i.e.*, trade and other general unsecured creditors (currently

intended to be a blended cash recovery of 80%); and (c) upon entry of the Final Order, satisfy the

Debtors' outstanding first lien facility in full, in cash.

4.      But those aspects of the DIP Financing Facility are only part of the story.  In

connection with providing the DIP Financing Facility, the Backstoppers (in their various

capacities) have agreed to support the terms of a specific restructuring pursuant to a

Restructuring Support Agreement (the "RSA"), attached to the First Day Declaration as

Exhibit B.[5]  The lynchpin of the RSA is that pursuant to the plan of reorganization contemplated

thereby (the "Plan"), the outstanding claims under the DIP Financing Facility will, upon the

effective date of the Plan, ***equitize, in full***.  That is an extraordinary result in an extremely

challenging environment where commodity prices have continued to fall—indeed, in the past

---

[4]     Importantly, between entry of the Interim DIP Order and the Final DIP Order, the DIP Financing
        Facility will be made available, on a *pro rata* basis across both tranche A and tranche B, to holders of
        the Debtors' Second Lien Credit Facility (for 35% of the DIP Financing Loans) and the Debtors
        Senior Unsecured Notes (for 65% of the DIP Financing Loans).

[5]     To be clear, the Debtors are not now seeking approval of the RSA or the settlements contemplated
        thereby.

week alone commodity prices for natural gas and crude oil have fallen approximately 8.4% and

3.6% respectively.  Put simply, not only have the Debtors been able to obtain $200 million in

DIP financing from their existing stakeholders, they have received a commitment to ***convert that***

***financing into equity*** upon emergence under the Plan,[6] thereby helping to achieve an almost

fully deleveraged capital structure.

5.      But the conversion of the claims under the DIP Financing Facility to equity is not

all the Debtors hope to achieve in these chapter 11 cases.  As part of this motion, the Ad Hoc

Group of Second Lien Lenders—whose liens and claims could be the subject of dispute,

analysis, and debate, in the period leading up to the Petition Date—have agreed to a "priming" of

their prepetition liens with regard to a take-out by the DIP Financing Facility of the Prepetition

First Lien Financing Facility.  The Ad Hoc Group of Second Lien Lenders have also agreed to

permit the use of cash collateral on a consensual basis in return for certain adequate protection

based on a "settled" amount, which is less than the full amount of the interest that would be paid,

which preserves liquidity during these chapter 11 cases.  And, as part of the overall transaction,

***they too*** have agreed to convert their entire prepetition claim to equity upon emergence.  Thus, if

the restructuring contemplated by the RSA is achieved, all of the Debtors' pre- and postpetition

secured creditors—as well as all of the Debtors' prepetition unsecured noteholders—will equitize

their claims under the Plan.

6.      The Debtors were able to achieve these terms in their DIP Financing Facility and

in the RSA based on a complex, delicate settlement reached between the Debtors, the Ad Hoc

---

[6]     Specifically, the claims under the DIP Financing Facility will, on the effective date of the Plan,
convert to equity in the reorganized Debtors at a discount of 25% to "Settlement Equity Value."
Settlement Equity Value will be calculated based on the Settlement Enterprise Value of $900 million
(determined on a settled value basis only) less any funded debt at emergence, plus any balance sheet
cash at emergence.

Group of Noteholders, and the Ad Hoc Group of Second Lien Lenders.  The terms of that settlement—laid out in the term sheet attached to the RSA—are dependent upon approval of *this* DIP Financing Facility and *this* Plan getting to consummation on the time frame set forth in *this* DIP Financing Agreement.  If any of the Debtors fail to achieve any of those key aspects of the deal, the Debtors will be back to the starting point with respect to their restructuring negotiations. That result is because the proposed Interim DIP Order explicitly provides in Paragraph 35 that, if the RSA is terminated, all parties will revert to the *status quo ante*, including that all of the Debtors' stipulations and admissions, and this Court's findings and orders, will be *void ab initio*. Importantly, pursuant to the RSA, the Debtors' retain the right to market other DIP financing proposals

7.      For these reasons, and for the reasons set forth below, in the Laurinaitis Declaration and the First Day Declaration, the Debtors firmly believe that the DIP Financing Facility will maximize the value of all of the Debtors' stakeholders and is in the exercise of the Debtors' sound business judgment.  Accordingly, the Debtors respectfully request that the Court approve the entry of the Interim Order and the Final Order.

**Concise Statement Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2**

8.      The Debtors seek entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order,"[7] and together with the Interim DIP Order, the "DIP Orders"):  (i) authorizing the Debtors to obtain both senior and junior secured postpetition financing (the "DIP Financing Facility") as set forth in that certain loan agreement, annexed as **Exhibit 1** to **Exhibit A** attached hereto (the "DIP Financing Agreement" and, together with all agreements, documents, and instruments executed

---

[7]      The Debtors will file the form of Final DIP Order prior to the Final Hearing (as defined herein).

and delivered in connection therewith, as hereafter amended, supplemented, or otherwise modified from time to time in accordance with the DIP Orders, the "DIP Financing Documents") among MHRC, the Guarantors, Cantor Fitzgerald Securities ("Cantor Fitzgerald"), as administrative agent (in such capacity, the "DIP Financing Agent"), and the lenders of the DIP Financing Loans (collectively, in such capacities, the "DIP Financing Lenders"); (ii) granting liens and providing superpriority claims with respect to such postpetition financing; (iii) authorizing the Debtors, upon entry of the Final DIP Order, to repay in full all obligations under the Prepetition First Lien Facility; (iv) authorizing the Debtors to use Cash Collateral; (v) approving the form of adequate protection to be provided to certain prepetition lenders; (vi) modifying the automatic stay; (vii) scheduling a final hearing (the "Final Hearing") to consider entry of the Final DIP Order; and (viii) granting related relief.

9.      The provisions of the DIP Financing Agreement and the Interim DIP Order were extensively negotiated and are the most favorable terms that the Debtors were able to obtain. Moreover, the Debtors have an urgent need for the DIP Financing Facility.  Approval of the DIP Financing Facility will ensure the Debtors are able to maintain their operations, pursue reorganization, and maximize the value of their estates for the benefit of all stakeholders. Accordingly, the Debtors request that the Court enter the Interim DIP Order and Final DIP Order approving the DIP Financing Facility.

10.     The below chart contains a summary of the material terms of the proposed DIP Financing Facility, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2.[8]

---

8   The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced.  To the extent anything in this motion is inconsistent with such documents, the

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Borrower** Bankruptcy Rule 4001(c)(1)(B) | Magnum Hunter Resources Corporation (the "<u>Borrower</u>" or "<u>MHRC</u>"). <br><br> *See* DIP Financing Agreement Preamble; Interim DIP Order Preamble. |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Each of Debtors, other than MHRC (the "<u>Guarantors</u>"). <br><br> *See* DIP Financing Agreement § 1.02; Interim DIP Order Preamble. |
| **DIP Financing Lenders** Bankruptcy Rule 4001(c)(1)(B) | Certain holders of greater than 66.8% of MHRC's Prepetition Second Lien Facility (the "<u>Second Lien Backstoppers</u>") and certain holders of greater than 80% of MHRC's Prepetition Notes (the "<u>Noteholder Backstoppers</u>" and, together with the Second Lien Backstoppers, the "<u>Backstoppers</u>"). <br><br> *See* DIP Financing Agreement § 1.02; Interim DIP Order ¶ 7(f). |
| **Term** Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B) Local 4001-2(a)(ii) | The term of the DIP Financing Facility shall mature on the earliest to occur of (i) of nine months after the closing date of the DIP Financing Facility, (ii) 31 days after entry by the Court of the Interim DIP Order, if the Final DIP Order has not been entered by the Court prior to the expiration of such 30-day period, (iii) the effective date of a plan of reorganization or liquidation in the Bankruptcy Cases, (iv) the consummation of a sale of all or substantially all of the assets of the Borrower and its subsidiaries pursuant to Section 363 of the Bankruptcy Code, or (v) the date of termination of the DIP Financing Lenders' Commitments and the acceleration of any outstanding extensions of credit, in each case, under the DIP Facility in accordance with the terms of the DIP Financing Documents. <br><br> *See* DIP Financing Agreement § 1.02. |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The total DIP Financing Facility shall include loans to be advanced and made available to the Borrower in the aggregate maximum principal amount of $200 million as follows: <br><br> $40 million to be made available on the date the Court enters the Interim DIP Order, subject to certain conditions (the "<u>Initial Draw</u>"); <br><br> $100 million to be made available on the date the Court enters the Final DIP Order, subject to certain conditions (the "<u>Final Order Draw</u>"); and <br><br> $60 million to be made available upon the occurrence of certain conditions, as set forth in Section 3.03 of the DIP Financing Agreement (the "<u>Third Draw</u>" and, together with the Initial Draw and the Final Order Draw, the "<u>Commitments</u>"). <br><br> *See* DIP Financing Agreement § 2.01; Interim DIP Order ¶ 8(a). |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The Initial Draw is subject to customary borrowing conditions, as well as, but not limited to, the following:  (i) all documentation relating to the DIP Financing Facility, including the Interim DIP Order and Final DIP Order, shall be in form and substance satisfactory to the DIP Financing Lenders and duly executed counterparts of which shall be delivered to the DIP Financing Agent; (ii) all "first day motions" filed and "first day orders" entered at the time of commencement of these chapter 11 cases shall be in form and substance reasonably satisfactory to the DIP Financing Lenders; (iii) all reasonable out-of-pocket fees and expenses (including the fees and expenses of outside counsel) of the DIP Financing Lenders shall have been paid whether incurred prior to or after the Petition Date; (iv) the DIP Financing Lenders shall be satisfied that, except as authorized by the Interim DIP Order, there shall not occur as a result of, and after giving effect to, the initial |

terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Financing Documents or the Interim DIP Order, as applicable.

KE 38077330

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | extension of credit under the DIP Financing Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Borrower's or the Guarantors' other material agreements; (v) the DIP Financing Lenders and DIP Financing Agent shall have a valid and perfected lien on and security interest in the Collateral as provided in the DIP Orders; (vi) the DIP Financing Agent shall have received endorsements naming the DIP Financing Agent, on behalf of the DIP Financing Lenders, as an additional insured and loss payee, as applicable, under all insurance policies to be maintained with respect to the Collateral; (vii) the DIP Financing Agent shall have received the Budget in form and substance satisfactory to the DIP Financing Lenders; and (viii) the DIP Financing Agent shall have received the Debtors' executed counterparts of the RSA, which shall be in form and substance satisfactory to the Debtors and the Required Backstop Lenders.<br><br>The conditions to the Final Order Draw include, but are not limited to, the following: (i) there shall exist no Default or Event of Default under the DIP Financing Documents; (ii) the representations and warranties of the Debtors therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding; (iii) the making of such DIP Financing Loan shall not violate any material requirement of law and shall not be enjoined, temporarily, preliminarily or permanently; (iv) no later than 31 days after the entry of the Interim DIP Order, the Court shall have entered the Final DIP Order; (v) the Final DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of the DIP Financing Lenders and (vi) all Obligations (as defined in the Prepetition First Lien Facility) shall have been, substantially concurrently with the funding, repaid in full in cash.<br><br>The conditions to the Third Draw include, but are not limited to, the following: (a) the DIP Financing Agent and the Backstoppers shall have received all fees and other amounts due and payable on or prior to the date of the Third Draw; (b) no Default or Event of Default shall have occurred and be continuing or would result from the Third Draw and there shall not occur as a result of, and after giving effect to, the Third Draw a Default under any of the Borrower's or the Guarantors' other material agreements (other than debt instruments or defaults arising due to the filing of the Bankruptcy Cases); (c) the representations and warranties made by the Debtors in the DIP Financing Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding; (d) the provision of the Third Draw shall not violate any material requirement of law and shall not be enjoined, temporarily, preliminarily or permanently; (e) the Final DIP Order shall be in full force and effect and the Debtors shall be in compliance in all material respects therewith; (f) the DIP Financing Agent shall have received a notice of the Third Draw; (g) Specified Tranche A Lenders or Specified Tranche B Lenders shall have determined to fund the Third Draw; (h) the Disclosure Statement, in form and substance satisfactory to the Required Tranche Lenders, shall have been approved by the Court; (i) the then-current status of the contractual relationship with Eureka Hunter Holdings, LLC ("EHH"), as directed by Morgan Stanley, in connection with EHH and its subsidiaries (collectively, "Eureka") shall be in form and substance satisfactory to the Required Tranche Lenders; and (j) the RSA shall be in full force and effect.<br><br>*See* DIP Financing Agreement § Article III. |

8

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | LIBOR plus 8.0 percent, with a LIBOR floor of 1.0 percent (plus 2.0 percent upon default).<br><br>*See* DIP Financing Agreement § 2.06. |
| **Use of DIP Financing Facility and Cash Collateral**<br>**Bankruptcy Rule** 4001(b)(l)(B)(ii)<br>Local Rule 4001-2(a)(ii)<br><br>**Repayment Features**<br>Local Rule 4001-2(a)(i)(E) | The DIP Financing Facility shall be used (a) to repay all obligations outstanding under the Prepetition First Lien Facility, upon entry of a Final DIP Order, and to cash collateralize existing letters of credit; (b) in accordance with and subject to the Budget, for general corporate purposes of the debtors (including payment of fees and expenses in connection with the transactions contemplated hereby, any adequate protection payments included herein, and working capital); (c) to fund payment of general unsecured claims in accordance with Section 5.21 of the DIP Financing Agreement and certain other costs and expenses with respect to the administration of the Chapter 11 Cases; and (iv) such prepetition obligations as the Court shall approve, in each case in a manner consistent with the terms and conditions contained in the DIP Financing Agreement.<br><br>*See* DIP Financing Agreement § 5.21. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The lenders party to the Prepetition First Lien Facility (the "<u>Prepetition First Lien Facility Secured Lenders</u>") and the lenders party to the Prepetition Second Lien Facility (the "<u>Prepetition Second Lien Facility Secured Lenders</u>" and, together with the Prepetition First Lien Facility Secured Lenders, the "<u>Prepetition Secured Lenders</u>").<br><br>*See* Interim DIP Order ¶¶ 4(e), 5(e). |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | <u>DIP Agency Fee:</u> The DIP Financing Agent shall receive, for its own account, a non-refundable and customary (i) annual administration fee to be funded in three increments on the closing date of the DIP Financing Facility, the date of the Final Order Draw and the date of the Third Draw and (ii) funding fee, which shall be fully earned, due and payable on the closing date of the DIP Financing Facility.<br><br>*See* DIP Financing Agreement § 2.05(a); Interim DIP Order ¶ 8(b)(ii).<br><br><u>Backstop Fee:</u>  In consideration for providing a backstop of the DIP Financing Facility, each Backstopper will receive an irrevocable fee in the amount of its pro rata share (based on commitments for the DIP Financing Facility on the initial funding date of the DIP Financing Loan) of 3.00% of the New Common Equity of Reorganized MHRC; *provided*, that to the extent the plan of reorganization (the "<u>Plan</u>") contemplated by the RSA is not consummated, this fee will be paid in cash; *provided*, that to the extent the Third Draw does not occur, this fee shall be paid in cash in an aggregate amount equal to 3.00% of the aggregate amount of the Backstoppers' Commitments made to date.<br><br>*See* DIP Financing Agreement § 2.05(b); Interim DIP Order ¶ 8(b)(ii).<br><br><u>Commitment Fee:</u>  Each DIP Financing Lender will receive its pro rata share of 2% of the DIP Financing Loans, earned upon entry of the Interim DIP Order, and payable upon entry of the Final DIP Order.<br><br>*See* DIP Financing Agreement § 2.05(c); Interim DIP Order ¶ 8(b)(ii). |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B)<br>Local Rule 4001-2(a)(ii) | The use of cash and proceeds from the DIP Financing Loans is subject to a customary budget (the "<u>Budget</u>"), attached to the Interim DIP Order as **Exhibit 2**.<br><br>*See* DIP Financing Agreement § 5.21; Interim DIP Order ¶ 9. |

KE 38077330

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(ii) | The DIP Financing Agreement requires compliance with certain reporting covenants that are usual and customary for DIP financings, including, without limitation, delivery of: annual financial statements; quarterly financial statements; monthly financial statements; thirteen-week weekly budgets; variance reports; compliance certificates; notices of certain dispositions; notices of certain changes to the Debtors; and production reports and lease operating statements, in each case, within certain time periods.<br><br>*See* DIP Financing Agreement § 5.01; Interim DIP Order ¶ 26. |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B)<br>Local Rule 4001-2(a)(ii) | The DIP Financing Agreement requires compliance with a budget variance covenant, which requires, as of any testing date and for the immediately preceding testing period: (i) the aggregate receipts received by the Debtors during such period must not be less than 80% of the aggregate receipts set forth in the Budget for such period; (ii) the aggregate disbursements made by the Debtors during such period must not be greater than 120% of the aggregate disbursements set forth in the Budget for such period; and (iii) the aggregate capital expenditures made by the Debtors during such period must not exceed 120% of the capital expenditures set forth in the Budget for such period.<br><br>*See* DIP Financing Agreement § 5.23. |
| **Chapter 11 Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | **December 17, 2015** — The Court shall have entered the Interim DIP Order.<br><br>**January 7, 2016** — The Debtors shall have filed with the Court: (i) a motion to reject executory contracts and set procedures with regard to the determination of rejection damages; (ii) a confirmable Plan and related disclosure statement (the "Disclosure Statement"); (iii) a motion to approve the adequacy of such Disclosure Statement, procedures for solicitation of such Plan, and three schedule the hearing to consider confirmation of the Plan; and (iv) a motion seeking to assume the RSA.<br><br>**January 15, 2016** — The Court shall have entered the Final DIP Order.<br><br>**February 12, 2016** — The Court shall have entered (i) an order approving the assumption of the RSA and (ii) an order approving the adequacy of the Disclosure Statement.<br><br>**March 28, 2016** — The Court shall have commenced the hearing to consider confirmation of the Plan.<br><br>**April 1, 2016** — The Court shall have entered an order confirming the Plan.<br><br>**April 15, 2016** — The Plan shall become effective.<br><br>*See* DIP Financing Agreement § 1.02. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i)<br>Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | The DIP Financing Obligations shall (collectively, the "DIP Financing Liens"):<br><br>(i) upon entry of the Interim DIP Order, pursuant to section 364(c)(1) of the Bankruptcy Code, have joint and several super-priority administrative expense claims status in the Bankruptcy Cases, subject only to the Carve Out;<br><br>(ii) pursuant to sections 364(d)(i) and (c)(2) of the Bankruptcy Code, be secured by (a) to the extent, and only to the extent, of, Obligations not to exceed $70,000,000 and subject to entry of the Final DIP Order, a perfected first priority "priming" lien on the Prepetition Collateral (other than Permitted Priority Liens), subject in all respects to Section 12 of the Seventh Amendment to the Existing First Lien Credit Agreement, dated as of November 30, 2015 and to repayment in full of the Obligations (as defined under the Existing First Lien Credit Agreement), and (b) upon entry of the Interim DIP Order, a perfected first priority Lien on all Collateral that is not subject to valid, perfected, and non-avoidable liens as of the Petition Date (including, subject to entry of the Final DIP Order, Equity |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | Interests in EHH owned by any Debtor, to the extent that necessary consents are obtained for the pledge of such Equity Interests, and all proceeds thereof), in each case, subject to the Carve Out; and <br><br> (iii) upon entry of the Interim DIP Order, pursuant to section 364(c)(3) of the Bankruptcy Code and except as provided in clause (ii)(a) above, be secured by a perfected Lien on all Prepetition Collateral, subject to the Carve Out and subject to (a) Liens on Prepetition Collateral securing obligations under the Existing Second Lien Credit Agreement and Existing Other Secured Debt, (b) valid Liens in existence on the Petition Date with respect to each Debtor, or (c) valid Liens that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code . <br><br> *See* DIP Financing Agreement § 2.23; Interim DIP Order ¶ 10. |
| **Carve Out** <br> Bankruptcy Rule 4001(c)(1)(B) <br> Local Rule 4001-2(a)(i)(f) | The sum of: (i) all fees required to be paid to the Clerk of the Court and U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Allowed Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "<u>Debtor Professionals</u>") and any official committee appointed in the Chapter 11 Cases pursuant to sections 328 or 1103 of the Bankruptcy Code (together with the Debtor Professionals, the "<u>Professionals</u>") at any time before the delivery by the DIP Financing Agent of a Carve Out Trigger Notice (defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) the Allowed Professional Fees of the Professionals in an aggregate amount not to exceed $2 million incurred beginning the first business day following delivery by the DIP Financing Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>"). <br><br> For purposes of the foregoing, "<u>Carve Out Trigger Notice</u>" shall mean a written notice delivered by electronic mail (or other electronic means) by the DIP Financing Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the official committee of unsecured creditors, if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Financing Obligations under the DIP Financing Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked. <br><br> On the day on which a Carve Out Trigger Notice is given by the DIP Financing Agent to the Debtors (the "<u>Termination Declaration Date</u>"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors under the DIP Financing Agreement in an amount equal to the then unpaid amounts of the Allowed Professional Fees and (ii) constitute a demand to the Debtors to utilize all cash on hand as of the date of such notice and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account in trust to pay any then-unpaid Allowed Professional Fees (the "<u>Pre-Carve Out Trigger Notice Reserve</u>") prior to any and all other claims. <br><br> On the Termination Declaration Date, the Carve Out Trigger Notice shall also be deemed a draw request and notice of borrowing by the Debtors under the DIP Financing Agreement in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  The DIP Financing Agent shall immediately send the Carve Out Trigger Notice to the DIP Financing Lenders.  On the first business day after the DIP Financing Agent sends a Carve Out Trigger Notice to the DIP Financing Lenders, notwithstanding anything in the DIP Financing Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Financing Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for the loans under the DIP Financing Facility, any termination of the commitments under the DIP Financing Facility following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Financing Agreement), each DIP Financing Lender (on a pro rata basis based on the then-outstanding commitments under the DIP Financing Facility) shall make available to the DIP Financing Agent such DIP Financing Lender's pro rata share with respect to such borrowing in accordance with the DIP Financing Facility. |
| | All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Financing Agent for the benefit of the DIP Financing Lenders until the DIP Financing Obligations have been paid in full, in which case any such excess shall be paid to any prepetition claimants in accordance with their rights and priorities under applicable law. |
| | All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Financing Agent for the benefit of the DIP Financing Lenders until the DIP Financing Obligations have been paid in full, in which case any such excess shall be paid to any prepetition claimants in accordance with their rights and priorities as of the Petition Date. |
| | Notwithstanding anything to the contrary in the DIP Financing Documents or the DIP Orders, if either of the Carve Out Reserves is not funded in full in the amounts set forth in the DIP Orders, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in the DIP Orders, prior to making any payments to the DIP Financing Agent, the DIP Financing Lenders, or any prepetition claimants. |
| | Notwithstanding anything to the contrary in the DIP Financing Documents or the DIP Orders, following delivery of a Carve Out Trigger Notice, none of the DIP Financing Agent, DIP Financing Lenders, Prepetition First Lien Agent, Prepetition Second Lien Agent, or Prepetition Lenders shall, nor shall they direct any entity to, sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid to the DIP Financing Agent for application in accordance with the DIP Financing Documents.  Further, notwithstanding anything to the contrary in the DIP Financing Documents, the DIP Orders: (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute loans or increase or reduce the DIP Financing Obligations; (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out; and (iii) in no way shall the Budget, any Permitted Variance, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves |

12

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors nor shall the Debtor Professionals be subject to any budget. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, in the DIP Orders, or any prepetition secured debt, the Carve Out shall be senior to all liens and claims securing the DIP Financing Facility, the Adequate Protection Liens, and the 507(b) Claims (as defined herein) and any and all other forms of adequate protection, liens, or claims securing the obligations under the DIP Financing Facility or the prepetition secured obligations. Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Notice in respect of any Allowed Professional Fees shall not reduce the Carve Out. <br><br> *See* Interim DIP Order ¶¶ 10(f)–(m). |
| **506(c) Waiver** <br> Bankruptcy Rule 4001(c)(l)(B)(x) <br> Local Rule 4001-2(a)(i)(C) | Subject to entry of the Final DIP Order, except to the extent of the Carve Out, no expenses of administration of the Debtors' chapter 11 cases or any Successor Case that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Financing Collateral or the Prepetition Collateral, as the case may be, pursuant to sections 105 and 506(c) of the Bankruptcy Code or any similar principle of law. <br><br> *See* DIP Financing Agreement § 3.01(e); Interim DIP Order ¶ 22. |
| **Section 552(b)** <br> Bankruptcy Rule 4001(c)(l)(B) <br> Local Rule 4001-2(a)(i)(h) | Subject to entry of the Final DIP Order, the Prepetition First Lien Facility Agent, the Prepetition Second Lien Facility Agent, the Prepetition Secured Parties, the DIP Financing Agent, and the DIP Financing Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition First Lien Facility Agent, the Prepetition Second Lien Facility Agent, the Prepetition Secured Lenders, the DIP Financing Agent, and the DIP Financing Lenders with respect to (i) proceeds, products, offspring or profits of any of the Prepetition Collateral, including the Cash Collateral, or the DIP Financing Collateral, as applicable, or (ii) the extension of the Adequate Protection Liens to cover proceeds of the Prepetition Collateral. <br><br> *See* Interim DIP Order ¶ 23. |
| **Stipulations to Prepetition Liens and Claims** <br> Bankruptcy Rule 4001(c)(1)(B)(iii) <br> Local Rule 4001-2(a)(i)(B) <br><br> **Challenge Period** <br> Bankruptcy Rule 4001(c)(l)(B) <br> Local Rule 4001-2(a)(i)(B) | Subject to Paragraph 35 of the Interim DIP Order, the Debtors make certain customary admissions and stipulations with respect to the aggregate amount of the prepetition debt and the extent, validity, enforceability, and priority of the liens and security interests securing the obligations under the Prepetition First Lien Facility and the Prepetition Second Lien Facility, subject to a challenge period of the later of (i) seventy-five days following entry of the Final DIP Order and (ii) any such later date agreed to in writing by each of the Backstoppers, the Prepetition First Lien Facility Agent, and the Prepetition Second Lien Facility Agent, in their respective sole and absolute discretion. <br><br> *See* Interim DIP Order ¶¶ 4, 5, 6, 21, 35. |
| **Adequate Protection** <br> Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Subject in all respects to the Carve Out and the DIP Financing Liens, as adequate protection for their interests in the Prepetition Collateral: <br><br> i.  The Prepetition First Lien Facility Secured Parties shall receive (a) an allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code as provided for by section 507(b) of the Bankruptcy Code on account of the Adequate Protection Obligations (the "First Lien Facility 507(b) Claim"); (b) subject and junior in priority in all respects to |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | the Carve Out and the DIP Financing Liens, additional and replacement liens on, and security interests in, all previously unencumbered property, as set forth in paragraph 12(b) of the Interim DIP Order, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code; (c) subject and junior in priority in all respects to the Carve Out and the DIP Financing Liens but senior in all respects to the Adequate Protection Liens granted to the Prepetition Second Lien Facility Secured Parties, a junior priority replacement lien on, and security interest in, all property of each Debtor and each Debtor's "estate"; (d) payment of actual, reasonable, and documented professional fees incurred in connection with work performed for the Prepetition First Lien Facility Secured Lenders; and (e) cash payment of interest at the non-default contract rate.<br><br>ii.  The Prepetition Second Lien Facility Secured Parties shall receive: (a) subject and junior in priority in all respects to the Carve Out, the DIP Financing Liens, the Adequate Protection Liens granted to the Prepetition First Lien Facility Secured Parties, and the First Lien Facility 507(b) Claim, (1) liens on, and security interests in, all previously unencumbered property, as set forth in paragraph 13(b) of the Interim DIP Order, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code and (2) a junior priority replacement lien on, and security interest in, all property of each Debtor and each Debtor's "estate"; (b) payment of the actual, reasonable, and documented fees and expenses of the Prepetition Second Lien Facility Secured Parties' legal and financial advisors incurred in connection with work performed for the Prepetition Second Lien Facility Secured Parties; and (c) payment of post-petition interest, at the contract rate, on 63.0% of the principal amount outstanding of the Prepetition Second Lien Facility.<br><br>iii.  Other Secured Lenders will receive replacement liens (other than on equity interests or economic interests (or proceeds thereof) in EHH) and super-priority claims under section 507(b) of the Bankruptcy Code to the extent of any diminution in value of the Other Secured Lenders' respective Prepetition Collateral.<br><br>*See* Interim DIP Order ¶¶ 12, 13, 14. |
| **Events of Default** Bankruptcy Rule 4001(c)(1)(B) Local Rule 4001-2(a)(ii) | The DIP Financing Agreement contains events of default that are usual and customary for DIP financings, including, without limitation: failure to pay principal, interest or fees when due; any representation or warranty found to be incorrect; breach of certain covenants; certain cross-defaults; specified decrease in natural gas prices; dismissal of any of the chapter 11 case; conversion of the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; the appointment of a chapter 11 trustee or an examiner (other than a fee or other similar examiner); and failure to comply with any of the chapter 11 Milestones, in each case, subject to any applicable grace periods.<br><br>*See* DIP Financing Agreement § 7.1. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed by section 362(a) of the Bankruptcy Code is modified pursuant to the Interim DIP Order to permit (a) the Debtors to grant the DIP Financing Liens and to perform such acts as the DIP Financing Agent may request in its sole discretion to assure the perfection and priority of the DIP Financing Liens, (b) the Debtors to incur all liabilities and obligations to the DIP Financing Agent as contemplated under the DIP Financing Documents, (c) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the Interim DIP Order, and (e) the implementation of the terms of the Interim DIP Order. |

14

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | *See* Interim DIP Order Preamble, ¶ 18(a). |
| | In the case of an Event of Default, at any time thereafter during the continuance of such Event of Default, upon three Business Days' written notice to the Borrower from the Required Tranche Lenders, in their sole and absolute discretion, the automatic stay of Section 362 of the Bankruptcy code shall be terminated without order of the Court, without the need for filing any motion for relief from the automatic stay or any other pleading, for the purpose of permitting the following remedies: (i) foreclose on the Collateral; (w) enforce all of their rights under the Guaranty; (x) charge the default rate of interest on the Loans; and (y) declare the principal of and accrued interest, fees and expenses constituting the obligations under the DIP Facility to be due and payable.<br><br>*See* DIP Financing Agreement § 7.02(a); Interim DIP Order ¶¶ 11, 17. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim DIP Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted in the Interim DIP Order without the necessity of filing or recording any financing without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the Prepetition First Lien Facility Secured Parties and the Prepetition Second Lien Facility Secured Parties.[9]<br><br>*See* Interim DIP Order ¶ 17(b). |
| **Indemnification**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | Subject to entry of the Final DIP Order, the Debtors shall indemnify the Prepetition Secured Parties, the DIP Financing Agent, the DIP Financing Lenders, and the Backstoppers and their respective affiliates, successors, and assigns, and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, an "Indemnified Person") and hold each of them harmless from and against all costs, expenses (including reasonable fees, disbursements and other charges of counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Debtors or any of their affiliates or shareholders) that relates to the DIP Financing Documents or this Interim DIP Order, including the financial accommodations to the Debtors contemplated hereby, the Debtors' chapter 11 cases, or any transactions in connection therewith; *provided, however*, that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such Indemnified Person's gross negligence or willful misconduct. Nothing herein is meant to limit the scope of any indemnity provided for the benefit of the DIP Financing Agent or the DIP Financing Lenders in the DIP Financing Documents. For the avoidance of doubt, this indemnification does not apply or otherwise affect any indemnification rights or obligations in respect of the Prepetition Secured Parties under the Prepetition Loan Documents.<br><br>*See* DIP Financing Agreement § 9.05(b); Interim DIP Order ¶ 27. |

---

[9]    The Interim Order doesn't include this waiver/modification for the DIP Liens, should it?

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| Liens on Avoidance Actions Local Rule 4001-2(a)(i)(D) | With respect to the First Lien Replacement Portion, to the extent approved by and subject to the Final DIP Order, the DIP Financing Lenders will receive the proceeds of any causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (collectively, the "Avoidance Actions"). *See* Interim DIP Order ¶ 10(b). |

## Jurisdiction and Venue

11.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

12.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

13.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

## Relief Requested

14.     The Debtors request that the Court, on an interim basis pending entry of the Final DIP Order:

    a.     authorize the Debtors to obtain the DIP Financing (consisting of approximately $70,000,000 of senior secured financing and up to

16

$130,000,000 in junior secured financing) up to an aggregate principal amount of $200,000,000, in the form of a multiple delayed draw term loan (the "<u>DIP Financing Loans</u>") subject to and pursuant to the terms and conditions set forth in the Interim DIP Order and the DIP Financing Agreement;

b. authorize the Debtors to execute and deliver the DIP Financing Agreement and the other DIP Financing Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

c. authorize the Debtors to (a) use Cash Collateral (as defined in the Interim DIP Order) to the extent required herein, and (b) provide adequate protection, solely to the extent provided herein, to the Prepetition First Lien Facility Secured Parties and the Prepetition Second Lien Facility Secured Parties (the "<u>Prepetition Secured Parties</u>") under: (i) that certain credit agreement, dated as of October 22, 2014 and amended as of November 3, 2015 and December 1, 2015, between and among MHRC, as borrower, the guarantors party thereto, the Prepetition First Lien Facility Secured Lenders, Bank of Montreal, as administrative agent and issuing bank (the "<u>Prepetition First Lien Facility Administrative Agent</u>"), and Cantor Fitzgerald, as loan administrator (in such capacity, the "<u>Prepetition First Lien Facility Loan Administrator</u>" and, together with the Prepetition First Lien Facility Secured Lenders, and the Prepetition First Lien Facility Administrative Agent, the "<u>Prepetition First Lien Facility Secured Parties</u>"), in the principal amount of $70,000,000; and (ii) that certain credit facility, dated as of October 22, 2014, between and among MHRC, as borrower, the guarantors party thereto, the Prepetition Second Lien Facility Secured Lenders, and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (in such capacity, the "<u>Prepetition Second Lien Facility Agent</u>" and, together with the Prepetition Second Lien Facility Secured Lenders, the "<u>Prepetition Second Lien Facility Secured Parties</u>"; the Prepetition Second Lien Facility Agent, together with the Prepetition First Lien Facility Agent, the "<u>Prepetition Agents</u>"), issued in the principal amount of $340,000,000; on account of the Debtors' use of Cash Collateral and any other Prepetition Collateral and solely to the extent of any diminution in value of the Prepetition Secured Parties' respective interests in the Prepetition Collateral (as defined in the Interim DIP Order) as of the Petition Date as a result of such use of Cash Collateral and any other Prepetition Collateral and the Debtors' incurrence of the debt under the DIP Financing Agreement;

d. authorize the DIP Financing Agent, to exercise remedies under the DIP Financing Documents upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Financing Agreement);

e.    subject to entry of the Final DIP Order, authorize the Debtors to grant liens to the DIP Financing Lenders on the proceeds of the Avoidance Actions (as defined herein);

f.    subject to entry of the Final DIP Order, waive the Debtors' right to surcharge against the DIP Financing Collateral (as defined in the Interim DIP Order) or, solely to the extent set forth herein, the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code;

g.    schedule the Final Hearing for a date that is before the thirty-first (31st) day after the Petition Date to consider entry of the Final DIP Order authorizing the borrowings under, and the Debtors' entry into, the DIP Financing Agreement on a final basis and approval of notice procedures with respect thereto; and

h.    the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Orders.

### Background

### I.    The Debtors' Prepetition Capital Structure.

15.    As of the Petition Date, the Debtors had more than $1 billion of funded indebtedness and related obligations outstanding, consisting of the Prepetition First Lien Facility, the Prepetition Second Lien Facility, Other Prepetition Facilities, and the Prepetition Notes.  As of the Petition Date, the obligations outstanding under these facilities, excluding accrued interest, are estimated at the following amounts:

|  | $ millions |
|---|---|
| Prepetition First Lien Facility | $70 |
| Prepetition Second Lien Facility | $337 |
| Other Prepetition Facilities | $13 |
| Prepetition Notes | $600 |
| **Total** | $1,020 |

### A.    Prepetition First Lien Facility.

16.    On and effective as of November 3, 2015, MHRC entered into the Sixth Amendment to Credit Agreement (the "Sixth Amendment"), amending the Fourth Amended and Restated Credit Agreement, dated as of October 22, 2014 (the "First Lien Credit Agreement").

18

The Sixth Amendment was entered into by and among (i) MHRC, as borrower; (ii) the guarantors party thereto; (iii) the Prepetition First Lien Facility Secured Lenders; (iv) the Prepetition First Lien Facility Administrative Agent; and (v) Prepetition First Lien Facility Loan Administrator.  The Prepetition First Lien Facility Secured Obligations are guaranteed by the Guarantors and are secured by first priority security interests in and liens on on certain of the Debtors' assets described in the Prepetition First Lien Facility Documents (collectively, the "Prepetition Collateral").

17.    The Sixth Amendment amended the First Lien Credit Agreement to, among other things, (i) assign amounts outstanding of approximately $5 million under the First Lien Credit Agreement, in the form of a single tranche of term loans, to the Prepetition First Lien Facility Secured Lenders; (ii) cash collateralize certain outstanding letters of credit issued under the First Lien Credit Agreement in an aggregate amount of approximately $39 million; and (iii) provide MHRC with an additional new term loan in the aggregate principal amount of approximately $16 million, which was funded by the Prepetition First Lien Facility Secured Lenders on the closing date of the Sixth Amendment.  The aggregate amount provided for under the Sixth Amendment was approximately $60 million.

18.    On and effective as of November 30, 2015, MHRC entered into the Seventh Amendment to Credit Agreement and Increase Joinder (the "Seventh Amendment" and, such financing provided thereunder, together with the financing provided pursuant to the Sixth Amendment, as otherwise amended, restated, supplemented or otherwise modified, the "Prepetition First Lien Facility" and, together with all security, pledge and guaranty agreements and all other documentation executed in connection with the Prepetition First Lien Facility, each as amended, supplemented, or otherwise modified, the "Prepetition First Lien Facility

Documents") amending the First Lien Credit Agreement. The Seventh Amendment was entered into by and among (i) MHRC, as borrower; (ii) the guarantors party thereto; (iii) the Prepetition First Lien Facility Secured Lenders; (iv) the Prepetition First Lien Facility Administrative Agent; and (v) the Prepetition First Lien Facility Loan Administrator. The Seventh Amendment provided MHRC new commitments in an aggregate principal amount of $10 million under the same principal terms as the prior loans under the Sixth Amendment.

19.    As of the Petition Date, the Debtors' obligations under the Prepetition First Lien Facility Documents include the loans in the aggregate principal amount of $70 million (the "Prepetition First Lien Facility Secured Loans") plus accrued and unpaid interest and fees in accordance with the terms of the Prepetition First Lien Facility Documents (the "Prepetition First Lien Facility Secured Obligations"). The Prepetition First Lien Facility Secured Obligations are guaranteed by the Guarantors and secured by first priority security interests in and liens on the Prepetition Collateral. The Prepetition First Lien Facility matures on December 30, 2015, and bears interest at a floating rate. As of the Petition Date, the interest rate was approximately 4.25 percent.

20.    The Prepetition First Lien Facility provided the Debtors with the immediate near-term liquidity to forestall an immediate bankruptcy filing and sufficient time to explore various consensual restructuring opportunities.

**B.    Prepetition Second Lien Facility.**

21.    MHRC is the borrower under that certain Second Lien Credit Agreement, dated as of October 22, 2014 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Second Lien Facility" and, together with all security, pledge and guaranty agreements and all other documentation executed in connection with the Prepetition Second Lien Facility, each as amended, supplemented, or otherwise modified, the "Prepetition Second Lien

20

Facility Documents" and, together with the Prepetition First Lien Facility Documents, the "Prepetition Loan Documents"), by and between MHRC, as borrower; (ii) the guarantors party thereto; (iii) the Prepetition Second Lien Facility Secured Lenders; and (iv) the Prepetition Second Lien Facility Agent.

22.     As of the Petition Date, the Debtors' obligations under the Prepetition Second Lien Facility Documents include the loans in the aggregate principal amount of $340 million plus accrued and unpaid interest and fees in accordance with the terms of the Prepetition Second Lien Facility Documents (the "Prepetition Second Lien Facility Secured Obligations").  The Prepetition Second Lien Facility Secured Obligations are guaranteed by the Guarantors and are asserted to be secured by second priority security interests in and liens on the Prepetition Collateral.  The Prepetition Second Lien Facility matures on October 22, 2019, and bears interest at a floating rate.  As of the Petition Date, the interest rate was approximately 8.50 percent.

**C.     The Intercreditor Agreement.**

23.     The relationship and relative lien priorities among the Prepetition Agents and Prepetition Secured Lenders is subject to that certain Intercreditor Agreement, dated as of October 22, 2014 (as amended from time to time and with all supplements and exhibits thereto, the "Intercreditor Agreement"), by and among MHRC, certain grantors, the Prepetition First Lien Facility Administrative Agent, and the Prepetition Second Lien Facility Agent.  The Intercreditor Agreement, among other things, provides that the liens and security interests of the Second Lien Agent and Prepetition Second Lien Facility Secured Lenders are subordinate to the liens and security interests of the Prepetition First Lien Facility Administrative Agent and Prepetition First Lien Facility Secured Lenders with respect to shared collateral.  The Intercreditor Agreement also governs certain of the respective rights and interests among the secured parties, including, limitations on the Second Lien Agent and Prepetition Second Lien

21

Facility Secured Lenders' rights to object to the Debtors' proposed use of cash collateral in connection with a chapter 11 proceeding where the Prepetition First Lien Facility Administrative Agent, on behalf of itself and the First Lien Secured Parties, has consented to the use of such cash collateral.  As described below, the Prepetition First Lien Facility Administrative Agent on behalf of the Prepetition First Lien Facility Secured Lenders and the Second Lien Agent on behalf of the Prepetition Second Lien Facility Secured Lenders have consented to the Debtors' use of Cash Collateral.

### D.   Other Prepetition Facilities.

24.     In the ordinary course of business, the Debtors routinely issue various equipment and real estate notes payable.  As of the Petition Date, the Debtors have several of such notes payable outstanding, including:  (a) the Loan and Security Agreement, dated as of February 12, 2010, between Alpha Hunter Drilling, LLC ("Alpha Hunter") and Wesbanco Bank, Inc., as lender; (b) the Master Loan and Security Agreement, dated as of January 23, 2014, between Alpha Hunter and CIT Finance LLC, as lender, including Schedule No. 1 thereunder; (c) the Loan Agreement, dated as of December 14, 2011, between MHRC and Capital One, National Association, as lender; and (d) the Business Loan Agreement, dated as of February 17, 2010, between Magnum Hunter Production, Inc. (as successor to Daugherty Petroleum, Inc.) and Traditional Bank, Inc., as lender (collectively, the "Other Prepetition Facilities" and the lenders thereunder, the "Other Prepetition Secured Parties").  The Other Prepetition Facilities have maturity dates ranging from December 1, 2016 to September 30, 2024 and accrue interest at rates varying between 4.25 percent and 8.70 percent.  As of the Petition Date, the Debtors had approximately $13.2 million of principal outstanding under the Other Prepetition Facilities, approximately $11.1 million of which is secured by certain of the Debtors' assets.

22

E.        **The Prepetition Notes.**

25.       On May 16, 2012, MHRC issued approximately $450 million of 9.75% senior

unsecured notes due 2020 (the "Prepetition Notes").  On December 18, 2012, the Debtors issued

an additional $150 million of Prepetition Notes.  The Prepetition Notes are governed by that

certain indenture, dated as of May 16, 2012 (together with all other agreements, instruments,

notes, guaranties and other documents executed in connection therewith, the "Prepetition Notes

Documents"), by and among MHRC, certain of its subsidiary guarantors, and Wilmington Trust,

National Association, as indenture trustee.  The obligations under the Prepetition Notes are

unsecured and are fully and unconditionally guaranteed, jointly and severally, on a senior

unsecured basis by sixteen of MHRC's subsidiaries.

26.       As of the Petition Date, the Prepetition Notes have an outstanding principal

balance of approximately $600 million. Interest on the Prepetition Notes is payable semi-

annually on May 15 and November 15.

II.       **The Debtors Have an Immediate Need for Cash.**

27.       The Debtors require immediate access to liquidity to ensure that they are able to

continue operating during these chapter 11 cases and preserve the value of their estates for the

benefit of all parties in interest.  As of the Petition Date, the Debtors' total cash balance is

approximately $2.2 million, which is insufficient to operate their enterprise and continue paying

their debts as they come due.  Without prompt postpetition financing and access to cash

collateral, the Debtors will be unable to pay wages for their employees, preserve and maximize

the value of their estates, and administer these chapter 11 cases, causing immediate and

irreparable harm to the value of the Debtors' estates to the detriment of all stakeholders.

*See* Laurinaitis Decl. ¶ 10.

23

### III.    Alternative Sources of Financing Are Not Readily Available.

28.    The Debtors do not believe it would prudent, or even possible, to administer these chapter 11 estates on a "cash collateral" basis, rendering postpetition financing a necessity. However, the Debtors do not have a variety of sources of financing readily available.   A significant portion of the Debtors' existing producing reserves are encumbered under their existing capital structure, which, along with the Debtors' long-term liquidity needs, projected cash losses, and the current state of the oil and gas commodity markets and its impact on cash flows and asset values, restricts the availability of, and options for, postpetition financing. *See* Laurinaitis Decl. ¶¶ 8, 11.   As a result, the Debtors do not believe third-party debtor-in-possession financing would be reasonably obtainable.

29.    Indeed, PJT Partners LP, the Debtors' financial advisors, reached out to fifteen potential sources of financing (outside of the Debtors' prepetition lenders) that routinely provide debtor-in-possession financing to gauge their interest in providing such financing. *See* Laurinaitis Decl. ¶ 17.  Of this group, only two parties executed confidentiality agreements and three additional parties were negotiating such agreements as of the time of this filing. Certain of the potential sources of financing indicated likely pricing in the 10-15% range, a general unwillingness to convert such loan to equity, and inclusion of restrictive covenants. *See* Laurinaitis Decl. ¶ 18.  These indicators did not portend the development of a feasible third-party financing option.  With any third-party proposal, the Debtors would incur the execution risk associated with a new lender transaction, including material timing and due diligence constraints, necessarily involving the payment of additional professional fees.  In contrast, the proposed DIP Financing Facility offered by the DIP Financing Lenders allows the Debtors to avoid the need to engage in a costly and time-consuming priming fight at the outset of these chapter 11 cases.

## Basis for Relief

I.   **The Debtors Should Be Authorized to Obtain Postpetition Financing through the DIP Financing Documents.**

    A.   **Entering into the DIP Financing Documents Is an Exercise of the Debtors' Sound Business Judgment.**

30.   The Court should authorize the Debtors, as an exercise of the Debtors' sound business judgment, to enter into the DIP Financing Documents and the DIP Agent Fee Letter, obtain access to the DIP Financing Facility, and continue using the Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances discussed in detail below.   Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code.  *See*, *e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

31.   Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In*

*re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

32.    Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.)*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).  The Court may also appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  *Relevant features of the financing must be evaluated, including non economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.*  This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan. That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

33.    The Debtors' determination to move forward with the DIP Financing Facility is an exercise of their sound business judgment following an arms'-length process and careful

evaluation of alternatives.  Specifically, and in the face of extremely limited cash on hand, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support their operational and restructuring activities.  Further, while the Debtors' vendors historically have allowed the Debtors to purchase goods on credit, the Debtors' ability to continue this practice is dependent upon their having access to sufficient liquidity to assure business counterparties that the Debtors are not a credit risk.  The Debtors negotiated the DIP Financing Agreement and other DIP Financing Documents with the DIP Financing Lenders in good faith, at arms' length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available.  Accordingly, the Court should authorize the Debtors' entry into the DIP Financing Documents and the DIP Agent Fee Letter, as it is a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

34.      The Debtors propose to obtain financing under the DIP Financing Facility by providing security interests and liens as set forth in the DIP Financing Documents pursuant to section 364(c) of the Bankruptcy Code; specifically, the Debtors propose to provide first priority "priming" liens to the extent of the First Lien Replacement Portion and, with respect to the remainder of the DIP Financing Facility, first liens on all unencumbered property and junior liens on all property securing the Prepetition Second Lien Facility.

35.      The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of the [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured

credit cannot be obtained).   Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.    the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

b.    the credit transaction is necessary to preserve the assets of the estate; and

c.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

36.      As described above and as set forth in the Laurinaitis Declaration, the Debtors are in need of an immediate capital infusion, yet current market conditions are extremely challenging and a significant portion of the Debtors' existing producing reserves are asserted to be encumbered under their existing capital structure.  *See* Laurinaitis Decl. ¶¶ 7, 11.  Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' existing lenders and noteholders.  Indeed, when the Debtors reached out to potential third-party sources of financing, only a small fraction executed confidentiality agreements and those parties indicated reluctance to enter into terms comparable to those provided in the DIP Financing Facility.   *See* Laurinaitis Decl. ¶¶ 17, 18.  Without postpetition financing, the Debtors lack sufficient funds to operate their enterprise, continue paying their debts as they come due, or cover the projected costs of these chapter 11 cases.  *See* Laurinaitis Decl. ¶¶ 6, 10.  Absent the DIP Financing Facility, which will allow the Debtors to meet their working capital needs during these chapter 11 cases and consummate the proposed restructuring transaction, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors

believe that the terms of the DIP Financing Facility, as set forth in the DIP Financing Agreement, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

37.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  As described above, the Debtors are unable to obtain unsecured credit.  Therefore, approving a superpriority claim in favor of the DIP Financing Lenders is reasonable and appropriate, as is providing liens on the Debtors' unencumbered property and junior liens on the property that is asserted to be securing the Prepetition Second Lien Facility.

38.    Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  Consent by the secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  Accordingly, the Debtors may incur "priming" liens under the DIP Financing Facility if they are unable to obtain unsecured or junior secured credit and either

(a) the Prepetition Secured Lenders have consented or (b) the Prepetition Secured Lenders' interests in collateral are adequately protected.

39.     Here, the Prepetition First Lien Facility Secured Lenders will be paid in full in cash under the DIP Financing Facility, upon entry of the Final DIP Order and the Prepetition Second Lien Facility Secured Lenders have consented to the DIP Financing Facility and the priming liens granted thereunder.  Therefore, the relief requested pursuant to section 364(d)(1) of the Bankruptcy Code is appropriate.

40.     As discussed more fully in the First Day Declaration, the Debtors hold a 45.53% membership interest in EHH.  The Debtors' interest in EHH, which is currently unencumbered, is subject to certain restrictions set forth in the Second Amended and Restated Limited Liability Agreement of Eureka Hunter Holdings, LLC, dated October 3, 2014, by and among MHRC, EHH, MSIP II Buffalo Holdings, LLC, and other parties thereto (the "Eureka LLC Agreement").  Specifically, the Eureka LLC Agreement expressly prohibits direct pledges of equity interests in Eureka—absent MSIP II's consent—and certain pledges of the equity interests in Eureka's members.  The Eureka LLC Agreement does not, however, bar further indirect pledges.[10]  Moreover, pledges of *proceeds from* a direct disposition of equity interests falls outside the ambit of restrictions placed on such dispositions,[11] and are therefore not proscribed by the Eureka LLC Agreement.  Accordingly, because the Debtors seek only to grant a lien to the DIP Facility Lenders on all proceeds, products, offspring, or profits from all sales, transfers,

---

[10]   LLC Agmt. Art. 7, Ex. A.

[11]   The Eureka LLC Agreement also disallows indirect dispositions of equity interests "in such Member" if intended to circumvent the restrictions on direct dispositions.  LLC Agmt. Art. 7.  The pledge of proceeds from a disposition of equity interests to a third party does not trigger this constraint on indirect dispositions.

dispositions, or monetizations of Debtors' equity interests in Eureka, the Court should authorize

the Debtors to grant the DIP Financing Liens on the Debtors' equity interests in Eureka.

> ### C.    No Comparable Alternative to the DIP Financing Facility Is Reasonably Available.

41.    A debtor need only demonstrate "by a good faith effort that credit was not

available without" the protections afforded to potential lenders by sections 364(c) of the

Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also*

*In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).    Moreover, in

circumstances where only a few lenders likely can or will extend the necessary credit to a debtor,

"it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive

search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*

*sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see*

*also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was

unavailable absent the senior lien by establishment of unsuccessful contact with other financial

institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981)

(bankruptcy court's finding that two national banks refused to grant unsecured loans was

sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*,

115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of

financing under section 364(a) and (b)).

42.    As noted above, the Debtors do not believe that alternative sources of financing

are reasonably available given the realities imposed by the Debtors' existing capital structure.  A

significant portion of the Debtors' existing producing reserves are encumbered under their

existing capital structure, and the Debtors believe the Prepetition Second Lien Facility Secured

Lenders are materially undersecured.  *See* Laurinaitis Decl. ¶ 11.    Thus, the Debtors have

determined that the DIP Financing Facility provides the best opportunity available to the Debtors under the circumstances to both fund these chapter 11 cases and provide a clear path toward the confirmation and consummation of a plan of reorganization.  *See* Laurinaitis Decl. ¶¶ 13–16. Therefore, in addition to evidence to be introduced at the hearing on the Interim DIP Order if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

   **D.    The Repayment Feature of the DIP Financing Facility Under the Final DIP Order Is Appropriate.**

   43.    Section 363(b) of the Bankruptcy Code permits a debtor to use, sell or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.  *See In re Abbots Dairies, Inc*., 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).  The business judgment rule shields a debtor's management from judicial second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

   44.    Repayment of prepetition debt (often referred to as a "roll-up") is a common feature in debtor-in-possession financing arrangements.  Courts in this jurisdiction have approved similar DIP features on the first day of the case.  *See, e.g.*, *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Mar. 5, 2014) (authorizing approximately $200 million DIP that included roll-up of approximately $144 million prepetition debt pursuant to interim order); *In re Furniture Brands Int'l, Inc.*, No. 13-12329 (CSS) (Bankr. D. Del. Sept. 11, 2013)

32

(authorizing approximately $140 million DIP that included roll-up of approximately $91 million prepetition debt pursuant to interim order); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Jan. 20, 2011) (authorizing approximately $140 million DIP that included roll-up of approximately $48.6 million prepetition debt pursuant to interim order); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del. Apr. 21, 2009) (authorizing approximately $165 million DIP that included roll-up of approximately $110 million prepetition debt pursuant to interim order).[12]

45.    The repayment of the Prepetition First Lien Facility in full in cash from DIP Financing Loan proceeds upon entry of the Final DIP Order is a sound exercise of the Debtors' business judgment.    Under the proposed DIP Financing Facility, the Prepetition First Lien Facility will be repaid on the Effective Date such that $70 million will be "rolled-up" into the DIP Financing Facility.    The repayment of the Prepetition First Lien Facility is a material component of the structure of the DIP Financing Facility and was required by the DIP Financing Lenders as a condition to their commitment to provide postpetition financing.    Importantly, the Prepetition First Lien Facility Secured Lenders, with approximately $70 million of first lien, first priority claims, are oversecured.    See Laurinaitis Decl. ¶ 14.

46.    Where, as here, a prepetition secured creditor is oversecured, repaying such creditor that stands to receive payment in full with postpetition loans will not harm the Debtors' estates and other creditors.    In contrast, absent the DIP Financing Facility, the Debtors' ability to continue operating as a going concern will be jeopardized to the detriment of all parties in interest.    The DIP Financing Facility's proposed repayment feature merely affects the timing, not the amount, of the Prepetition First Lien Facility Secured Lenders' recovery.    And the only

---

[12]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion.  Copies of these orders are available upon request of the Debtors' proposed counsel.

holders of undersecured funded debt—the Prepetition Second Lien Facility Secured Lenders—support the relief requested as DIP Financing Lenders. Given these circumstances, repayment of the Prepetition First Lien Facility is reasonable, appropriate, and a sound exercise of the Debtors' business judgment.

## II.    The Debtors Should Be Authorized to Use the Cash Collateral.

47.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party. Here, the Prepetition First Lien Facility Secured Lenders and Prepetition Second Lien Facility Secured Lenders consent to the Debtors' use of the Cash Collateral, subject to the terms and limitations set forth in the Interim DIP Order.

48.    Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

49.     As described more fully above, and as set forth in the Interim DIP Order, the Debtors propose to provide the Prepetition Secured Lenders with a variety of adequate protection to protect against the postpetition diminution in value of the Cash Collateral resulting from the use, sale, or lease of the Cash Collateral by the Debtors and the imposition of the automatic stay (collectively, the "Adequate Protection Obligations"):

a.      **Adequate Protection to Prepetition First Lien Facility Secured Lenders:** payment of professional fees, replacement liens and the First Lien Facility 507(b) Claim, and cash payment of interest at the non-default contract rate.

b.      **Adequate Protection to Prepetition Second Lien Facility Secured Lenders:** payment of professional fees, payment of post-petition interest at the contract rate, replacement liens and superpriority claims under section 507(b) of the Bankruptcy Code, continued access to information and financial reporting, and, upon entry of the Final DIP Order, waiver of any "equities of the case" exception under Section 552(b) of the Bankruptcy Code and the provisions of Section 506(c) of the Bankruptcy Code.

c.      **Adequate Protection to Other Secured Lenders:** replacement liens and superpriority claims under section 507(b) of the Bankruptcy Code.

50.     Therefore, the Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Lenders from any diminution in value to the Cash Collateral.  In light of the foregoing, the Debtors further submit, and the Prepetition First Lien Facility Secured Lenders and Prepetition Second Lien Facility Secured Lenders agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Lenders are appropriate.[13]  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to

---

[13]  Pursuant to the DIP Orders, the Prepetition Secured Lenders are permitted to seek additional adequate protection in accordance with the terms thereof.

continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim

DIP Order, for the benefit of all parties in interest and their estates.

### III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Financing Agent and the DIP Financing Lenders under the DIP Financing Documents.

51.     Under the DIP Financing Documents, the Debtors have agreed, subject to Court

approval, to pay certain fees to the DIP Financing Agent and the DIP Financing Lenders.   In

particular, as noted above, the Debtors have agreed to pay:

   a.    a non-refundable administration fee consisting of (i) an annual fee in the aggregate amount of $100,000.00 ($50,000 to be paid on closing date of the DIP Financing Facility, $25,000 to be paid on the date of the Final Order Draw, and $25,000 to be paid on the date of the Third Draw); and (ii) a funding fee equal to the greater of 0.30% of the DIP Financing Loans funded by Cantor Fitzgerald or $60,000.00 to the DIP Financing Agent;

   b.    a backstop fee to each Backstopper in the amount of its pro rata share of 3.00% of the New Common Equity of Reorganized MHRC; *provided*, that to the extent the Plan contemplated by the RSA is not consummated, this fee will be paid in cash; *provided*, that to the extent the Third Draw does not occur, this fee shall be in an aggregate amount equal to 3.00% of the aggregate amount of the Backstoppers' commitments made to date; and

   c.    a commitment fee to each DIP Financing Lender of its pro rata share of 2% of the DIP Financing Loans.

52.     The amount of New Common Equity (as defined in the RSA) received as a

backstop fee equates to a higher dollar value (based on the Settlement Enterprise Value (as

defined in the RSA)) than 3% of the total committed amount of the DIP Financing Facility

because the Backstoppers are being compensated for:  (a) agreeing to backstop a fully equitizable

DIP Financing Facility; (b) agreeing to receive the backstop fee in the form of equity rather than

cash; and (c) agreeing to receive the backstop fee at the end of the chapter 11 cases, rather than at

the time the commitment is made.  It is understood and agreed by all parties, including the

Debtors, that the backstop fee is an integral component of the overall agreed-to settlement

between the Ad Hoc Group of Second Lien Lenders and Ad Hoc Group of Noteholders, and any

36

failure to receive approval thereof will cause a termination of the RSA.  *See* Laurinaitis Decl. ¶ 18.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Financing Documents in connection with entering into those agreements.

**IV.    The DIP Financing Lenders Should Be Deemed Good-Faith Lenders under Section 364(e).**

53.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

54.    As explained herein, in the Laurinaitis Declaration, and in the First Day Declaration, the DIP Financing Documents are the result of (i) the Debtors' reasonable and informed determination that the DIP Financing Lenders offered the most favorable terms on which to obtain vital postpetition financing, and (ii) extended arms'-length, good-faith negotiations between the Debtors and the Second Lien Backstoppers and the Noteholder Backstoppers.  The Debtors submit that the terms and conditions of the DIP Financing Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Financing Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Financing Documents other than as described herein.  Accordingly, the Court should find that the DIP Financing

KE 38077330

Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

**V.      The Automatic Stay Should Be Modified on a Limited Basis.**

55.      The proposed Interim DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Financing Lenders to file any financing statements, security agreements, notices of Liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim DIP Order.   The proposed Interim DIP Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Financing Liens to the DIP Financing Lenders and to incur all liabilities and obligations set forth in the Interim DIP Order.   Finally, the proposed Interim DIP Order provides that, following the occurrence of an Event of Default (as defined in the DIP Financing Agreement), the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Financing Agent to exercise all rights and remedies in accordance with the DIP Financing Documents, or applicable law.

56.      Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.   *See, e.g.*, *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

38

**VI.     Failure to Obtain Immediate Interim Access to the DIP Financing Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

57.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

58.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim DIP Order authorizing the Debtors, from and after entry of the Interim DIP Order until the Final Hearing, to receive the First Draw under the DIP Financing Facility.  The Debtors require the First Draw prior to the Final Hearing and entry of the Final DIP Order to continue operating, pay their administrative expenses, and to implement the relief requested in the Debtors' other "first day" motions.  This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.  *See* Laurinaitis Decl. ¶ 20.

**Request for Final Hearing**

59.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event after January 15, 2016, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

KE 38077330

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

60.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

61.     The Debtors will provide notice of this motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the holders of the 50 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Financing Agent; (d) counsel to the Noteholder Backstoppers; (e) counsel to the Second Lien Backstoppers; (f) counsel to the Prepetition First Lien Facility Agent; (g) counsel to the Prepetition Second Lien Facility Agent; (h) counsel to the Prepetition Indenture Trustee; (i) all known parties asserting a lien against the DIP Collateral; (j) the United States Attorney's Office for the District of Delaware; (k) the Internal Revenue Service; (l) the Environmental Protection Agency; (m) the office of the attorneys general for the states in which the Debtors operate; (n) the Securities and Exchange Commission; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## No Prior Request

62.     No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders,

granting the relief requested herein and such other relief as the Court deems appropriate under

the circumstances.

Wilmington, Delaware
Dated: December 15, 2015

Laura Davis Jones (DE Bar No. 2436)
Colin R. Robinson (DE Bar No. 5524)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:      (302) 652-4100
Facsimile:      (302) 652-4400
Email:      ljones@pszjlaw.com
            crobinson@pszjlaw.com
            jmulvihill@pszjlaw.com

- and -

Edward O. Sassower, P.C. (*pro hac vice* admission pending)
Brian E. Schartz (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:      edward.sassower@kirkland.com
            brian.schartz@kirkland.com

- and -

James H.M. Sprayregen, P.C.
Justin R. Bernbrock (*pro hac vice* admission pending)
Alexandra Schwarzman (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200
Email:      james.sprayregen@kirkland.com
            justin.bernbrock@kirkland.com
            alexandra.schwarzman@kirkland.com

*Proposed Co-Counsel to the Debtors*