# ORIGINAL

## IN THE UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| MAGNUM HUNTER RESOURCES | ) | Case No. 15-12533 (KG) |
| CORPORATION, *et al.*,[1] | ) |  |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |
|  | ) | **Re: Docket No. 18** |
|  | ) |  |

## INTERIM ORDER
## (I) AUTHORIZING THE DEBTORS TO
## OBTAIN BOTH SENIOR AND JUNIOR SECURED
## POSTPETITION FINANCING PURSUANT TO SECTION
## 364 OF THE BANKRUPTCY CODE, (II) GRANTING LIENS AND
## PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE
## STATUS, (III) AUTHORIZING REPAYMENT OF THE PREPETITION
## FIRST LIEN FACILITY IN FULL PURSUANT TO SECTION 363 OF
## THE BANKRUPTCY CODE, (IV) AUTHORIZING THE DEBTORS TO USE
## CASH COLLATERAL, (V) GRANTING ADEQUATE PROTECTION TO THE
## PREPETITION SECURED PARTIES, (VI) MODIFYING THE AUTOMATIC STAY,
## (VII) SCHEDULING A FINAL HEARING, AND (VIII) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an interim order (this "Interim Order") and a final order (a "Final Order"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Magnum Hunter Resources Corporation (9278); Alpha Hunter Drilling, LLC (7505); Bakken Hunter Canada, Inc. (7777); Bakken Hunter, LLC (3862); Energy Hunter Securities, Inc. (9725); Hunter Aviation, LLC (8600); Hunter Real Estate, LLC (8073); Magnum Hunter Marketing, LLC (2527); Magnum Hunter Production, Inc. (7062); Magnum Hunter Resources GP, LLC (5887); Magnum Hunter Resources, LP (5958); Magnum Hunter Services, LLC (5725); NGAS Gathering, LLC (2054); NGAS Hunter, LLC (3737); PRC Williston LLC (1736); Shale Hunter, LLC (1952); Triad Holdings, LLC (8947); Triad Hunter, LLC (5830); Viking International Resources Co., Inc. (0097); and Williston Hunter ND, LLC (3798). The location of the Debtors' service address is: 909 Lake Carolyn Parkway, Suite 600, Irving, Texas 75039.

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

(I)     authorizing the Debtors to obtain secured postpetition financing (consisting of approximately $70,000,000 of senior secured financing and up to $130,000,000 in junior secured financing) up to an aggregate principal amount of $200,000,000 (the "DIP Financing Facility") in the form of a multiple delayed draw term loan (the "DIP Financing Loans") subject to and pursuant to the terms and conditions set forth in this Interim Order and the *Debtor-In-Possession Credit Agreement*, dated December 15, 2015 (substantially in the form annexed hereto as **Exhibit 1**, and as hereafter amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "DIP Financing Agreement"; together with all agreements, documents, and instruments executed and delivered in connection therewith, as hereafter amended, supplemented, or otherwise modified from time to time in accordance with this Interim Order or any final order concerning the subject matter hereof (a "Final Order"), the "DIP Financing Documents"), among Magnum Hunter Resources Corporation ("MHRC"), as borrower (the "Borrower"), the other Debtors, as guarantors (the "Guarantors"), Cantor Fitzgerald Securities ("Cantor Fitzgerald"), as administrative agent and collateral agent (in such capacity, the "DIP Financing Agent"), and the lenders of the DIP Financing Loans (collectively, in such capacities, the "DIP Financing Lenders" and, together with the DIP Financing Agent, in such capacity, collectively, the "DIP Financing Parties");

(II)    authorizing and directing the Debtors to execute and deliver the DIP Financing Agreement and the other DIP Financing Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(III)    authorizing the Debtors to (a) use Cash Collateral (as defined herein), solely to the extent provided herein, and (b) provide adequate protection, solely to the extent provided herein, to the Prepetition Secured Parties (as defined herein) under:  (i) that certain credit agreement, dated as of October 22, 2014 and amended as of November 3, 2015 and December 1, 2015, between and among MHRC, as borrower, the guarantors party thereto, each of the lenders from time to time party thereto (collectively, in such capacities, the "Prepetition First Lien Facility Secured Lenders"), Bank of Montreal, as administrative agent and issuing bank (the "Prepetition First Lien Facility Administrative Agent"), and Cantor Fitzgerald, as loan administrator (in such capacity, the "Prepetition First Lien Facility Loan Administrator" and, together with the Prepetition First Lien Facility Administrative Agent, the "Prepetition First Lien Facility Agent"), in the principal amount of $70,000,000 (as otherwise amended, restated, supplemented or otherwise modified, the "Prepetition First Lien Facility" and, together with all security, pledge and guaranty agreements and all other documentation executed in connection with the Prepetition First Lien Facility, each as amended, supplemented, or otherwise modified, the "Prepetition First Lien Facility Documents"); and (ii) that

3

certain credit facility, dated as of October 22, 2014, between and among MHRC, as borrower, the guarantors party thereto, each of the lenders from time to time party thereto (collectively, in such capacities, the "Prepetition Second Lien Facility Secured Lenders" and, together with the Prepetition First Lien Facility Secured Lenders, the "Prepetition Secured Lenders"), and Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent (in such capacity, the "Prepetition Second Lien Facility Agent" and, together with the Prepetition Second Lien Facility Secured Lenders, the "Prepetition Second Lien Facility Secured Parties"; the Prepetition Second Lien Facility Agent, together with the Prepetition First Lien Facility Agent, the "Prepetition Agents"), issued in the principal amount of $340,000,000 (the "Prepetition Second Lien Facility" and, together with all security, pledge and guaranty agreements and all other documentation executed in connection with the Prepetition Second Lien Facility, each as amended, supplemented, or otherwise modified, the "Prepetition Second Lien Facility Documents" and, together with the Prepetition First Lien Facility Documents, the "Prepetition Loan Documents"); on account of the Debtors' use of Cash Collateral and other Prepetition Collateral and solely to the extent of any diminution in value of the Prepetition Secured Parties' (as defined herein) respective interests in the Prepetition Collateral (as defined herein) as of the Petition Date (as defined herein) as a result of such use of Cash Collateral and Prepetition

4

Collateral and the Debtors' incurrence of the debt under the DIP Financing Agreement;

(IV)    authorizing the DIP Financing Agent to exercise remedies under the DIP Financing Documents upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Financing Agreement);

(V)    subject to entry of the Final Order, authorizing the Debtors to grant liens to the DIP Financing Agent, for the benefit of itself and the DIP Financing Lenders, on the Avoidance Actions (as defined herein) and any proceeds thereof;

(VI)    subject to entry of the Final Order, waiving the Debtors' right to surcharge against the DIP Financing Collateral (as defined herein) or, solely to the extent set forth herein, the Prepetition Collateral (as defined herein) pursuant to section 506(c) of title 11 of the United States Code (the "Bankruptcy Code");

(VII)    scheduling a final hearing (the "Final Hearing") on the Motion for a date that is before the thirtieth (30th) day after the Petition Date (as defined herein) to consider entry of a Final Order authorizing the borrowings under, and the Debtors' entry into, the DIP Financing Agreement on a final basis and approval of notice procedures with respect thereto; and

(VIII)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of this Interim Order.

The interim hearing (the "Interim Hearing") for the Court to consider entry of this Interim Order granting the relief requested in the Motion having been held by the Court on December ___, 2015; and upon the record made by the Debtors at the Interim Hearing (including the First Day Declaration and the Laurinaitis Declaration); and the Court having heard and resolved or overruled all objections to the relief requested in the Motion; and it appearing that the relief requested on an interim basis in the Motion is in the best interests of the Debtors, their estates and creditors; and after due deliberation and consideration and sufficient cause appearing therefor,

·      IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *The Motion.* The Motion is granted on an interim basis as set forth herein. Any objection to the Motion to the extent not withdrawn or resolved is hereby overruled.

2.      *Jurisdiction.* This Court has core jurisdiction over the above-captioned chapter 11 cases commenced on December 15, 2015 (the "Petition Date"), the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      *Notice.* The Debtors have represented that telephonic, facsimile notice or overnight mail notice of this Interim Hearing and the proposed entry of this Interim Order has been provided to: (i) the fifty (50) largest unsecured creditors on a consolidated basis; (ii) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (iii) counsel to the DIP Financing Agent; (iv) counsel to the Noteholder Backstoppers (as defined herein); (v) counsel to the Second Lien Backstoppers (as defined herein) (iv) counsel to the Prepetition First Lien Facility Agent; (v) counsel to the Prepetition Second Lien Facility Agent; (vi) counsel to

the Prepetition Indenture Trustee (as defined herein); (vi) all known parties asserting a lien against the DIP Collateral; and (vii) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or is required to receive notice under the Bankruptcy Rules and the Local Rules. Requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Interim Order.

4.    *Debtors' Stipulations (Prepetition First Lien Facility Secured Obligations)*. Subject to (i) Paragraphs 21 and 35 of this Interim Order and (ii) all parties reserving all rights with regard to this Paragraph 4, to the extent that certain Restructuring Support Agreement, dated as of December 15, 2015, attached as Exhibit B to the First Day Declaration (the "RSA"), is terminated prior to repayment in full and in cash of the Prepetition First Lien Facility Secured Obligations (as defined below) and any Adequate Protection Obligations (as defined below) with respect thereto, and that the stipulations set forth below in Paragraph 4 or any findings or orders with regard thereto may not be used by any party for any purpose whatsoever in the chapter 11 cases or otherwise, each as further addressed in Paragraphs 21 and 35 of this Interim Order, and *provided* that, to the extent the RSA is terminated prior to the repayment in full and in cash of the Prepetition First Lien Facility Secured Obligations (as defined below) and any Adequate Protection Obligations (as defined below) with respect thereto, the stipulations contained herein shall be void *ab initio* and of no further force and effect, the Debtors admit, stipulate, and agree that:

(a)    as of the Petition Date, the Debtors were unconditionally indebted and liable to the Prepetition First Lien Facility Secured Parties (as defined herein), without defense, counterclaim or offset of any kind, for all of the obligations under the Prepetition

7

First Lien Facility Documents, including the loans (the "Prepetition First Lien Facility Secured Loans") made by the Prepetition First Lien Facility Secured Lenders in the aggregate principal amount of $70,000,000 under the Prepetition First Lien Facility, plus accrued and unpaid interest and fees in accordance with the terms of the Prepetition First Lien Facility Documents (the "Prepetition First Lien Facility Secured Obligations"); the Prepetition First Lien Facility Secured Obligations are unconditionally and irrevocably guaranteed by the Guarantors (as defined in the Prepetition First Lien Facility Documents) and, secured by first priority security interests in and liens (collectively, the "First Priority Prepetition Liens") on certain of the Debtors' assets described in the Prepetition First Lien Facility Documents (collectively, the "Prepetition Collateral"), pursuant to that certain Amended and Restated Security and Pledge Agreement, dated as of December 13, 2013 (as amended, restated, supplemented or otherwise modified, the "Prepetition First Lien Security Agreement"), between and among MHRC, the Guarantors (as defined therein), and the Prepetition First Lien Facility Administrative Agent (the Prepetition First Lien Facility Administrative Agent, together with the Prepetition First Lien Facility Secured Lenders and the Prepetition First Lien Facility Loan Administrator, in such capacities, the "Prepetition First Lien Facility Secured Parties");

(b)     the Prepetition First Lien Facility Secured Obligations constitute the legal, valid, binding, non-avoidable obligations of each of the Debtors, and the First Priority Prepetition Liens are valid, binding, perfected, non-avoidable, and enforceable liens on and security interests in the Prepetition Collateral;

8

(c)    (i) no portion of the Prepetition First Lien Facility Secured Obligations, the Prepetition First Lien Facility Documents, and the transactions contemplated thereby is subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law); (ii) the Debtors do not have any claims, challenges, counterclaims, causes of action, defenses, recoupment, disgorgement, or setoff rights related to the Prepetition First Lien Facility Secured Obligations or the Prepetition First Lien Facility Documents, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, on or prior to the date hereof, against the Prepetition First Lien Facility Secured Parties, and the Debtors each irrevocably waive, for themselves, and their subsidiaries, any right to challenge or contest in any way the perfection, validity, and enforceability of the First Priority Prepetition Liens or the validity or enforceability of the Prepetition First Lien Facility Secured Obligations and the Prepetition First Lien Facility Documents; and (iii) the Debtors and their estates have no claim, objection, challenge or cause of action against the Prepetition First Lien Facility Secured Parties or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law

9

(including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with the Prepetition First Lien Facility Documents or the transactions contemplated thereunder or the Prepetition First Lien Facility Secured Obligations, including without limitation, any right to assert any disgorgement or recovery. The Prepetition First Lien Facility Secured Obligations constitute allowed claims for all purposes between and against the Debtors' estates, and neither the Prepetition First Lien Facility Agent nor any Prepetition First Lien Facility Secured Party is required to file a proof of claim with regard to the Prepetition First Lien Facility Secured Obligations or the First Priority Prepetition Liens. Any order entered by the Court in relation to the establishment of a bar date for any claims (including administrative expense claims) in any of these chapter 11 cases or any Successor Case shall not apply to the Prepetition First Lien Facility Secured Parties with respect to the Prepetition First Lien Facility Secured Obligations (including the First Priority Prepetition Liens).

(d)    the First Priority Prepetition Liens, security interests, and rights granted to the Prepetition First Lien Facility Secured Parties pursuant to, and in connection with, the Prepetition First Lien Facility Loan Documents, including the Prepetition First Lien Security Agreement and that certain Intercreditor Agreement, dated as of October 22, 2014 and amended as of November 3, 2015 (as amended, restated, supplemented or otherwise modified, the "Intercreditor Agreement") between and among the Borrower, the Grantors (as defined therein), the Prepetition First Lien Facility Administrative Agent, as Senior Representative (as defined therein), and the Prepetition Second Lien

10

Facility Agent, as Second Priority Representative (as defined therein) are valid, binding, perfected, enforceable, non-avoidable liens and security interests on the First Priority Prepetition Collateral, senior in priority over any and all other liens on the First Priority Prepetition Collateral, subject to permitted exceptions under the Prepetition First Lien Facility, and the other Prepetition First Lien Facility Documents, to the extent such permitted exceptions were valid, properly perfected, non-avoidable liens senior in priority to the liens and security interests of the Prepetition First Lien Facility Secured Parties on the Petition Date; and

(e)     certain of the Debtors' cash (including, without limitation, any and all accounts referred to in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions, (II) Granting Superpriority Administrative Expense Status to Postpetition Intercompany Balances, and (III) Granting Related Relief* [Docket No. 5]) (the "Cash Management Motion")), and any amounts generated by the collection of accounts receivable, the exercise of letter of credit rights, the sale of inventory, or other disposition of the Prepetition Collateral existing as of the Petition Date (including the sale of as-yet-unproduced hydrocarbons at the Debtors' oil and gas properties, to the extent the same constitute Prepetition Collateral), the proceeds of any of the foregoing and the Prepetition Collateral is the Prepetition First Lien Facility Secured Parties' cash collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

11

5.      *Debtors' Stipulations (Prepetition Second Lien Facility Secured Obligations).*
Subject to (i) Paragraphs 21 and 35 of this Interim Order and (ii) all parties reserving all rights
with regard to this Paragraph 5, to the extent the RSA is terminated at any time, and that the
stipulations set forth in Paragraph 5 below or any findings or orders with regard thereto may not
be used by any party for any purpose whatsoever in the chapter 11 cases or otherwise, each as
further addressed in Paragraphs 21 and 35 of this Interim Order, and *provided* that, to the extent
the RSA is terminated at any time, the stipulations contained herein shall be void *ab initio* and of
no further force and effect, the Debtors admit, stipulate, and agree that:

(a)      as of the Petition Date, the Debtors were unconditionally indebted and
liable to the Prepetition Second Lien Facility Secured Parties (as defined herein), without
defense, counterclaim or offset of any kind, for all of the obligations under the Prepetition
Second Lien Facility Documents, including the loans (the "Prepetition Second Lien
Facility Secured Loans" and, together with the Prepetition First Lien Facility Secured
Loans, the "Prepetition Secured Loans") made by the Prepetition Second Lien Facility
Secured Lenders in the aggregate principal amount of $340,000,000 under the Prepetition
Second Lien Facility, plus accrued and unpaid interest and fees in accordance with the
terms of the Prepetition Second Lien Facility Documents (the "Prepetition Second Lien
Facility Secured Obligations" and, together with the Prepetition First Lien Facility
Secured Obligations, the "Prepetition Secured Obligations"); the Prepetition Second Lien
Facility Secured Obligations are unconditionally and irrevocably guaranteed by the
Guarantors (as defined in the Prepetition Second Lien Facility Documents) and, secured
by second priority security interests in and liens (collectively, the "Second Priority
Prepetition Liens" and, together with the First Priority Prepetition Liens, the "Prepetition

Liens") on the Prepetition Collateral, pursuant to that certain Security and Pledge Agreement, dated as of October 22, 2014 (as amended, restated, supplemented or otherwise modified, the "Prepetition Second Lien Security Agreement"), between and among MHRC, the Guarantors (as defined therein), and the Prepetition Second Lien Facility Agent (the Prepetition Second Lien Facility Agent, together with the Prepetition Second Lien Facility Secured Lenders, collectively, the "Prepetition Second Lien Facility Secured Parties"; the Prepetition Second Lien Facility Secured Parties, together with the Prepetition First Lien Facility Secured Parties, the "Prepetition Secured Parties");

(b)    the Prepetition Second Lien Facility Secured Obligations constitute the legal, valid, binding, non-avoidable obligations of each of the Debtors, and the Second Priority Prepetition Liens are valid, binding, perfected, non-avoidable, and enforceable liens on and security interests in the Prepetition Second Lien Collateral;

(c)    (i) no portion of the Prepetition Second Lien Facility Secured Obligations, the Prepetition Second Lien Loan Documents, and the transactions contemplated thereby is subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law); (ii) other than, among other things, as may be reflected in the settlement incorporated in the RSA, the

13

Debtors do not have any claims, challenges, counterclaims, causes of action, defenses, recoupment, disgorgement, or setoff rights related to the Prepetition Second Lien Facility Secured Obligations or the Prepetition Second Lien Facility Documents, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, on or prior to the date hereof, against the Prepetition Second Lien Facility Secured Parties, and the Debtors each irrevocably waive, for themselves, and their wholly owned subsidiaries, any right to challenge or contest in any way the perfection, validity, and enforceability of the Second Priority Prepetition Liens or the validity or enforceability of the Prepetition Second Lien Facility Secured Obligations and the Prepetition Second Lien Facility Documents; and (iii) the Debtors and their estates have no claim, objection, challenge or cause of action against the Prepetition Second Lien Facility Secured Parties or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with the Prepetition Second Lien Facility Documents or the transactions contemplated thereunder or the Prepetition Second Lien Facility Secured Obligations, including without limitation, any right to assert any disgorgement or recovery.  The Prepetition Second Lien Facility Secured Obligations constitute allowed claims for all purposes between and against the Debtors' estates, and neither the Prepetition Second Lien Facility Agent nor any Prepetition Second Lien Facility Secured Party is required to file a proof of claim with regard to the Prepetition Second Lien Facility Secured Obligations or the Second Priority Prepetition Liens.  Any

14

order entered by the Court in relation to the establishment of a bar date for any claims (including administrative expense claims) in any of these chapter 11 cases or subsequent chapter 7 or chapter 11 cases (each, any "Successor Case") shall not apply to the Prepetition Second Lien Facility Secured Parties with respect to the Prepetition Second Lien Facility Secured Obligations (including the Second Priority Prepetition Liens).

(d)   the Second Priority Prepetition Liens, security interests, and rights granted to the Prepetition Second Lien Facility Secured Parties pursuant to, and in connection with, the Prepetition Second Lien Facility Loan Documents, including the Prepetition Second Lien Security Agreement and the Intercreditor Agreement, are valid, binding, perfected, enforceable, non-avoidable liens and security interests on the Prepetition Collateral, junior in priority to the First Priority Prepetition Liens and any other senior liens on the Prepetition Collateral and subject to permitted exceptions under the Prepetition Second Lien Facility and the other Prepetition Second Lien Facility Documents, to the extent such permitted exceptions were valid, properly perfected, non-avoidable liens senior in priority to the liens and security interests of the Prepetition Second Lien Facility Secured Parties on the Petition Date; and

(e)   certain of the Debtors' cash, (including, without limitation, any and all accounts referred to in the Cash Management Motion), and any amounts generated by the collection of accounts receivable, the exercise of letter of credit rights, the sale of inventory, or other disposition of the Prepetition Second Lien Collateral existing as of the Petition Date (including the sale of as-yet-unproduced hydrocarbons at the Debtors' oil and gas properties, to the extent the same constitute Prepetition Collateral, the proceeds

of any of the foregoing and the Prepetition Collateral is the Prepetition Second Lien Facility Secured Parties' Cash Collateral.

6.      *Debtors' Stipulations (Prepetition Notes Indenture).*  Subject to (i) Paragraphs 21 and 35 of this Interim Order and (ii) all parties reserving all rights with regard to this Paragraph 6, to the extent the RSA is terminated at any time, and that the stipulations set forth in Paragraph 6 below or any findings or orders with regard thereto may not be used by any party for any purpose whatsoever in the chapter 11 cases or otherwise, each as further addressed in Paragraphs 21 and 35 of this Interim Order, and *provided* that, to the extent the RSA is terminated at any time, the stipulations contained herein shall be void *ab initio* and of no further force and effect, the Debtors admit, stipulate, and agree that:

(a)      Pursuant to that certain indenture, dated as of May 16, 2012 (as the same has been and may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Notes Indenture" and, together with all other agreements, instruments, notes, guaranties and other documents executed in connection therewith, the "Prepetition Notes Documents"), between and among MHRC, as issuer, the Guarantors (as defined therein), and Wilmington Trust, National Association, as trustee (in such capacity, the "Prepetition Indenture Trustee"), MHRC issued the 9.75% senior unsecured notes due 2020 (the "Prepetition Notes" and, the holders of such Prepetition Notes, the "Prepetition Noteholders" and, together with the Prepetition Indenture Trustee, the "Prepetition Notes Parties").  As of the Petition Date, $600,000,000 in aggregate principal amount of Prepetition Notes, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition Notes Documents, including but not limited to, accrued and unpaid interest,

16

any fees, expenses and disbursements as provided under the Prepetition Notes Documents (collectively, the "Prepetition Notes Obligations") was outstanding.

(b)    (i) the Prepetition Notes Obligations constitute legal, valid, enforceable non-avoidable and binding obligations of MHRC, as issuer, and each of the guarantors party thereto; (ii) no offsets, defenses or counterclaims to the Prepetition Notes Obligations exist; (iii) other than, among other things, as may be reflected in the settlement incorporated in the RSA, no portion of the Prepetition Notes Obligations is subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute, or common law; (iv) the Prepetition Notes Documents are valid and enforceable by the Prepetition Notes Parties against MHRC and the Guarantors (as defined therein); and (v) the Debtors and their estates have no claim, objection, challenge or cause of action against the Prepetition Notes Parties or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in

connection with the Prepetition Notes Indenture or the transactions contemplated thereunder or the Prepetition Notes Obligations, including without limitation, any right to assert any disgorgement or recovery.

(c)     The Prepetition Notes Obligations constitute allowed claims for all purposes between and against the Debtors' estates, and neither the Prepetition Indenture Trustee, nor any Prepetition Noteholder, is required to file a proof of claim with regard to the Prepetition Notes Obligations.  Any order entered by the Court in relation to the establishment of a bar date for any claims (including administrative expense claims) in any of these chapter 11 cases or any Successor Cases shall not apply to the Prepetition Indenture Trustee or the Prepetition Noteholders with respect to the Prepetition Notes Obligations.

7.     *Findings Regarding the DIP Financing Loans and the Use of Prepetition Collateral.*

(a)     Good cause has been shown for the entry of this Interim Order.

(b)     The Debtors require the DIP Financing Loans and need to continue to use the Prepetition Collateral, including the Cash Collateral, to fund, among other things, their operations and to pay for certain costs and expenses related to the Debtors' chapter 11 cases.

(c)     The Debtors are unable to obtain financing on more favorable terms and conditions, both with regard to the DIP Financing itself as well as with regard to support for the Debtors' overall restructuring efforts, from sources other than the DIP Financing Lenders pursuant to, and for the purposes set forth in, the DIP Financing Documents and are unable to obtain unsecured credit allowable under section 503(b)(1) of the

18

Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code without granting priming liens under section 364(d)(1) of the Bankruptcy Code, to the extent of $70,000,000 of the DIP Financing Loans (the "First Lien Replacement Portion"), and the Superpriority Claim (as defined herein) on the terms and conditions set forth in this Interim Order, the DIP Financing Documents and the Final Order, as applicable. In addition, the Debtors are unable to obtain credit with respect to the remainder of the DIP Financing Loans (other than the First Lien Replacement Portion, as described above), without granting a second priority junior lien on the Prepetition Collateral. Further, the Debtors represent, and it is hereby found that, payment of the Prepetition First Lien Facility Secured Obligations upon and subject to entry of the Final Order is necessary as the DIP Financing Lenders will not otherwise consent to providing the DIP Financing Facility and extending credit to the Debtors thereunder, and the Prepetition Secured Parties will not otherwise consent to the use of their Cash Collateral and other Prepetition Collateral or the subordination of their liens to the Carve Out (as defined herein). The Debtors further represent, and it is hereby found that, such payment of the Prepetition First Lien Facility Secured Obligations, upon and subject to entry of the Final Order, will not prejudice the Debtors or their estates, because payment of such amounts is on account of the Prepetition First Lien Facility Secured Parties being oversecured.

(d)     Subject in all respects to section 12 of that certain seventh amendment to the Prepetition First Lien Facility, dated as of December 1, 2015, which remains in full force and effect, the Prepetition Secured Parties have consented to (i) the financing

arrangements contemplated by this Interim Order and the DIP Financing Documents and (ii) the Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Interim Order and the DIP Financing Documents.

(e)    The terms upon which the Debtors will be permitted to use Cash Collateral pursuant to this Interim Order and the terms of the DIP Financing Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and are in the best interests of the Debtors' stakeholders. Subject to the terms and conditions of the DIP Financing Documents, the DIP Financing Agent, the DIP Financing Lenders, and the Prepetition Secured Parties either consent or do not object to the use of Cash Collateral on the terms and for the purposes specified herein and in the DIP Financing Documents.

(f)    The DIP Financing Documents and the use of the Prepetition Collateral, including the Cash Collateral, have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the DIP Financing Agent, the DIP Financing Lenders, certain holders of approximately 80% of MHRC's Prepetition Notes (the "Noteholder Backstoppers"), and certain holders of approximately 65% of MHRC's Prepetition Second Lien Facility (the "Second Lien Backstoppers" and, together with the Noteholder Backstoppers, the "Backstoppers")[3] and all of the Debtors' obligations and indebtedness arising under or in connection with the DIP Financing Documents, this Interim Order and the DIP Financing Loans (collectively, the "DIP Financing

---

[3]    Unless otherwise specified, any reference herein to the requirement that the Backstoppers consent to any item or that such item be satisfactory to the Backstoppers, shall require the agreement of a majority of the holders of the Backstop Commitment (as defined in the DIP Financing Agreement).

Obligations") shall be deemed to have been extended by the DIP Financing Agent and the DIP Financing Lenders in "good faith" as such term is used in sections 363(m) and 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(g)     Absent granting the relief set forth in this Interim Order, the Debtors' estates and their business operations will be immediately and irreparably harmed.   In particular, the Debtors require immediate postpetition financing, and use of the Prepetition Collateral, including the Cash Collateral, in order to, among other things, permit the orderly continuation of their businesses and pay for certain costs and expenses related to the Debtors' chapter 11 cases.  The borrowing of the DIP Financing Loans and the use of the Prepetition Collateral, including the Cash Collateral, in accordance with this Interim Order and the DIP Financing Documents are, therefore, in the best interests of the Debtors' estates.

8.    *Authorization of the DIP Financing Loans and the DIP Financing Documents.*

(a)     The Debtors are hereby authorized to enter into, and perform under, the DIP Financing Documents and, in the case of the Borrower, to borrow, subject to the terms and conditions of (1) this Interim Order, (2) the DIP Financing Documents, and (3) the Budget (as defined herein), the DIP Financing Loans in an aggregate principal amount of up to $200,000,000 for working capital and other general corporate purposes of the Debtors, and, upon entry of the Final Order and subject in all respects to section 12 of that certain seventh amendment to the Prepetition First Lien Facility, dated as of

21

December 1, 2015, which remains in full force and effect, payment in full of the Prepetition First Lien Facility Secured Obligations, to be incurred as follows: (i) $40,000,000 upon entry of this Interim Order (the "Initial Draw"); (ii) $100,000,000 upon entry of the Final Order (the "Final Order Draw"); and (iii) $60,000,000 upon the occurrence of certain conditions, as set forth in the DIP Financing Documents (the "Third Draw").

(b)    In furtherance of the foregoing and without further approval of the Court, each Debtor is authorized and directed to perform all acts (and to the extent such acts have already occurred, such acts are hereby ratified) and to execute and deliver all instruments and documents that the DIP Financing Agent determines to be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Financing Documents including, without limitation:

(i)    the execution, delivery and performance of the DIP Financing Documents;

(ii)    the non-refundable payment to the DIP Financing Agent, the Backstoppers, or the DIP Financing Lenders, as the case may be, of the fees set forth in the DIP Financing Documents including, without limitation: (1) any seasoning or administrative agency fees, which may be referred to in one or more fee letters executed among the Debtors and the DIP Financing Agent;[4] (2) the non-refundable payment to each DIP Financing Lender on the date of the Final Order of a fee, payable in cash, in the amount of its pro rata share of 2% of the

---

[4]    The Debtors will share an unredacted copy of any fee letters executed with the DIP Financing Agent with the U.S. Trustee and the Creditors' Committee.

DIP Financing Loans (the "Commitment Fee"), which Commitment Fee shall be earned upon entry of this Interim Order and payable upon entry of the Final Order; (3) the non-refundable payment to each Backstopper pursuant to the terms of the RSA and the DIP Credit Agreement of a "backstop" fee, which "backstop" fee shall be earned upon entry of this Interim Order and payable pursuant to the terms of the RSA and the DIP Financing Documents; and (4) reasonable costs and expenses as may be due from time to time as provided in this Interim Order and in the DIP Financing Documents, including, without limitation, reasonable attorneys' fees and other financial advisory (including success), consultant and professional fees and disbursements as provided in the DIP Financing Documents;

      (iii)    making any payments in respect of Adequate Protection Obligations as provided for in this Interim Order and the DIP Financing Agreement; and

      (iv)    the performance of all other acts required under or in connection with the DIP Financing Documents.

      (c)    Upon and subject to entry of the Final Order, the Debtors shall be authorized to pay and shall pay the Prepetition First Lien Facility Secured Lenders in full and in cash, all outstanding Prepetition First Lien Facility Secured Obligations and any unpaid Adequate Protection Obligations (as defined herein) with respect thereto, from the proceeds of the DIP Financing Loans.

      (d)    The DIP Financing Documents constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Interim Order and the DIP Financing Documents. No obligation, payment, transfer or grant of

security by the Debtors under the DIP Financing Documents (or, as it relates to the DIP Financing Loans, this Interim Order) shall be subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law).

9.      *Budget*.  Attached as **Exhibit 2** hereto and incorporated by reference herein is the 13-week budget (which has been approved by the Noteholder Backstoppers, the Second Lien Backstoppers, and the DIP Financing Agent) setting forth the Debtors' projected receipts and disbursements for the 13-week period after the date hereof (the "Budget").  Subject to the permitted variances as set forth in the DIP Financing Documents (the "Permitted Variances"), the Debtors' use of Cash Collateral and other unrestricted cash and cash equivalents shall be only permitted pursuant to the terms of, and in accordance with, the Budget subject to Permitted Variances.  The Backstoppers, the DIP Financing Agent, and the Prepetition Agents shall have no obligations with respect to the Debtors' use of the Cash Collateral, and shall not be obligated to ensure or monitor the Debtors' compliance with the Budget or to pay (directly or indirectly from the Cash Collateral) any expenses incurred or authorized to be incurred pursuant to the Budget.  Any and all Cash Collateral and unrestricted cash and cash equivalents shall be used by the Debtors solely in accordance with this Interim Order and the Budget subject to Permitted

Variances. The consent of the Noteholder Backstoppers, the Second Lien Backstoppers, the DIP Financing Agent, and the Prepetition Agents to the Budget shall not be construed as consent to the use of any Cash Collateral after the occurrence of an Event of Default (as defined in the DIP Financing Agreement), regardless of whether the aggregate funds shown on the Budget have been expended. The Debtors shall have an obligation to update the Budget and receive the Backstoppers' approval with respect thereto pursuant to the terms of the DIP Financing Documents. The Debtors shall provide the following reporting to counsel to the Backstoppers:

      (a)    The Debtors will provide notice to and consult with counsel to the Backstoppers regarding all proposed payments or distributions for prepetition Operating Expenses, Marketing Expenses, Joint Interest Billings, Shipping and Warehousing Claims, and 503(b)(9) Claims (each as defined in the *Debtors Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of (A) Operating Expenses, (B) Joint Interest Billings, (C) Marketing Expenses, (D) Shipping and Warehousing Claims, and (E) 503(B)(9) Claims, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief* (the "Lien Claimants Motion")) together with reasonable information regarding such payments or distributions, five (5) business days before making such payment or distribution pursuant to an order approving the Lien Claimants Motion. The Backstoppers shall have the right to object to any payment or distribution of prepetition (i) (a) Operating Expenses, Marketing Expenses, and Joint Interest Billings (each as defined in the Lien Claimants Motion) in excess of $100,000 and (ii) Shipping and Warehousing Claims and 503(b)(9) Claims (each as defined in the Lien Claimants Motion) in excess of $50,000 and (ii) (a) Operating Expenses, Marketing Expenses, and Joint Interest Billings (each as defined in the Lien Claimants Motion)

equal to or less than $100,000 and (b) Shipping and Warehousing Claims and 503(b)(9) Claims (each as defined in the Lien Claimants Motion) equal to or less than $50,000 to the extent the aggregate amount of such payments exceeds (1) in the week ending December 25, 2015, $500,000, (2) in the week beginning December 28, 2015 and ending January 1, 2016, $1,250,000, (3) in the week beginning January 2, 2016 and ending January 8, 2016, $1,000,000, (4) in the week beginning January 9, 2016 and ending January 15, 2016, $750,000, and (5) in any subsequent calendar week, $500,000, at least two (2) business days prior to the proposed payment or distribution date by notifying the Debtors of such objection, without the need to file a formal objection with the Bankruptcy Court; *provided* that any Backstoppers' consent to such payments or distributions under the Lien Claimants Motion shall not preclude any such party from arguing for any purpose whatsoever in any proceeding in these chapter 11 cases that the liens on account of which such payments or distributions were made do not constitute valid, first priority liens, whether or not payments to the holders of such liens have been made by the Debtors pursuant to the Lien Claimants Motion; *provided further* that the Backstoppers shall not have the right to object to any payments or distributions to Eureka Hunter Holdings, LLC or any of its wholly-owned subsidiaries agreed to under that certain forbearance agreement dated as of November 19, 2015 by and between North Haven Infrastructure Partners II Buffalo Holdings LLC (on its behalf and on behalf of Eureka Hunter Holdings, LLC and its subsidiaries), Triad Hunter, LLC and Magnum Hunter Resources Corporation, and authorized pursuant to the Lien Claimants Motion. Upon receiving any such objection, the Debtors shall consult with counsel to the Backstoppers and the parties shall make good faith efforts to resolve such objection

consensually. If the parties are unable to resolve such objection consensually, the matter shall be resolved by the Court at a hearing to be scheduled as soon as reasonably practicable and in accordance with the Court's calendar. The Debtors shall not make any payment that is the subject of an objection under this paragraph pending the resolution of such objection either by mutual agreement among the parties or by a final order of the Court.

(b)     Beginning the first full week following the date of entry of this Order, the Debtors will provide counsel to the Backstoppers bi-weekly reports of all payments or distributions for 503(b)(9) Claims (as defined in the Lien Claimants Motion). Each biweekly report shall be delivered on a Wednesday and shall cover the two week period prior to the week in which the report will be delivered. For the avoidance of doubt, the first biweekly report will be delivered the week of January 4th, 2016 for the two week period beginning December 21, 2015 and ending January 1, 2016.

(c)     The Debtors will provide notice to and consult with counsel to the Backstoppers regarding all proposed payments or distributions for prepetition Mineral Payments and Working Interest Disbursements (each as defined in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Mineral Payments and (B) Working Interest Disbursements and (II) Granting Related Relief* (the "Mineral Payment Motion")), together with reasonable information regarding such payments or distributions, by the 22nd day of each month before making such payment pursuant to an order approving the Mineral Payment Motion. The Backstoppers shall have the right to object to any such payment or distribution in excess of $100,000 at least two (2) business days prior to the proposed payment or distribution date by notifying the Debtors of such

27

objection, without the need to file a formal objection with the Bankruptcy Court. Upon receiving any such objection, the Debtors shall consult with counsel to the Backstoppers and the parties shall make good faith efforts to resolve such objection consensually. If the parties are unable to resolve such objection consensually, the matter shall be resolved by the Court at a hearing to be scheduled as soon as reasonably practicable and in accordance with the Court's calendar. The Debtors shall not make any payment that is the subject of an objection under this paragraph pending the resolution of such objection either by mutual agreement among the parties or by a final order of the Court; *provided* that the Debtors may make any such payment if the objection has not been resolved by the 27th day of each month; *provided, further*, that any recipient of such payment made before resolution of an applicable objection shall be provided notice that such payment is subject to such unresolved objection and may be subject to avoidance.

(d)     The Debtors will provide notice to and consult with counsel to the Backstoppers regarding all proposed payments or distributions for Taxes and Fees (each as defined in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief* (the "Taxes Motion")), together with reasonable information regarding such payments or distributions, five (5) business days before making such payment pursuant to an order approving the Taxes Motion. The Backstoppers shall have the right to object to any such payment or distribution in excess of $100,000 at least two (2) business days prior to the proposed payment or distribution date by notifying the Debtors of such objection, without the need to file a formal objection with the Bankruptcy Court. Upon receiving any such objection, the Debtors shall consult with counsel to the Backstoppers and the parties shall

28

make good faith efforts to resolve such objection consensually. If the parties are unable to resolve such objection consensually, the matter shall be resolved by the Court at a hearing to be scheduled as soon as reasonably practicable and in accordance with the Court's calendar. The Debtors shall not make any payment that is the subject of an objection under this paragraph pending the resolution of such objection either by mutual agreement among the parties or by a final order of the Court.

(e) The Debtors will provide notice to and consult with counsel to the Backstoppers regarding all proposed payments or distributions on account of the Surety Bond Program (as defined in the *Debtors' Motion for Entry of an Order (I) Approving Continuation of Surety Bond Program and (II) Granting Related Relief* (the "Surety Motion")), together with reasonable information regarding such payments or distributions, five (5) business days before making such payment pursuant to an order approving the Surety Motion. The Backstoppers shall have the right to object to any such payment or distribution in excess of $100,000 at least two (2) business days prior to the proposed payment or distribution date by notifying the Debtors of such objection, without the need to file a formal objection with the Bankruptcy Court. Upon receiving any such objection, the Debtors shall consult with counsel to the Backstoppers and the parties shall make good faith efforts to resolve such objection consensually. If the parties are unable to resolve such objection consensually, the matter shall be resolved by the Court at a hearing to be scheduled as soon as reasonably practicable and in accordance with the Court's calendar. The Debtors shall not make any payment that is the subject of an objection under this paragraph pending the resolution of such objection either by mutual agreement among the parties or by a final order of the Court.

29

(f)     For so long as the RSA remains in effect, the Debtors will provide notice to and consult with counsel to the Backstoppers prior to (i) any renewal, amendment, supplement, extension, or purchase of insurance policies and (ii) the Debtors' entry into any new premium financing agreement. To the extent any such renewal, amendment, supplement, extension, or purchase of insurance policies or any such new premium finance agreement relates to D&O coverage, the Backstoppers shall have the right to object to such renewal, amendment, supplement, extension, or purchase of insurance policies or entry into such agreement by notifying the Debtors of such objection, without the need to file a formal objection with the Bankruptcy Court. Upon receiving any such objection, the Debtors shall consult with counsel to the Backstoppers and the parties shall make good faith efforts to resolve such objection consensually. If the parties are unable to resolve such objection consensually, the matter shall be resolved by the Court at a hearing to be scheduled as soon as reasonably practicable and in accordance with the Court's calendar. The Debtors shall not renew, amend, supplement, extend, or purchase any insurance policy or enter into any new premium finance agreement that is the subject of an objection under this paragraph pending the resolution of such objection either by mutual agreement among the parties or by a final order of the Court.

10.     *DIP Financing Claims and Liens*. As security for the DIP Financing Obligations, the DIP Financing Agent, for the benefit of itself and the DIP Financing Lenders, is hereby granted the following claims, liens, security interests, rights, and benefits, in each case subject and subordinate to the Carve-Out in all respects and payment in full of the obligations benefiting from the Carve-Out (including paragraphs (a), (b), and (c) below, collectively, the "DIP Financing Liens"):

(a)     *Superpriority Claims.*  An allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code on account of the DIP Financing Obligations (the "Superpriority Claim").  The Superpriority Claim shall be an allowed claim against each of the Debtors (jointly and severally) with priority over any and all administrative expenses and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.

(b)     *Postpetition Priming Liens (First Lien Replacement Portion).*  With respect to the First Lien Replacement Portion, to the extent approved by and subject to entry of the Final Order, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, first priority, (i) pledge of (x) all promissory notes owned by the Debtors and (y) all capital stock owned by the Debtors (other than as set forth below) and (ii) senior, priming lien on, and security interest in, all property (including any previously unencumbered property), whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights,

instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property (other than as set forth below), letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor (other than equity interests in MHRC), other equity or ownership interests, including, upon entry of the Final Order, equity interests in subsidiaries and non-wholly-owned direct investments of any Debtor, including the Debtors' equity interests in Eureka Hunter Holdings, LLC ("EHH" and such equity interests, the "EHH Equity") to the extent MSIP II Buffalo Holdings, LLC's ("MSI") consent to such liens is obtained (and to the extent MSI's consent to such liens is not obtained, such liens shall in all events attach to all proceeds, products, offspring, or profits from all sales, transfers, dispositions, or monetizations of Debtors' EHH Equity; *provided* that, for the avoidance of doubt, the DIP Financing Lenders shall not have the ability to foreclose on the EHH Equity solely as a result of an Event of Default occurring under the DIP Financing Loans), money, investment property (other than as provided above), any causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, or 553 of the Bankruptcy Code or any other avoidance actions under the Bankruptcy Code (collectively, the "Avoidance Actions") subject to entry of the Final Order, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual

32

property, securities (other than as provided above), partnership or membership interests in limited liability companies (other than as provided above), and capital stock (other than as provided above), including, without limitation, the products, proceeds, and supporting obligations thereof, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, in each case, other than "Excluded Collateral" as such term is defined in the DIP Financing Documents (collectively, the "DIP Financing Collateral"), all such property in each case that is not subject to any Permitted Priority Liens (as defined in the DIP Financing Agreement), other than the Second Priority Prepetition Liens, subject in all respects to Section 12 of that certain seventh amendment to the Prepetition First Lien Facility, dated as of December 1, 2015.

(c)     *First Lien on Unencumbered Collateral.*  Pursuant to sections 364(c)(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected, non-avoidable first priority lien on, and security interest in, all previously unencumbered property, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property (other than set forth below), letter-

33

of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor (other than MHRC), other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned direct investments, including, upon entry of the Final Order, the Debtors' EHH Equity, to the extent MSI's consent is obtained (and to the extent MSI's consent to such liens is not obtained, such liens shall in all events attach to all proceeds, products, offspring, or profits from all sales, transfers, dispositions, or monetizations of Debtors' EHH Equity; *provided*, that, for the avoidance of doubt, that the DIP Financing Lenders shall not have the ability to foreclose on any EHH Equity solely as a result of an Event of Default occurring under the DIP Financing Loans), money, investment property (other than as provided above), Avoidance Actions subject to entry of the Final Order, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities (other than as provided above), partnership or membership interests in limited liability companies (other than as provided above) and capital stock (other than as provided above), including, without limitation, the products, proceeds and supporting obligations thereof, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, which in each case is not subject to (x) valid, perfected, unavoidable, and enforceable liens in existence on or as of the Petition Date or (y) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code

34

(the "Unencumbered Property") and, in each case, other than "Excluded Collateral" as such term is defined in the DIP Financing Documents.

(d) *Junior Liens on Prepetition Collateral.* Other than with respect to the First Lien Replacement Portion, the priority of which is addressed in Paragraph 10(b), the DIP Financing Lenders are granted a valid, binding, continuing, enforceable, fully-perfected, non-avoidable, third priority junior lien on the Prepetition Collateral and Other Prepetition Collateral (the "Junior DIP Financing Lien"), in each case, other than "Excluded Collateral" as such term is defined in the DIP Financing Documents,.

(e) *DIP Financing Liens Senior to Other Liens.* The DIP Financing Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise.

(f) *Carve Out.* As used in this Interim Order, the "Carve Out" means the sum of: (i) all fees required to be paid to the Clerk of the Court and all fees required to be paid to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the

Bankruptcy Code (collectively, the "Debtor Professionals") and any official committee appointed in the Chapter 11 Cases pursuant to sections 328 or 1103 of the Bankruptcy Code (together with the Debtor Professionals, the "Professionals") at any time before the delivery by the DIP Financing Agent of a Carve Out Trigger Notice (defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) the Allowed Professional Fees of the Professionals in an aggregate amount not to exceed $2,000,000 incurred beginning the first business day following delivery by the DIP Financing Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").

(g)    For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by electronic mail (or other electronic means) by the DIP Financing Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the official committee of unsecured creditors (the "Creditors' Committee"), if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Financing Obligations under the DIP Financing Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(h)    On the day on which a Carve Out Trigger Notice is given by the DIP Financing Agent to the Debtors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors under the DIP Financing Agreement in an amount equal to the then unpaid amounts of the Allowed Professional Fees and (ii) constitute a demand to the Debtors to utilize all

36

cash on hand as of the date of such notice and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account in trust to pay any then-unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims, subject to the provisions of Paragraph 10(j) hereto.

(i)      On the Termination Declaration Date, the Carve-Out Trigger Notice shall also be deemed a draw request and notice of borrowing by the Debtors under the DIP Financing Agreement in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims, subject to the provisions of Paragraph 10(j) below. The DIP Financing Agent shall immediately send the Carve-Out Trigger Notice to the DIP Financing Lenders. On the first business day after the DIP Financing Agent sends a Carve-Out Trigger Notice to the DIP Financing Lenders, notwithstanding anything in the DIP Financing Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Financing Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for the loans under the DIP Financing Facility, any termination of the commitments under the DIP Financing Facility following an Event of Default, or the occurrence of the Maturity Date (as defined in the DIP Financing Agreement), each DIP Financing Lender (on a pro rata basis based on the then-

outstanding commitments under the DIP Financing Facility) shall make available to the DIP Financing Agent such DIP Financing Lender's pro rata share with respect to such borrowing in accordance with the DIP Financing Facility.

(j) No fees shall be paid *Pursuant to this Interim Order* from the Carve Out Reserves pursuant to paragraphs 10(h) or 10(i) of this Interim Order, to any professional retained in these cases pursuant to section 327, section 328, or section 1103 of the Bankruptcy Code (a "Retained Professional") absent (i) compliance with any order entered by the Court regarding interim compensation procedures governing payment of such Retained Professional and, if applicable, (ii) a Court order approving payment of the such fees upon the filing, on notice, of a fee application of such Retained Professional. For the avoidance of doubt, the foregoing shall not apply to those professionals that are subject to any order entered by the Court concerning ordinary course professionals (an "OCP Order"), with respect to which no fees shall be paid to such ordinary course professionals except in compliance with the procedures set forth in such OCP Order.

(k) All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Financing Agent for the benefit of the DIP Financing Lenders until the DIP Financing Obligations have been paid in full, in which case any such excess shall be paid to any prepetition claimants in accordance with their rights and priorities under applicable law.

(l)     All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay any remaining obligations set forth in clause (i) of the definition of Carve Out set forth above, and then to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Financing Agent for the benefit of the DIP Financing Lenders until the DIP Financing Obligations have been paid in full, in which case any such excess shall be paid to any prepetition claimants in accordance with their rights and priorities as of the Petition Date.

(m)     Notwithstanding anything to the contrary in the DIP Financing Documents, this Interim Order, or the Final Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph 10, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this Paragraph 10, prior to making any payments to the DIP Financing Agent, the DIP Financing Lenders, or any prepetition claimants.

(n)     Notwithstanding anything to the contrary in the DIP Financing Documents, this Interim Order, or the Final Order, following delivery of a Carve Out Trigger Notice, none of the DIP Financing Agent, DIP Financing Lenders, Prepetition First Lien Agent, Prepetition Second Lien Agent, or Prepetition Lenders shall, nor shall they direct any entity to, sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the

Carve-Out Reserves, with any excess paid to the DIP Financing Agent for application in accordance with the DIP Financing Documents. Further, notwithstanding anything to the contrary in the DIP Documents, this Interim Order, or the Final Order: (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute loans or increase or reduce the DIP Financing Obligations; (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out; and (iii) in no way shall the Budget, any Permitted Variances, Carve Out, Post-Carve Out Trigger Notice Cap, Carve Out Reserves or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors nor shall the Debtor Professionals be subject to any budget. For the avoidance of doubt and notwithstanding anything to the contrary contained herein, in the Interim Order, the Final Order, or any prepetition secured debt, the Carve-Out shall be senior to all liens and claims securing the DIP Financing Facility, the Adequate Protection Liens, and the 507(b) Claims and any and all other forms of adequate protection, liens, or claims securing the obligations under the DIP Financing Facility or the prepetition secured obligations. Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Notice in respect of any Allowed Professional Fees shall not reduce the Carve Out.

11.    *Remedies upon Event of Default (DIP Financing Parties).*   The Debtors shall promptly provide notice to counsel to the Noteholder Backstoppers, the Second Lien Backstoppers, and the DIP Financing Agent (with a copy to counsel for the Creditors' Committee, if any, and the U.S. Trustee) of the occurrence of any Event of Default (as defined in the DIP Financing Agreement). Upon the occurrence of an Event of Default and following the

giving of three (3) business days' written notice (the "DIP Enforcement Notice") to the Debtors, counsel for the Creditors' Committee, if any, and the U.S. Trustee (the "DIP Financing Notice Period"), the DIP Financing Lenders and the DIP Financing Agent may exercise any remedies available to them under this Interim Order, the DIP Financing Documents, and applicable non-bankruptcy law, including but not limited to foreclosing upon the DIP Financing Collateral or otherwise enforcing the DIP Financing Obligations and the DIP Financing Liens on any or all of the DIP Financing Collateral and/or exercising any other default-related remedies under the DIP Financing Agreement, this Interim Order or applicable law in seeking to recover payment of the DIP Financing Obligations; *provided, however*, that any agreement of the DIP Financing Parties to terminate the DIP Financing Facility shall require the consent of holders of a majority of (i) the Backstop Commitments made by the Second Lien Backstoppers and (ii) the Backstop Commitments made by the Noteholder Backstoppers. Unless the Court orders otherwise during the DIP Financing Notice Period (unless such period may be extended by the Court), the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated at the end of the DIP Financing Notice Period, without further notice or order of the Court and the DIP Financing Lenders and the DIP Financing Agent shall be permitted to exercise all rights and remedies set forth in this Interim Order, the DIP Financing Documents, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code. In connection with the exercise of any rights by the DIP Financing Lenders or the DIP Financing Agent pursuant to the DIP Credit Agreements or this Interim Order to direct or compel a sale or assignment of the EHH Equity that constitutes DIP Financing Collateral pursuant to section 363 of the Bankruptcy Code, the DIP Financing Agent, on behalf of the applicable DIP Financing

41

Lenders, shall be permitted to credit bid forgiveness of some or all of the outstanding DIP Financing Obligations (in an amount equal to at least the consideration offered by any other party in respect of such sale or assignment) as consideration in exchange for such EHH Equity. Pursuant to section 364(e) of the Bankruptcy Code, absent a stay pending appeal, the DIP Financing Lenders' right to credit bid shall not be affected by the reversal or modification on appeal of the Debtors' authorization pursuant to this Interim Order or the Final Order to obtain credit and incur debt as and in accordance with the terms set forth herein, to the extent such credit has already been extended.

12.    *Entitlement to Adequate Protection (Prepetition First Lien Facility Secured Parties)*.  For the avoidance of doubt, this Paragraph 12 shall be subject in all respects to Pparagraph 35.  (i) The Prepetition First Lien Facility Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral (it being understood that the Prepetition First Lien Facility Secured Parties' interests extend to the Cash Collateral) as of the Petition Date in an amount equal to the aggregate postpetition diminution in value of such interests from and after the Petition Date, consisting of any such diminution resulting from the use by the Debtors of the Cash Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Debtors' incurrence of the DIP Financing Loans, and the use of the Cash Collateral pursuant to this Interim Order (such diminution in value, the "First Lien Facility Adequate Protection Obligations").  All distributions made on account of the First Lien Facility Adequate Protection Obligations shall be made and applied in accordance with the Prepetition First Lien Facility Documents, including the Intercreditor Agreement.  The Prepetition First Lien Facility Secured Parties shall be granted the following forms of Adequate Protection:

(a)    First Lien Facility Section 507(b) Claim.   An allowed superpriority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code as provided for by section 507(b) of the Bankruptcy Code on account of the Adequate Protection Obligations (the "First Lien Facility 507(b) Claims").  Subject and junior in priority in all respects to the Carve-Out, the Superpriority Claim held by the DIP Financing Lenders, and the DIP Financing Liens, the First Lien Facility Section 507(b) Claim shall be an allowed claim against each of the Debtors (jointly and severally) with priority over any and all administrative expenses and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.  Except to the extent expressly set forth in this Interim Order, the Prepetition Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the 507(b) Claims unless and until all DIP Financing Obligations shall have indefeasibly been paid in full in cash pursuant to the Final Order.

(b)    *First Lien Facility Adequate Protection Claims and Liens.*  Subject and junior in priority in all respects to the Carve-Out and the DIP Financing Liens, effective as of the Petition Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements,

43

pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the Prepetition First Lien Facility Secured Parties, the following security interests and liens are hereby granted to the Prepetition First Lien Facility Secured Parties (all such liens and security interests, the "First Lien Facility Adequate Protection Liens");

    (i) *Liens on Unencumbered Property.* Subject and junior in priority in all respects to the Carve-Out, the DIP Financing Liens, and the DIP Financing Claims, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, non-avoidable additional and replacement liens on, and security interests in, all property (including any previously unencumbered property), whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor, other equity or ownership

44

interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries (other than EHH Equity as provided below), money, investment property, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities, partnership or membership interests in limited liability companies and capital stock, including, without limitation, the products, proceeds and supporting obligations thereof, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located (all such property in each case that is not subject to (x) valid, perfected, unavoidable, and enforceable liens in existence on or as of the Petition Date or (y) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code);

(ii)    *Prepetition First Lien Facility Secured Lenders' Adequate Protection Liens on EHH.*  To the extent that pursuant to the Final Order the DIP Financing Obligations are secured by a lien on the Debtors' EHH Equity, the Prepetition First Lien Facility Secured Lenders are hereby granted a valid, binding, continuing, enforceable, fully-perfected, non-avoidable replacement lien on, and security interest in, the Debtors' EHH Equity, to the extent MSI consents to the granting of such liens; *provided, however*, that to the extent the Prepetition First Lien Facility Secured Lenders have any rights with regard to diminution in value of the Prepetition Collateral, the Prepetition First Lien Facility Secured Lenders will first need to marshal any such rights against all other collateral

45

secured by First Lien Facility Adequate Protection Liens prior to seeking to exercise rights and/or remedies against any Adequate Protection Liens on the EHH Equity, *provided, however*, that any proceeds from a sale of the Debtors' EHH Equity in excess of those funds required to satisfy the DIP Financing Obligations and the Second Lien Facility Adequate Protection Obligations in full shall be reserved until such time as it is determined that the First Lien Facility Adequate Protection Obligations, if any, have been satisfied in full.

(iii)   *Liens Junior to Certain Existing Liens.*   A valid, binding, continuing, enforceable, fully-perfected non-avoidable junior priority replacement lien on, and security interest in, all property, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), property of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property (other than EHH Equity as provided above), letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor (other than equity interests

46

in MHRC), other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned direct investments (other than EHH Equity as provided above), money, investment property (other than EHH Equity as provided above), Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities (other than EHH Equity as provided above), partnership or membership interests in limited liability companies (other than EHH Equity as provided above) and capital stock (other than EHH Equity as provided above), including, without limitation, the products, proceeds and supporting obligations thereof, whether now existing or hereafter acquired, that is only subject to (x) valid, perfected, non-avoidable and enforceable liens in existence immediately prior to the Petition Date or (y) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code. For the avoidance of doubt, any and all liens granted as adequate protection to the Prepetition First Lien Facility Secured Lenders shall be junior in all respects to the DIP Financing Liens and senior in all respects to the Second Lien Facility Adequate Protection Liens. For the avoidance of doubt, the carve outs in this subparagraph for EHH Equity shall not apply to the proceeds of a sale of EHH Equity, to the extent such credit has already been extended.

13. *Entitlement to Adequate Protection (Prepetition Second Lien Facility Secured Parties)*. For the avoidance of doubt, this Paragraph 13 shall be subject in all respects to Paragraph 35. Subject to and junior in priority in all respects to the Carve-Out, (i) the Prepetition

47

Second Lien Facility Secured Parties are entitled to adequate protection of their interests in the Prepetition Collateral (it being understood that the Prepetition Second Lien Facility Secured Parties' interests extend to the Cash Collateral) as of the Petition Date in an amount equal to the aggregate postpetition diminution in value of such interests from and after the Petition Date, consisting of any such diminution resulting from the use by the Debtors of the Cash Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Debtors' incurrence of the DIP Financing Loans, and the use of the Cash Collateral pursuant to this Interim Order (such diminution in value, the "Second Lien Facility Adequate Protection Obligations" and, together with the First Lien Facility Adequate Protection Obligations, the "Adequate Protection Obligations"). All distributions made on account of the Second Lien Facility Adequate Protection Obligations shall be made and applied in accordance with the Prepetition Second Lien Facility Documents, including the Intercreditor Agreement. The Prepetition Second Lien Facility Secured Parties shall be granted the following forms of adequate protection:

(a)    Second Lien Facility Section 507(b) Claim.    An allowed priority administrative expense claim pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code as provided for by section 507(b) of the Bankruptcy Code on account of the Second Lien Facility Adequate Protection Obligations (the "Second Lien Facility 507(b) Claim"). Subject and junior in priority in all respects to the Carve-Out, the Superpriority Claim held by the DIP Financing Lenders, the DIP Financing Liens, and the First Lien Facility Adequate Protection Obligations (including the liens and claims granted with regard thereto), the Second Lien Facility 507(b) Claim shall be an allowed claim against each of the Debtors (jointly and severally) with priority over any and all

48

administrative expenses and all other claims asserted against the Debtors now existing or hereafter arising of any kind whatsoever, including all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all other administrative expenses or other claims arising under any other provision of the Bankruptcy Code, including sections 105, 326, 327, 328, 330, 331, 503(b), 507(a), 507(b), or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. Except to the extent expressly set forth in this Interim Order, the Prepetition Second Lien Facility Secured Parties shall not receive or retain any payments, property, or other amounts in respect of the Second Lien Facility 507(b) Claim unless and until all DIP Financing Obligations, Prepetition First Lien Obligations, and First Lien Facility Adequate Protection Obligations shall have indefeasibly been paid in full in cash.

(b)  *Second Lien Facility Adequate Protection Claims and Liens*.  Subject and junior in priority in all respects to the Carve-Out, the First Lien Facility Adequate Protection Liens, and the DIP Financing Liens, effective as of the Petition Date and perfected without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, or the possession or control by the Prepetition Second Lien Facility Secured Parties, the following security interests and liens are hereby granted to the Prepetition Second Lien Facility Secured Parties (all such liens and security interests, the "Second Lien Facility Adequate Protection Liens");

(i)  *Liens on Unencumbered Property*.  Subject and junior in priority in all respects to the Carve-Out, the DIP Financing Liens and the DIP Financing

49

Claims, and the First Lien Facility Adequate Protection Liens and First Lien Facility Adequate Protection Claims, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected, non-avoidable liens on, and security interests in, all property (including any previously unencumbered property), whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property (other than as provided below), letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor (other than equity interests in MHRC), other equity or ownership interests (other than as provided below), including equity interests in subsidiaries and non-wholly-owned direct investments (other than as provided below), money, investment property, Cash Collateral, and all cash and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities

50

(other than as provided below), partnership or membership interests in limited liability companies (other than as provided below) and capital stock (other than as provided below), including, without limitation, the products, proceeds and supporting obligations thereof, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located (all such property in each case that is not subject to (x) valid, perfected, unavoidable, and enforceable liens in existence on or as of the Petition Date or (y) valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code);

(ii)    *Prepetition Second Lien Facility Secured Lenders' Adequate Protection Liens on EHH.*  To the extent that the DIP Financing Obligations are secured by a lien on the Debtors' EHH Equity, the Prepetition Second Lien Facility Secured Lenders are hereby granted a valid, binding, continuing, enforceable, fully-perfected, non-avoidable replacement lien on, and security interest in, the Debtors' EHH Equity, to the extent MSI consents to the granting of such liens; *provided, however,* that to the extent the Prepetition Second Lien Facility Secured Lenders have any rights with regard to diminution in value of the Prepetition Collateral, the Prepetition Second Lien Facility Secured Lenders will first need to marshal any such rights against all other collateral secured by Second Lien Facility Adequate Protection Liens prior to seeking to exercise rights and/or remedies against any Adequate Protection Liens on the EHH Equity, *provided, however,* that any proceeds from a sale of the Debtors' EHH Equity in excess of

51

those funds required to satisfy the DIP Financing Obligations and the First Lien Facility Adequate Protection Obligations in full shall be reserved until such time as it is determined that the Second Lien Facility Adequate Protection Obligations, if any, have been satisfied in full;

(iii)    *Liens Junior to Certain Existing Liens*.    A valid, binding, continuing, enforceable, fully-perfected, non-avoidable junior priority replacement lien on, and security interest in, all property, whether now owned or hereafter acquired or existing and wherever located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), property of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property (other than as provided above), letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding capital stock of each Debtor (other than equity interests in MHRC), other equity or ownership interests (other than as provided above), including equity interests in subsidiaries and non-wholly-owned direct investments (other than as provided above), money, Cash Collateral, and all cash

52

and non-cash proceeds, rents, products, substitutions, accessions, and profits of any of the collateral described above, documents, vehicles, intellectual property, securities (other than as provided above), partnership or membership interests in limited liability companies (other than as provided above) and capital stock (other than as provided above), including, without limitation, the products, proceeds and supporting obligations thereof, whether now existing or hereafter acquired, that is only subject to (x) valid, perfected, non-avoidable and enforceable liens in existence immediately prior to the Petition Date or (y) valid and non-avoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code.

14.    *Additional Adequate Protection.* As additional adequate protection,

(a)    Agents' Fees and Expenses. The Debtors shall pay within fourteen (14) days of presentment of an invoice to the Debtors, any Creditors' Committee (on a professionals' eyes only basis), the U.S. Trustee, and the Backstoppers describing in customary detail (redacted for privilege and work product, except that unredacted copies shall be provided to the U.S. Trustee) the actual, reasonable, and documented fees, costs and expenses of (i) the Prepetition First Lien Facility Administrative Agent, (ii) the Prepetition First Lien Facility Loan Administrator, (iii) the Prepetition Second Lien Facility Agent, and (iv) one law firm and one local counsel retained by each of the Prepetition First Lien Facility Administrative Agent, the Prepetition First Lien Facility Loan Administrator, and the Prepetition Second Lien Facility Agent, respectively,

53

whether incurred before or after the Petition Date, in each case without further order of, or application to, the Court or notice to any party.

(b)     Prepetition Second Lien Facility Secured Lenders' Fees and Expenses. The Debtors shall pay within fourteen (14) days of presentment of an invoice to the Debtors, the U.S. Trustee, and any Creditors' Committee (on professionals' eyes only basis), describing in customary detail (redacted for privilege and work product, except that unredacted copies shall be provided to the U.S. Trustee) the actual, reasonable, and documented fees, costs and expenses incurred by the Prepetition Second Lien Facility Secured Lenders, whether incurred before or after the Petition Date, including the fees, costs, and expenses for (i) lead counsel for the Prepetition Second Lien Facility Secured Lenders, Weil, Gotshal & Manges, LLP ("Weil"), (ii) the financial advisor for the Prepetition Second Lien Facility Secured Lenders, Houlihan Lokey Capital, Inc. ("Houlihan Lokey" and, together with Weil Gotshal, the "Prepetition Second Lien Facility Secured Lenders Advisors"), (iii) local counsel for the Prepetition Second Lien Facility Secured Lenders Advisors, and (iv) any consultants, engineers, or other advisors, or consultants retained by the Prepetition Second Lien Facility Secured Lenders Advisors in connection with the Debtors or these chapter 11 cases, in each case, in accordance with the prepetition engagement letters of each such professional, and in each case (1) including any success fees, transaction fee, or similar fee contemplated therein or thereby and (2) without further order of, or application to, the Court or notice to any party. For the avoidance of doubt, the payment of any such fees and expenses in this Paragraph 14(b) will not include payment of any fees or expenses which are in furtherance of any plan of reorganization or restructuring other than as contemplated by the RSA.

(c)    <u>Backstoppers Fees and Expenses</u>.  The Debtors shall pay within fourteen (14) days of presentment of an invoice to the Debtors, the U.S. Trustee, and any Creditors' Committee (on a professionals' eyes only basis), describing in customary detail (redacted for privilege and work product, except that unredacted copies shall be provided to the U.S. Trustee) the actual, reasonable, and documented fees, costs and expenses incurred by the Backstoppers, whether incurred before or after the Petition Date, including the fees, costs, and expenses for (i) lead counsel for the Noteholder Backstoppers, Akin Gump Strauss Hauer & Feld LLP ("<u>Akin Gump</u>"), (ii) the financial advisor for the Noteholder Backstoppers, Centerview Partners LLC ("<u>Centerview</u>" and, together with Akin Gump, the "<u>Noteholder Backstoppers Advisors</u>"), (iii) one set of local counsel for the Noteholder Backstoppers, (iv) any consultants, engineers, or other advisors, or consultants retained by the Noteholder Backstoppers in connection with the Debtors or these chapter 11 cases, in each case, in accordance with any prepetition engagement letters of such professional, which engagement letters were provided to the advisors to the Second Lien Backstoppers prior to the Petition Date, and in each case (1) including any success fees, transaction fee, or similar fee contemplated therein or thereby and (2) without further order of, or application to, the Court or notice to any party, (v) lead counsel for the Second Lien Backstoppers, Weil, (vi) the financial advisor for the Second Lien Backstoppers, Houlihan Lokey (and, together with Weil in their capacity as advisors to the Second Lien Backstoppers in connection with the DIP Financing Documents and the RSA, the "<u>Second Lien Backstoppers Advisors</u>"), (vii) one set of local counsel for the Second Lien Backstoppers, (viii) any consultants, engineers, or other advisors, or consultants retained by the Second Lien Backstoppers in connection with the

Debtors or these chapter 11 cases, in each case, in accordance with the prepetition engagement letters of each such professional, which engagement letter of Houlihan Lokey was provided to the advisors to the Noteholder Backstoppers prior to the Petition Date, and in each case (1) including any success fees, transaction fee, or similar fee contemplated therein or thereby and (2) without further order of, or application to, the Court or notice to any party; *provided*, *however*, that the payment of such fees and expenses with respect to the Second Lien Backstoppers Advisors (in their capacity as advisors in connection with the DIP Financing Documents and the RSA) and the Noteholder Backstoppers Advisors and other professionals will not include the payment of any fees and expenses which are in furtherance of any plan of reorganization or restructuring other than as contemplated by the RSA. For the avoidance of doubt, the payment of fees and expenses contemplated by this Paragraph 14(c) shall also be an obligation under the DIP Financing Loan Documents and approved as such pursuant to this Interim Order, and the Debtors are authorized and directed to pay such fees and expenses.

(d)     Interest.   For the avoidance of doubt, this paragraph is subject in all respects to Paragraph 35 of this Interim Order. Interest on the Prepetition First Lien Facility Obligations shall accrue and be paid in cash at the non-default contract rate under the Prepetition First Lien Loan Documents until repayment in full and in cash of the Prepetition First Lien Facility upon entry of the Final Order. Interest at the non-default contract rate under the Prepetition Second Lien Loan Documents shall accrue and be paid

in cash on 63.0%[5] of the principal amount outstanding under the Prepetition Second Lien Facility; *provided*, *however*, that to the extent that any milestone contemplated by the RSA is not met and the RSA is terminated, or the RSA is terminated on any other basis, such adequate protection payments (including any payments made prior thereto) on the Prepetition Second Lien Facility Obligations shall be subject to recharacterization as principal payments, and all parties reserve all rights to argue that the Prepetition Second Lien Facility Secured Lenders are entitled to more or less adequate protection payments.

(e)    Budget Compliance/Additional Reporting. With respect to the Prepetition Secured Parties, the Debtors shall comply with the Budget subject to Permitted Variances and reporting requirements set forth in this Interim Order and the DIP Financing Documents; *provided*, *however*, such compliance and rights set forth in this section 14(e) shall only apply with respect to the Prepetition Secured Parties to the extent that this Interim Order continues in full force and effect notwithstanding that the Debtors have indefeasibly paid and satisfied in full in cash the DIP Financing Obligations, but continue to use Cash Collateral; provided, further, (i) such Budget compliance and reporting requirements shall be subject to the cure periods set forth in the DIP Financing Documents, (ii) the DIP Financing Parties that are vested with the right to waive, extend, modify or consent to a departure from the Budget and reporting requirements under the DIP Financing Documents shall be vested with the sole right to waive, extend, modify or consent to a departure from the Budget or such reporting requirements to be delivered hereunder and (iii) any such waiver, extension, modification or consent under the DIP

---

[5]    It is intended that this percentage shall be approximately equal to the percentage of the Prepetition Second Lien Facility Secured Lenders' claims that are agreed, as part of the consensual Plan, to be secured. To the extent that the RSA is terminated, such secured "settlement" value shall not be admissible in any court or for any purposes whatsoever.

Financing Documents shall be binding on the Prepetition Secured Parties to the same extent as the DIP Financing Parties; provided, further, the Prepetition Secured Parties have agreed with the Debtors that the Prepetition Secured Parties shall have no cleansing rights and the Debtors shall have no cleansing obligations on account of or in respect of the Prepetition Secured Parties' receipt of material non-public information in connection with the Budget or such reporting requirements.

15.     *Right to Seek Additional Adequate Protection.*  This Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to request additional forms of adequate protection in the event the RSA is terminated or the rights of all parties to oppose such relief.

16.     *Release.*  Subject to entry of the Final Order, each of the Debtors and the Debtors' estates, on its own behalf and on behalf of each of their predecessors, their successors, and assigns (collectively, the "Releasors") shall to the maximum extent permitted by applicable law, unconditionally, irrevocably and fully forever release, remise, acquit, relinquish, irrevocably waive and discharge each of the DIP Financing Lenders, the DIP Financing Agent, the Backstoppers, and each of their respective former, current, or future officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors in interest (collectively, the "Releasees"), solely in their capacity as DIP Financing Parties, of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued,

unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description that exist on the date hereof relating to any of the Prepetition Loan Documents or the transactions contemplated under such documents, including, without limitation, (i) any so-called "lender liability" or equitable subordination claims or defenses, (ii) any and all claims and causes of action arising under title 11 of the United States Code, and (iii) any and all claims and causes of action regarding the validity, priority, perfection or avoidability of the liens or claims of the Releasees.

17.      *Termination (Prepetition Secured Parties)*.  The Debtors' right to use the Cash Collateral pursuant to this Interim Order shall terminate following the giving of five (5) Business Days' written notice to the Debtors, counsel to the DIP Financing Agent, counsel to the Noteholder Backstoppers, counsel to the Second Lien Backstoppers, counsel to the Creditors' Committee, if any, and the U.S. Trustee of a Termination Event (as defined herein) (the date of any such termination, the "Termination Date") (unless such period is extended by the Prepetition Secured Parties) on the occurrence of any of the events set forth in Paragraph 17(a) and Paragraph 17(b) below (unless waived by the DIP Financing Lenders) (the events set forth in Paragraphs 17(a) and 17(b) below are collectively referred to herein as the "Termination Events"):

(a)      any Event of Default under the DIP Financing Documents that is not waived by the DIP Financing Lenders; and

(b)      the Debtors' failure to comply with the adequate protection provisions or the covenants and other Adequate Protection Obligations of the Debtors contained in this Interim Order.

18.    *Rights and Remedies upon Event of Default (Prepetition Secured Parties).*  Upon the occurrence of an Event of Default under this Interim Order but not under the DIP Financing Documents and following the giving of three (3) Business Days' (the "Cash Collateral Notice Period") written notice (the "Cash Collateral Enforcement Notice") to the Debtors, counsel to the DIP Financing Agent, counsel to the Noteholder Backstoppers, counsel to the Second Lien Backstoppers, counsel to the Creditors' Committee, if any, and the U.S. Trustee, the Prepetition Secured Parties may exercise any remedies available to them under this Interim Order and applicable non-bankruptcy law including, without limitation, revoking the Debtors' right, if any, to use Cash Collateral and collecting and applying any proceeds of the Cash Collateral in accordance with the terms of this Interim Order and the Prepetition Loan Documents.  Unless the Court orders otherwise during the Cash Collateral Notice Period (as such period may be extended by the Court), the automatic stay pursuant to section 362 of the Bankruptcy Code shall be automatically terminated at the end of the Cash Collateral Notice Period, without further notice or order of the Court and the Prepetition Secured Parties shall be permitted to exercise all rights and remedies set forth in this Interim Order, the Prepetition Loan Documents, and as otherwise available at law without further order or application or motion to the Court, and without restriction or restraint by any stay under section 362 or 105 of the Bankruptcy Code.

19.    *Perfection of DIP Financing Liens and Adequate Protection Liens.*  Subject to Paragraph 35 of this Interim Order, to the extent applicable:

(a)    Without regard to the terms of section 362 of the Bankruptcy Code regarding the automatic stay, the DIP Financing Agent, the Prepetition First Lien Facility Agent, and the Prepetition Second Lien Facility Agent, as applicable, are each hereby authorized, but not required, to file or record financing statements, intellectual property

filings, mortgages, notices of lien, or similar instruments in any jurisdiction in order to validate and perfect the liens and security interests granted on account of the DIP Financing Liens and the Adequate Protection Obligations hereunder. Whether or not the DIP Financing Agent, the Prepetition First Lien Facility Agent, or the Prepetition Second Lien Facility Agent, as applicable, shall, in their respective sole discretion, file such financing statements, intellectual property filings, mortgages, notices of lien, or similar instruments, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute, subordination, contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law as of the date of entry of this Interim Order. If the DIP Financing Agent, the Prepetition First Lien Facility Agent, or the Prepetition Second Lien Facility Agent, as applicable, determines to file any financing statements, notice of liens or similar instruments, the Debtors will cooperate and assist in any such filings as reasonably requested by the DIP Financing Agent, the Prepetition First Lien Facility Agent, or the Prepetition Second Lien Facility Agent, and the automatic stay shall be modified to allow such filings.

(b)     The DIP Financing Agent, the Prepetition First Lien Facility Administrative Agent, the Prepetition First Lien Facility Loan Administrator, or the Prepetition Second Lien Facility Agent, as applicable, may, in their discretion, cause a certified copy of this Interim Order to be filed with or recorded in filing or recording

offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording.

(c) The Debtors shall execute and deliver to the DIP Financing Agent, the Prepetition First Lien Facility Administrative Agent, the Prepetition First Lien Facility Loan Administrator, and the Prepetition Second Lien Facility Agent, as applicable, all such agreements, financing statements, instruments and other documents as the DIP Financing Agent, the Prepetition First Lien Facility Administrative Agent, the Prepetition First Lien Facility Loan Administrator, and the Prepetition Second Lien Facility Agent, as applicable, may reasonably request to evidence, confirm, validate, or perfect the DIP Financing Liens and the Adequate Protection Liens, as applicable.

20. *Preservation of Rights Granted Under this Interim Order.* Subject to Paragraph 35 of this Interim Order, to the extent applicable:

(a) Notwithstanding any order dismissing any of these chapter 11 cases under section 1112 of the Bankruptcy Code or otherwise entered at any time, but subject to the Carve-Out in all respects, (x) the DIP Financing Liens, the Superpriority Claim, the Adequate Protection Liens, and the other administrative claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Financing Obligations and the Adequate Protection Obligations shall have been indefeasibly paid and satisfied in full in cash, as applicable, and (y) the Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens, and security interests referred to in clause (x) above.

(b)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect: (i) the validity, priority, or enforceability of the DIP Financing Liens or DIP Financing Obligations or any Adequate Protection Obligations incurred prior to the actual receipt of written notice by counsel to the Backstoppers and the DIP Financing Agent (with respect to the DIP Financing Obligations) and counsel to the Backstoppers and the Prepetition Agents, of the effective date of such reversal, stay, modification or vacatur; or (ii) the validity, priority or enforceability of the DIP Financing Liens and the Adequate Protection Liens, as applicable.  Notwithstanding any such reversal, stay, modification or vacatur, any use of the Collateral (including the Cash Collateral), the DIP Financing Liens, or the Adequate Protection Obligations incurred by the Debtors hereunder, as the case may be, prior to the actual receipt of written notice by counsel to the Backstoppers and the DIP Financing Agent (with respect to the DIP Financing Obligations) and the counsel to the Backstoppers and the Prepetition Agents (with respect to the Adequate Protection Obligations) of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Interim Order, and the DIP Financing Lenders, the DIP Financing Agent, and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in section 363(m) of the Bankruptcy Code with respect to all uses of the Collateral (including the Cash Collateral), all Adequate Protection Obligations, and the DIP Financing Obligations.

(c)    Except as expressly provided in this Interim Order, and subject to the Carve-Out, the DIP Financing Liens and the Adequate Protection Liens and all other

63

rights and remedies of the DIP Financing Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order shall survive, and shall not be modified, impaired, or discharged by the entry of an order converting any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of these chapter 11 cases. The terms and provisions of this Interim Order shall continue in these chapter 11 cases and in any Successor Cases, and the DIP Financing Liens and the Adequate Protection Liens, the Superpriority Claim, and the other administrative claims granted pursuant to this Interim Order, and all other rights and remedies of the DIP Financing Agent, the DIP Financing Lenders, and the Prepetition Secured Parties granted by the provisions of this Interim Order shall continue in full force and effect, unless and until the Interim Order is superseded by a Final Order.

21.     *Effect of Stipulations.* This Paragraph 21 is subject in all respects to Paragraph 35. The Debtors' acknowledgments, stipulations, and releases set forth in Paragraphs 4, 5, and 6 of this Interim Order shall be binding on the Debtors and their respective representatives, successors, and assigns and, subject to any action timely commenced before the expiration of the Challenge Period (as defined herein) by: (x) the Creditors' Committee, if any; or (y) a party in interest with requisite standing other than the Creditors' Committee, if any, on each of the Debtors' estates, all creditors thereof and each of their respective representatives, successors, and assigns, including any trustee appointed or elected for any of the Debtors, whether such trustee or representative is appointed in chapter 11 or chapter 7 (a "Trustee"). Notwithstanding anything to the contrary contained in this Paragraph 21, the Debtors' acknowledgements, stipulations, and releases set forth in Paragraphs 4, 5, and 6 of this Interim Order shall not be binding on the Debtors and their respective representatives, successors, and assigns, or any other party, and

shall be void *ab initio* and of no force and effect, and shall be of no use by any party for any purpose whatsoever, if the RSA is terminated by any Restructuring Support Party, regardless of when such RSA termination occurs. The stipulations and admissions contained in this Interim Order, including in Paragraphs 4, 5, and 6 hereof, shall be binding upon all other parties in interest, including any Trustee, unless (a) the Creditors' Committee, if any, or any other party in interest (including any Trustee), in each case, with requisite standing, has duly filed an adversary proceeding challenging the validity, enforceability, priority or extent of the Prepetition Secured Obligations or the liens on the Collateral securing the Prepetition Secured Obligations held by or on behalf of the Prepetition Secured Parties or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Secured Parties in connection with any matter related to the Obligations or the Collateral by no later than the later of (i) seventy-five (75) days after the date of entry of this Interim Order, and (ii) any such later date agreed to in writing by each of the Backstoppers, the Prepetition First Lien Facility Agent, and the Prepetition Second Lien Facility Agent, in their respective sole and absolute discretion (the time period established by the later of the foregoing clauses (i) and (ii), the "Challenge Period"); *provided, however,* that in the event that, prior to the expiration of the Challenge Period, (x) these chapter 11 cases are converted to chapter 7 or (y) a chapter 11 trustee is appointed in these chapter 11 cases, then, in each such case, the Challenge Period shall be extended for a period of 60 days commencing on the occurrence of either of the events described in the foregoing (x) and (y); and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding. If no such adversary proceeding is timely filed prior to the expiration of

65

the Challenge Period, without further order of the Court (x) the Prepetition Secured Obligations shall constitute allowed claims, not subject to any Claims and Defenses (whether characterized as a counterclaim, setoff, subordination, recharacterization, defense, avoidance, contest, attack, objection, recoupment, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, subordination (whether equitable, contractual or otherwise), or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law, for all purposes in these chapter 11 cases and any subsequent chapter 7 case, if any; and (y) the Prepetition Secured Obligations, the Prepetition Liens, and the Prepetition Secured Lenders shall not be subject to any other or further challenge and any party in interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including any successor thereto (including any estate representative or a Trustee, whether such Trustee is appointed or elected prior to or following the expiration of the Challenge Period). If any such adversary proceeding is timely filed prior to the expiration of the Challenge Period, the stipulations and admissions contained in this Interim Order, including in Paragraphs 4, 5, and 6 hereof, shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Creditors' Committee, if any, and any other Person (as defined in the Prepetition Loan Documents) or party in these cases, including any Trustee, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding. Nothing in this Interim Order vests or confers on any Person, including a Creditors' Committee (if any) or Trustee, standing or authority to pursue any cause of action belonging to the Debtors or their estates.

22. *Limitation on Charging Expenses against Collateral.* Subject to entry of the Final Order, except to the extent of the Carve-Out, no expenses of administration of the Debtors'

66

chapter 11 cases or any Successor Case that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Financing Collateral or the Prepetition Collateral, as the case may be, pursuant to sections 105 and 506(c) of the Bankruptcy Code or any similar principle of law.

23.     *Limitations under Section 552(b) of the Bankruptcy Code.* Subject to entry of the Final Order, the Prepetition First Lien Facility Agent, the Prepetition Second Lien Facility Agent, the Prepetition Secured Parties, the DIP Financing Agent, and the DIP Financing Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition First Lien Facility Agent, the Prepetition Second Lien Facility Agent, the Prepetition Secured Lenders, the DIP Financing Agent, and the DIP Financing Lenders with respect to (i) proceeds, products, offspring or profits of any of the Prepetition Collateral, including the Cash Collateral, or the DIP Financing Collateral, as applicable, or (ii) the extension of the Adequate Protection Liens to cover proceeds of the Prepetition Collateral.

24.     *Credit Bidding.* In accordance with and subject to paragraph 11 of this Interim Order, the (a) DIP Financing Agent (as directed by the applicable DIP Financing Lenders pursuant to the DIP Financing Documents) shall have the unqualified right to credit bid up to the full amount of any remaining DIP Financing Obligations in the sale of any of the Debtors' assets, including pursuant to (i) section 363 of the Bankruptcy Code, (ii) a chapter 11 plan pursuant to section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code and (b) subject to the indefeasible payment in full in cash of the DIP Financing Obligations, and subject to the Final Order and to the Challenge rights set forth in Paragraph 21 hereto, the Prepetition First Lien Facility Agent and the

Prepetition Second Lien Facility Agent (each as directed by the applicable Prepetition Secured Parties pursuant to the Prepetition Loan Documents) shall have the right to use, in their respective order of priority, the Prepetition Secured Obligations to credit bid in the sale of any of the Debtors' assets, which secure their prepetition obligations, including pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code. In consideration of the DIP Financing Loans and as additional adequate protection to the Prepetition Secured Parties, it shall be an Event of Default for any of the DIP Financing Agent or the Prepetition Secured Parties to not be allowed the right to credit bid their respective DIP Financing Obligations or Prepetition Secured Obligations in the manner set forth herein, except, as to the Prepetition Secured Obligations, subject to the Challenge rights set forth in Paragraph 21 hereto.

25.     *Marshaling.*   Subject to entry of the Final Order, none of the DIP Financing Collateral, the Prepetition Collateral, the DIP Financing Lenders, the DIP Financing Agent, or the Prepetition Secured Lenders shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine, except that (a) the Prepetition Second Lien Facility Secured Lenders may be subject to marshaling with respect to their Adequate Protection Liens, to the extent provided under Paragraph 13(b)(ii) of this Interim Order; and (b) the Prepetition First Lien Facility Secured Lenders and the DIP Financing Parties upon repayment of the Prepetition First Lien Facility, will be subject to marshaling pursuant to Section 12 of that certain seventh amendment to the Prepetition First Lien Facility, dated as of December 1, 2015, and repayment in full of the Prepetition First Lien Facility Secured Obligations.

26.  *Information and Other Covenants.*  The Debtors shall comply with the reporting requirements set forth in the DIP Financing Agreement.  The Debtors shall maintain their cash management arrangements in a manner consistent with that described in Cash Management Motion and any successor or final orders with respect thereto.

27.  *Indemnification.*  Subject to entry of the Final Order, the Debtors shall indemnify the DIP Financing Agent, the DIP Financing Lenders, and the Backstoppers and their respective affiliates, successors, and assigns, and the officers, directors, employees, agents, advisors, controlling persons and members of each of the foregoing (each, in their capacity as such, an "Indemnified Person") and hold each of them harmless from and against all costs, expenses (including reasonable fees, disbursements and other charges of counsel) and liabilities of such Indemnified Person arising out of or relating to any claim or any litigation or other proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Debtors or any of their affiliates or shareholders) that relates to the DIP Financing Documents or this Interim Order, including the financial accommodations to the Debtors contemplated hereby, the Debtors' chapter 11 cases, or any transactions in connection therewith; *provided, however,* that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from such Indemnified Person's gross negligence or willful misconduct.  Nothing herein is meant to limit the scope of any indemnity provided for the benefit of the DIP Financing Agent or the DIP Financing Lenders in the DIP Financing Documents.  For the avoidance of doubt, this Paragraph 27 does not apply or otherwise affect any indemnification rights or obligations in respect of the Prepetition Secured Parties under the Prepetition Loan Documents.

28.     *Limitation on Use of the DIP Financing Loans, the DIP Financing Collateral, the Prepetition Collateral (Including the Cash Collateral).*  The Debtors shall use the DIP Financing Loans and the Prepetition Collateral, including the Cash Collateral, solely as provided in this Interim Order, the Budget subject to Permitted Variances, and the DIP Financing Documents. Notwithstanding anything herein or in any other order of the Court to the contrary, neither the DIP Financing Loans, the DIP Financing Collateral, the Prepetition Collateral, including the Cash Collateral, nor the Carve-Out may be used to (a) object, contest, or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Financing Documents, the Prepetition Loan Documents or the liens or claims granted under this Interim Order, the DIP Financing Documents or Prepetition Loan Documents, (b) assert any Claims and Defenses or any other causes of action against the DIP Financing Agent, the DIP Financing Lenders, the Prepetition First Lien Facility Agent, the Prepetition Second Lien Facility Agent, the Prepetition Secured Parties, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Financing Agent's, the Prepetition First Lien Facility Agent's, or the Prepetition Second Lien Facility Agent's assertion, enforcement, or realization on the Prepetition Collateral or the DIP Financing Collateral in accordance with the DIP Financing Documents, the Prepetition Loan Documents or this Interim Order, (d) seek to modify any of the rights granted to the DIP Financing Agent, the DIP Financing Lenders, the Prepetition First Lien Facility Agent, or the Prepetition Second Lien Facility Agent hereunder or under the DIP Financing Documents or the Prepetition Loan Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of the Court and (ii)

70

permitted under the DIP Financing Documents and the Budget subject to Permitted Variances; *provided, however*, that notwithstanding anything to the contrary herein, the Debtors shall be authorized to use Cash Collateral or proceeds from the DIP Financing Facility to pay fees or expenses, (x) up to $20,000 per month (a "Committee Monthly Cap"), on account of Professionals retained by any Creditors' Committee and (y) up to $20,000 (the "Investigation Budget") for the Creditors' Committee, if any, to investigate Claims and Defenses against the Prepetition Secured Parties before the termination of the Challenge Period (as defined herein). Notwithstanding anything to the contrary herein, neither the Debtors nor any other person shall be authorized to use Cash Collateral or proceeds from the DIP Financing Facility to pay fees or expenses to initiate or prosecute proceedings or actions on account of any Claims or Defenses against the Prepetition Secured Parties.

29.    *Binding Effect; Successors and Assigns.*  Subject to paragraph 35, the provisions of this Interim Order, the DIP Financing Agreement, and the other DIP Financing Documents shall be binding upon all parties in interest in the Debtors' chapter 11 cases and any Successor Cases, including the Prepetition Secured Parties, any Creditors' Committee, the Debtors and their respective successors and assigns (including any Trustee hereinafter appointed or elected for the estates of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors).

30.    *Modifications of DIP Financing Documents.*  Notwithstanding anything to the contrary contained in the RSA, the parties required under the DIP Financing Documents are hereby authorized to implement, in accordance with the terms of the DIP Financing Documents, any non-material modifications (including without limitation, any change in the number or

71

composition of the DIP Financing Lenders or the DIP Financing Agent) of the DIP Financing Documents (other than this Interim Order and the Final Order) without further notice, motion or application to, order of or hearing before, the Court, and without the consent of the Prepetition Secured Parties. Any material modification or amendment to the DIP Financing Documents shall only be permitted pursuant to an order of the Court, after being submitted to the Court upon notice to counsel for the Creditors' Committee, if any, the U.S. Trustee, the Prepetition Agents and the Prepetition Indenture Trustee; *provided, however*, that any forbearance from, or waiver of, (a) a breach by the Debtors of a covenant representation or any other agreement or (b) a default or an Event of Default, in each case under the DIP Financing Documents shall not require an order of the Court.

31. *Limitation of Liability.* In determining to make any loan under the DIP Financing Agreement, permitting the use of Cash Collateral, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, the DIP Financing Documents or the Prepetition Loan Documents, the DIP Financing Agent, the DIP Financing Lenders, the Backstoppers, the Prepetition Agents, and the Prepetition Secured Parties shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute). Furthermore, nothing in this Interim Order, the DIP Financing Documents, or the Prepetition Loan Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Financing Agent, the DIP Financing Lenders, the Backstoppers, or the Prepetition

Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

32.     *Rights Reserved.*  Notwithstanding anything herein to the contrary, but subject to Paragraphs 16 and 35  hereof, no term or provision of this Interim Order or the Budget shall prejudice the rights or interests of any party in interest with respect to the Intercreditor Agreement or the rights of offset or recoupment of any party.

33.     *Choice of Law; Jurisdiction.*  The DIP Financing Loans and DIP Financing Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code.

34.     *Controlling Effect of Interim Order.*  To the extent any provision of this Interim Order conflicts or is inconsistent with any provision of the Motion or the DIP Financing Documents, the provisions of this Interim Order shall control.

35.     *Entire Order Override.*  Notwithstanding anything to the contrary contained in this Interim Order, and notwithstanding that the override set forth in this Paragraph 35 may be stated in some Paragraphs of this Interim Order but not others, for the avoidance of doubt:

(a)     To the extent that the RSA is terminated by any party, the Debtors' stipulations, releases, and agreement to take actions, and the Court's findings and orders with regard to the Prepetition Secured Obligations, the Prepetition Liens, the Prepetition Collateral, and the Prepetition Notes Obligations (i) shall be of no further force and effect, and shall be void *ab initio*; (ii) may not be used by any party for any reason (including, without limitation, as evidence or with regard to the strengths or weaknesses

of any of the various parties' positions, arguments, or claims), including, among other things, in any court or other forum whatsoever; (iii) are included in this Interim Order only as part of a settlement reached among the Noteholder Backstoppers, the Second Lien Backstoppers, and the Debtors, which settlement shall be of no further force and effect, and shall be void *ab initio*; and (iv) shall be subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery, disgorgement, attachment, "claim" (as defined by section 101(5) of the Bankruptcy Code), impairment, or subordination (whether equitable, contractual, or otherwise) or other challenge of any kind pursuant to the Bankruptcy Code or applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law);

(b)     to the extent the RSA is terminated by any party, any payments made on account of Adequate Protection, including without limitation, interest, fees and expenses, and other payments made prior to the termination of the RSA, shall be subject to recharacterization, and to the extent that recharacterization is an insufficient remedy because such payments exceed the amount of such secured parties prepetition secured claim as of the Petition Date (to the extent that the Secured Parties had a prepetition secured claim as of the Petition Date, which, for the avoidance of doubt, is not admitted, stipulated to, or conceded by any party if the RSA is terminated, and is subject to challenge of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law if the RSA is terminated), such payments shall be subject to disgorgement; *provided,*

*however*, that professional fees and expenses paid on account of Adequate Protection shall not be subject to recharacterization or disgorgement;

(c)    to the extent that the RSA is terminated by any party, the amount of the Adequate Protection Obligations, and the extent of First Lien Adequate Protection Liens and Second Lien Adequate Protection Liens shall be determined in accordance with the Bankruptcy Code and applicable law; and

(d)    to the extent that the RSA is terminated by any party, all parties in these chapter 11 cases reserve all rights with regard to any and all issues, controversies, and disputes regarding the claims and interests of the Prepetition Second Lien Facility Secured Parties and the Prepetition Noteholders, including the validity, enforceability, perfection, priority, and amount thereof, and the expiration of any challenge period that may have occurred pursuant to this Interim Order shall be of no further force and effect with regard to any party in these chapter 11 cases.

36.

(a)    EHH (together with its subsidiaries, "Eureka"), asserts that, with respect to amounts outstanding as of the Petition Date, (i) Eureka has liens and other interests pursuant to certain statutes and other applicable law in the gas, linefill and other goods contained within and in connection with the Eureka Pipeline and the proceeds and products thereof (the "Eureka Bailee Collateral") and (ii) Eureka is entitled to adequate protection of their interests in the Eureka Bailee Collateral (it being understood that the Eureka Bailee Collateral may include Cash Collateral) as of the Petition Date, in an amount equal to the aggregate postpetition diminution in value (if any) of such interests from and after the Petition Date, consisting of any such diminution resulting from the use

75

by the Debtors of the Eureka Bailee Collateral, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Debtors' incurrence of the DIP Financing Loans, and the use of the Cash Collateral pursuant to this Interim Order (such diminution in value, the "Asserted Eureka Adequate Protection Obligations"). For the avoidance of doubt, nothing herein shall be deemed a concession by the Debtors or any party in interest that Eureka's asserted liens or claims (contractual, common law, statutory or otherwise) are valid and the Debtors and all parties in interest reserve all rights to contest the extent, validity, amount or perfection or seek avoidance of all such asserted liens and claims.

(b)     On account of the Asserted Eureka Adequate Protection Obligations, if any, Eureka shall receive the following forms of Adequate Protection: (i) subject and junior in priority in all respects to the Carve-Out and any DIP Financing Claims, an allowed superpriority administrative claim (pursuant to sections 503(b), 507(a), and 507(b) of the Bankruptcy Code) as provided for by section 507(b) of the Bankruptcy Code on account of the Eureka Adequate Protection Obligations ("Eureka 507(b) Claims") and (ii) subject and junior and priority in all respects to the Carve-Out and any DIP Financing Claims, valid, binding, continuing, enforceable, fully-perfected, non-avoidable additional and replacement liens on, and security interests in Eureka Bailee Collateral whether now held or hereafter acquired ("Eureka Adequate Protection Liens") and with the same priority in relation to the First Lien Facility Adequate Protection Liens and Second Lien Facility Adequate Protection Liens as the liens and other interests of Eureka in the Eureka Bailee Collateral had in relation to the liens in such collateral of the First Lien Facility and the Second Lien Facility in the Eureka Bailee Collateral, as of the

Petition Date. The benefits and protections of Paragraph 19, 20 and 29 shall apply for the benefit and protection of Eureka *mutatis mutandis* to the same extent as such benefits and protections apply to the lenders referenced therein. Nothing in this Interim Order shall constitute a concession by the Debtors or any other Person as to the validity, amount or priority of the liens, claims, and other interests of Eureka in the Eureka Bailee Collateral as of the Petition Date and the Debtors, Eureka, MSI and all other Persons reserve all rights with respect to the Eureka Bailee Collateral, including the right to seek further adequate protection.

37. For the avoidance of doubt, nothing in this order shall be deemed a consent by MSI to any transaction involving the EHH Equity, including the consent to any foreclosure or other sale, transfer or monetization of the EHH Equity (whether by credit bid, section 363 sale or otherwise) or a waiver of any rights of MSI or any other Person under or in respect of the Eureka LLC Agreement pursuant to the terms thereof or applicable law. In the event that MSI consents, in its sole discretion, to the grant of a lien on EHH Equity, the possibility of which is contemplated by Paragraph 10(b), 10(c) and 12(b) of this Interim Order, the terms of such consent and the scope of, and rights arising under, any such consented liens (if any) will be as set forth in a written instrument executed by MSI, the DIP Financing Lenders and any other required party.

38. No DIP Facility proceeds may be transferred to or used for the benefit of non-Debtor subsidiary entities.

39. *Jurisdiction.* This Court shall have and retain exclusive jurisdiction to enforce the terms of this Interim Order and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Interim Order, including with respect to any and all

disputes or matters under, or arising out of or in connection with, either the DIP Financing Loans or DIP Financing Documents.

40.    *Final Hearing.*  The Final Hearing shall be heard before the Court on January __11__, 2016 at 1 p.m. in Courtroom __3__ at the United States Bankruptcy Court, 824 Market Street, Wilmington, Delaware 19801.

41.    *Service.*  Service of this Interim Order and notice of the Final Hearing shall be made on the top 50 unsecured creditors, any Committee (if and when it is appointed), the Internal Revenue Service, the state taxing authorities in the states in which the Debtors do business, the Securities and Exchange Commission, any federal or state regulatory authorities governing the Debtors' industry, the U.S. Attorney's Office, Delaware Attorney General, U.S. Trustee, and any party who files a request for service under Bankruptcy Rule 2002.

42.    *Objections.*  Any objections or responses to entry of the Final Order shall be filed on or before 12:00 p.m., prevailing Eastern Time, on Jan. 6, 2016, and shall be served on: (a) the Debtors, Magnum Hunter Resources Corporation, 909 Lake Carolyn Parkway, Suite 600, Irving, Texas 75039, Attn:  Paul Johnston; (b) proposed counsel to the Debtors, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:  Edward O. Sassower, P.C. and Brian E. Schartz, and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn:  Justin R. Bernbrock and Alexandra Schwarzman; (c) proposed co-counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801), Attn:  Laura Davis Jones; (d) counsel to the Prepetition First Lien Facility Loan Administrator, Shipman & Goodwin LLP, One Constitution Plaza, Hartford, Connecticut 06103, Attn:  Nathan Z. Plotkin; (e) counsel to the Prepetition Second Lien Facility Agent, Latham & Watkins LLP, 811 Main Street, Suite 3700, Houston,

Texas 77002, Attn:  J. Michael Chambers; (f) counsel to the Second Lien Backstoppers, Weil,

Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, Attn: Gary T. Holtzer

and Joseph H. Smolinsky; (g) counsel to the Prepetition Indenture Trustee, Ropes & Gray LLP,

Prudential Tower, 800 Boylston Street, Boston, Massachusetts 02199, Attn: Michael Roh and

Chenelle Idehen; (h) counsel to the Noteholder Backstoppers, Akin Gump Strauss Hauer & Feld

LLP, One Bryant Park, Bank of America Tower, New York, New York 10036, Attn:  Michael

Stamer and Arik Preis; (i) counsel to the DIP Financing Agent, Shipman & Goodwin LLP, One

Constitution Plaza, Hartford, Connecticut 061031, Attn: Nathan Plotkin; (j) counsel to any

statutory committee appointed in these cases; and (k) Office of The United States Trustee, 844

King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801, Attn:  Juliet Sarkessian,

Esq.  In the event no objections to entry of the Final Order are timely received, the Court may

enter such Final Order without need for the Final Hearing.

Dated: **Dec. 16**, 2015
      Wilmington, Delaware

                  THE HONORABLE KEVIN GROSS
                  UNITED STATES BANKRUPTCY JUDGE