# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNUM HUNTER RESOURCES CORPORATION, *et al.*,[1] | ) | Case No. 15-12533 (KG) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF MAGNUM HUNTER RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES

Edward O. Sassower, P.C. (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
    brian.schartz@kirkland.com

- and -

James H.M. Sprayregen, P.C.
Nora S. Tauke Schweighart (admitted *pro hac vice*)
Justin R. Bernbrock (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
    nora.schweighart@kirkland.com
    justin.bernbrock@kirkland.com
    alexandra.schwarzman@kirkland.com

Laura Davis Jones (DE Bar No. 2436)
Colin R. Robinson (DE Bar No. 5524)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
    crobinson@pszjlaw.com
    jmulvihill@pszjlaw.com

*Proposed Co-Counsel to the Debtors*

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Magnum Hunter Resources Corporation (9278); Alpha Hunter Drilling, LLC (7505); Bakken Hunter Canada, Inc. (7777); Bakken Hunter, LLC (3862); Energy Hunter Securities, Inc. (9725); Hunter Aviation, LLC (8600); Hunter Real Estate, LLC (8073); Magnum Hunter Marketing, LLC (2527); Magnum Hunter Production, Inc. (7062); Magnum Hunter Resources GP, LLC (5887); Magnum Hunter Resources, LP (5958); Magnum Hunter Services, LLC (5725); NGAS Gathering, LLC (2054); NGAS Hunter, LLC (3737); PRC Williston LLC (1736); Shale Hunter, LLC (1952); Triad Holdings, LLC (8947); Triad Hunter, LLC (5830); Viking International Resources Co., Inc. (0097); and Williston Hunter ND, LLC (3798). The location of the Debtors' service address is: 909 Lake Carolyn Parkway, Suite 600, Irving, Texas 75039.

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT[2]

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE JOINT PLAN OF REORGANIZATION OF MAGNUM HUNTER RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.

THE PLAN IS SUPPORTED BY THE DEBTORS, THE BACKSTOPPERS, 100 PERCENT OF THE DIP FACILITY LENDERS, APPROXIMATELY 66.5 PERCENT OF THE SECOND LIEN LENDERS, AND APPROXIMATELY 79 PERCENT OF THE NOTEHOLDERS. THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY. FURTHERMORE, THE COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER. THE DEBTORS OR ANY OTHER AUTHORIZED PARTY MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING

---

[2]  Capitalized terms used but not defined in this disclaimer shall have the meaning ascribed to them elsewhere in this Disclosure Statement.

STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.    INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.    THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN AND THE RESTRUCTURING SUPPORT AGREEMENT.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, WHO VOTE TO REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTION CONTEMPLATED THEREBY.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.    THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING ARTICLE IX, ENTITLED "RISK FACTORS," WHICH BEGINS ON PAGE 34, BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE COURT OF THE MERITS OF THE PLAN.

SUMMARIES OF THE PLAN AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN.    THE SUMMARIES OF THE FINANCIAL INFORMATION AND THE DOCUMENTS ANNEXED TO THIS DISCLOSURE STATEMENT OR OTHERWISE INCORPORATED HEREIN BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.    THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE IS NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.    EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN ACCORDANCE WITH APPLICABLE LAW, THE DEBTORS ARE UNDER NO DUTY TO UPDATE OR SUPPLEMENT THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES TO, AND CONFIRMATION OF, THE PLAN AND MAY NOT BE RELIED ON FOR ANY OTHER PURPOSE.    IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.    THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

UPON CONFIRMATION OF THE PLAN, CERTAIN OF THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, 15 U.S.C. §§ 77A–77AA, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "SECURITIES ACT"), OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN LAWS, IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145 OF THE BANKRUPTCY CODE.  OTHER SECURITIES MAY BE ISSUED PURSUANT TO OTHER APPLICABLE EXEMPTIONS UNDER THE FEDERAL SECURITIES LAWS.  TO THE EXTENT EXEMPTIONS FROM REGISTRATION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR APPLICABLE FEDERAL SECURITIES LAW DO NOT APPLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO A VALID EXEMPTION OR UPON REGISTRATION UNDER THE SECURITIES ACT.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- ESTIMATED FUTURE RESERVES AND PRESENT VALUE THEREOF;

- TECHNOLOGY;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, PROJECTIONS, AND OPERATING RESULTS;

- OIL, NATURAL GAS, AND NATURAL GAS LIQUIDS PRICES;

- TIMING AND AMOUNT OF FUTURE PRODUCTION OF OIL AND NATURAL GAS;

- AVAILABILITY OF DRILLING AND PRODUCTION EQUIPMENT;

- AVAILABILITY OF OILFIELD LABOR;

- AVAILABILITY OF THIRD-PARTY NATURAL GAS GATHERING, PROCESSING, AND TRANSPORTATION CAPACITY;

- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES, INCLUDING FUTURE EXPLORATION AND DEVELOPMENT COSTS;

- AVAILABILITY AND TERMS OF CAPITAL;

- DRILLING OF WELLS, INCLUDING THE DEBTORS' IDENTIFIED DRILLING LOCATIONS;

- SUCCESSFUL RESULTS FROM THE DEBTORS' IDENTIFIED DRILLING LOCATIONS;

- MARKETING OF OIL, NATURAL GAS, AND NATURAL GAS LIQUIDS;

- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;

- INFRASTRUCTURE FOR DISPOSAL OF SALT WATER AND OTHER BYPRODUCTS OF EXPLORATION AND PRODUCTION ACTIVITIES;

- SOURCES OF ELECTRICITY UTILIZED IN OPERATIONS AND THE RELATED INFRASTRUCTURES;

- COSTS OF DEVELOPING THE DEBTORS' PROPERTIES AND CONDUCTING OTHER

OPERATIONS;

- GENERAL ECONOMIC AND BUSINESS CONDITIONS;

- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;

- ENVIRONMENTAL LIABILITIES;

- COUNTERPARTY CREDIT RISK;

- THE OUTCOME OF PENDING AND FUTURE LITIGATION;

- GOVERNMENTAL REGULATION AND TAXATION OF THE OIL AND NATURAL GAS INDUSTRY;

- DEVELOPMENTS IN OIL-PRODUCING AND NATURAL GAS-PRODUCING COUNTRIES;

- UNCERTAINTY REGARDING THE DEBTORS' FUTURE OPERATING RESULTS;

- PLANS, OBJECTIVES, AND EXPECTATIONS;

- VARIATIONS IN THE MARKET DEMAND FOR, AND PRICES OF, OIL, NATURAL GAS, AND NATURAL GAS LIQUIDS;

- UNCERTAINTIES ABOUT THE DEBTORS' ESTIMATED QUANTITIES OF OIL AND NATURAL GAS RESERVES;

- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY;

- ACCESS TO CAPITAL;

- UNCERTAINTIES ABOUT THE DEBTORS' ABILITY TO REPLACE RESERVES AND ECONOMICALLY DEVELOP THEIR CURRENT RESERVES;

- RISKS IN CONNECTION WITH ACQUISITIONS;

- DRILLING RESULTS;

- THE POTENTIAL ADOPTION OF NEW GOVERNMENTAL REGULATIONS; AND

- THE DEBTORS' ABILITY TO SATISFY FUTURE CASH OBLIGATIONS AND ENVIRONMENTAL COSTS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE REORGANIZED DEBTORS' FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE THE REORGANIZED DEBTORS' ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE: THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE PLAN MAY BE CONVERTED TO A PROCESS TO SELL SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS UNDER SECTION 363 OF THE BANKRUPTCY CODE; THE DEBTORS' ABILITY TO REDUCE THEIR OVERALL FINANCIAL LEVERAGE; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES, AND THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; CUSTOMER RESPONSES TO THE CHAPTER 11 CASES; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS, AND MARKET CONDITIONS; CURRENCY FLUCTUATIONS; INTEREST RATE FLUCTUATIONS; PRICE INCREASES; EXPOSURE TO LITIGATION; A DECLINE IN THE DEBTORS' MARKET SHARE DUE TO COMPETITION OR PRICE PRESSURE BY CUSTOMERS; THE DEBTORS' ABILITY TO IMPLEMENT COST REDUCTION INITIATIVES IN A TIMELY MANNER; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; FINANCIAL CONDITIONS OF THE DEBTORS' CUSTOMERS; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; TRADE

**BALANCE; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION..............................................................................................................1

II.   PRELIMINARY STATEMENT ......................................................................................1

III.  OVERVIEW OF THE PLAN..........................................................................................3

IV.   QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
      PLAN................................................................................................................................5

      A.    What is chapter 11?..................................................................................................5
      B.    Why are the Debtors sending me this Disclosure Statement?..................................5
      C.    Am I entitled to vote on the Plan?...........................................................................5
      D.    What will I receive from the Debtors if the Plan is consummated? ........................6
      E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP
            Facility Claim, or a Priority Tax Claim?..................................................................9
      F.    Are any regulatory approvals required to consummate the Plan? ..........................10
      G.    What happens to my recovery if the Plan is not confirmed or does not go effective? ...................10
      H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
            Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
            "Consummation?"...................................................................................................10
      I.    What are the sources of Cash and other consideration required to fund the Plan?.........................10
      J.    Are there risks to owning the New Common Equity upon emergence from chapter 11? ..............11
      K.    Is there potential litigation related to the Plan?....................................................11
      L.    What is the Management Incentive Plan and how will it affect the distribution I receive
            under the Plan?.......................................................................................................11
      M.    Will the final amount of Allowed General Unsecured Claims affect the recovery of
            holders of Allowed General Unsecured Claims under the Plan? ...........................11
      N.    How will Claims asserted with respect to rejection damages affect my recovery under the
            Plan?.......................................................................................................................12
      O.    How will the resolution of certain contingent, unliquidated, and disputed litigation
            Claims affect my recovery under the Plan?...........................................................12
      P.    How will the preservation of the Causes of Action impact my recovery under the Plan? ............12
      Q.    How will the release of Avoidance Actions affect my recovery under the Plan? ..................13
      R.    Will there be releases and exculpation granted to parties in interest as part of the Plan? .............13
      S.    What impact does the Claims Bar Date have on my Claim? ..................................17
      T.    What is the deadline to vote on the Plan? .............................................................17
      U.    How do I vote for or against the Plan? ..................................................................17
      V.    Why is the Court holding a Confirmation Hearing? ..............................................18
      W.    When is the Confirmation Hearing set to occur? ...................................................18
      X.    What is the purpose of the Confirmation Hearing?................................................18
      Y.    What is the effect of the Plan on the Debtors' ongoing business? .........................18
      Z.    Will any party have significant influence over the corporate governance and operations of
            the Reorganized Debtors?......................................................................................19
      AA.   Who do I contact if I have additional questions with respect to this Disclosure Statement
            or the Plan? ...........................................................................................................19
      BB.   Do the Debtors recommend voting in favor of the Plan?.......................................19
      CC.   Who Supports the Plan?.........................................................................................19

V.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN ................................20

      A.    Restructuring Support Agreement..........................................................................20
      B.    The Plan .................................................................................................................20

**VI.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** ........... 23

A.    The Debtors ................................................................................................................. 23
B.    Assets and Operations ................................................................................................ 23
C.    Prepetition Capital Structure ..................................................................................... 25

**VII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS** ........................................................ 27

A.    Adverse Market Conditions ....................................................................................... 27
B.    Proactive Approach to Addressing Liquidity Constraints ........................................ 27
C.    The November Suspension by NHIP and Resulting Shut-In of Producing Wells .......... 29
D.    Agreement with Restructuring Support Parties on Restructuring Support Agreement and DIP Facility ........................................................................................................... 29

**VIII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES** ........................................................................................................................... 31

A.    Corporate Structure upon Emergence ....................................................................... 31
B.    Expected Timetable of the Chapter 11 Cases ........................................................... 31
C.    First Day Relief .......................................................................................................... 31
D.    Other Procedural and Administrative Motions ......................................................... 31
E.    Appointment of Official Committee ........................................................................... 32
F.    Eclipse Litigation ....................................................................................................... 32
G.    RSA Assumption Motion ........................................................................................... 33
H.    Other Litigation Matters ............................................................................................ 33
I.    Rejection and Assumption of Executory Contracts and Unexpired Leases .............. 33
J.    Subscription to the DIP Facility ................................................................................ 34

**IX.    RISK FACTORS** ..................................................................................................................... 34

A.    Bankruptcy Law Considerations ............................................................................... 34
B.    Risks Related to Recoveries under the Plan .............................................................. 37
C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses ................. 40

**X.    SOLICITATION AND VOTING PROCEDURES** ................................................................ 46

A.    Holders of Claims Entitled to Vote on the Plan ....................................................... 46
B.    Voting Record Date .................................................................................................... 47
C.    Voting on the Plan ...................................................................................................... 47
D.    Ballots Not Counted .................................................................................................. 47

**XI.    CONFIRMATION OF THE PLAN** ...................................................................................... 48

A.    Requirements for Confirmation of the Plan .............................................................. 48
B.    Best Interests of Creditors/Liquidation Analysis ..................................................... 48
C.    Feasibility ................................................................................................................... 49
D.    Acceptance by Impaired Classes ............................................................................... 49
E.    Confirmation Without Acceptance by All Impaired Classes .................................... 49
F.    Valuation of the Debtors ............................................................................................ 50

**XII.    CERTAIN SECURITIES LAW MATTERS** ........................................................................ 51

A.    New Common Equity .................................................................................................. 51
B.    Issuance and Resale of New Common Equity under the Plan ................................... 51

**XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ...................................................................................................................................... 53

A.    Introduction ................................................................................................................ 53

B.      Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized
        Debtors.................................................................................................................................54
C.      Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims ....................58
D.      Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims.............62
E.      Information Reporting and Back-Up Withholding ......................................................................65

**XIV.    RECOMMENDATION ...............................................................................................................67**

**EXHIBITS[3]**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Restructuring Support Agreement

EXHIBIT C    Corporate Organization Chart

EXHIBIT D    Disclosure Statement Order

EXHIBIT E    Liquidation Analysis

EXHIBIT F    Financial Projections

EXHIBIT G    Valuation Analysis

---

[3]    Each Exhibit is incorporated herein by reference.  To the extent any Exhibit is not filed with this Disclosure Statement on January 7, 2016, such Exhibit(s) will be filed by no later than January 14, 2016 (with the exception of Exhibit D, which will be filed upon entry of the Disclosure Statement Order by the Court).

## I.    INTRODUCTION

Magnum Hunter Resources Corporation ("MHRC") and its nineteen debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to holders of Claims against and Interests in the Debtors in connection with the solicitation of acceptances with respect to the *Joint Chapter 11 Plan of Reorganization of Magnum Hunter Resources Corporation and its Debtor Affiliates* (the "Plan"), dated January 7, 2016.[1]    A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for MHRC and each of the other Debtors.

**THE DEBTORS, THE BACKSTOPPERS, 100 PERCENT OF THE DIP FACILITY LENDERS, APPROXIMATELY 66.5 PERCENT OF THE SECOND LIEN LENDERS, AND APPROXIMATELY 79 PERCENT OF THE NOTEHOLDERS (COLLECTIVELY, THE "CONSENTING PARTIES") SUPPORT THE PLAN, AND THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

The Debtors are an oil and gas company headquartered in Irving, Texas that primarily is engaged in the acquisition, development, and production of oil and natural gas reserves in the United States.  The Debtors own interests in approximately 431,643 net acres in total and have proved reserves with an industry value of approximately $234.5 million as of December 31, 2015.[2]  In the aggregate, the Debtors generated approximately $391.5 million in revenue from their operations in 2014 and generated approximately $169.3 million in revenues from their operations for the ten months ended October 31, 2015.

In addition to traditional exploration, development, and production operations, the Debtors also engage in midstream operations in West Virginia and Ohio and oilfield services operations in West Virginia, Ohio, and Pennsylvania.  Specifically, MHRC owns an approximately 44.5 percent equity interest in Eureka Hunter Holdings, LLC ("EHH"), which owns, through its wholly-owned subsidiary Eureka Hunter Pipeline, LLC ("EHP"), a natural gas gathering pipeline system located in West Virginia and Ohio (the "Eureka Pipeline").[3]

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement shall have the meaning ascribed to such terms in the Plan. **The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern**.

[2]    This figure reflects the "PV-10" value of the Debtors' proved reserves, which is a common reference point for the value of an exploration and production company's proved oil and gas reserves for investment and disclosure purposes.  PV-10 is the present value of the exploration and production company's estimated future cash flows from estimated total proved reserves after deducting estimated production and ad valorem taxes, future capital costs, abandonment costs net of salvage value, gathering, transportation, and operating expenses, but before deducting any estimates of future income taxes. The estimated future cash flows are discounted at an annual rate of 10 percent to determine their "present value."  This figure is calculated using prices of oil and natural gas futures contracts on the New York Mercantile Exchange as of December 31, 2015.

[3]    MHRC's percentage ownership is sufficient to render EHH an "affiliate" as defined in section 101(2)(B) the Bankruptcy Code.  *See* 11 U.S.C. § 101(2)(B) (defining "affiliate" to include a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with the power to vote, by the debtor").  EHH,

Although the Debtors' operations remain strong and their production output continues to increase year-over-year, the Debtors have fallen victim to the same macroeconomic forces afflicting the rest of the oil and natural gas industry: historically low commodity prices coupled with relatively weak consumer demand.  Emblematic of these broader trends, crude oil prices have dropped to their lowest levels since 2009, with benchmark prices at around $34 per barrel as of January 6, 2016, and the near-term outlook for crude oil prices remains weak due to the record levels of worldwide inventories, resilient international production, including anticipated increases in Iranian production, seasonal realities, and decelerating global economic growth.  More importantly for the Debtors—whose operations are focused primarily on natural gas production—natural gas prices have plunged to a 16-year low as the warmest start to winter on record in the United States has cut demand for this heating fuel.  A chart illustrating the magnitude of the decline in oil and natural gas prices over the last several years follows:[4]



Further, the total number of drilling rigs in operation in the United States today is just 38 percent of the number of rigs that were in operation in the United States just one year ago.  Nevertheless, United States natural gas production hit a record high in August, despite the continued slump in natural gas prices and a decrease in the number of drilling rigs targeting natural gas formations.  With record warm weather throughout most of the United States continuing during the winter of 2015/2016 thus far, lower demand for natural gas has put significant pressure on natural gas prices, leading to a pricing environment as of the Petition Date that was below $1.90/MMBtu,[5] the lowest level seen since February 1992.

Despite the Debtors' efforts to mitigate these and other effects through non-core asset divestitures and operational "rightsizing," the capital-intensive nature of the Debtors' businesses together with the

---

however, is not a debtor in these Chapter 11 Cases.  Notwithstanding MHRC's ownership interest, EHH is an independent legal entity with its own corporate governance and fiduciary duties to the owners of its remaining approximately 55.5 percent equity.  Specifically, MHRC's joint venture partner, North Haven Infrastructure Partners II Buffalo Holdings LLC (f/k/a MSIP II Buffalo Holdings LLC) ("NHIP") currently owns approximately 54 percent of the equity, and also appoints three members of the six-member board of managers, which board of managers is the body having full, exclusive, and complete discretion to manage and conduct the business and affairs of EHH under that certain Second Amended and Restated Limited Liability Company Agreement of Eureka Hunter Holdings, LLC dated October 3, 2014 (as amended) (the "Eureka LLC Agreement").  More importantly, the Eureka LLC Agreement gives NHIP the sole authority to take any and all actions related to the exercise and/or enforcement of rights and/or remedies under certain agreements, including the Gas Gathering Agreements (as defined herein) and certain other agreements between EHH, EHP, and one or more of the Debtors.  Thus, MHRC and its principals do not exercise complete control over EHH's business decisions.

[4]    *See Commodity Futures Price Quotes for Crude Oil*, NASDAQ, http://www.nasdaq.com/markets/crude-oil.aspx?timeframe=2y (last visited Dec. 12, 2015); *Commodity Futures Price Quotes for Natural Gas*, NASDAQ, http://www.nasdaq.com/markets/natural-gas.aspx?timeframe=2y (last visited Dec. 12, 2015).

[5]    "MMBtu" is a unit of measurement meaning one million British thermal units.

Debtors' overleveraged capital structure have made it difficult to withstand the current economic climate. These macroeconomic factors, coupled with the Debtors' substantial debt obligations and natural gas gathering and transportation costs, strained their ability to sustain the weight of their capital structure and devote the capital necessary to maintain and grow their businesses. As a result, beginning in October 2015, the Debtors engaged financial advisors and legal counsel to advise management and the board of directors regarding potential strategic alternatives to enhance the Debtors' liquidity and address their capital structure.

The Debtors' efforts in this regard were successful, and are outlined in more detail elsewhere in this Disclosure Statement. Most importantly, as the culmination of these efforts, on December 15, 2015, the Debtors entered into the Restructuring Support Agreement, a copy of which is attached hereto as **Exhibit B**, with the Restructuring Support Parties, which together hold approximately 75 percent of the outstanding principal amount of the Debtors' prepetition funded indebtedness.[6] Since that time, the Debtors successfully have worked to document the restructuring transaction contemplated by the Restructuring Support Agreement, resulting in the filing of the Plan and this Disclosure Statement. The Plan contemplates the implementation of a value-maximizing debt-to-equity conversion of substantially all of the Debtors' pre- and postpetition funded indebtedness that will result in a significantly deleveraged balance sheet upon emergence. Successful implementation of the Debtors' proposed restructuring will avoid a sale of all or substantially all of the Debtors' assets, which likely would occur at a significant discount given current market conditions, allowing the Debtors to benefit from any of their assets' appreciation in value if the market improves. Importantly, under the Plan, holders of General Unsecured Claims are expected to receive a significant recovery in cash. In addition, the compromises and settlements embodied in the Restructuring Support Agreement, and to be implemented pursuant to the Plan, preserve value by enabling the Debtors to avoid costly and time-consuming litigation that would delay the Debtors' emergence from chapter 11.

The Plan represents a significant achievement for the Debtors in the face of historic commodity price declines and an increasingly depressed operating environment. The Debtors strongly believe that the Plan is in the best interests of the Debtors' estates, represents the best available alternative, and, with the unified support of the Restructuring Support Parties, will almost completely deleverage the Debtors' balance sheet at a critical time when the commodity cycle downturn is negatively affecting highly-leveraged companies within the oil and gas industry as a whole.

## III.    OVERVIEW OF THE PLAN

The Plan provides for the reorganization of the Debtors as a going concern and will significantly reduce long-term debt and annual interest payments, resulting in a stronger, de-levered balance sheet for the Debtors. Specifically, the Plan contemplates a restructuring of the Debtors through a debt-for-equity conversion of substantially all of the Debtors' remaining pre- and postpetition funded indebtedness. The key terms of the Plan are as set forth below.

### 1.    Substantial Debt-for-Equity Exchange

The key element of the Plan is the agreement of the Consenting Parties to convert their pre- and postpetition funded debt Claims, including the DIP Facility Claims, Second Lien Claims, and Note

---

[6]    Specifically, the Restructuring Support Agreement was executed by (a) holders of substantially all of the outstanding principal amount under the Bridge Financing Facility, (b) holders of approximately 66.5 percent of the outstanding principal amount under the Second Lien Credit Agreement, and (c) holders of approximately 79 percent of the outstanding principal amount of the Notes. The percentage support given by holders of Second Lien Claims and holders of Note Claims may increase after the subscription process for the DIP Facility has concluded, as subscribers will need to execute a joinder to the Restructuring Support Agreement for their Second Lien Claims or Note Claims, as applicable.

Claims, into New Common Equity. Specifically, the DIP Facility Lenders shall receive their Pro Rata share of 28.8 percent of the New Common Equity, the Second Lien Lenders shall receive their Pro Rata share of 36.87 percent of the New Common Equity, and the Noteholders shall receive their Pro Rata share of 31.33 percent of the New Common Equity (all of which is subject to dilution by the Management Incentive Plan).[7] Moreover, the holders of the Equipment and Real Estate Notes shall have their Claims Reinstated.

The issuance of the New Common Equity, including options, or other equity awards, if any, reserved under the Management Incentive Plan, shall be authorized on the Effective Date without the need for any further corporate action and without any further action by the holders of Claims or Interests.

### 2.    Treatment of General Unsecured Claims

The holders of General Unsecured Claims will receive their Pro Rata share of the Unsecured Creditor Cash Pool. It is currently intended that the Unsecured Creditor Cash Pool will be $20,000,000, which amount may be subject to the costs of any professional fees or other expenses incurred as part of the claims reconciliation process.

### 3.    Exit Financing

On the Effective Date, the Reorganized Debtors shall enter into the Exit Financing, the terms of which will be set forth in the Exit Financing Documents. The Exit Financing will be in form and substance (and in an amount) satisfactory to the Majority Backstoppers and the Confirmation Order shall approve the Debtors' negotiation of and entry into any Exit Financing Documents necessary to implement the Exit Financing.

### 4.    General Settlement of Claims and Interests

As described more fully in Article V.B.6 hereof and as otherwise provided in the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.

### 5.    Releases

The Plan contains certain releases (as described more fully in Article IV.R hereof), including mutual releases between the Debtors and Reorganized Debtors, on the one hand, and the Backstoppers, the Indenture Trustee, the Bridge Facility Agent, the DIP Facility Agent, the DIP Facility Lenders, the Exit Financing Agent, and the Exit Financing Lenders, on the other hand (each solely in their capacity as such). The Plan also provides that each holder of a Claim or an Interest that (i) votes to accept or is deemed to accept the Plan or (ii) votes to reject the Plan, is deemed to reject the Plan, or is in a voting Class that abstains from voting on the Plan but does not elect to opt out of the release provisions contained in Article VIII of the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

---

[7]    The Backstoppers will receive an Allowed superpriority Administrative Claim that will be exchanged on the Effective Date for the remaining three percent of the New Common Equity as a fee for backstopping the DIP Facility.

## IV.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement with all holders of claims and interests whose votes on the Plan are being solicited.  This Disclosure Statement is being submitted in accordance with these requirements.

### C.    Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold.  Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective voting status is set forth below.

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Equipment and Other Note Claims | Unimpaired | Presumed to Accept |
| 4 | Second Lien Claims | Impaired | Entitled to Vote |
| 5 | Note Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 8 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote |
| 9 | Interests in MHRC | Impaired | Deemed to Reject |

**D.     What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

**THE  PROJECTED  RECOVERIES  SET  FORTH  IN  THE  TABLE  BELOW  ARE ESTIMATES  ONLY  AND  THEREFORE  ARE  SUBJECT  TO  CHANGE.   FOR  A  COMPLETE DESCRIPTION  OF  THE  DEBTORS'  CLASSIFICATION  AND  TREATMENT  OF  CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.[8]**

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | **Projected Recovery Under the Plan** |
| 1 | Other Priority Claims | In   full   and   final   satisfaction,   compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall receive (A) payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the latest of:   (i) on or as soon as reasonably practicable after the Effective Date if such Allowed Other Priority Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Other Priority Claim is Allowed; and (iii) the date such Allowed Other Priority Claim becomes due and payable, or as soon thereafter   as   is   reasonably   practicable,   or (B) treatment pursuant to such other terms as may be agreed to by the holder of such Allowed Other Priority Claim, the Debtors, and the Majority | $[●] | [100]% |

---

[8]     The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means with respect to any Claim, except as otherwise provided in the Plan:  (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Court; *provided that* with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court.  Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable.  For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim.  "Allow" and "Allowing" shall have correlative meanings.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | Backstoppers. | | |
| 2 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment with the consent of the Majority Backstoppers, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such holder shall receive, at the Debtors' option and with the consent of the Majority Backstoppers, either: (i) payment in full in Cash of the unpaid portion of its Allowed Other Secured Claim on the latest of (a) on or as soon as reasonably practicable after the Effective Date if such Allowed Other Secured Claim is Allowed as of the Effective Date, (b) on or as soon as reasonably practicable after the date such Other Secured Claim is Allowed, and (c) the date such Allowed Other Secured Claim becomes due and payable, (ii) Reinstatement pursuant to section 1124 of the Bankruptcy Code, (iii) the return or abandonment of the collateral securing such Allowed Other Secured Claim, or (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | $[●] | [100]% |
| 3 | Equipment and Other Note Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed Equipment and Other Note Claim agrees to less favorable treatment with the consent of the Majority Backstoppers, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Equipment and Other Note Claim, each such claim shall be Reinstated pursuant to section 1124 of the Bankruptcy Code. | $[●] million | 100% |
| 4 | Second Lien Claims | On the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Second Lien Claim, each Second Lien Lender shall receive its Pro Rata share of the Second Lien Recovery Pool. | $[●] million | [●]%[9] |
| 5 | Note Claims | On the Effective Date, or as soon thereafter as | $[●] | [●]%[10] |

---

[9]    Calculated prior to Management Incentive Plan dilution.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | | reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Note Claim, each Noteholder shall receive its Pro Rata share of the Noteholder Recovery Pool. | million | |
| 6 | General Unsecured Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment with the consent of the Majority Backstoppers, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each such holder shall receive its Pro Rata share of the Unsecured Creditor Cash Pool, payable from the General Unsecured Claims Distribution Escrow Account. Satisfaction of such General Unsecured Claim is subject to the rights of the Debtors, the Reorganized Debtors, or any other party in interest to dispute such Claim as if the Chapter 11 Cases had not been commenced in accordance with applicable non-bankruptcy law. | $[●] | [●]% |
| 7 | Intercompany Claims | Intercompany Claims shall be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, with the consent of the Majority Backstoppers, shall be cancelled. No distribution shall be made on account of any Intercompany Claims. | $[●] | 100%/0% |
| 8 | Intercompany Interests | Intercompany Interests shall be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, with the consent of the Majority Backstoppers, shall be cancelled. No distribution shall be made on account of any Intercompany Interests. | $[●] | 100%/0% |
| 9 | Interests in | On the Effective Date, all Interests[11] in MHRC will be cancelled and the holders of Interests in MHRC | N/A | 0% |

---

[10]   Calculated prior to Management Incentive Plan dilution.

[11]   "Interests" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, including, without limitation, the Preferred Stock, and the Common Stock, and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any Claim against the Debtors that is subject to subordination pursuant to section

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| | MHRC | shall not receive or retain any distribution, property, or other value on account of their Interests in MHRC. | | |

    **E.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, DIP Facility Claim, or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims, DIP Backstop Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

    **1.    Administrative Claims**

Administrative Claims will be satisfied as set forth in Article II.A of the Plan, as summarized herein. Except with respect to Administrative Claims that are Professional Fee Claims, or that are DIP Facility Claims or DIP Backstop Fee Claims, which Claims shall receive the treatment provided under Article II.B.5 of the Plan, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s), with the consent of the Majority Backstoppers, agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided that* Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Claims that are Professional Fee Claims, (i) requests for payment of Administrative Claims arising in the time period between the Petition Date and the Administrative Claims Bar Date must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Administrative Claims Order no later than the Administrative Claims Bar Date, and (ii) requests for payment of Administrative Claims arising between the Administrative Claims Bar Date and the Effective Date must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Final Administrative Claims Bar Date.

    **2.    DIP Facility Claims and DIP Backstop Fee Claims**

DIP Facility Claims will be satisfied as set forth in Article II.B of the Plan, as summarized herein. The DIP Facility Claims shall be deemed to be Allowed superpriority Administrative Claims in the full

---

    510(b) of the Bankruptcy Code arising from or related to any of the foregoing; *provided, however*, that the term "Interests" shall not include the Intercompany Interests.

amount due and owing under the DIP Facility as of the Effective Date.  In full satisfaction of and in exchange for each DIP Facility Claim, each DIP Facility Claim will be satisfied in full on the Effective Date pursuant to the DIP Credit Agreement and the Restructuring Support Agreement and each holder of a DIP Facility Claim shall receive its Pro Rata share of the DIP Recovery.  The DIP Backstop Fee Claims shall be deemed to be Allowed superpriority Administrative Claims in the full amount of the DIP Backstop Fee as of the Effective Date.  In full satisfaction of and in exchange for each DIP Backstop Fee Claim, each DIP Backstop Fee Claim will be satisfied in full on the Effective Date pursuant to the DIP Credit Agreement and the Restructuring Support Agreement and each holder of a DIP Backstop Fee Claim shall receive its Pro Rata share of the DIP Backstop Fee.

### 3.  Priority Tax Claims

Priority Tax Claims will be satisfied as set forth in Article II.C of the Plan, as summarized herein.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

### F.    Are any regulatory approvals required to consummate the Plan?

No.  There are no known regulatory approvals that are required to consummate the Plan.

### G.    What happens to my recovery if the Plan is not confirmed or does not go effective?

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to reorganize their businesses.  It is possible that any alternative may provide holders of Claims and Interests with less than they would have received pursuant to the Plan.  For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Section XI.B of this Disclosure Statement, entitled "Best Interests of Creditors/Liquidation Analysis," which begins on page 48, and the Liquidation Analysis attached hereto as **Exhibit E**.

### H.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"

"Confirmation" of the Plan refers to approval of the Plan by the Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation of the Plan by the Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.  Initial distributions to holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as reasonably practicable thereafter, as specified in the Plan.  *See* Article XI of this Disclosure Statement, entitled "Confirmation of the Plan," which begins on page 48, for a discussion of the conditions precedent to consummation of the Plan.

### I.    What are the sources of Cash and other consideration required to fund the Plan?

The Plan will be funded by the following sources of consideration:  (a) the issuance of the New Common Equity; (b) new capital provided pursuant to the Exit Financing; and (c) the remaining proceeds of the DIP Facility.

**J.      Are there risks to owning the New Common Equity upon emergence from chapter 11?**

Yes.  *See* Article IX of this Disclosure Statement, entitled "RISK FACTORS," which begins on page 34.

**K.      Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation.  *See* Article IX.C.9 of this Disclosure Statement, entitled "The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases," which begins on page 45.

In the event that it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes.  The Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Court to confirm a plan that has been rejected by an impaired Class if it determines that the Plan satisfies section 1129(b) of the Bankruptcy Code.  *See* Article IX.A.4 of this Disclosure Statement, entitled "The Debtors May Not Be Able to Secure Confirmation of the Plan," which begins on page 35.

**L.      What is the Management Incentive Plan and how will it affect the distribution I receive under the Plan?**

The percentage of New Common Equity to be set aside for the Management Incentive Plan shall be up to a percentage determined by the Debtors and the Majority Backstoppers prior to the Confirmation Hearing, which maximum percentage shall be disclosed either in the Plan Supplement or the Confirmation Order.  The parameters, incentives, and eligible executives with respect to this Management Incentive Plan shall be determined by the compensation committee of the New MHRC Board, with input to be provided to the New MHRC Board designees by the Backstoppers prior to the Effective Date.  The Confirmation Order shall authorize the New MHRC Board to adopt and enter into the Management Incentive Plan, on the terms set forth in Article IV.N of the Plan.  The Management Incentive Plan shall dilute all of the New Common Equity.

**M.      Will the final amount of Allowed General Unsecured Claims affect the recovery of holders of Allowed General Unsecured Claims under the Plan?**

The Debtors estimate that Allowed General Unsecured Claims total approximately $[38 million].  Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Unsecured Creditor Cash Pool.  Although the Debtors' estimate of Allowed General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.  Moreover, the Debtors are rejecting and in the future may reject certain Executory Contracts and Unexpired Leases, which may result in additional rejection damages Claims not accounted for in this estimate.  Further, the Debtors or the Committee may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed General Unsecured Claims to change.  These changes could affect recoveries to holders of Claims in Class 6, and such changes could be material.

**N.    How will Claims asserted with respect to rejection damages affect my recovery under the Plan?**

The Debtors estimate that Allowed General Unsecured Claims total approximately $[38 million], which includes approximately $[6 million] in estimated Claims arising from the Debtors' rejection of Executory Contracts and Unexpired Leases.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to holders of Claims in Class 6 could change as well, and such changes could be material.

**O.    How will the resolution of certain contingent, unliquidated, and disputed litigation Claims affect my recovery under the Plan?**

The Debtors estimate that Allowed General Unsecured Claims total approximately $[38 million]. This amount includes the Debtors' reasonable estimate of certain contingent, unliquidated, and disputed litigation Claims known to the Debtors as of the date hereof, which, with few exceptions, are considered General Unsecured Claims.  As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their businesses and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to holders of Claims in Class 6 could change as well, and such changes could be material.

**P.    How will the preservation of the Causes of Action impact my recovery under the Plan?**

The Plan provides for the retention of all Causes of Action other than those that are expressly waived, relinquished, exculpated, released, compromised, or settled.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, Article IV.L, and the last sentence of the first paragraph of Article IV.K of the Plan, the Reorganized Debtors (or any other authorized party) shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it.  The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Restructuring Support Agreement or the Plan or a Court order, including, without limitation, pursuant to Article VIII and Article IV.L of the Plan, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.K of the Plan include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Plan, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

**Q.    How will the release of Avoidance Actions affect my recovery under the Plan?**

On the Effective Date the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors, shall be deemed to have waived the right to pursue any and all Avoidance Actions, except (i) for Avoidance Actions commenced prior to the Confirmation Date, (ii) for Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors, and (iii) to the extent otherwise reserved in the Plan Supplement. No Avoidance Actions shall revert to creditors of the Debtors.

**R.    Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. The Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Debtors' overall restructuring efforts and were an essential element of the negotiations between the Debtors and the Consenting Parties in obtaining their support for the Plan pursuant to the terms of the Restructuring Support Agreement.

All of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize and preserve the going-concern value of the Debtors for the benefit of all parties in interest. Accordingly, each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.

Each holder of a Claim or Interest that (i) votes to accept or is deemed to accept the Plan or (ii) votes to reject the Plan, is deemed to reject the Plan, or is in a voting Class that abstains from voting on the Plan but does not elect to opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties. The releases represent an integral element of the Plan.

Based on the foregoing, the Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Third Circuit. Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions. The release, exculpation, and injunction provisions that are contained in the Plan are copied below.

**1.    Release of Liens**

**Except as otherwise specifically provided in the Plan, the Exit Financing Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Financing Documents), or in any contract,**

13

instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors.  In addition, the DIP Facility Agent and the Second Lien Agent shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors, or administrative agent(s) for the Exit Financing to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.

### 2.    Debtor Release

Except to the extent that Causes of Action are preserved pursuant to Article IV.K of the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (including dividends paid), transactions pursuant and/or related to the Bridge Financing Facility, the Second Lien Credit Agreement, the Notes, the Intercreditor Agreement, the Final DIP and Cash Collateral Order (and any payments or transfers in connection therewith), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Definitive Documentation, the DIP Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, the Definitive Documentation, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Releases by the Debtors described in Article VIII.E of the Plan, which includes by reference each of the related provisions and definitions contained herein,

and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any claim or cause of action released pursuant to such releases.

### 3.    Third Party Release

Except to the extent that Causes of Action are preserved pursuant to Article IV.K of the Plan, as of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (including dividends paid), transactions pursuant and/or related to the Bridge Financing Facility, the Second Lien Credit Agreement, the Notes, the Intercreditor Agreement, the Final DIP and Cash Collateral Order (and any payments or transfers in connection therewith), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Definitive Documentation, the DIP Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, the Definitive Documentation, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (i) post-Effective Date obligations of any party or Entity under the Plan, (ii) any Restructuring Transaction, or (iii) any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Releases by Holders of Claims and Interests described in Article VIII.F of the Plan, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to such releases.

### 4.  Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Definitive Documentation, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Definitive Documentation, or the DIP Facility, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, the Definitive Documentation, or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### 5.  Injunction

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.E or Article VIII.F of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Non-Debtor Subsidiaries, the Reorganized Debtors, the Released Parties, or the Exculpated Parties:  (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document,

**instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.**

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which begins on page 35 thereof, and is incorporated herein by reference.

**S.     What impact does the Claims Bar Date have on my Claim?**

The Court has established [February 26], 2016, at 5:00 p.m. (prevailing Eastern Time), as the Claims bar date (the "Bar Date") in the Chapter 11 Cases. The following entities holding Claims against the Debtors that arose (or that are deemed to have arisen) prior to the Petition Date, including without limitation Class 7 General Unsecured Claims, must file proofs of claim on or before the Bar Date:  (1) any entity whose Claim against a Debtor is not listed in the applicable Debtor's schedules of assets and liabilities ("Schedules") or is listed in the applicable Debtor's Schedules as contingent, unliquidated, or disputed if such entity desires to participate in any of the Chapter 11 Cases or share in any distribution in any of the Chapter 11 Cases; (2) any entity that believes its Claim is improperly classified in the Schedules or is listed in an incorrect amount and desires to have its Claim allowed in a different classification or amount from that identified in the Schedules; (3) any entity that believes its Claim as listed in the Schedules is not an obligation of the specific Debtor against which the Claim is listed and that desires to have its Claim allowed against a Debtor other than that identified in the Schedules; and (4) any entity that believes its Claim against a Debtor is or may be an administrative expense pursuant to section 503(b)(9) of the Bankruptcy Code (but not any entity that believes it holds an administrative expense Claim under section 503(b)(1) of the Bankruptcy Code).

In accordance with Bankruptcy Rule 3003(c)(2), if any person or entity that is required, but fails, to file a proof of claim on or before the Bar Date: (1) such person or entity will be forever barred, estopped, and enjoined from asserting such Claim against the Debtors (or filing a proof of claim with respect thereto); (2) the Debtors and their property may be forever discharged from any and all indebtedness or liability with respect to or arising from such Claim; (3) such person or entity will not receive any distribution in the Chapter 11 Cases on account of that Claim; and (4) such person or entity will not be permitted to vote on any plan or plans of reorganization for the Debtors on account of these barred Claims or receive further notices regarding such Claim.

As described in this Disclosure Statement, the distribution you receive on account of your Claim (if any) may depend, in part, on the amount of Claims for which proofs of claim are filed on or before the Bar Date.

**T.     What is the deadline to vote on the Plan?**

The Voting Deadline is [March 21], 2016, at 4:00 p.m. (prevailing Eastern Time).

**U.     How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your ballot must be completed and signed so that it is **actually received** by [March 21], 2016, at 4:00 p.m. (prevailing Eastern Time) at the following address:  Magnum Hunter Resources Corporation, c/o Prime Clerk LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022.  Ballots may not be transmitted by facsimile, email, or other electronic means, except through a customized online balloting portal on the Debtors' case website maintained by the Notice and Claims Agent.  *See* Article X of this Disclosure Statement, entitled "SOLICITATION AND VOTING PROCEDURES," which begins on page 46.

**V.    Why is the Court holding a Confirmation Hearing?**

Section 1128(a) of the Bankruptcy Code requires the Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

**W.    When is the Confirmation Hearing set to occur?**

The Court has scheduled the Confirmation Hearing for [March 28], 2016, at [__:__] [a/p].m. (prevailing Eastern Time).  The Confirmation Hearing may be adjourned from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [March 21], 2016, at 4:00 p.m. (prevailing Eastern Time) in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement and the Disclosure Statement Order attached hereto as **Exhibit D** and incorporated herein by reference.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in *USA Today* (national edition), the *Houston Chronicle*, *The Marietta Times*, the *Tyler Star News*, the *Wetzel Chronicle*, and the *Oil & Gas Journal* to provide notification to those persons who may not receive notice by mail.  The Debtors may also publish the notice of the Confirmation Hearing in such trade or other publications as the Debtors may choose.

**X.    What is the purpose of the Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under a plan of reorganization, any person acquiring property under a plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of such plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**Y.    What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing under chapter 11 of the Bankruptcy Code.  As a result, the occurrence of the Effective Date means that the Debtors will not be liquidated or forced to go out of business.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors and the Majority Backstoppers that is the first business day after which all conditions to Consummation have been satisfied or waived.  *See* Article IX of the Plan.  On or after the Effective Date, and unless otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and, except as otherwise provided by the Plan, may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**Z.      Will any party have significant influence over the corporate governance and operations of the Reorganized Debtors?**

As of the Effective Date, the term of the current members of the boards of directors of the Debtors shall expire, and the initial boards of directors, including the New Boards, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.  The initial New MHRC Board shall consist of those individuals that are selected in accordance with Article IV.N of the Plan.  Successors will be elected in accordance with the New Organizational Documents of Reorganized MHRC, which forms shall be included in the Plan Supplement.

**AA.    Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Prime Clerk LLC:

> *By regular mail, hand delivery, or overnight mail at:*
> Magnum Hunter Resources Corporation
> c/o Prime Clerk LLC
> 830 3rd Avenue, 3rd Floor
> New York, NY 10022
>
> *By electronic mail at:*
> magnumhunterinfo@PrimeClerk.com
>
> *By telephone at:*
> (844) 276-3026 (U.S. and Canada)
> (917) 962-8497  (International)

Copies of the Plan, this Disclosure Statement, and any other publicly filed documents in the Chapter 11 Cases are available upon written request to the Debtors' Notice and Claims Agent at the address above or by downloading the exhibits and documents from the website of the Debtors' Notice and Claims Agent at https://cases.primeclerk.com/magnumhunter (free of charge) or the Court's website at www.deb.uscourts.gov (for a fee).

**BB.    Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a significant deleveraging of the Debtors' balance sheet and enables them to emerge from chapter 11 expeditiously, is in the best interest of all holders of Claims, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

**CC.    Who Supports the Plan?**

The Plan is supported by the Debtors and the Consenting Parties, as set forth in the following chart:

| Consenting Parties | Support (expressed as an approximate percentage of the total principal amount of claims outstanding)[12] |
|---|---|
| Debtors | N/A |
| DIP Facility Lenders | 100% |
| Holders of Second Lien Claims | 66.5% |
| Holders of Note Claims | 79% |

## V.    THE DEBTORS' RESTRUCTURING SUPPORT AGREEMENT AND PLAN

### A.    Restructuring Support Agreement

On December 15, 2015, the Debtors, a group of Second Lien Lenders holding approximately 66.5 percent of outstanding loans and obligations under the Second Lien Credit Facility and approximately 50 percent of outstanding loans and obligations under the Bridge Facility, and a group of Noteholders holding approximately 79 percent of the Notes outstanding and approximately 50 percent of outstanding loans and obligations under the Bridge Facility, entered into the Restructuring Support Agreement.

Since executing the Restructuring Support Agreement, the Debtors have documented the terms of the prearranged restructuring contemplated thereby, including the Plan.[13]  As of the Petition Date, the Consenting Parties represent holdings in the aggregate of approximately 75 percent in principal amount of the Debtors' prepetition funded debt.  The Plan effectuates a debt-for-equity conversion, which will significantly reduce long-term debt and annual interest payments and result in a stronger balance sheet for the Debtors.

The Plan represents the last step in the Debtors' months-long restructuring process.  The Restructuring Support Agreement (which sets forth the key terms of the Plan) together with the Exit Financing contemplated thereby, will allow—and, indeed, require—the Debtors to proceed expeditiously through chapter 11 to a successful emergence.  The Plan will significantly deleverage the Debtors' balance sheet and provide the capital injection needed for the Debtors to return to competitive operations going forward.

### B.    The Plan

As discussed in Article III herein, the Plan contemplates a debt-for-equity conversion effectuated through a chapter 11 plan under the following key terms:

---

[12]    The percentage support given by holders of Second Lien Claims and holders of Note Claims may increase after the subscription process for the DIP Facility has concluded, as subscribers will need to execute a joinder to the Restructuring Support Agreement for their Second Lien Claims or Note Claims, as applicable.

[13]    The key terms of the Plan are discussed in greater detail in Section V.B of this Disclosure Statement, entitled "The Plan," immediately following this section.

### 1. New Common Equity

The issuance of the New Common Equity, including options, or other equity awards reserved under the Management Incentive Plan, shall be authorized on the Effective Date without the need for any further corporate action and without any further action by the holders of Claims or Interests.

All of the shares of New Common Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. For the avoidance of doubt, any Claim holder's acceptance of the New Common Equity shall be deemed as its agreement to the New Shareholders' Agreement.

### 2. Exit Financing

On the Effective Date the Reorganized Debtors shall enter into the Exit Financing, the terms of which will be set forth in the Exit Financing Documents. The Exit Financing will be in form and substance (and in an amount) satisfactory to the Majority Backstoppers and the Confirmation Order shall approve the Debtors' negotiation of and entry into any Exit Financing Documents necessary to implement the Exit Financing.

### 3. Use of Proceeds

The Exit Financing proceeds will be used to fund the Debtors' operations and for general corporate purposes.

### 4. Governance

The initial New MHRC Board shall consist of those individuals selected in accordance with Article IV.H of the Plan. Successors will be elected in accordance with the New Organizational Documents of Reorganized MHRC, which mean the forms of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of Reorganized MHRC, which forms shall be included in the Plan Supplement.

### 5. Recoveries to Claim Holders

The DIP Facility Lenders shall receive their Pro Rata share of 28.8 percent of the New Common Equity on account of their DIP Facility Claims, the Second Lien Lenders shall receive their Pro Rata share of 36.87 percent of the New Common Equity on account of their Second Lien Claims, and the Noteholders shall receive their Pro Rata share of 31.33 percent of the New Common Equity on account of their Note Claims, all of which is subject to dilution on account of the Management Incentive Plan. The remaining three percent of the New Common Equity shall be distributed to the Backstoppers (as of the Petition Date) in exchange for their DIP Backstop Fee Claims. These amounts shall also be subject to dilution by a Management Incentive Plan.

The holders of the Equipment and Other Note Claims shall have their Claims Reinstated pursuant to section 1124 of the Bankruptcy Code.

Additionally, the holders of General Unsecured Claims will receive their Pro Rata share of the Unsecured Creditor Cash Pool. It is currently intended that the Unsecured Creditor Cash Pool will be

$20,000,000, which amount may be subject to the costs of any professional fees and other expenses incurred as part of the claims reconciliation process.

### 6.    General Settlement of Claims and Interests

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, which distributions and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest, including:

- the amount (if any) of the Secured portion of the Second Lien Claim, including the perfection, validity, effectiveness, and amount of any mortgages held by the Second Lien Agent evidencing the security interests (if any) granted by the Debtors to secure the Second Lien Credit Agreement;

- the dispute regarding whether (and/or to what extent) the Liens and Claims granted by Triad Hunter, LLC ("Triad Hunter") in connection with the Debtors' entry into the Second Lien Credit Agreement or the Indenture should be avoided as fraudulent conveyances;

- the validity, priority, treatment, and amount of any intercompany transfers, including the intercompany transfers between MHRC and Triad Hunter;

- the potential to recharacterize as principal (or otherwise) any adequate protection payments made to the Second Lien Lenders;

- any dispute regarding the appropriate allocation of general and administrative costs across the Debtors' assets; and

- any challenges to transfers made by the Debtors to any related entities (including any of such entities that are affiliated with or owned in part by the Debtors' officers, including, without limitation, GreenHunter Resources, Inc.) and, to the extent any modifications to the EHH agreements are achieved, to EHH.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors (or any other party, as determined by the Debtors, the Majority Backstoppers, and the Committee) may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

Pursuant to Rule 408 of the Federal Rules of Evidence, the Plan, this Disclosure Statement, the Restructuring Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be admissible into evidence in any proceeding unless and until the Plan is consummated, and then only in accordance with the Plan.  In the event the Plan is not consummated, provisions of the Plan, this Disclosure Statement, the Restructuring Support Agreement

(and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be binding or probative.

### 7. Releases

The Plan contains certain releases (as described more fully in Section IV.R of this Disclosure Statement), including mutual releases among (a) the Debtors; (b) the Reorganized Debtors; (c) the Backstoppers; (d) the Indenture Trustee; (e) the Bridge Facility Agent; (f) the DIP Facility Agent; (g) the DIP Facility Lenders; (h) the Exit Financing Agent; and (i) the Exit Financing Lenders, each solely in their capacity as such. The Plan also provides that each holder of a Claim or an Interest that (y) votes to accept or is deemed to accept the Plan or (z) votes to reject the Plan, is deemed to reject the Plan, or is in a voting Class that abstains from voting on the Plan but does not elect to opt out of the release provisions contained in Article VIII of the Plan, will be deemed to have expressly, unconditionally, generally, individually, and collectively released and discharged all Claims and Causes of Action against the Debtors and the Released Parties.

## VI.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    The Debtors

The Debtors primarily are engaged in the acquisition, development, and production of oil and natural gas reserves in the United States. The Debtors' current operations focus primarily on unconventional shale resource plays in the productive Marcellus Shale and Utica Shale in West Virginia and Ohio, although they also own oil and gas properties in Kentucky, Oklahoma, Texas, and the Williston Basin/Bakken Shale in North Dakota. Collectively, the Debtors have leasehold working interests in approximately 3,042 oil and gas production sites.

As of the Petition Date, the Debtors had approximately 346 full-time employees. None of their employees is represented by a collective bargaining unit. A corporate organization chart is attached as **Exhibit C**. Below is a summary of the Debtors' businesses and operations.

### B.    Assets and Operations

The Debtors, together with their non-Debtor affiliates, have operations across most spectrums of the oil and gas industry. The Debtors' operations are divided into three primary business segments: traditional oil and gas exploration, development, and production (or "upstream") operations; "midstream" natural gas gathering, processing, and marketing operations; and oilfield services operations.

### 1. Upstream Operations

Oil and natural gas exploration, development, and production remains at the core of the Debtors' businesses and operations. In 2014, the Debtors generated revenues of approximately $268.5 million as a result of their oil and natural gas exploration, development, and production activities. These operations consist primarily of acquiring and developing leasehold working interests in properties with potential oil or natural gas reserves and the production of oil and natural gas from producing properties. In instances where the Debtors own less than 100 percent of the leasehold working interest in a property, the Debtors and the other working interest owners usually enter into joint operating agreements to govern the parties' responsibilities with respect to the development and operation of the acreage, including which party (the "Operator") will be responsible for the exploration and production of oil and gas therefrom. The Debtors' "upstream" operations currently are focused in two regions: the Appalachian Basin and the Williston Basin/Bakken Shale.

As of November 30, 2015, the Debtors' holdings in the Appalachian Basin totaled approximately 375,811 net acres, including: (a) approximately 74,170[14] net leasehold acres in the Marcellus Shale, (b) approximately 124,079[14] net leasehold acres prospective for the Utica Shale, and (c) approximately 208,309 net leasehold acres in the Devonian Shale formation and the Mississippian Weir sandstone, located primarily in Kentucky.  As of November 30, 2015, the Debtors had approximately 2,332 gross producing wells in the Appalachian Basin, with estimated proved reserves totaling approximately 555.2 Bcfe[15] as of December 10, 2015.  The Debtors are the Operator of approximately 81.1 percent of their producing wells in the Appalachian Basin.

As of November 30, 2015, the Debtors also have approximately 55,832 net leasehold acres in the Williston Basin/Bakken Shale in North Dakota, substantially all of which are non-operated.  As of November 30, 2015, the Debtors had approximately 169 gross producing wells in the Williston Basin/Bakken Shale in North Dakota, with estimated proved reserves of approximately 25.1 Bcfe as of September 30, 2015.  The Debtors are the Operator for approximately 5.3 percent of their producing wells in the Williston Basin/Bakken Shale in North Dakota.

## 2.  Midstream Operations

The Debtors also are indirectly involved in midstream operations through MHRC's approximately 44.5 percent equity interest in EHH and its wholly-owned subsidiaries (collectively, "Eureka").  In the aggregate, the Debtors' midstream operations generated net revenues of approximately $44.5 million in 2014.

EHH and its subsidiaries are not Debtors in the Chapter 11 Cases.  However, the midstream operations of EHH and its subsidiaries, and the Eureka Pipeline in particular, play an important role in the Debtors' development and delineation of their acreage positions in both the Utica Shale and the Marcellus Shale.  Further, the Eureka Pipeline's continuing commercial development supports the development of the Debtors' existing and anticipated future Marcellus Shale and Utica Shale undeveloped leasehold acreage positions, as well as the expanding gas gathering needs of third-party producers in these regions.  In January 2015, the Eureka Pipeline flowed an average of approximately 365,000 MMBtu of natural gas per day, and has consistently increased daily natural gas throughput from the Debtors and other third-party producers since that time, with throughput volumes reaching 835,000 MMBtu of natural gas per day as of December 1, 2015.

Although EHH and its subsidiaries are not included in these Chapter 11 Cases, their operations and interests are intertwined with the Debtors' through various agreements and business arrangements.  Specifically, pursuant to a shared services agreement between EHH and Debtor entity Magnum Hunter Services, LLC dated as of March 20, 2012, the Debtors provide employees and administrative services to EHH and its subsidiaries, which facilitate cost-saving and operational synergies between the Debtors' oil and gas exploration and production operations and EHH's midstream operations.  The Debtors and EHP also have certain business relationships, including a gas gathering agreement between EHP and Debtor Triad Hunter, pursuant to which the Eureka Pipeline gathers a substantial volume of natural gas produced by Triad Hunter (the "Gas Gathering Agreements").  The Gas Gathering Agreements accounted for approximately 26.9 percent of EHP's revenue in September 2015.

---

[14]   These figures include approximately 44,791 net overlapping acres prospective for both the Utica Shale and the Marcellus Shale.

[15]   "Bcfe" is a unit of measurement meaning billions of cubic feet equivalent.

### 3.  Oilfield Services Operations

The Debtors also provide certain oilfield services operations to third parties through the Debtor entity Alpha Hunter Drilling, LLC ("Alpha Hunter").  In 2014, the Debtors generated revenue of approximately $23.1 million through their oilfield services operations.  Alpha Hunter owns and operates six drilling rigs that are used primarily for vertical section (top-hole) air drilling in the Appalachian Basin.  Alpha Hunter provides services to the Debtors and third parties.  One of Alpha Hunter's drilling rigs also can drill the horizontal sections of wells in the Marcellus Shale and Utica Shale plays, and was designed especially for pad drilling.  The demand for these services generally has declined in conjunction with the decline in commodities prices.  As a result, most of Alpha Hunter's drilling rigs are now idle, including a drilling rig formerly used for the Debtors' now-suspended drilling operations and two rigs that were previously deployed to a third party under firm contracts.  However, Alpha Hunter is entitled to receive certain payments from the third party operators as a result of the idled rigs and the cancellation of their corresponding contracts.

### C.    Prepetition Capital Structure

As of September 30, 2015,[16] the Debtors reported approximately $1.1 billion in total liabilities, as well as approximately $416.3 million in stated value of Preferred Stock (as defined herein).  As described in greater detail below, the Debtors' significant funded debt obligations include: (a) approximately $70 million in principal amount of obligations under the Debtors' Bridge Financing Facility; (b) approximately $336.6 million in principal amount of obligations under the Debtors' Second Lien Credit Agreement; (c) approximately $13.2 million in principal amount of Equipment and Real Estate Notes; and (d) approximately $600 million in principal amount of Notes.

### 1.    Bridge Financing Facility

On October 22, 2014, the Debtors entered into the Fourth Amended and Restated Credit Agreement by and among MHRC, as borrower, Bank of Montreal, as administrative agent, and the lenders from time to time party thereto (as amended, the "Revolving Credit Facility").  The Revolving Credit Facility provided a reserves-based, senior secured revolving credit facility with an initial borrowing base of $50 million (subject to periodic redeterminations).  The Revolving Credit Facility was secured by a first priority lien in substantially all of the Debtors' assets, including certain of the Debtors' oil and gas properties and interests, and was fully and unconditionally guaranteed by certain of the Debtors.  The Revolving Credit Facility was not secured by MHRC's equity interest in EHH or almost all of the Debtors' unproved, undeveloped leasehold acreage.

On November 3, 2015 and November 30, 2015, the Debtors entered into the Bridge Financing Facility.  The Bridge Financing Facility converted the Revolving Credit Facility to a $60 million senior secured term loan facility on November 3, 2015 (which was then increased by $10 million on November 30, 2015), providing the Debtors with incremental liquidity and time to negotiate a consensual restructuring.  The Bridge Financing Facility was provided by certain of the Noteholders and certain of the Second Lien Lenders.  Prior to the Bridge Financing Facility, the Revolving Credit Facility had been amended five times in order to remedy certain defaults caused by the Debtors' deteriorating liquidity position, including most recently on July 10, 2015.

The Bridge Financing Facility is secured by a first priority lien and security interest in substantially all of the Debtors' assets, including all Oil and Gas Properties (as such term is defined in the

---

[16]    These financial figures reflect the Debtors' most recent review of their businesses, as disclosed in the Debtors' public filings.  The Debtors reserve all rights to revise and supplement the figures presented herein.

Bridge Financing Facility), but excluding MHRC's equity interest in EHH.  Obligations under the Bridge Financing Facility are guaranteed by certain of the Debtors.

The Bridge Financing Facility currently accrues interest at a floating interest rate.  As of the Petition Date, the interest rate was approximately 4.25 percent per annum.  The Bridge Financing Facility became due and payable on the Petition Date.

### 2.  Second Lien Credit Facility

In October of 2014, the Debtors determined to obtain additional financing to reduce their exposure to commodity price fluctuations under their reserves-based Revolving Credit Facility. Accordingly, on October 22, 2014, the Debtors entered into the Second Lien Credit Agreement. The aggregate principal amount outstanding under the Second Lien Credit Agreement term loan totals approximately $336.6 million and matures in 2019.  As of the Petition Date, the interest rate was approximately 8.5 percent per annum. A portion of the proceeds of the term loan under the Second Lien Credit Agreement was used to repay existing borrowings under the Revolving Credit Facility.

Pursuant to the documents governing the Second Lien Credit Agreement, the Second Lien Agent was granted a security interest in substantially all of the Debtors' assets, including all Oil and Gas Properties (as such term is defined in the Second Lien Credit Agreement), but excluding MHRC's equity interest in EHH.[17]  Obligations under the Second Lien Credit Agreement are guaranteed by certain of the Debtors.

### 3.  Equipment and Real Estate Notes

As of the Petition Date, certain of the Debtors had several Equipment and Real Estate Notes payable outstanding, including:  (a) the Wesbanco Facility, totaling approximately $4,150,853.87 in Allowed Claims on account thereof; (b) the CIT Facility, totaling approximately $2,887,222.38 in Allowed Claims on account thereof; (c) the Piaggio Facility, totaling approximately $2,568,824.83 in Allowed Claims on account thereof; and (d) the Office Building Facility, totaling approximately $3,622,038.54 in Allowed Claims on account thereof.  As of the Petition Date, the Debtors had approximately $13.2 million of outstanding Equipment and Real Estate Notes, all of which are secured by certain of the Debtors' assets.  The Equipment and Real Estate Notes have maturity dates ranging from December 2016 to September 2024 and accrue interest at rates varying between 4.25 percent and 8.7 percent per annum.

### 4.  Notes

On May 16, 2012, the Debtors issued approximately $450 million in principal amount of Notes under the Indenture.  On December 13, 2012, the Debtors issued an additional $150 million in principal amount of Notes.  As of the Petition Date, the total principal amount outstanding under the Indenture was $600 million.  The interest rate under the Indenture and the Notes is 9.75 percent, payable semiannually in May and November, subject to a 30-day grace period.  The Notes are guaranteed by certain of the Debtors.  The Debtors did not make their semiannual interest payment on the Notes due on November 15, 2015.

---

[17]    As further set forth in the Debtors' motion to approve debtor-in-possession financing [Docket No. 18] (the "DIP Financing Motion") and the Interim DIP and Cash Collateral Order, certain parties in interest dispute the extent and the validity of the security interests under the Revolving Credit Facility and Second Lien Credit Agreement, but have settled any disputes with respect thereto as part of the global settlement embodied in the Plan.  All rights with respect thereto are reserved, including as set forth in the Interim DIP and Cash Collateral Order, the Restructuring Support Agreement, and the Plan.

### 5.    Preferred and Common Stock

MHRC has three series of Preferred Stock issued and outstanding:  (a) the 10.25% Series C Cumulative Perpetual Preferred Stock (the "Series C Preferred"); (b) the 8.0% Series D Cumulative Preferred Stock (the "Series D Preferred"); and (c) the 8.0% Series E Cumulative Convertible Preferred Stock (the "Series E Preferred").  As of September 30, 2015, the Series C Preferred, Series D Preferred, and Series E Preferred had stated values of approximately $100 million, $221.2 million, and $95.1 million, respectively.  The terms of the Preferred Stock require monthly cash dividend payments, which accumulate if unpaid in any given month.  MHRC paid approximately $26.5 million in dividends on account of the Preferred Stock for the nine months ended September 30, 2015.  As part of its ongoing efforts to preserve liquidity while exploring strategic alternatives, MHRC did not declare a dividend after September 30, 2015, and announced on October 9, 2015 that it was suspending payment of monthly dividends on the Preferred Stock, beginning with the monthly cash dividend payment due on October 31, 2015.  The NYSE Market LLC suspended trading of the Preferred Stock on November 10, 2015, and the Preferred Stock was delisted from the NYSE MKT effective December 11, 2015.

Until recently, the Common Stock was publicly traded on the New York Stock Exchange ("NYSE").  As of December 11, 2015, there were approximately 264.1 million shares of Common Stock outstanding, with a par value of $0.01 per share and a total market value as of the Petition Date of approximately $11.8 million.  On November 10, 2015, the NYSE suspended trading of the Common Stock based on "abnormally low" price levels and the Common Stock was delisted from the NYSE effective December 11, 2015.

## VII.    EVENTS LEADING TO THE CHAPTER 11 FILINGS

### A.    Adverse Market Conditions

In recent years, the Debtors have primarily focused their operations on exploration, development, and production in the Marcellus Shale and Utica Shale of the Appalachian Basin.  The Debtors' aggressive focus on the Appalachian Basin has resulted in dramatic increases in both production and proved reserves over the previous five years.  These production increases also led to increases in the Debtors' revenue and cash flow over the same period.

However, recent macroeconomic factors have made it difficult for the Debtors to support their debt obligations and generate sufficient capital to grow their businesses.  In the fall of 2014, oil prices plummeted due to an oversupply worldwide and have yet to recover.  Simultaneously, the natural gas market saw the impact of continued growth in natural gas production in the United States, which, coupled with unusually and unexpectedly mild weather in 2015 and into 2016, has caused a sustained drop in natural gas prices for the foreseeable future.

The difficulties faced by the Debtors are consistent with the difficulties faced industry-wide.  Exploration and production companies and others have been challenged by relatively low natural gas prices for several years.  The scale of these price declines cannot be overstated.  In December 2015, the Henry Hub natural gas spot prices fell below $2.00/MMBtu.  Prior to this time, Henry Hub natural gas spot prices had only closed below $2.00/MMBtu on twenty trading days since 2002.

### B.    Proactive Approach to Addressing Liquidity Constraints

In response to deteriorating market conditions, the Debtors immediately began implementing various cost-cutting initiatives in late 2014 to mitigate declining commodities prices.  These initiatives included lowering the Debtors' capital expenditure budget for 2015 by approximately $300 million, closing branch offices in Denver, Colorado and Alberta, Canada in early 2015, and consolidating

administrative responsibilities, which reduced general and administrative expenses by an estimated $2.5 million annually. Additionally, in late 2014 the Debtors saw an opportunity to further reduce their exposure to the declining commodities market under their reserves-based Revolving Credit Facility by entering into the Second Lien Credit Agreement.

As revenues continued to decline throughout the first half of 2015 because of the dramatic drop in commodity prices, the Debtors continued to explore various opportunities to increase near-term liquidity. To this end, the Debtors continued their efforts to divest non-core assets, successfully generating approximately $33.9 million in proceeds on the sale in 2015 of unproven properties with no cash flow. More significantly, the Debtors explored alternatives for monetizing their primary unencumbered assets, namely, MHRC's equity interest in EHH, as well as certain other undeveloped, unproved leasehold acreage located in the Utica Shale and Marcellus Shale plays.

In particular, the Debtors continued negotiations with a potential third-party financial investor to enter into a joint venture, whereby the Debtors would contribute certain of their undeveloped, unproved leasehold acreage in Ohio in exchange for a total investment commitment of approximately $330 million. A portion of that commitment would consist of an upfront cash payment, which would improve the Debtors' near-term liquidity. Negotiations with the third party remained ongoing as of the Petition Date.

MHRC also began to pursue a potential sale of its equity interest in EHH in March 2015. In connection with the marketing process, MHRC executed confidentiality agreements with numerous strategic and financial buyers, conducted multiple in-person diligence meetings between management and the prospective purchasers, and received formal and informal bids from an aggregate of six prospective purchasers. MHRC has not acted on any of the bids received to date. Rather, the Debtors, in consultation with their advisors and, as of the date of execution of the Restructuring Support Agreement, the Backstoppers, continue to examine whether a sale of MHRC's equity interest in EHH would maximize value at this time in light of current market conditions, which have also deteriorated within the midstream space.

Recognizing that a near-term solution to their imminent liquidity constraints may not be achievable without the support of their major creditors, the Debtors sought external strategic advice and assistance, engaging PJT Partners LP ("PJT") as its financial advisor and Kirkland & Ellis LLP ("K&E") as legal advisor in October 2015 and Alvarez & Marsal North America, LLC ("A&M") as restructuring advisor in November 2015. The advisors were retained to assist the Debtors with exploring strategic alternatives to their current liquidity situation in a manner that would maximize value for all stakeholders.

With the assistance of their advisors, the Debtors engaged the major constituents in their capital structure in an attempt to negotiate a consensual out-of-court restructuring that would maximize value for all parties in interest. In the weeks leading up to the Petition Date, the Debtors and their advisors met with the Debtors' principal creditors and their advisors on multiple occasions and provided such parties with substantial diligence. The Debtors first engaged such parties to explore potential comprehensive out-of-court restructuring opportunities, but ultimately focused on negotiating the terms of a potential out-of-court incremental financing that would provide the Debtors with time to stabilize their operations and negotiate the Restructuring Support Agreement.

On November 3, 2015, the Debtors entered into the Bridge Financing Facility, pursuant to which the Debtors secured additional liquidity of approximately $16 million to stabilize their operations while the Debtors engaged in good faith negotiations regarding potential in-court or out-of-court restructuring options. The Bridge Financing Facility contained a two-week moratorium on the Debtors' ability to pursue, and the Bridge Lenders' ability to propose, the terms of any debtor-in-possession financing. The moratorium was intended to provide all parties with time to focus on negotiating the terms of a consensual restructuring.

On November 30, 2015, the Debtors took advantage of their ability to obtain an additional $10 million of incremental financing under the Bridge Financing Facility to finance operations while the Debtors continued discussions with the Restructuring Support Parties regarding a comprehensive restructuring, including new postpetition financing and the consensual use of cash collateral.   In conjunction with this additional financing, the moratorium on the Debtors' ability to pursue, and the Bridge Lenders' ability to propose, the terms of any debtor-in-possession financing was further extended to December 7, 2015.

### C.    The November Suspension by NHIP and Resulting Shut-In of Producing Wells

Shortly after closing on the Bridge Financing Facility, on November 5, 2015, the Debtors received a letter (the "November 5 Letter") from NHIP on behalf of EHP, pursuant to which NHIP demanded, in connection with past due amounts, adequate assurance of performance in the form of security in the amount of approximately $20.8 million on or before November 10, 2015.  NHIP advised the Debtors that their failure to provide NHIP such adequate assurance of performance by the specified deadline would result in suspension of services under the Gas Gathering Agreements until such time as the Debtors provided such adequate assurance of performance.  The Debtors did not provide EHP with the requested adequate assurance by November 10, 2015.  As a result, EHP suspended services to the Debtors under the Gas Gathering Agreements (the "Suspension").  The Suspension impeded the Debtors' ability to gather gas, which in turn led to the shut-in of approximately 38 of the Debtors' operated wells (the "Shut-In Wells") on November 11, 2015, disrupting the Debtors' operations in the Appalachian Basin.

Following the delivery of the November 5 Letter and the implementation of the Suspension, the Debtors and NHIP engaged in extensive good faith and arm's-length negotiations relating thereto, including the performance of services under the Gas Gathering Agreements following any bankruptcy filing and the status of the agreement in relation to a bankruptcy case.  The Debtors and NHIP ultimately reached a resolution pursuant to a letter agreement dated November 19, 2015 (the "November Agreement") and the Shut-In Wells were returned to production on or around November 21, 2015.  Pursuant to the November Agreement, the Debtors agreed, among other things, to pay EHP an aggregate of $5 million by December 4, 2015, of which $250,000 could be used for the payment of the expenses of NHIP's legal and other advisors.  In exchange, NHIP agreed to, among other things, take actions to cause EHP to restore services and instruct EHP to temporarily forbear from exercising remedies in connection with the ongoing defaults under the Gas Gathering Agreements.

The execution of the November Agreement avoided a prolonged, and potentially significant, disruption to the Debtors' core operations in the Appalachian Basin and reconfirmed the support of an important business partner as the Debtors continued their efforts to negotiate a consensual restructuring with their major stakeholders.   Importantly, the amount paid under the November Agreement was substantially less than the amount that EHP believed it was owed at the time of the Suspension, but EHP and NHIP, having been informed by the Debtors of their very limited available cash at the time, the substantial risk that the continued Suspension could have a material adverse effect on the Debtors' restructuring efforts, and ongoing negotiations with the Restructuring Support Parties, agreed to accept such lesser amount and restore services based on the Debtors' agreement to seek and use commercially reasonable efforts to obtain certain first day relief in the Chapter 11 Cases.

### D.    Agreement with Restructuring Support Parties on Restructuring Support Agreement and DIP Facility

The Debtors successfully used the time and liquidity provided by the Bridge Financing Facility to finalize the terms of the Restructuring Support Agreement with the Restructuring Support Parties.   The Debtors and the Restructuring Support Parties recognized that the Debtors' ability to operate as a going

concern could only be achieved through a comprehensive restructuring that included an almost complete deleveraging of the Debtors' balance sheet. The Restructuring Support Agreement provides the framework for a swift restructuring under chapter 11 of the Bankruptcy Code.

As part of the Restructuring Support Agreement, the Backstoppers agreed to fund a DIP Facility. The DIP Facility provides the Debtors with postpetition financing in the form of a senior secured, multi-draw term loan in the aggregate principal amount of $200 million. This amount will be made available in three installments, the availability of which is tied to certain milestones set forth in the Restructuring Support Agreement and the DIP Facility, including:

- $40 million, which was made available upon entry of the interim order approving the DIP Facility on December 16, 2015;

- $100 million to be made available upon entry of a final order approving the DIP Facility, which the Debtors will seek entry of at a hearing before the Bankruptcy Court on January 11, 2016; and

- $60 million to be made available on or prior to the date that is one week prior to the scheduled commencement of the Confirmation Hearing, on the timeline set forth in the Restructuring Support Agreement (as may be amended from time to time), subject to certain conditions (the "Final DIP Facility Draw").

Further, the DIP Facility and the Restructuring Support Agreement provide the Debtors with access to the consensual use of their prepetition secured creditors' cash collateral. As set forth in greater detail in the declaration of Peter Laurinaitis in support of the DIP Financing Motion, the Debtors conducted a process to gauge third-party interest in providing debtor-in-possession financing, ultimately concluding that such third-party financing could not be obtained and would not be on terms as favorable as those provided by the Backstoppers. In sum, the DIP Facility gives the Debtors sufficient liquidity to stabilize their operations and fund the administration of the Chapter 11 Cases as the Debtors seek to implement the restructuring embodied in the Restructuring Support Agreement.

The Restructuring Support Agreement provides for the reorganization of the Debtors as a going concern with an almost completely deleveraged capital structure and sufficient liquidity to fund the Debtors' postpetition business plan. The key element of the reorganization contemplated by the Restructuring Support Agreement is the elimination of substantially all of the Debtors' pre- and postpetition funded debt obligations through a substantial debt-to-equity conversion, whereby the DIP Facility Lenders, the Second Lien Lenders, and the Noteholders will become the New Common Equity owners of the Reorganized Debtors. In addition, the Restructuring Support Agreement and the Plan implement a settlement of certain disputes that, if litigated, could be costly and could significantly delay the Debtors' emergence from chapter 11.

The Debtors filed the Chapter 11 Cases to implement their prearranged restructuring pursuant to the terms of the Restructuring Support Agreement, enhance liquidity, and bolster their long-term growth prospects and operating performance. The Plan represents the successful culmination of weeks of restructuring efforts and gives the Debtors the best opportunity to withstand current adverse market conditions, generate sufficient liquidity to fund their operations, and maximize value for the benefit of their stakeholders.

## VIII.    MATERIAL DEVELOPMENTS AND ANTICIPATED EVENTS OF THE CHAPTER 11 CASES

### A.    Corporate Structure upon Emergence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

### B.    Expected Timetable of the Chapter 11 Cases

The Debtors expect the Chapter 11 Cases to proceed quickly.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 by April 15, 2016.  **No assurances can be made, however, that the Court will enter various orders on the timetable anticipated by the Debtors.**

### C.    First Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, and customers following the commencement of the Chapter 11 Cases.  On December 16, 2015, the Court entered orders approving the First Day Motions on an interim basis.  A final hearing to approve the First Day Motions will be held on January 11, 2016.

The First Day Motions, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://cases.primeclerk.com/magnumhunter.

### D.    Other Procedural and Administrative Motions

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including:

- Schedules and Statements Extension Motion.  On December 23, 2015, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Related Relief* [Docket No. 131] (the "Schedules Extension Motion").  The Schedules Extension Motion seeks to extend the time for filing the Debtors' schedules and statements of financial affairs through and including January 29, 2016.  A hearing on the Schedules Extension Motion will be held on January 11, 2016.

31

- Ordinary Course Professionals Motion.  On December 23, 2015, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 133] (the "OCP Motion").  The OCP Motion seeks to establish procedures for the retention and compensation of certain professionals utilized by the Debtors in the ordinary course operation of their businesses.  A hearing on the OCP Motion will be held on January 11, 2016.

- Claims Bar Date Motion.  On December 31, 2015, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 165] (the "Bar Date Motion") and corresponding motion to shorten notice thereof [Docket No. 166].  The Bar Date Motion seeks entry of an order approving:  (a) February 26, 2016, at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-Governmental Units to File Claims in the Chapter 11 Cases; (b) June 13, 2016, at 5:00 p.m., prevailing Eastern Time, as the deadline for all Governmental Units to File Claims in the Chapter 11 Cases; (c) procedures for Filing Proofs of Claims; and (d) the form and manner of notice of the bar dates.  A hearing on the Bar Date Motion will be held on January 11, 2016.

### E.    Appointment of Official Committee

On December 23, 2015, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 128], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases.  The Committee is currently composed of the following members:  (a) Wilmington Trust National Association in its capacity as Indenture Trustee to the Notes; (b) Hunt Oil Company; and (c) Michael Rozenfeld, an individual Noteholder that is not a member of the group of Noteholder Backstoppers.  The Committee has retained Ropes & Gray LLP and Cole Schotz P.C. as its legal counsel and Capstone/Berkeley Research Group as its financial advisor, subject to Court approval.

### F.    Eclipse Litigation

On December 23, 2015, Eclipse Resources I, LP ("Eclipse") filed the *Emergency Motion for an Order Granting Equitable Relief and Directing Debtor Triad Hunter, LLC to Discontinue Willful Misconduct and Improper Operations and to Assume or Reject a Certain Executory Contract by a Date Certain* [Docket No. 125] (the "Eclipse Motion") and a corresponding motion to shorten notice thereof [Docket No. 126] (the "Eclipse Motion to Shorten").  The Eclipse Motion asserted, among other things, that on December 18, 2015, Debtor Triad Hunter improperly revoked a prior "Take in Kind Election" made by Eclipse with respect to certain natural gas produced by wells operated by Triad Hunter under a joint operating agreement (the "Eclipse JOA") and transported by the Eureka Pipeline pursuant to a gas gathering agreement between Triad Hunter and the Eureka Pipeline. As a result of this alleged improper conduct, Eclipse argued, it is suffering damages of approximately $25,000 per day.  Thus, by the Eclipse Motion, Eclipse sought to reinstate its "Take in Kind Election" and otherwise return the parties to the status quo existing prior to the revocation of its election, as well as to establish January 14, 2016 as the date by which the Debtors must determine whether to assume or reject the Eclipse JOA.

Although the Debtors dispute certain of the assertions set forth in the Eclipse Motion, the Debtors worked in good faith with Eclipse in an attempt to reach a consensual resolution.  As a result, on January 5, 2016, the Debtors and Eclipse entered into a stipulation (the "Stipulation") whereby the parties agreed,

among other things, that: (a) the Eclipse Motion and the Eclipse Motion to Shorten would be deemed withdrawn upon entry of the Stipulation; (b) the automatic stay arising under section 362 of the Bankruptcy Code would be deemed modified to permit Eclipse to proceed with its nonbankruptcy litigation against Triad Hunter in the appropriate venue; and (c) Triad Hunter would reverse its suspension of Eclipse's "Take in Kind Election," subject to certain conditions. The Stipulation is filed at Docket No. 185 in these Chapter 11 Cases.

### G.    RSA Assumption Motion

As described more fully herein, before commencing the Chapter 11 Cases, the Debtors, certain holders of Second Lien Claims, and certain holders of Note Claims worked diligently to negotiate the terms of a global restructuring. The result of these efforts was the Restructuring Support Agreement executed prior to the filing of the Petitions on December 15, 2015, the material terms of which are incorporated in the Plan. The Restructuring Support Agreement binds the support of the Restructuring Support Parties for the restructuring contemplated thereby so long as the Debtors satisfy the milestone deadlines and other conditions contained in the Restructuring Support Agreement.

On January 7, 2016, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume the Restructuring Support Agreement* [Docket No. ___] (the "RSA Assumption Motion"). Pursuant to the RSA Assumption Motion, the Debtors request entry of an order authorizing the Debtors to assume the prepetition Restructuring Support Agreement among the Debtors and the Restructuring Support Parties.

### H.    Other Litigation Matters

In the ordinary course of business, the Debtors are parties to a number of lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### I.    Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into over one thousand Executory Contracts and Unexpired Leases. The Debtors, with the assistance of their advisors, have reviewed and will continue to review the Executory Contracts and Unexpired Leases to identify contracts and leases to either assume or reject pursuant to sections 365 or 1123 of the Bankruptcy Code.

On December 23, 2015, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Reject Certain Unexpired Leases Effective* Nunc Pro Tunc *to December 31, 2015, and (II) Granting Related Relief* [Docket No. 132] (the "Houston Lease Rejection Motion"). The Houston Lease Rejection Motion seeks to reject an Unexpired Lease for certain nonresidential real property located in Houston, Texas, as well as certain ancillary agreements related thereto. A hearing on the Houston Lease Rejection Motion will be held on January 11, 2016.

On January 7, 2016, the Debtors also filed the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving Expedited Procedures to Reject Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. ___] (the "Rejection Procedures Motion"). Given the large number of executory contracts and unexpired leases to which the Debtors are party, the Debtors filed the Rejection Procedures Motion to implement expedited procedures allowing for the efficient assumption or rejection of executory contracts and unexpired leases. A hearing on the Rejection Procedures Motion will be held on January 28, 2016.

The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of the remainder of their Executory Contracts and Unexpired Leases to be carried out as of the Effective Date, but may also elect to file additional discrete motions seeking to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases before such time.

### J.    Subscription to the DIP Facility

Pursuant to the Restructuring Support Agreement, the Backstoppers agreed to provide all Noteholders and all Second Lien Lenders the opportunity to participate as DIP Facility Lenders on a pro rata basis based upon their holdings of Note Claims and Second Lien Claims, provided that such Noteholders or Second Lien Lenders execute a joinder to the Restructuring Support Agreement on behalf of all Claims that they hold against the Debtors, including any DIP Facility Claims. To that end, on December 21, 2015, the Debtors filed the *Notice of Filing of Debtor in Possession Financing Syndication Procedures* [Docket No. 109], which included, as an exhibit, the DIP Facility syndication procedures, and the Debtors have worked with the Notice and Claims Agent as well as the DIP Facility Agent, to effectuate the DIP Facility syndication process.

Pursuant to the original procedures as filed on December 21, 2015, the deadline for subscribing to the DIP Facility was January 8, 2016 at 5:00 p.m. (prevailing Eastern Time). On January 6, 2016, the Noteholder Backstoppers and the Debtors agreed to extend the subscription period for all Noteholders interested in participating in the DIP Facility (i.e. as Tranche B Lenders thereto) to March 10, 2016, at 5:00 p.m. (prevailing Eastern Time), and filed a notice on the docket in the Chapter 11 Cases with regard thereto [Docket No. 193].

## IX.    RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under

the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Court will reach the same conclusion.

### 2.    The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

### 3.    The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan. In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or proceed with a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 4.    The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan. A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If a chapter 11 plan of reorganization is not confirmed by the Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Allowed Claims against them would ultimately receive on account of such Allowed Claims.

Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan. If the Plan is not confirmed, it is unclear what distributions, if any, holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently provided in

the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.    Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.    Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to chapter 11 proceedings, changes in consumer demand for, and acceptance of, their oil and gas, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code provides the Debtors with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose the Plan upon filing their Petitions.  If the Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' businesses after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

### 7.    The Chapter 11 Cases May Be Converted to Cases under Chapter 7 of the Bankruptcy Code

If the Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than reorganizing or selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some

36

of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8. The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

### 10. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 11. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors, Reorganized Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### B. Risks Related to Recoveries under the Plan

#### 1. The Total Amount of Allowed General Unsecured Claims May Be Higher Than Anticipated By the Debtors

With respect to holders of Allowed General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated.

### 2. The Debtors May Not Be Able to Achieve their Projected Financial Results

The Reorganized Debtors may not be able to achieve their projected financial results.  The Financial Projections set forth in this Disclosure Statement represent the Debtors' management team's best estimate of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the United States and world economies in general, and the industry segments in which the Debtors operate in particular.  While the Debtors believe that the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance that they will be realized.  If the Debtors do not achieve their projected financial results, the value of the New Common Equity may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the financial condition or results of operations reflected in the Debtors' historical financial statements.

### 3. The Reorganized Debtors' New Common Equity Initially Will Not Be Publicly Traded

The New Common Equity to be issued under the Plan will not be listed on or traded on any nationally recognized market or exchange.  Accordingly, there can be no assurance that an active trading market for the New Common Equity will develop, nor can any assurance be given as to the prices at which such stock might be traded. In the event an active trading market does not develop, the ability to transfer or sell New Common Equity may be substantially limited.

### 4. Certain Holders of New Common Equity May Be Restricted in their Ability to Transfer or Sell their Securities

To the extent that the New Common Equity issued under the Plan is covered by section 1145(a)(1) of the Bankruptcy Code, it may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities.  Resales by Persons who receive New Common Equity pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  Such Persons would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.

The New Common Equity will not be registered under the Securities Act or any state securities laws, and the Debtors make no representation regarding the right of any holder of New Common Equity to freely resell the New Common Equity.  *See* Article XII to this Disclosure Statement, entitled "CERTAIN SECURITIES LAW MATTERS," which begins on page 51.

### 5. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XIII of this Disclosure Statement, entitled "CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN," which begins on page 53, to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors and holders of Claims.

### 6. The Debtors May Not Be Able to Accurately Report Their Financial Results

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors'

financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud. Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required for the Debtors' financial reporting under SEC rules and regulations and the terms of the agreements governing the Debtors' indebtedness. Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition. Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

### 7.   The Backstoppers May Decide Not to Fund the Final DIP Facility Draw

The availability of the Final DIP Facility Draw is subject to a number of conditions precedent, not all of which may occur. In particular, the Final DIP Facility Draw may not be funded unless at least 25 percent of the holders of the funded loans and unfunded commitments made by the Second Lien Backstoppers (the "Tranche A Lenders") or at least 25 percent of the holders of the funded loans and unfunded commitments made by the Noteholder Backstoppers (the "Tranche B Lenders") determine to fund the Final DIP Facility Draw. If the Debtors do not obtain the Final DIP Facility Draw, they may lack sufficient liquidity to continue operating in the ordinary course, may be unable to the consummate the Plan or any other plan of reorganization, or may be forced to seek alternative sources of financing, which may not be available on terms as favorable as those provided under the DIP Facility.

### 8.   The Resolution of Litigation with Samson Resources Company Could Materially Impact Creditor Recoveries

Debtor Bakken Hunter LLC ("Bakken") and Samson Resources Company ("Samson") are parties to two Participation Agreements (together, the "Samson Participation Agreements") for the purchase, sale and further participation in oil and gas activities, and a related Operating Agreement pursuant to which Samson was designated the "operator" and was required to conduct operations in a good and workmanlike manner (together with the Samson Participation Agreements, the "Samson Agreements").

On July 2, 2015, Bakken commenced an action against Samson by filing a Complaint in the United States District Court for the District of North Dakota, Northwestern Division, Case No. 4:15-cv-00088 (DLH) (the "Samson Action"). In its Complaint, Bakken alleges that Samson breached the Samson Agreements by, among other things, failing to promptly pay and discharge certain expenses resulting in third party liens, failing to keep accurate records, failing to make its accounts available to Bakken for audit and failing to respond to Bakken's concerns about Samson's billing and accounting practices. Bakken seeks equitable relief and damages in an unliquidated amount. The Samson Action has been stayed as a result of Samson's own bankruptcy filing in the United States Bankruptcy Court for the District of Delaware, Case No. 15-11942. On November 20, 2015, Bakken filed a proof of claim against Samson in the Samson bankruptcy. The proof of claim is based on the same facts alleged in the Samson Action.

Prior to filing for bankruptcy, Samson served its answer and counterclaims in the Samson Action. Samson asserted claims for breach of contract, contending that Bakken failed to pay its proportionate share of expenses in the aggregate amount of $17,488,214.33. In June 2015, Samson executed and filed ten oil and gas well liens in Divide County, North Dakota, to secure the payments it contends were due from Bakken. In its counterclaims, Samson sought a declaration that its liens were "valid, first, prior, and superior against the wells and leasehold working interests" as described therein, and sought in its counterclaims to foreclose on those liens.

Bakken believes Samson's claims are without merit.  Bakken disputes Samson's claims and asserts that Samson's purported liens are invalid and unenforceable.  Bakken intends to pursue its claims against Samson and defend itself against Samson's claims.  A resolution of the Samson Action that is adverse to Bakken, however, could materially impact, among other things, creditor recoveries, including recoveries for holders of Claims in Classes 2 and 6.

### C.    Risks Related to the Debtors' and the Reorganized Debtors' Businesses

#### 1.    The Reorganized Debtors May Not Be Able to Generate Sufficient Cash to Service All of their Indebtedness

The Reorganized Debtors' ability to make scheduled payments on, or refinance their debt obligations, depends on the Reorganized Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Reorganized Debtors to pay the principal, premium, if any, and interest on their indebtedness, including, without limitation, anticipated borrowings under the Exit Financing upon emergence.

#### 2.    The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include the following:  (a) ability to develop, confirm, and consummate the Restructuring Transactions specified in the Plan; (b) ability to obtain Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationships with suppliers, service providers, customers, employees, royalty interest holders, working interest holders, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans, including, without limitation, the right of the Tranche A Lenders and the Tranche B Lenders to determine not to fund the Final DIP Facility Draw.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, customers, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition.  Also, the Debtors will need the prior approval of the Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

#### 3.    Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

The Debtors' future results will be dependent upon the successful confirmation and implementation of a plan of reorganization.  A long period of operations under Court protection could

have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. A prolonged period of operating under Court protection also may make it more difficult to retain management and other key personnel necessary to the success and growth of the Debtors' businesses. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their businesses successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. The chapter 11 proceedings also require the Debtors to seek debtor-in-possession financing to fund operations. If the Debtors are unable to obtain final approval of such financing on favorable terms or at all, or if the Debtors are unable to fully draw on the availability under the DIP Facility, the chances of successfully reorganizing the Debtors' businesses may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be enhanced, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, the Reorganized Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

### 4. Financial Results May Be Volatile and May Not Reflect Historical Trends

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as asset impairments, asset dispositions, restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

### 5. The Debtors' Substantial Liquidity Needs May Impact Production Levels and Revenue

The Debtors' principal sources of liquidity historically have been cash flow from operations, sales of oil and gas properties, borrowings under the Revolving Credit Facility and Second Lien Credit Facility, and issuances of debt securities. If the Debtors' cash flow from operations remains depressed or decreases as a result of lower commodity prices or otherwise, the Debtors' ability to expend the capital necessary to replace proved reserves, maintain leasehold acreage, or maintain current production may be limited, resulting in decreased production and proved reserves over time.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.  The Debtors cannot guarantee that cash on hand, cash flow from operations, and cash provided by the DIP Facility will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) ability to comply with the terms and condition of any debtor-in-possession financing and/or cash collateral order entered by the Court in connection with the Chapter 11 Cases; (b) ability to maintain adequate cash on hand; (c) ability to generate cash flow from operations; (d) ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; (e) the willingness of the Tranche A Lenders and the Tranche B Lenders to fund the Final DIP Facility Draw; and (f) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control.  In the event that cash on hand, cash flow from operations, and cash provided under the DIP Facility are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing.  The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms.  The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.  In addition, the Debtors' ability to consummate the Plan is dependent on their ability to obtain Exit Financing in an amount sufficient to fund their postpetition operations.  The Debtors can provide no assurance that Exit Financing will be available in an amount necessary to fund their future operations or, if available, offered on terms (and in an amount) that are acceptable to the Debtors and the Majority Backstoppers.  The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 6. Oil and Natural Gas Prices Are Volatile, and Continued Low Oil or Natural Gas Prices Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition

The Debtors' revenues, profitability and the value of the Debtors' properties substantially depend on prevailing oil and natural gas prices.  Oil and natural gas are commodities, and therefore, their prices are subject to wide fluctuations in response to changes in supply and demand.  Oil and natural gas prices historically have been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions.  During 2015, NYMEX-WTI[18] oil prices fell from an already depressed $60 per Bbl[19] to as low as $35 per Bbl, with prices continuing to fall to an 11-year low of just $33.97 per Bbl as of close of markets on January 6, 2016. Over the same period, Henry Hub[20] natural gas prices fell from as high as $3.70 per MMBtu to as low as $1.80 per MMBtu, with prices closing at $2.27 per MMBtu on January 6, 2016. The Debtors expect such volatility to continue in the future.  The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' control, such as:

---

[18]   West Texas Intermediate light sweet crude oil delivered to Cushing, Oklahoma and listed with the New York Mercantile Exchange.

[19]   "Bbl," or "barrel," is a unit of volume for crude oil and petroleum products.  One bbl equals approximately 42 U.S. gallons.

[20]   Natural gas delivered to the Henry Hub in Louisiana and listed on the New York Mercantile Exchange.

- the current uncertainty in the global economy;

- changes in global supply and demand for oil and natural gas;

- the condition of the United States and global economies;

- the actions of certain foreign countries;

- the price and quantity of imports of foreign oil and natural gas;

- political conditions, including embargoes, war or civil unrest in or affecting other oil producing activities of certain countries;

- the level of global oil and natural gas exploration and production activity;

- the level of global oil and natural gas inventories;

- production or pricing decisions made by the Organization of Petroleum Exporting Countries ("OPEC");

- weather conditions;

- technological advances affecting energy consumption; and

- the price and availability of alternative fuels.

Oil and natural gas prices affect the amount of cash flow available to the Debtors to meet their financial commitments and fund capital expenditures.  Moreover, prior to the Petition Date, the Debtors had terminated most of their open commodity derivative contracts, meaning substantially all of the Debtors' estimated production is exposed to commodity price volatility.  Oil and natural gas prices also impact the Debtors' ability to borrow money and raise additional capital. For example, the amount the Debtors will be able to borrow under the Exit Financing may be subject to periodic redeterminations based, in part, on current oil and natural gas prices and on changing expectations of future prices.  Lower oil and natural gas prices may not only decrease the Debtors' revenues on a per-unit basis, but also may reduce the amount of oil and natural gas that the Debtors can produce economically in the future.  Higher operating costs associated with any of the Debtors' oil or natural gas fields will make their profitability more sensitive to oil or natural gas price declines.  A sustained decline in oil or natural gas prices may materially and adversely affect the Debtors' future business, financial condition, results of operations, liquidity or ability to finance planned capital expenditures.  In addition, a sustained decline in oil or natural gas prices might result in substantial downward estimates of the Debtors' proved reserves.  As a result, if there is a further decline or sustained depression in commodity prices, the Debtors may, among other things, be unable to maintain or increase their borrowing capacity, meet their debt obligations or other financial commitments, or obtain additional capital, all of which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

> **7.  Drilling for and Producing Natural Gas and Oil Are High Risk Activities with Many Uncertainties that Could Adversely Affect the Debtors' Business, Financial Condition and Results of Operations**

The Debtors' future success will depend on, among other things, the success of their exploitation, exploration, development, and production activities.  The Debtors' natural gas and oil exploration and production activities are subject to numerous risks beyond their control, including the risk that drilling will not result in commercially viable oil or natural gas production.  The Debtors' decisions to purchase,

explore, develop, or otherwise exploit prospects or properties will depend in part on the evaluation of data obtained through geophysical and geological analysis, production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations. The Debtors' costs of drilling, completing, and operating wells are often uncertain before drilling commences. Overruns in budgeted expenditures are common risks that can make a particular project uneconomical. Further, the Debtors' future business, financial condition, results of operations, liquidity, or ability to finance planned capital expenditures could be materially and adversely affected by any factor that may curtail, delay, or cancel drilling, including the following:

- delays imposed by or resulting from compliance with regulatory requirements;

- unusual or unexpected geological formations;

- pressure or irregularities in geological formations;

- shortages of or delays in obtaining equipment and qualified personnel;

- equipment malfunctions, failures, or accidents;

- unexpected operational events and drilling conditions;

- pipe or cement failures;

- casing collapses;

- lost or damaged oilfield drilling and service tools;

- loss of drilling fluid circulation;

- uncontrollable flows of oil, natural gas, and fluids;

- fires and natural disasters;

- environmental hazards, such as natural gas leaks, oil spills, pipeline ruptures, and discharges of toxic gases;

- adverse weather conditions;

- reductions in oil and natural gas prices;

- natural gas and oil property title problems; and

- market limitations for natural gas and oil.

If any of these factors were to occur with respect to a particular field, the Debtors could lose all or a part of their investment in the field, or they could fail to realize the expected benefits from the field, either of which could materially and adversely affect their revenue and profitability.

### 8. Commodity Prices and Hedging May Present Additional Risks

During the Chapter 11 Cases, the Debtors' ability to enter into new commodity derivatives covering additional estimated future production will depend upon either entering into unsecured hedges or obtaining Court approval to enter into secured hedges. As a result, the Debtors may not be able to enter into additional commodity derivatives covering their production in future periods on favorable terms or at

all.  If the Debtors cannot or choose not to enter into commodity derivatives in the future, the Debtors could be more affected by changes in commodity prices than their competitors that engage in hedging arrangements.  The Debtors' inability to hedge the risk of low commodity prices in the future, on favorable terms or at all, could have a material adverse impact on their businesses, financial condition, and results of operations.

If the Debtors are able to enter into any commodity derivatives, such derivatives may limit the benefit the Debtors would receive from increases in commodity prices.  These arrangements would also expose the Debtors to risk of financial losses in some circumstances, including the following:  (a) the Debtors' production could be materially less than expected; or (b) the counterparties to the contracts could fail to perform their contractual obligations.

If the Debtors' actual production and sales for any period are less than the production covered by any commodity derivatives (including reduced production due to operational delays) or if the Debtors are unable to perform their exploration and development activities as planned, the Debtors might be required to satisfy a portion of their obligations under those commodity derivatives without the benefit of the cash flow from the sale of that production, which may materially impact the Debtors' liquidity.  Additionally, if market prices for production exceed collar ceilings or swap prices, the Debtors would be required to make monthly cash payments, which could materially adversely affect their liquidity.

## 9.  The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results.  It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

## 10.  The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel, including the Debtors' executive officers.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition. Because competition for experienced personnel in the oil and gas industry can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale at the corporate and/or field levels could have a material adverse effect on the Debtors' ability to meet customer and counterparty expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

## 11.  Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation.  With few exceptions, all Claims that arise prior to the Debtors' filing of their Petitions or before confirmation of the plan of reorganization (a) would be subject to compromise and/or treatment under the plan of reorganization and/or (b) would be

discharged in accordance with the terms of the plan of reorganization. Any Claims not ultimately discharged through a plan of reorganization could be asserted against the reorganized entity and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

### 12. Relationship with EHH

Certain of the Debtors' operations are reliant on their relationship with EHH and its wholly-owned subsidiaries.  The Debtors cannot guarantee that they will continue to have such a relationship with EHH on an ongoing basis.  Although the Debtors own approximately 44.5 percent of the equity in EHH, NHIP, as the current majority owner of EHH, may direct EHH to take action that adversely affects the Debtors in the future.  This could include, among other things, the suspension or termination of services provided to the Debtors by EHP under the Gas Gathering Agreements.  This could force the Debtors to shut-in certain of their wells, which would disrupt their operations in the Appalachian Basin and otherwise adversely impact their businesses.

Further, under the Eureka LLC Agreement, the Debtors are unable to pledge their equity interest in EHH as security for new indebtedness absent the consent of NHIP.  This limitation may inhibit the Debtors' ability to obtain Exit Financing or other financing to fund their operations on the most favorable terms possible.  In addition, the Eureka LLC Agreement contains numerous provisions that restrict the Debtors' ability to monetize their interest in EHH.  As such, any efforts now or in the future to monetize such interest to generate additional liquidity may be adversely affected.

## X.    SOLICITATION AND VOTING PROCEDURES

This Disclosure Statement, which is accompanied by a Ballot or Ballots to be used for voting on the Plan, is being distributed to the holders of Claims in those Classes that are entitled to vote to accept or reject the Plan.  The procedures and instructions for voting and related deadlines are set forth in the exhibits annexed to the Disclosure Statement Order, which is attached hereto as **Exhibit D**.

***The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan***.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING PROCESS SET FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY**.
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER ATTACHED HERETO FOR A MORE COMPREHENSIVE DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against a debtor are entitled to vote on a chapter 11 plan.  The table in section IV.C of this Disclosure Statement, entitled "Am I entitled to vote on the Plan?," which begins on page 5, provides a summary of the status and voting rights of each Class (and, therefore, of each holder within such Class absent an objection to the holder's Claim) under the Plan.

As shown in the table, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Classes 4, 5, and 6 (collectively, the "Voting Classes").  The holders of Claims in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution

under the Plan. Accordingly, holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from holders of Claims and Interests in Classes 1, 2, 3, 7, 8, and 9. Additionally, the Disclosure Statement Order provides that certain holders of Claims in the Voting Classes, such as those holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### B.    Voting Record Date

**The Voting Record Date is [February 11], 2016.** The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

### C.    Voting on the Plan

**The Voting Deadline is [March 21], 2016, at 4:00 p.m. (prevailing Eastern Time)**. In order to be counted as votes to accept or reject the Plan, all ballots must be (a) electronically submitted utilizing the online balloting portal maintained by the Notice and Claims Agent on or before the Voting Deadline; or (b) properly executed, completed, and delivered (either by using the return envelope provided, by first class mail, overnight courier, or personal delivery) so that the ballots are **actually received** by the Notice and Claims Agent on or before the Voting Deadline at the following address:

---

**DELIVERY OF BALLOTS**

**MAGNUM HUNTER RESOURCES CORPORATION**
**C/O PRIME CLERK**
**830 3RD AVENUE 3TH FLOOR**
**NEW YORK, NY 10022**

If you received an envelope addressed to your nominee, please return your ballot to your nominee, allowing enough time for your nominee to cast your vote on a ballot before the Voting Deadline.

---

### D.    Ballots Not Counted

**No ballot will be counted toward Confirmation if, among other things**: (1) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (2) it was transmitted by facsimile, email, or other electronic means other than as specifically set forth in the ballots; (3) it was cast by an entity that is not entitled to vote on the Plan; (4) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (5) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (6) it was sent to the Debtors, the Debtors' agents/representatives (other than the Notice and Claims Agent), the Second Lien Agent, an indenture trustee, or the Debtors' financial or legal advisors instead of the Notice and Claims Agent; (7) it is unsigned; or (8) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

> **IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS, PLEASE CONTACT THE NOTICE AND CLAIMS AGENT TOLL-FREE AT 844-276-3026. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR OTHERWISE NOT IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER WILL <u>NOT</u> BE COUNTED.**

## XI.   CONFIRMATION OF THE PLAN

### A.   Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims and Interests.

At the Confirmation Hearing, the Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### B.   Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit E** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of A&M, the Debtors' financial advisor.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

If the Plan is not confirmed, and the Debtors fail to propose and confirm an alternative plan of reorganization, the Debtors' businesses may be liquidated pursuant to the provisions of a chapter 11 liquidating plan.  In liquidations under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation may result in larger recoveries than a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs.  Any distribution to holders of Claims under a chapter 11 liquidation plan would most likely be substantially delayed.  Most importantly, the Debtors believe that any distributions to creditors in a chapter 11 liquidation scenario would fail to capture the significant going concern value of their businesses, which is reflected in the New Common Equity to be distributed under the Plan.  Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

## C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of PJT, have analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors have prepared a projected consolidated income statement, which includes the following: (a) the Debtors' consolidated, unaudited, preliminary, financial statement information for the fiscal year ended December 31, 2015 and (b) consolidated, projected, unaudited, financial statement information of the Reorganized Debtors (collectively, the "Financial Projections") for the period beginning 2016 and continuing through 2018.  The Financial Projections are based on an assumed Effective Date of April 15, 2016 and certain assumptions regarding the Debtors' ability to obtain Exit Financing.  To the extent that the Effective Date occurs before or after April 15, 2016, recoveries on account of Allowed Claims could be impacted.  Creditors and other interested parties should review Article IX of this Disclosure Statement, entitled "RISK FACTORS," which begins on page 34, for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit F** and incorporated herein by reference.  Based upon the Financial Projections, the Debtors believe that they will be a viable operation following the Chapter 11 Cases and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

## D.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[21]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have *actually* voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

## E.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided* that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is

---

[21]    A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

"fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

### 1.  No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2.  Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100 percent of the amount of Allowed Claims in that Class.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### F.    Valuation of the Debtors

In conjunction with formulating the Plan and satisfying its obligations under section 1129 of the Bankruptcy Code, the Debtors determined that it was necessary to estimate the post-Confirmation going concern value of the Debtors.  The Valuation Analysis is set forth in **Exhibit G** attached hereto[22] and incorporated herein by reference.  The Debtors' enterprise valuation, as set forth in the Valuation Analysis, is substantially less than the value ascribed to the Debtors' assets in their Petitions. The value of the Debtors' assets as listed on the Debtors' Petitions was based on an accounting book value calculated in accordance with Generally Accepted Accounting Principles ("GAAP") as of September 30, 2015.  Book values of assets prepared in accordance with GAAP generally do not reflect the current performance of the assets or the impact of the commodity price environment and may differ materially

---

[22]    As stated earlier, to the extent Exhibit G is not filed contemporaneously with this Disclosure Statement, it will be filed by no later than January 14, 2016.

from the actual value and/or performance of the underlying assets. Given the dramatic swing in the commodity prices over the past few months, this difference is material. As such, the value listed in the Petitions cannot be, and was not, used to determine the Debtors' enterprise valuation.

## XII.    CERTAIN SECURITIES LAW MATTERS

### A.    New Common Equity

As discussed herein, the Plan provides for Reorganized MHRC to distribute New Common Equity to the DIP Facility Lenders, Second Lien Lenders, and the Noteholders. New Common Equity will also be distributed under the Management Incentive Plan

The Debtors believe that the class of New Common Equity will be "securities," as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities law (a "Blue Sky Law"). The Debtors further believe that the offer and sale of the New Common Equity pursuant to the Plan is, and subsequent transfers of the New Common Equity by the holders thereof that are not "underwriters" (as defined in section 2(a)(11) of the Securities Act and in the Bankruptcy Code) will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code, and any applicable state Blue Sky Law. The New Common Equity underlying the Management Incentive Plan will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.

### B.    Issuance and Resale of New Common Equity under the Plan

#### 1.    Private Placement Exemptions

All shares of New Common Equity issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code. It is not anticipated that any New Common Equity will be issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder, but if any shares of New Common Equity are issued pursuant to such exemption, those shares will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. The New Common Equity underlying the Management Incentive Plan will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.

Persons who are issued New Common Equity pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder will hold "restricted securities." Resales of such restricted securities would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Holders of restricted securities would, however, be permitted to resell New Common Equity without registration if they are able to comply with the applicable provisions of Rule 144 or Rule 144A under the Securities Act, or another applicable exemption from the securities laws, or if such securities are registered with the Securities and Exchange Commission.

*Recipients of the New Common Equity are advised to consult with their own legal advisors as to the availability of any exemption from registration under the Securities Act and any applicable state Blue Sky Law.*

### 2.    Resale of New Common Equity; Definition of Underwriter

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer":  (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest; (b) offers to sell securities offered or sold under a plan for the holders of such securities; (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan; or (d) is an issuer of the securities within the meaning of section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter" contained in section 2(a)(11) of the Securities Act, is intended to cover "Controlling Persons" of the issuer of the securities.  "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "Controlling Person" of the debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities.  In addition, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent or more of a class of securities of a reorganized debtor may be presumed to be a "Controlling Person" and, therefore, an underwriter.

Resales of the New Common Equity by Entities deemed to be "underwriters" (which definition includes "Controlling Persons") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of New Common Equity who are deemed to be "underwriters" may be entitled to resell their New Common Equity pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such Person if the required holding period has been met and, under certain circumstances, current information regarding the issuer is publicly available and volume limitations, manner of sale requirements and certain other conditions are met.  Whether any particular Person would be deemed to be an "underwriter" (including whether the Person is a "Controlling Person") with respect to the New Common Equity would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the New Common Equity and, in turn, whether any Person may freely resell New Common Equity.  **The Debtors recommend that potential recipients of New Common Equity consult their own counsel concerning their ability to freely trade such securities without compliance with the federal law and any applicable state Blue Sky Law.**

### 3.    New Common Equity / Management Incentive Plan

The percentage of New Common Equity to be set aside for the Management Incentive Plan shall be up to a percentage determined by the Debtors and the Majority Backstoppers prior to the Confirmation

Hearing, which maximum percentage shall be disclosed either in the Plan Supplement or the Confirmation Order. The parameters, incentives, and eligible executives with respect to this Management Incentive Plan shall be determined by the compensation committee of the New MHRC Board, with input to be provided to the New MHRC Board designees by the Backstoppers prior to the Effective Date. The Confirmation Order shall authorize the New MHRC Board to adopt and enter into the Management Incentive Plan, on the terms set forth in Article IV.N of the Plan. The Management Incentive Plan shall dilute all of the New Common Equity.

## XIII.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.  Introduction

The following discussion summarizes certain United States ("U.S.") federal income tax consequences of the implementation of the Plan to the Debtors, the Reorganized Debtors, and certain holders of Claims. This summary is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions and published administrative rules, and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof (collectively, "Applicable Tax Law"). Changes in the rules or new interpretations of the rules may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. The Debtors have not requested, and will not request, any ruling or determination from the IRS or any other taxing authority with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, persons who hold Claims or who will hold the New Common Equity as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy). Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code). This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the Tax Code. This summary does not discuss differences in tax consequences to holders of Claims that act or receive consideration in a capacity other than any other holder of a Claim of the same Class or Classes, and the tax consequences for such holders may differ materially from that described below.

For purposes of this discussion, a "U.S. holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or

(B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "non-U.S. holder" is any holder of a Claim that is not a U.S. holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

B.      **Certain U.S. Federal Income Tax Consequences to the Debtors and the Reorganized Debtors**

1.      **Potential Characterization of Restructuring Transactions as a Taxable Transaction**

The U.S. federal income tax consequences of the implementation of the Plan to the Debtors will depend on, among other things, whether the Restructuring Transactions are structured in whole or in part as a taxable sale of the Debtors' assets and/or stock (such a structure, a "Taxable Transaction").  The Debtors expect that they generally will be able to structure the Restructuring Transactions as a Taxable Transaction in whole or in part, if desired.  For example, the Debtors may structure the Restructuring Transactions in part as a transfer of some of the Debtors' assets in a Taxable Transaction to a newly formed corporation that will be the Reorganized MHRC and in part as a tax-free exchange of Claims for New Common Equity of such Reorganized MHRC such that following the consummation of the Plan Reorganized MHRC will own all of the stock of MHRC.  The Debtors have not yet determined whether or not they intend to structure the Restructuring Transactions as a Taxable Transaction, whether in whole or in part.

If the transactions undertaken pursuant to the Plan is structured in whole or in part as a Taxable Transaction with respect to the assets of any Debtor, the Debtors would recognize taxable gain or loss upon the transfer in an amount equal to the difference between (a) the greater of (1)the fair market value of the assets treated as sold in the Taxable Transaction and (2) the sum of any cash and the fair market value of any property received by the Debtors plus the amount of any of the Debtors' liabilities assumed by the acquiror in exchange for the assets treated as sold in the Taxable Transaction, and (b) the applicable Debtor's tax basis in such assets.    It is possible the Debtors will recognize a substantial amount of taxable income or gain in connection with a Taxable Transaction and may not have sufficient net operating loss carryforwards or other tax attributes to apply to fully offset the amount of gain recognized, in which case the Debtors will be required to pay cash income taxes (federal and state) with respect to the net amount of taxable income (and the Debtors' ability to apply net operating losses ("NOLs") to reduce any such taxable income is also subject to "Alternative Minimum Tax" discussed in Article XIII.B.4, herein).

If a Reorganized Debtor purchases assets or stock of any Debtor pursuant to a Taxable Transaction, it will take a fair market value basis in the transferred assets or stock. However, if a Taxable Transaction involves a purchase of stock of an entity treated as a corporation for income tax purposes, the Debtor whose stock is transferred would retain its basis in its assets (unless the seller of such stock and the Reorganized Debtor of such stock are corporations for U.S. federal income tax purposes and make an election under Tax Code section 338(h)(10) or 336(e) to treat the transaction as a taxable sale of the underlying assets), subject to reduction due to COD Income (as defined herein).

## 2. Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("COD Income"), for U.S. federal income tax purposes, upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of Cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued, and (iii) the fair market value of any other new consideration (including stock of the debtor) given in satisfaction of such indebtedness at the time of the exchange.

Under section 108 of the Tax Code, a debtor is not required to include COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income pursuant to the rule discussed in the preceding sentence. In general, tax attributes will be reduced in the following order: (a) NOLs and NOL carryforwards; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets; (f) passive activity loss and credit carryovers; and (g) foreign tax credit carryovers. Alternatively, a debtor with COD Income may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Tax Code. The reduction in tax attributes occurs only after the tax for the year of the debt discharge has been determined. Any excess COD Income over the amount of available tax attributes is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

The Treasury Regulations address the method and order for applying tax attribute reduction to an affiliated group of corporations. Under these Treasury Regulations, the tax attributes of each member of an affiliated group of corporations that is excluding COD Income is first subject to reduction. To the extent the debtor member's tax basis in stock of a lower-tier member of the affiliated group is reduced, a "look through rule" requires that a corresponding reduction be made to the tax attributes of the lower-tier member. If a debtor member's excluded COD Income exceeds its tax attributes, the excess COD Income is applied to reduce certain remaining consolidated tax attributes of the affiliated group.

As a result of the Restructuring Transactions, the Debtors expect to realize significant COD Income. The amount of the tax attributes required to be reduced by COD Income will depend in part on whether the transaction undertaken pursuant to the Plan is structured in whole or in part as a Taxable Transaction. However, regardless of whether the Restructuring Transactions are structured as a Taxable Transaction, the Debtors expect that there will be material reductions in NOLs, NOL carryforwards, and other tax attributes.

## 3. Limitation of NOL Carryforwards and Other Tax Attributes

As of December 31, 2014, the Debtors had approximately $642 million of NOLs and approximately $204 million of capital losses. The Debtors estimate that, as of December 31, 2015, they have approximately $762 million of NOLs. To the extent the Restructuring Transactions include a Taxable Transaction, any gain recognized as a result thereof would reduce the Debtors' NOLs and, to the

extent such gain is capital, capital loss carryovers. In addition, any NOL carryovers, capital loss carryovers, tax credit carryovers, and certain other tax attributes that are not utilized to offset gain from a Taxable Transaction could be eliminated if the applicable Debtor is liquidated following the Taxable Transaction. Following the Effective Date, the Debtors anticipate that any remaining NOL carryovers, capital loss carryovers, tax credit carryovers, and certain other tax attributes (such as losses and deductions that have accrued economically but are unrecognized as of the date of the ownership change) of the Reorganized Debtors allocable to periods before the Effective Date (collectively, the "Pre-Change Losses") may be subject to limitation under sections 382 and 383 of the Tax Code as a result of an "ownership change" of the Reorganized Debtors by reason of the transactions consummated pursuant to the Plan.

Under sections 382 and 383 of the Tax Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The rules of section 382 of the Tax Code are complicated, but as a general matter, the Debtors anticipate that the distribution of the New Common Equity pursuant to the Plan will result in an "ownership change" of the Reorganized Debtors for these purposes, and that the Reorganized Debtors' use of their Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Tax Code applies.

For this purpose, if a corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's (or consolidated group's) net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15 percent of the fair market value of its assets (with certain adjustments) before the ownership change.

### (a)    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the 3-calendar-month period ending with the calendar month in which the "ownership change" occurs: 2.65 percent for January 2016). The section 382 Limitation may be increased to the extent that the Debtors recognize certain built-in gains in their assets during the five-year period following the ownership change, or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Tax Code applies a similar limitation to capital loss carryforwards and tax credits. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

### (b)    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their Claims, at least 50 percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception"). Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, NOL carryforwards will be reduced by the amount of any interest deductions claimed during the three taxable

years preceding the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies and the Reorganized Debtors undergo another "ownership change" within two years after the Effective Date, then the Reorganized Debtors' Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception"). Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of the value of the debtor corporation's new stock (with certain adjustments) immediately after the ownership change or the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and the debtor may undergo an ownership change within two years without triggering the elimination of its Pre-Change Losses.

The Debtors believe that the Restructuring Transactions will not qualify for the 382(l)(5) Exception. Even if the Restructuring Transactions qualify for the 382(l)(5) Exception, the Debtors or the Reorganized Debtors may decide to elect out of the 382(l)(5) Exception, particularly if it appears likely that another ownership change will occur within two years after emergence. In either case, the Debtors expect that their use of the Pre-Change Losses (if any) after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtors take advantage of the 382(l)(6) Exception or the 382(l)(5) Exception, the Reorganized Debtors' use of their Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of section 382 of the Tax Code were to occur after the Effective Date.

### 4. Alternative Minimum Tax

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20 percent rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in certain years, which can offset 100 percent of a corporation's AMTI, only 90 percent of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. The effect of this rule could cause the Reorganized Debtors to owe some federal income tax on taxable income in future years even if NOL carryforwards are available to offset that taxable income. Additionally, under section 56(g)(4)(G) of the Tax Code, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under section 382(h) of the Tax Code, immediately before the ownership change, the effect of which may increase the amount of AMT owed by the Reorganized Debtors.

**C.      Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Claims**

The following discussion assumes that the Debtors will undertake the Restructuring Transactions currently contemplated by the Plan.  Holders of Claims and Interests are urged to consult their tax advisors regarding the tax consequences of the Restructuring Transactions.

**1.   U.S. Federal Income Tax Consequences to U.S. Holders of Allowed DIP Facility Claims, Second Lien Claims, and Note Claims**

Pursuant to the Plan, except to the extent that a U.S. holder of an Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim agrees to a less favorable treatment in exchange for full and final satisfaction, settlement, release and discharge of the DIP Facility Claims, Second Lien Claims, or Note Claims, respectively, the U.S. holder of such Claims shall receive a Pro Rata distribution of the New Common Equity (subject to dilution by the Management Incentive Plan).

Whether and the extent to which the U.S. holder of a DIP Facility Claim, Second Lien Claim, or Note Claim recognizes gain or loss as a result of the exchange of its claim for the New Common Equity depends, in part, on whether (a) the exchange is intended to qualify in whole or in part as an exchange of stock or securities in a tax-free reorganization to which Reorganized MHRC is treated as a party under the reorganization provisions of the Tax Code (a "Reorganization") or (b) a tax-free transfer of property to Reorganized MHRC in exchange for New Common Equity pursuant to Section 351 of the Tax Code (a "351 Exchange").  Whether an exchange of such holder's Claim for New Common Equity qualifies as a tax-free Reorganization with respect to such holder further depends on whether  the debt underlying the DIP Facility Claim, Second Lien Claim, or Note Claim surrendered is treated as a "security" for purposes of the reorganization provisions of the Tax Code, as further described below.  In contrast, if the exchange of such holder's claim for New Common Equity is structured as a 351 Exchange, the exchange may be tax-free to such holder regardless of whether the debt underlying such claim is a security.

**(a)      U.S. Holder Exchanges its Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim in a Transaction that does not Qualify as a Reorganization or a 351 Exchange**

To the extent that a U.S. holder of an Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim exchanges its Claim for New Common Equity in a transaction that does not qualify as a Reorganization or a 351 Exchange such U.S. holder will be treated as exchanging such Claim for New Common Equity, in a taxable exchange under section 1001 of the Tax Code.  Accordingly, each U.S. holder of such Claim should recognize gain or loss equal to the difference between (1) the fair market value of New Common Equity received in exchange for the Claim; and (2) such U.S. holder's adjusted basis, if any, in such Claim.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. holder, the nature of the Claim in such U.S. holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. holder previously has claimed a bad debt deduction with respect to its Claim.   The deductibility of capital losses is subject to certain limitations as discussed below.   *See* Sections XIII.C.4 and XIII.C.5 of this Disclosure Statement, entitled "Accrued Interest" and "Market Discount," respectively, which begin on page 61. A U.S. holder's tax basis in any New Common Equity received should equal the fair market value of such New Common Equity as of the date such New Common Equity is distributed to the holder.  A U.S. holder's holding period for the New Common Equity received should begin on the day following the Effective Date.

**(b)      U.S. Holder Exchanges Its Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim in a Transaction that Is Intended to Qualify as a Reorganization**

### (i)    Treatment of a Debt Instrument as a "Security"

To the extent that a U.S. holder exchanges its Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim for New Common Equity in a transaction that is intended to qualify as a Reorganization, such exchange may qualify for tax-free treatment if the debt underlying the surrendered Claim is a security. Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued. Since the obligations underlying the DIP Facility Claims and the Second Lien Claims have terms of less than five years it is unlikely that such Claims constitute securities for U.S. federal income tax purposes.

### (ii)    Treatment of a U.S. Holder of an Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim if the Exchange of Its Claims Is Treated as an Exchange of Securities Pursuant to a Reorganization

To the extent the exchange of an Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim for New Common Equity is treated as an exchange of securities pursuant to a Reorganization, a U.S. holder should not recognize loss with respect to the exchange and should not recognize gain (subject to "Accrued Interest," as discussed in Section XIII.C.4 of this Disclosure Statement, entitled "Accrued Interest," which begins on page 61). Such U.S. holder's total combined tax basis in its New Common Equity received should equal the U.S. holder's tax basis in the Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim surrendered therefor increased by gain, if any, recognized by such U.S. holder in the transaction.    Subject to Section XIII.C.4 of this Disclosure Statement, entitled "Accrued Interest," a U.S. holder's holding period for its interest in the New Common Equity should include the holding period for the Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim surrendered therefor.

### (iii)    Treatment of a U.S. Holder of an Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim if Its Claim Does NOT Constitute a Security

To the extent the transactions undertaken pursuant to the Plan are structured to qualify as a Reorganization and not as a 351 Exchange but a U.S. holder's Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim is not treated as a security a U.S. holder of such Claim will be treated as exchanging such Claim for New Common Equity in a taxable exchange under section 1001 of the Tax Code. The U.S. federal income tax consequences to such U.S. holder will be substantially similar to the consequences, described above, that such U.S. holder would have experienced if such U.S. holder's exchange of its Claim did not constitute a Reorganization or a 351 Exchange.

(c)     **U.S. Holder Exchanges Its Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim in a Transaction That Qualifies as a 351 Exchange**

To the extent a U.S. holder's exchange of an Allowed DIP Facility Claim, Allowed Second Lien Claim, or Allowed Note Claim for New Common Equity qualifies as a 351 Exchange the consequences to such U.S. holder will be substantially similar to the consequences, described above, that such holder would have experienced if such holder's exchange were treated as an exchange of securities pursuant to a Reorganization.

### 2.    U.S. Federal Income Tax Consequences to U.S. Holders of General Unsecured Claims

The Debtors intend to create a General Unsecured Claims Distribution Escrow Account to hold the Unsecured Creditor Cash Pool held for the benefit of holders of Allowed General Unsecured Claims. The Debtors and the Reorganized Debtors intend to (i) treat the General Unsecured Claims Distribution Escrow Account as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  Under such treatment, a separate federal income tax return shall be filed with the IRS for the General Unsecured Claims Distribution Escrow Account with respect to any income attributable to the account, and any taxes imposed on the General Unsecured Claims Distribution Escrow Account or its assets shall be paid out of the assets of the General Unsecured Claims Distribution Escrow Account.

Although not free from doubt, U.S. holders should not recognize any gain or loss on the date that the Unsecured Creditor Cash Pool is transferred by the Debtors to the General Unsecured Claims Distribution Escrow Account, but should recognize gain or loss in an amount equal to: (i) the amount of Cash actually distributed to such U.S. holder from the General Unsecured Claims Distribution Escrow Account, less (ii) the U.S. holder's adjusted tax basis of its Claim when and to the extent Cash is actually distributed to such U.S. holder.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. holder, the nature of the Claim in such U.S. holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. holder previously has claimed a bad debt deduction with respect to its Claim.     The deductibility of capital losses is subject to certain limitations as discussed below.   *See* Sections XIII.C.4 and XIII.C.5 of this Disclosure Statement, entitled "Accrued Interest" and "Market Discount," respectively, which begin on page 61.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

### 3.    U.S. Federal Income Tax Consequences to Holders of Owning and Disposing of Shares of New Common Equity

(a)     **Dividends on New Common Equity**

Any distributions made on account of the New Common Equity will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of the Reorganized MHRC as determined under U.S. federal income tax principles.  To the extent that a U.S. holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be

treated first as a non-taxable return of capital reducing the U.S. holder's basis in its shares.  Any such distributions in excess of the holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

**(b)      Sale, Redemption, or Repurchase of New Common Equity**

Unless a non-recognition provision applies, U.S. holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of New Common Equity.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. holder held the New Common Equity for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.  The deductibility of capital losses is subject to certain limitations as described below.

**(c)      Medicare Tax**

Certain U.S. holders that are individuals, estates, or trusts are required to pay an additional 3.8% tax on, among other things, dividends and gains from the sale or other disposition of capital assets.  U.S. holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of New Common Equity.

**4.      Accrued Interest**

To the extent that any amount received by a U.S. holder of a Claim is attributable to accrued but unpaid interest on the debt instruments constituting the surrendered Claim, the receipt of such amount should be taxable to the U.S. holder as ordinary interest income (to the extent not already taken into income by the U.S. holder).  Conversely, a U.S. holder of a Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest previously was included in the U.S. holder's gross income but was not paid in full by the Debtors.  Such loss may be ordinary, but the tax law is unclear on this point.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on these Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest.  The IRS could take the position that the consideration received by the holder should be allocated in some way other than as provided in the Plan.  U.S. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 5. Market Discount

Under the "market discount" provisions of the Tax Code, some or all of any gain realized by a U.S. holder of a Claim who exchanges the Claim for an amount on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, by at least a de minimis amount (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. holder on the taxable disposition of a Claim that had been acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. holder (unless the U.S. holder elected to include market discount in income as it accrued). To the extent that the Allowed Claims that were acquired with market discount are exchanged in a tax-free transaction for other property, any market discount that accrued on the Allowed Claims (i.e., up to the time of the exchange) but was not recognized by the U.S. holder is carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the property is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR CLAIMS.**

### 6. Limitation on Use of Capital Losses

A U.S. holder of a Claim who recognizes capital losses as a result of the distributions under the Plan will be subject to limits on the use of such capital losses. For a non-corporate U.S. holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of the lesser of (a) $3,000 ($1,500 for married individuals filing separate returns) or (b) the excess of the capital losses over the capital gains. A non-corporate U.S. holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. holders, capital losses may only be used to offset capital gains. A corporate U.S. holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year or may carry over unused capital losses for the five years following the capital loss year.

### D. Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Claims

#### 1. Consequences to Non-U.S. Holders of Allowed DIP Facility Claims, Second Lien Claims and Note Claims

This following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to non-U.S. holders. The discussion does not include any non-U.S. tax

considerations. The rules governing the U.S. federal income tax consequences to non-U.S. holders are complex. Each non-U.S. holders should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such non-U.S. holders and the ownership and disposition of the New Common Equity, as applicable.

Whether a non-U.S. holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. holders.

### (a) Gain Recognition

Any gain realized by a non-U.S. holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the non-U.S. holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such non-U.S. holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such non-U.S. holder in the United States).

If the first exception applies, to the extent that any gain is taxable and does not qualify for deferral pursuant to a Reorganization of a 351 Exchange as described above, the non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the non-U.S. holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the non-U.S. holder's conduct of a trade or business in the United States in the same manner as a U.S. holder. In order to claim an exemption from withholding tax, such non-U.S. holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a non-U.S. holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### (b) Accrued Interest

Payments to a non-U.S. holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the non-U.S. holder is not a U.S. person, unless:

(i)     the non-U.S. holder actually or constructively owns 10% or more of the total combined voting power of all classes of MHRC's stock entitled to vote;

(ii)    the non-U.S. holder is a "controlled foreign corporation" that is a "related person" with respect to MHRC (each, within the meaning of the Tax Code);

(iii)   the non-U.S. holder is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; or

(iv)    such interest is effectively connected with the conduct by the non-U.S. holder of a trade or business within the United States (in which case, provided the non-U.S. holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the non-U.S. holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. holder (unless an

applicable income tax treaty provides otherwise), and a non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A non-U.S. holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 2. U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Shares of New Common Equity

#### (a) Dividends on New Common Equity

Any distributions made with respect to New Common Equity will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized MHRC's current or accumulated earnings and profits as determined under U.S. federal income tax principles.  To the extent that a non-U.S. holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the holder's basis in its shares. Any such distributions in excess of a non-U.S. holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain from a sale or exchange (and the respective excess distributions as proceeds from a sale or exchange; *see* Section XIII.D(b) of this Disclosure Statement, entitled "Sale, Redemption, or Repurchase of New Common Equity," which begins on page 64).  Except as described below, dividends paid with respect to New Common Equity held by a non-U.S. holder that are not effectively connected with a non-U.S. holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such non-U.S. holder in the United States) will be subject to U.S. federal withholding tax at a rate of 30% (or lower treaty rate or exemption from tax, if applicable). A non-U.S. holder generally will be required to satisfy certain IRS certification requirements in order to claim a reduction of or exemption from withholding under a tax treaty by filing IRS Form W-8BEN or W-BEN-E (or a successor form) upon which the non-U.S. holder certifies, under penalties of perjury, its status as a non-U.S. person and its entitlement to the lower treaty rate or exemption from tax with respect to such payments. Dividends paid with respect to New Common Equity held by a non-U.S. holder that are effectively connected with a non-U.S. holder's conduct of a U.S. trade or business (and if an income tax treaty applies, are attributable to a permanent establishment maintained by such non-U.S. holder in the United States) generally will be subject to U.S. federal income tax in the same manner as a U.S. holder, and a non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such non-U.S. holder's effectively connected earnings and profits that are attributable to the dividends at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty).

#### (b) Sale, Redemption, or Repurchase of New Common Equity

The Debtors expect that Reorganized MHRC will constitute a "United States real property holding corporation" within the meaning of section 897 of the Tax Code as of the Effective Date, and thus

that the New Common Equity will constitute a United States real property interest, for the period required under the Tax Code. As such, any non-U.S. holders of New Common Equity that sell, exchange, or otherwise dispose of their New Common Equity may be subject to 10 percent gross basis withholding, and generally will be required to file U.S. federal income tax returns and pay U.S. federal tax on a graduated basis on any gains recognized on such disposition. Non-U.S. holders who may receive or acquire New Common Equity in connection with the Restructuring Transactions are urged to consult a U.S. tax advisor with respect to the U.S. tax consequences applicable to their acquisition, holding, and disposition of such New Common Equity.

### 3.  FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including dividends, if any, on shares of New Common Equity), and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends (which would include New Common Equity). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

Each non-U.S. holder should consult its own tax advisor regarding the possible impact of these rules on such non-U.S. holder's ownership of New Common Equity.

### E.    Information Reporting and Back-Up Withholding

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. The Debtors will comply with all applicable reporting requirements of the Tax Code. In general, information reporting requirements may apply to distributions or payments made to a holder of a Claim under the Plan.    In addition, backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan unless, in the case of a U.S. holder, such U.S. Holder provides a properly executed IRS Form W-9 and, in the case of non-U.S. holder, such non-U.S. holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. holder's eligibility for an exemption).

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a federal income tax return).

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME**

**TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.    ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS**.

## XIV.   RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  January 7, 2016

MAGNUM HUNTER RESOURCES CORPORATION
on behalf of itself and all other Debtors

_____

Gary C. Evans
Chairman and Chief Executive Officer
909 Lake Carolyn Parkway, Suite 600
Irving, Texas 75039

**<u>Exhibit A</u>**

**Plan of Reorganization**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MAGNUM HUNTER RESOURCES | ) | Case No. 15-12533 (KG) |
| CORPORATION, *et al.*,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

**JOINT CHAPTER 11 PLAN OF REORGANIZATION OF MAGNUM HUNTER
RESOURCES CORPORATION AND ITS DEBTOR AFFILIATES**

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE COURT. THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE COURT.**

---

Edward O. Sassower, P.C. (admitted *pro hac vice*)
Brian E. Schartz (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:    edward.sassower@kirkland.com
        brian.schartz@kirkland.com

- and -

James H.M. Sprayregen, P.C.
Nora S. Tauke Schweighart (admitted *pro hac vice*)
Justin R. Bernbrock (admitted *pro hac vice*)
Alexandra Schwarzman (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:    james.sprayregen@kirkland.com
        nora.schweighart@kirkland.com
        justin.bernbrock@kirkland.com
        alexandra.schwarzman@kirkland.com

*Proposed Co-Counsel to the Debtors*

Laura Davis Jones (DE Bar No. 2436)
Colin R. Robinson (DE Bar No. 5524)
Joseph M. Mulvihill (DE Bar No. 6061)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:    ljones@pszjlaw.com
        crobinson@pszjlaw.com
        jmulvihill@pszjlaw.com

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Magnum Hunter Resources Corporation (9278); Alpha Hunter Drilling, LLC (7505); Bakken Hunter Canada, Inc. (7777); Bakken Hunter, LLC (3862); Energy Hunter Securities, Inc. (9725); Hunter Aviation, LLC (8600); Hunter Real Estate, LLC (8073); Magnum Hunter Marketing, LLC (2527); Magnum Hunter Production, Inc. (7062); Magnum Hunter Resources GP, LLC (5887); Magnum Hunter Resources, LP (5958); Magnum Hunter Services, LLC (5725); NGAS Gathering, LLC (2054); NGAS Hunter, LLC (3737); PRC Williston LLC (1736); Shale Hunter, LLC (1952); Triad Holdings, LLC (8947); Triad Hunter, LLC (5830); Viking International Resources Co., Inc. (0097); and Williston Hunter ND, LLC (3798).  The location of the Debtors' service address is:  909 Lake Carolyn Parkway, Suite 600, Irving, Texas 75039.

**TABLE OF CONTENTS**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ........................................................................................................ 1
  A.    Defined Terms ..................................................................................................... 1
  B.    Rules of Interpretation .................................................................................... 13
  C.    Computation of Time ...................................................................................... 13
  D.    Governing Law ................................................................................................ 14
  E.    Reference to Monetary Figures ....................................................................... 14
  F.    Reference to the Debtors or the Reorganized Debtors .................................... 14
  G.    Controlling Document .................................................................................... 14

**ARTICLE II. ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY CLAIMS** ................................................................................................................................ 14
  A.    Administrative Claims .................................................................................... 14
  B.    Professional Compensation ............................................................................ 15
  C.    Priority Tax Claims ........................................................................................ 16
  D.    Statutory Fees ................................................................................................. 16

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ............................ 16
  A.    Summary of Classification .............................................................................. 16
  B.    Treatment of Claims and Interests ................................................................. 17
  C.    Special Provision Governing Unimpaired Claims ........................................... 20
  D.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .............................................................................................................. 20
  E.    Elimination of Vacant Classes ....................................................................... 20
  F.    Voting Classes; Presumed Acceptance by Non-Voting Classes ...................... 20
  G.    Intercompany Interests .................................................................................. 20
  H.    Subordinated Claims ...................................................................................... 21

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ........................................................ 21
  A.    Restructuring Transactions ............................................................................ 21
  B.    Sources of Consideration for Plan Distributions ............................................ 21
  C.    Corporate Existence ....................................................................................... 22
  D.    Vesting of Assets in the Reorganized Debtors ............................................... 22
  E.    Cancellation of Existing Securities ................................................................. 23
  F.    Corporate Action ........................................................................................... 23
  G.    New Organizational Documents ..................................................................... 24
  H.    Directors and Officers of the Reorganized Debtors ........................................ 24
  I.    Effectuating Documents; Further Transactions .............................................. 24
  J.    Exemption from Certain Taxes and Fees ....................................................... 25
  K.    Preservation of Causes of Action ................................................................... 25
  L.    Release of Avoidance Actions ........................................................................ 25
  M.    Director and Officer Liability Insurance and Indemnification ......................... 25
  N.    Management Incentive Plan ............................................................................ 26
  O.    Employee and Retiree Benefits ...................................................................... 26
  P.    Payment of Fees and Expenses of the Indenture Trustee ............................... 26

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ...................... 27
  A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ..... 27
  B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ....... 27
  C.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases .... 27
  D.    Indemnification Obligations ........................................................................... 28
  E.    Insurance Policies .......................................................................................... 28
  F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ........... 29
  G.    Reservation of Rights ..................................................................................... 29
  H.    Nonoccurrence of Effective Date ................................................................... 29

I.          Contracts and Leases Entered into After the Petition Date ................................................29

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ...........................................................**29**
A.          Timing and Calculation of Amounts to Be Distributed ....................................29
B.          General Unsecured Claims Distribution Escrow Account ................................30
C.          Delivery of Distributions and Undeliverable or Unclaimed Distributions........30
D.          Registration or Private Placement Exemption ...............................................31
E.          Compliance with Tax Requirements................................................................32
F.          Allocations.......................................................................................................32
G.          No Postpetition Interest on Claims .................................................................32
H.          Setoffs and Recoupment ................................................................................32
I.          Claims Paid or Payable by Third Parties ........................................................33

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT,  UNLIQUIDATED, AND DISPUTED CLAIMS**.........................................................................................................**33**
A.          Allowance of Claims ........................................................................................33
B.          Claims and Interests Administration Responsibilities .....................................34
C.          Estimation of Claims .......................................................................................34
D.          Adjustment to Claims Without Objection ........................................................34
E.          Time to File Objections to Claims ...................................................................34
F.          Disallowance of Claims ...................................................................................34
G.          Amendments to Claims ...................................................................................35
H.          No Distributions Pending Allowance ...............................................................35
I.          Distributions After Allowance .........................................................................35
J.          Single Satisfaction of Claims ..........................................................................35

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ....................**35**
A.          Compromise and Settlement of Claims, Interests, and Controversies ...........35
B.          Discharge of Claims and Termination of Interests .........................................36
C.          Term of Injunctions or Stays ..........................................................................37
D.          **Release of Liens**............................................................................................37
E.          **Releases by the Debtors**..............................................................................37
F.          **Releases by Holders of Claims and Interests**.............................................38
G.          **Exculpation**...................................................................................................38
H.          **Injunction** .....................................................................................................39
I.          Protection Against Discriminatory Treatment ..................................................39
J.          Recoupment ....................................................................................................39
K.          Subordination Rights .......................................................................................40
L.          Reimbursement or Contribution ......................................................................40

**ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ...............................................................................................................**40**
A.          Conditions Precedent to the Confirmation Date .............................................40
B.          Conditions Precedent to the Effective Date ....................................................41
C.          Waiver of Conditions.......................................................................................43
D.          Substantial Consummation .............................................................................43
E.          Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date .................................................................................................43

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**..............................**43**
A.          Modification and Amendments ........................................................................43
B.          Effect of Confirmation on Modifications ..........................................................43
C.          Revocation or Withdrawal of the Plan.............................................................43

**ARTICLE XI. RETENTION OF JURISDICTION** ..................................................................................**44**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ............................................................................**46**
    A.          Immediate Binding Effect.................................................................................46
    B.          Additional Documents ......................................................................................46
    C.          Dissolution of the Committee ...........................................................................46
    D.          Reservation of Rights .......................................................................................46
    E.          Successors and Assigns .....................................................................................46
    F.          Service of Documents .......................................................................................47
    G.          Term of Injunctions or Stays ...........................................................................47
    H.          Entire Agreement..............................................................................................48
    I.           Exhibits............................................................................................................48
    J.           Nonseverability of Plan Provisions...................................................................48
    K.          Votes Solicited in Good Faith ..........................................................................48
    L.          Closing of Chapter 11 Cases.............................................................................48
    M.         Waiver or Estoppel ...........................................................................................49

**INTRODUCTION**

Magnum Hunter Resources Corporation and its debtor affiliates, as debtors and debtors in possession propose this joint plan of reorganization for the resolution of outstanding Claims against, and Interests in, the Debtors. Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A hereof. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.      "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims; and (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

2.      "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims (other than Professional Fee Claims) as set by the Court pursuant to the Administrative Claims Order or other Final Order.

3.      "*Administrative Claims Order*" means the order entered by the Court setting the Administrative Claims Bar Date [Docket No. ___].

4.      "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

5.      "*Allowed*" means with respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or pursuant to a Final Order a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Court; *provided that* with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as applicable. For the avoidance of doubt, a Proof of Claim Filed after the Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Claim. "Allow" and "Allowing" shall have correlative meanings.

6.    "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code.

7.    "*Backstoppers*" means, collectively, the Second Lien Backstoppers and the Noteholder Backstoppers.

8.    "*Bankruptcy Code*" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

9.    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Court other than the Local Rules.

10.    "*Bridge Facility Agent*" means Cantor Fitzgerald Securities, as successor to Bank of Montreal, or any successor thereto, as administrative agent under the Bridge Financing Facility, solely in its capacity as such.

11.    "*Bridge Financing Facility*" means the Fourth Amended and Restated Credit Agreement, dated as of October 22, 2014, by and among MHRC and the lenders and agents from time-to-time party thereto, as amended, including pursuant to the Sixth and Seventh Amendments dated as of November 3, 2015, and November 30, 2015, respectively.

12.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

13.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

14.    "*Causes of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

15.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Court and (b) when used with reference to all of the Debtors, the procedurally consolidated and jointly administered chapter 11 cases pending for the Debtors in the Court.

16.    "*Chapter 11 Compensation Order*" means the order (or, collectively, the orders, if applicable), if any, to be entered by the Court, as contemplated in the Restructuring Support Agreement and in accordance with the consent rights set forth therein, authorizing the Debtors to implement and perform according to the key employee retention plans and/or the key employee incentive plans approved pursuant to such order [Docket No. ___].

17.    "*CIT Facility*" means that certain Master Loan and Security Agreement, dated as of January 23, 2014, as amended, restated, modified, supplemented or replaced from time to time prior to the Petition Date, between Alpha Hunter Drilling, LLC and CIT Finance LLC, as lender, including Schedule No. 1 thereunder (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date).

18.      "*CIT Secured Claims*" means all Allowed claims against Alpha Hunter Drilling, LLC arising on account of the CIT Facility, in the aggregate Allowed amount of $2,887,222.38.

19.      "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

20.      "*Claims Bar Date*" means the date or dates to be established by the Court by which Proofs of Claim must be Filed.

21.      "*Claims Objection Deadline*" means the deadline for objecting to a Claim, which shall be on the date that is the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by the Debtors or the Reorganized Debtors, as applicable, or by an order of the Court for objecting to such Claims.

22.      "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Notice and Claims Agent.

23.      "*Class*" means a category of holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

24.      "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

25.      "*Common Stock*" means MHRC's authorized and issued and outstanding common stock as of the Effective Date.

26.      "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

27.      "*Confirmation Date*" means the date upon which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

28.      "*Confirmation Hearing*" means the hearing held by the Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

29.      "*Confirmation Order*" means a Final Order of the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance satisfactory to the Debtors and Majority Backstoppers.

30.      "*Consummation*" means the occurrence of the Effective Date.

31.      "*Contract Procedures Order*" means the order entered by the Court authorizing and approving procedures for assumption or rejection of certain of the Debtors' prepetition Executory Contracts and Unexpired Leases [Docket No. ___].

32.      "*Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of the withdrawal of any reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the District of Delaware.

33.      "*Cure Claim*" means a monetary Claim based upon the Debtors' defaults under any Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

34.      "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed or assumed and assigned under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed

assumptions or assumptions and assignments of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith, and (c) procedures for resolution by the Court of any related disputes.

35.    "*D&O Liability Insurance Policies*" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") of any of the Debtors with respect to directors, managers, officers, and employees of the Debtors.

36.    "*Debtors*" means, collectively, the following:  Magnum Hunter Resources Corporation; Alpha Hunter Drilling, LLC; Bakken Hunter Canada, Inc.; Bakken Hunter, LLC; Energy Hunter Securities, Inc.; Hunter Aviation, LLC; Hunter Real Estate, LLC; Magnum Hunter Marketing, LLC; Magnum Hunter Production, Inc.; Magnum Hunter Resources GP, LLC; Magnum Hunter Resources, LP; Magnum Hunter Services, LLC; NGAS Gathering, LLC; NGAS Hunter, LLC; PRC Williston LLC; Shale Hunter, LLC; Triad Holdings, LLC; Triad Hunter, LLC; Viking International Resources Co., Inc.; and Williston Hunter ND, LLC.

37.    "*Definitive Documentation*" shall include every order entered by the Bankruptcy Court, and every pleading, motion, proposed order, or document filed by the Debtors at any point prior to the Termination Date including, without limitation:  (a) the Plan (and all exhibits thereto) and the Confirmation Order; (b) the Disclosure Statement; (c) the solicitation materials with respect to the Plan; (d) the Interim DIP and Cash Collateral Order and the Final DIP and Cash Collateral Order and DIP Credit Agreement; (e) the Exit Financing and the Exit Financing Documents; and (f) any documents or agreements in connection with the Reorganized Debtors, including any shareholders' agreements, certificates of incorporation, etc.  Any document that is included within this definition of "Definitive Documentation," including any amendment, supplement, or modification thereof, shall be defined to be in form and substance satisfactory to the Majority Backstoppers.

38.    "*DIP Backstop Fee*" means 3% of the New Common Equity issued on the Effective Date, subject to dilution on account of the Management Incentive Plan, to be distributed Pro Rata to each Backstopper (based on each Backstopper's commitments for the DIP Facility on the initial funding date under the DIP Credit Agreement) on the Effective Date.  The DIP Backstop Fee is an Allowed Administrative Claim.

39.    "*DIP Backstop Fee Claims*" means the Allowed Administrative Claims held by each Backstopper arising under or related to the DIP Credit Agreement on account of the DIP Backstop Fee.

40.    "*DIP Credit Agreement*" means that certain Debtor in Possession Credit Agreement, dated as of December 17, 2015, by and among MHRC, as borrower, each of the other Debtors as guarantors, each of the lenders from time to time party thereto, and the DIP Facility Agent.

41.    "*DIP Facility*" means that certain $200 million senior secured multi-draw term loan credit facility provided pursuant to the DIP Credit Agreement.

42.    "*DIP Facility Agent*" means Cantor Fitzgerald Securities, or any successor thereto, as administrative agent and collateral agent under the DIP Credit Agreement, solely in its capacity as such.

43.    "*DIP Facility Claims*" means any Claim held by any of the DIP Facility Lenders or the DIP Facility Agent arising under or related to the DIP Credit Agreement or the Final DIP and Cash Collateral Order, including any Claim for principal, interest, and fees and expenses to the extent not otherwise satisfied pursuant to an Order of the Court, but excluding the DIP Backstop Fee.

44.    "*DIP Facility Lenders*" means those certain lenders under the DIP Credit Agreement, solely in their capacity as such.

45.    "*DIP Loan Documents*" means, collectively, the DIP Credit Agreement and other guarantee, security, and relevant documentation associated with the DIP Facility.

46.    "*DIP Recovery*" means 28.80% of the New Common Equity issued on the Effective Date, subject to dilution on account of the Management Incentive Plan.

47.     "*Disallowed*" means, with respect to any Claim, or any portion thereof, that such Claim, or any portion thereof, is not Allowed.

48.     "*Disclosure Statement*" means the *Disclosure Statement for the Joint Chapter 11 Plan of Reorganization of Magnum Hunter Resources Corporation and its Debtor Affiliates,* dated as of January 7, 2016, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, in form and substance satisfactory to the Debtors and Majority Backstoppers, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law [Docket No. _____].

49.     "*Disputed Claim*" means a Claim that is not yet Allowed.

50.     "*Distribution Record Date*" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date as designated in an order of the Court.

51.     "*DTC*" means Depository Trust Company.

52.     "*Effective Date*" means, with respect to the Plan, the date that is a Business Day selected by the Debtors with the consent of the Majority Backstoppers on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.B have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan is declared effective.

53.     "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

54.     "*Equipment and Other Note Claims*" means each of the Wesbanco Secured Claims, CIT Secured Claims, Piaggio Secured Claims, and the Office Building Claims.

55.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

56.     "*Exculpated Party*" means each of the following solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Backstoppers (in all of their various capacities in the Chapter 11 Cases); (d) the Indenture Trustee; (e) the Bridge Facility Agent; (f) the DIP Facility Agent; (g) the DIP Facility Lenders; (h) the Exit Financing Agent; (i) the Exit Financing Lenders; (j) the Committee and its members (solely in their capacities as such); and (k) with respect to each of the foregoing Entities in clauses (a) through (j), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each solely in their capacity as such.

57.     "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

58.     "*Exit Financing*" means a new credit facility or credit facilities in the aggregate committed amount, on terms and conditions (including amount), and with lenders, satisfactory to Majority Backstoppers and the Debtors.

59.     "*Exit Financing Agent*" means the administrative agent and collateral agent under the Exit Financing, or any successor thereto, solely in its capacity as such.

60.     "*Exit Financing Documents*" means the Exit Financing credit facility and any other guarantee, security, and relevant documentation with respect to the Exit Financing.

61.     "*Exit Financing Lender*" means each lender under the Exit Financing, solely in its capacity as such.

62.     "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

63.     "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Court or, with respect to the filing of a Proof of Claim or proof of Interest, the Notice and Claims Agent.

64.     "*Final Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which: (a) with respect to Administrative Claims, other than Professional Fee Claims, arising in the time period between the Administrative Claims Bar Date and the Effective Date, shall be 30 days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be 45 days from the Effective Date.

65.     "*Final DIP and Cash Collateral Order*" means the Final Order entered by the Court authorizing the Debtors to (a) obtain postpetition secured financing pursuant to the DIP Credit Agreement, (b) use cash collateral during the pendency of the Chapter 11 Cases, and (c) granting certain related relief [Docket No. ___].

66.     "*Final Order*" means (i) an order or judgment of the Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction, or (ii) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Court (or any other court of competent jurisdiction, including in an appeal taken) in the Chapter 11 Cases (or in any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided*, *however*, that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

67.     "*General Unsecured Claim*" means any Unsecured Claim against any Debtor that is not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Court, other than an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim, an Other Priority Claim, a Note Claim, a Section 510(b) Claim, or an Intercompany Claim.  For the avoidance of doubt, General Unsecured Claims shall not include any Claim, including any deficiency Claim, arising under or related to the Second Lien Credit Agreement.

68.     "*General Unsecured Claims Distribution Escrow Account*" means the account established pursuant to Article VI..B in the amount of the Unsecured Creditor Cash Pool, disbursements from which shall be payable to holders of Allowed General Unsecured Claims in accordance with Article III..B..6 and Article IV.

69.     "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

70.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

71.     "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for the current and former directors and the officers of the Debtors; *provided however* that the Indemnification Obligations shall not include any indemnification obligations arising under the D&O Liability Insurance Policies.

72.    "*Indenture*" means that certain Indenture, dated as of May 16, 2012, as amended, restated, modified, supplemented, or replaced from time to time, for the 9.750% Senior Notes Due 2020, among MHRC, each of the guarantors party thereto, the Indenture Trustee, and Citibank, N.A., as paying agent, registrar, and authenticating agent.

73.    "*Indenture Trustee*" means Wilmington Trust, National Association, or any successor thereto, as trustee under the Indenture.

74.    "*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

75.    "*Intercompany Claim*" means any Claim held by one Debtor or a Non-Debtor Subsidiary against another Debtor.

76.    "*Intercompany Interest*" means, other than an Interest in MHRC, an Interest in one Debtor or Non-Debtor Subsidiary held by another Debtor.

77.    "*Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of October 22, 2014 and as amended from time to time prior to the date hereof, by and among MHRC, certain grantors, Cantor Fitzgerald Securities, as senior representative (and successor to Bank of Montreal), and Credit Suisse AG, Cayman Islands Branch, as second priority representative.

78.    "*Interests*" means the common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Debtor, including, without limitation, the Preferred Stock, and the Common Stock, and options, warrants, rights, or other securities or agreements to acquire the common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Debtor (whether or not arising under or in connection with any employment agreement), including any Claim against the Debtors that is subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing, *provided*, *however*, that the term "Interests" shall not include the Intercompany Interests.

79.    "*Interim Compensation Order*" means the order entered by the Court establishing procedures for the compensation of Professionals [Docket No. ___].

80.    "*Interim DIP and Cash Collateral Order*" means the interim Order entered by the Court authorizing the Debtors, on an interim basis, to (a) obtain postpetition secured financing pursuant to the DIP Credit Agreement, (b) use cash collateral during the pendency of the Chapter 11 Cases, and (c) granting certain related relief [Docket No. 75].

81.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

82.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

83.    "*Local Rules*" means the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware.

84.    "*Majority Backstoppers*" means, together, the Majority Noteholder Backstoppers and the Majority Second Lien Backstoppers.

85.    "*Majority Noteholder Backstoppers*" means Noteholder Backstoppers holding, in aggregate, 50.1% or more of the Noteholder Backstoppers' aggregate commitment under the DIP Credit Agreement.

86.    "*Majority Second Lien Backstoppers*" means Second Lien Backstoppers holding, in aggregate, 50.1% or more of the Second Lien Backstoppers' aggregate commitment under the DIP Credit Agreement.

87.    "*Management Incentive Plan*" means that certain post-Effective Date management and New MHRC Board equity incentive plan.

88.     "*Material Adverse Change*" means any change, effect, fact, event, occurrence, condition, circumstance or development after the Petition Date, that, individually or in the aggregate, (a) is, or is reasonably likely to have, a material adverse effect on the business, condition (financial or otherwise), operations, performance, properties, contingent liabilities, or material agreements or prospects of the Debtors, taken as a whole, since June 30, 2015 or (b) would reasonably be expected to prevent or materially restrict or delay the ability of the Debtors to perform their respective material obligations under the DIP Loan Documents, in each case other than any change, effect, fact, event, occurrence, condition, circumstance or development resulting from (i) the effect of any change in the United States or foreign economies or securities, commodities or financial markets; (ii) the effect of any change arising in connection with hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway; (iii) the effect of any action taken by Backstoppers or their Affiliates with respect to the DIP Facility or with respect to the Debtors (including through such persons' participation in the Chapter 11 Cases); (iv) the effect of any changes in applicable laws or accounting rules; and (v) any effect resulting from the filing or public announcement of the Chapter 11 Cases.

89.     "*MHRC*" means Magnum Hunter Resources Corporation, a Delaware corporation, the ultimate parent of each of the Debtors and the predecessor to Reorganized MHRC.

90.     "*New Boards*" means the initial board of directors, members, or managers, as applicable, of each Reorganized Debtor, including the New MHRC Board.

91.     "*New Common Equity*" means the common stock of Reorganized MHRC to be issued pursuant to the Plan on the Effective Date, which, initially, shall not be listed on a national exchange.

92.     "*New MHRC Board*" means Reorganized MHRC's initial board of directors, as determined pursuant to Article IV.H.

93.     "*New Organizational Documents*" means the form of the certificates or articles of incorporation, bylaws, or such other applicable formation documents of each of the Reorganized Debtors, including the New Shareholders' Agreement, which forms shall be included in the Plan Supplement, in each case in form and substance satisfactory to the Debtors and Majority Backstoppers.

94.     "*New Shareholders' Agreement*" means that shareholders' agreement that will govern certain matters related to the governance of Reorganized MHRC, a draft of which shall be included in the Plan Supplement and which shall be in form and substance satisfactory to the Debtors and the Majority Backstoppers.

95.     "*Non-Debtor Subsidiaries*" means all of MHRC's wholly and not-wholly owned subsidiaries who are not Debtors in these Chapter 11 Cases, including:  (a) Arkoma Gathering, LLC; (b) Eureka Hunter Holdings, LLC; (c) Eureka Hunter Pipeline, LLC; (d) Eureka Hunter Land, LLC; (e) TransTex Hunter, LLC; (f) Magnum Hunter Midstream, LLC; (g) MHR Acquisition Company I, LLC; (h) MHR Acquisition Company II, LLC; (i) MHR Acquisition Company III, LLC; (j) NSE Hunter, LLC; (k) Outback Shale Hunter Pty Ltd; (l) Sentra Corporation; (m) Triad Hunter Gathering, LLC; (n) VIRCO Pipeline of Ohio, LLC; (o) VIRCO Pipeline of West Virginia, LLC; (p) 54NG, LLC; (q) Daugherty Petroleum N.D. Ventures, LLC; and (r) MHR Management, LLC.  For the avoidance of doubt, Eureka Hunter Holdings, LLC and its subsidiaries are not Debtors in the Chapter 11 Cases.

96.     "*Note Claims*" means all claims against the Debtors arising on account of the Indenture and the Notes.

97.     "*Noteholder Backstoppers*" means AmTrust Financial Services, Inc., CVC Capital Partners, Farmstead Capital Management LLC, Kayne Anderson Capital Advisors, L.P., Raging Capital Management LLC, River Birch Capital, LLC, Third Point LLC, Western Asset Management Co., Wingspan Investment Management, LP, and any party that is a valid transferee of a Note Claim from any such institution (or from any such valid transferee) under and in accordance with the Restructuring Support Agreement.

98.    "*Noteholder Recovery Pool*" means 31.33% of the New Common Equity issued on the Effective Date and subject to dilution on account of the Management Incentive Plan.

99.    "*Noteholders*" means holders of the Notes.

100.    "*Notes*" means the senior notes issued pursuant to the Indenture.

101.    "*Notice and Claims Agent*" means Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases pursuant to the order appointing Prime Clerk LLC as the notice and claims agent for the Debtors in their Chapter 11 Cases, entered by the Court on December 16, 2015 [Docket No. 62].

102.    "*Office Building Claims*" means all claims against Magnum Hunter Production, Inc. arising on account of the Office Building Facility, in the aggregate Allowed amount of $3,622,038.54.

103.    "*Office Building Facility*" means that certain Business Loan Agreement, dated as of February 17, 2010, as amended, restated, modified, supplemented or replaced from time to time, between Magnum Hunter Production, Inc., as successor to Daugherty Petroleum, Inc., and Traditional Bank, Inc., as lender.

104.    "*Ordinary Course Professionals*" shall mean the various attorneys, accountants, auditors, and other professionals the Debtors employ in the ordinary course of their business and retained by the Debtors pursuant to, and who are subject to, the Ordinary Course Professionals Order.

105.    "*Ordinary Course Professionals Order*" shall mean the order entered by the Court establishing the procedures for retaining and compensating the Ordinary Course Professionals [Docket No. ___].

106.    "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such claim has not already been paid during the Chapter 11 Cases.

107.    "*Other Secured Claim*" means any Secured Claim other than the following:  (a) a DIP Facility Claim; (b) a Second Lien Claim; (c) an Equipment and Other Note Claim; or (d) a Priority Tax Claim.  For the avoidance of doubt, "Other Secured Claims" includes any Claim arising under, derived from, or based upon any letter of credit issued for the account of one or more Debtors, the reimbursement obligation for which is either secured by a Lien on collateral or is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

108.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

109.    "*Petition Date*" means December 15, 2015, the date on which each of the Debtors Filed their voluntary petitions for relief commencing the Chapter 11 Cases.

110.    "*Piaggio Facility*" means that certain Loan Agreement, dated as of December 14, 2011, as amended, restated, modified, supplemented or replaced from time to time, between MHRC and Capital One, National Association, as lender.

111.    "*Piaggio Secured Claims*" means all claims against MHRC arising on account of the Piaggio Facility, in the aggregate Allowed amount of $2,568,824.83.

112.    "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time in accordance with the Restructuring Support Agreement and the terms hereof, including the Plan Supplement and all exhibits, supplements, appendices, and schedules to the Plan, in all cases in form and substance satisfactory to the Debtors and the Majority Backstoppers.

113.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, each of which shall be in form and substance reasonably acceptable to the Debtors, Majority Backstoppers, and/or their advisors (as amended, supplemented, or modified from time to time in accordance with

the terms hereof, the Bankruptcy Code, the Bankruptcy Rules, and the Restructuring Support Agreement), to be Filed by the Debtors no later than 14 days before the Voting Deadline, and additional documents or amendments to previously Filed documents, Filed before the Confirmation Date as amendments to the Plan Supplement (which, for the avoidance of doubt, shall also be in form and substance reasonably acceptable to the Debtors, the Majority Backstoppers, and their advisors), including the following, as applicable:  (a) the New Organizational Documents; (b) the Exit Financing Documents (which, for the purposes of the Plan Supplement, may consist solely of a commitment letter, letter of intent, or other indication of interest); (c) the Schedule of Rejected Executory Contracts and Unexpired Leases; (d) the Schedule of Assumed Executory Contracts and Unexpired Leases; (e) a list of retained Causes of Action; (f) the New Shareholders' Agreement; and (g) any and all other documentation necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan; *provided*, *however* that, to the extent the Exit Financing Documents (which, for the purposes of the Plan Supplement, may consist solely of a commitment letter, letter of intent, or other indication of interest) are not Filed 14 days before the Voting Deadline such documents will be filed no later than the date of the Confirmation Hearing.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date consistent with the Restructuring Support Agreement and with the consent of Majority Backstoppers.

114.    "*Preferred Stock*" means all issuances of preferred stock issued by any of the Debtors, including (a) the 10.25% Series C Cumulative Perpetual Preferred Stock; (b) the 8.0% Series D Cumulative Preferred Stock; and (c) the 8.0% Series E Cumulative Convertible Preferred Stock.

115.    "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

116.    "*Pro Rata*" means, unless indicated otherwise, the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed Interests under the Plan.

117.    "*Professional*" means an Entity employed pursuant to a Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

118.    "*Professional Fee Claims*" means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to the Interim Compensation Order or any other order of the Court.  To the extent the Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

119.    "*Professional Fee Escrow Account*" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount and funded by the Debtors on the Effective Date, pursuant to Article II.B.2.

120.    "*Professional Fee Reserve Amount*" means the total amount of Professional Fee Claims estimated, with the reasonable consent of the Majority Backstoppers (which consent will not be unreasonably withheld), in accordance with Article II.B.3.

121.    "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

122.    "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

123.    "*Released Party*" means each of the following solely in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Backstoppers; (d) the Indenture Trustee; (e) the Bridge Facility Agent; (f) the DIP

Facility Agent; (g) the DIP Facility Lenders; (h) the Exit Financing Agent; (i) the Exit Financing Lenders; and (j) with respect to each of the foregoing parties under (a) through (j), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each solely in their capacity as such.

124. "*Releasing Party*" means each of the following solely in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Backstoppers; (d) the Indenture Trustee; (e) the Bridge Facility Agent; (f) the DIP Facility Agent; (g) the DIP Facility Lenders; (h) the Exit Financing Agent; (i) the Exit Financing Lenders; (j) all holders of Claims and Interests that are deemed to accept the Plan; (k) all holders of Claims and Interests who vote to accept the Plan; (l) all holders in voting Classes who abstain from voting on the plan and who do not opt out of the releases provided by the Plan; and (m) with respect to each of the foregoing parties under (a) through (l), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each solely in their capacity as such.

125. "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including any new Entity formed pursuant to the Restructuring Transactions to directly or indirectly acquire the assets or equity of the Debtors.

126. "*Reorganized MHRC*" means MHRC, or any successors thereto, by merger, consolidation, or otherwise, on and after the Effective Date.

127. "*Restructuring Support Agreement*" means that certain Magnum Hunter Resources Corp. Restructuring Support Agreement, dated December 15, 2015, by and among the Debtors and the Restructuring Support Parties, as may be amended, modified, or supplemented, from time to time, in accordance with its terms, a copy of which is attached as Exhibit B to the Disclosure Statement.

128. "*Restructuring Support Parties*" means each Entity, other than a Debtor, that is party to the Restructuring Support Agreement.

129. "*Restructuring Transactions*" shall have the meaning set forth in Article IV.A.

130. "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be assumed by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as may be amended by the Debtors from time to time prior to the Confirmation Date.

131. "*Schedule of Rejected Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan, as set forth in the Plan Supplement, as may be amended by the Debtors from time to time prior to the Confirmation Date.

132. "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

133. "*Second Lien Agent*" means Credit Suisse AG, Cayman Islands Branch, or any successor thereto, as administrative agent and collateral agent under the Second Lien Credit Agreement, solely in its capacity as such.

134.    "*Second Lien Backstoppers*" means Goldman Sachs Asset Management L.P., Highbridge Principal Strategies, LLC, Fifth Street Station, LLC, and any party that is a valid transferee of a Second Lien Claim from any such institution (or from any such valid transferee) under and in accordance with the Restructuring Support Agreement.

135.    "*Second Lien Claim*" means any Claim against the Debtors arising on account of the Second Lien Credit Agreement.

136.    "*Second Lien Credit Agreement*" means that certain Second Lien Credit Agreement, dated as of October 22, 2014, as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, by and among MHRC, as borrower, certain of the other Debtors, as guarantors, the Second Lien Agent, and the Second Lien Lenders.

137.    "*Second Lien Lenders*" means the lenders party to the Second Lien Credit Agreement, solely in their capacity as such.

138.    "*Second Lien Recovery Pool*" means 36.87% of the New Common Equity issued on the Effective Date and subject to dilution on account of the Management Incentive Plan.

139.    "*Section 510(b) Claim*" means any Claim arising from (a) rescission of a purchase or sale of a security of the Debtors or an Affiliate of the Debtors, (b) purchase or sale of such a security, or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

140.    "*Secured*" means when referring to a Claim, a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

141.    "*Secured Tax Claims*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

142.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

143.    "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

144.    "*Termination Date*" shall have the meaning ascribed to such term in the Restructuring Support Agreement.

145.    "*Termination Event*" shall have the meaning ascribed to such term in the Restructuring Support Agreement.

146.    "*U.S. Trustee*" means the Office of the United States Trustee for the District of Delaware.

147.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

148.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

149.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

150.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash or Reinstatement.

151.    "*Unsecured*" means not Secured.

152.    "*Unsecured Creditor Cash Pool*" means Cash in the amount of $[_____] for purposes of disbursements to holders of Allowed General Unsecured Claims in Class 6.[2]

153.    "*Voting Deadline*" means the deadline for submitting votes to accept or reject the Plan as set by the Court pursuant to a Final Order.

154.    "*Wesbanco Facility*" means that certain Facility Loan and Security Agreement, dated as of February 12, 2010, as amended, restated, modified, supplemented or replaced from time to time between Alpha Hunter Drilling, LLC and Wesbanco Bank, Inc., as lender.

155.    "*Wesbanco Secured Claims*" means all claims against Alpha Hunter Drilling, LLC arising on account of the Wesbanco Facility, in the aggregate Allowed amount of $4,150,853.87.

B.    *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan and the Restructuring Support Agreement; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (5) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Court in the Chapter 11 Cases.

C.    *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

---

[2]    It is currently intended that the Unsecured Creditor Cash Pool will be $20,000,000.00, which amount may be subject to the costs of any professional fees and other expenses incurred as part of the claims reconciliation process.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided that* corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated or formed (as applicable) in Delaware shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Reorganized Debtor.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing, other than the Plan Supplement), the terms of the Plan shall control in all respects.   In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).   In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Claims*

Except with respect to Administrative Claims that are Professional Fee Claims, or that are DIP Facility Claims or DIP Backstop Fee Claims, which Claims shall receive the treatment provided under Article II.B.5, and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s), with the consent of the Majority Backstoppers, agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided that* Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses shall be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Professional Fee Claims, (i) requests for payment of Administrative Claims arising in the time period between the Petition Date and the Administrative Claims Bar Date must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Administrative Claims Order no later than the Administrative Claims Bar Date, and (ii) requests for payment of Administrative Claims arising between the Administrative Claims Bar Date and the Effective Date must be Filed and served on the Reorganized Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Final Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such dates shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Reorganized Debtors and the requesting party no later than 60 days after the Effective Date.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed.

B.      *Professional Compensation*

        1.      Final Fee Applications

        All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through the Effective Date, must be Filed and served on the Reorganized Debtors and counsel to the Noteholder Backstoppers and Second Lien Backstoppers no later than 45 days after the Effective Date.  All such final requests will be subject to approval by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court in the Chapter 11 Cases, including the Interim Compensation Order, and once approved by the Court, will be promptly paid from the Professional Fee Escrow Account up to its full Allowed amount.  If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be promptly paid by Reorganized MHRC without any further action or order of the Court.

        2.      Professional Fee Escrow Account

        On the Effective Date, the Reorganized Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount, which shall be funded by Reorganized MHRC.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or the Reorganized Debtors.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order.  When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to Reorganized MHRC without any further action or order of the Court.

        3.      Professional Fee Reserve Amount

        Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors before and as of the Effective Date, which estimate shall be subject to the reasonable consent of the Majority Backstoppers (which consent will not be unreasonably withheld), and shall deliver such estimate to the Debtors and counsel to the Noteholder Backstoppers and Second Lien Backstoppers no later than five days before the Effective Date, *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors or Reorganized Debtors may estimate, with the reasonable consent of the Majority Backstoppers (which consent will not be unreasonably withheld), the unpaid and unbilled fees and expenses of such Professional.

4. Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors or Reorganized Debtors shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Court.

5. DIP Facility Claims and DIP Backstop Fee Claims

The DIP Facility Claims shall be deemed to be Allowed superpriority Administrative Claims in the full amount due and owing under the DIP Facility as of the Effective Date. In full satisfaction of and in exchange for each DIP Facility Claim, each DIP Facility Claim will be satisfied in full on the Effective Date pursuant to the DIP Credit Agreement and the Restructuring Support Agreement and each holder of a DIP Facility Claim shall receive its Pro Rata share of the DIP Recovery. The DIP Backstop Fee Claims shall be deemed to be Allowed superpriority Administrative Claims in the full amount of the DIP Backstop Fee as of the Effective Date. In full satisfaction of and in exchange for each DIP Backstop Fee Claim, each DIP Backstop Fee Claim will be satisfied in full on the Effective Date pursuant to the DIP Credit Agreement and the Restructuring Support Agreement and each holder of a DIP Backstop Fee Claim shall receive its Pro Rata share of the DIP Backstop Fee.

C. *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

D. *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors. On and after the Effective Date, the Reorganized Debtors shall pay any and all such fees when due and payable, and shall File with the Court quarterly reports in a form reasonably acceptable to the U.S. Trustee. Each Debtor shall remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A. *Summary of Classification*

Claims and Interests, except for Administrative Claims, Professional Fee Claims, DIP Facility Claims; Cure Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and the classifications set forth in Classes 1 through 9 shall be deemed to apply to each Debtor; *provided that* the Debtors, with the consent of the Majority Backstoppers, reserve the right to modify the Plan in accordance with Article X hereof, including the right to withdraw the Plan as to an

16

individual Debtor at any time before the Confirmation Date.  For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (i.e., there will be 10 Classes for each Debtor); *provided*, *that*, any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.E below.

    1.    <u>Class Identification</u>

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
| --- | --- | --- | --- |
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Equipment and Other Note Claims | Unimpaired | Presumed to Accept |
| 4 | Second Lien Claims | Impaired | Entitled to Vote |
| 5 | Note Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 8 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote |
| 9 | Interests in MHRC | Impaired | Deemed to Reject |

B.    *Treatment of Claims and Interests*

    1.    <u>Class 1 – Other Priority Claims</u>

    a.    *Classification*:  Class 1 consists of Other Priority Claims.

    b.    *Treatment*:  In full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall receive (A) payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the latest of:  (i) on or as soon as reasonably practicable after the Effective Date if such Allowed Other Priority Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Other Priority Claim is Allowed; and (iii) the date such Allowed Other Priority Claim becomes due and payable, or as soon thereafter as is reasonably practicable, or (B) treatment pursuant to such other terms as may be agreed to by the holder of such Allowed Other Priority Claim, the Debtors, and the Majority Backstoppers.

    c.    *Voting*:  Class 1 is Unimpaired under the Plan.  Each holder of an Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of an Other Priority Claim will not be entitled to vote to accept or reject the Plan.

    2.    <u>Class 2 – Other Secured Claims</u>

    a.    *Classification*:  Class 2 consists of Other Secured Claims.

    b.    *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment with the consent of the Majority Backstoppers, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such holder shall receive, at the Debtors' option and with the consent of the Majority Backstoppers, either: (i) payment in full in Cash of

the unpaid portion of its Allowed Other Secured Claim on the latest of (a) on or as soon as reasonably practicable after the Effective Date if such Allowed Other Secured Claim is Allowed as of the Effective Date, (b) on or as soon as reasonably practicable after the date such Other Secured Claim is Allowed, and (c) the date such Allowed Other Secured Claim becomes due and payable, (ii) Reinstatement pursuant to section 1124 of the Bankruptcy Code, (iii) the return or abandonment of the collateral securing such Allowed Other Secured Claim; or (iv) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

c. *Voting*: Class 2 is Unimpaired under the Plan. Each holder of an Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Other Secured Claim will not be entitled to vote to accept or reject the Plan.

3. Class 3 - Equipment and Other Note Claims

a. *Classification*: Class 3 consists of all Equipment and Other Note Claims.

b. *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed Equipment and Other Note Claim agrees to less favorable treatment with the consent of the Majority Backstoppers, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Equipment and Other Note Claim, each such claim shall be Reinstated pursuant to section 1124 of the Bankruptcy Code.

c. *Voting*: Class 3 is Unimpaired under the Plan. Each holder of an Equipment and Other Note Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, each holder of an Equipment and Other Note Claim will not be entitled to vote to accept or reject the Plan.

4. Class 4 - Second Lien Claims

a. *Classification*: Class 4 consists of all Second Lien Claims.

b. *Allowance:* The Second Lien Claims shall be Allowed in the aggregate amount equal to $336,600,000.00 plus accrued and unpaid interest owing under the Second Lien Credit Agreement at the non-default rate set forth in the Second Lien Credit Agreement.

c. *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Second Lien Claim, each Second Lien Lender shall receive its Pro Rata share of the Second Lien Recovery Pool.

d. *Voting*: Class 4 is Impaired under the Plan. Each Second Lien Lender will be entitled to vote to accept or reject the Plan.

5. Class 5 - Note Claims

a. *Classification*: Class 5 consists of all Note Claims.

b. *Allowance:* The Note Claims shall be Allowed in the aggregate principal amount equal to $600,000,000.00 plus accrued and unpaid interest owing under the Indenture at the non-default rate set forth in the Indenture.

    c.      *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Note Claim, each Noteholder shall receive its Pro Rata share of the Noteholder Recovery Pool.

    d.      *Voting*: Class 5 is Impaired under the Plan. Each Noteholder will be entitled to vote to accept or reject the Plan.

6.        <u>Class 6 - General Unsecured Claims</u>

    a.      *Classification*: Class 6 consists of all General Unsecured Claims.

    b.      *Treatment*: On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment with the consent of the Majority Backstoppers, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each such holder shall receive its Pro Rata share of the Unsecured Creditor Cash Pool, payable from the General Unsecured Claims Distribution Escrow Account. Satisfaction of such General Unsecured Claim is subject to the rights of the Debtors, the Reorganized Debtors, or any other party in interest to dispute such Claim as if the Chapter 11 Cases had not been commenced in accordance with applicable non-bankruptcy law.

    c.      *Voting*: Class 6 is Impaired under the Plan. Each holder of an Allowed General Unsecured Claim will be entitled to vote to accept or reject the Plan.

7.        <u>Class 7 - Intercompany Claims</u>

    a.      *Classification*: Class 7 consists of all Intercompany Claims.

    b.      *Treatment*: Intercompany Claims shall be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, with the consent of the Majority Backstoppers, shall be cancelled. No distribution shall be made on account of any Intercompany Claims.

    c.      *Voting*: Intercompany Claims are either Unimpaired, in which case the holders of such Intercompany Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the holders of such Intercompany Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an Intercompany Claim will not be entitled to vote to accept or reject the Plan.

8.        <u>Class 8 - Intercompany Interests</u>

    a.      *Classification*: Class 8 consists of all Intercompany Interests.

    b.      *Treatment*: Intercompany Interests shall be Reinstated as of the Effective Date or, at the Debtors' or the Reorganized Debtors' option, with the consent of the Majority Backstoppers, shall be cancelled. No distribution shall be made on account of any Intercompany Interests.

    c.      *Voting*: Intercompany Interests are either Unimpaired, in which case the holders of such Intercompany Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, in which case the holders of such

Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an Intercompany Interest will not be entitled to vote to accept or reject the Plan.

9.    Class 9 - Interests in MHRC

a.    *Classification*:   Class 9 consists of all Interests in MHRC (including Section 510(b) Claims).

b.    *Treatment*:   On the Effective Date, all Interests in MHRC will be cancelled and the holders of Interests in MHRC shall not receive or retain any distribution, property, or other value on account of their Interests in MHRC.

c.    *Voting*: Class 9 is Impaired under the Plan. Each holder of an Interest in MHRC will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, each holder of an Interest in MHRC will not be entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.

D.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors reserve the right to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

E.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims or Interests in such Class.

G.    *Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience, for the ultimate benefit of the holders of the New Common Equity, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the holders of Allowed Claims. For the avoidance of doubt: (1) to the extent Reinstated pursuant to the Plan, on and after the Effective Date, all Intercompany Interests shall continue to be owned by the same Reorganized Debtor that corresponds with the Debtor that owned such Intercompany Interests prior to the Effective Date; and (2) no Interests in a Debtor or Non-Debtor Subsidiary, or affiliate of a Debtor or Non-Debtor Subsidiary, held by a Non-Debtor Subsidiary or a Non-Debtor Affiliate of a Debtor will be affected by the Plan.

H.    *Subordinated Claims*

Except as may be the result of the settlement described in Article VIII.A of the Plan, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors, with the consent of the Majority Backstoppers, shall take all actions as may be necessary or appropriate to effect the transactions described in, approved by, contemplated by, or necessary to effectuate the Restructuring Support Agreement and the Plan (the "Restructuring Transactions"), including:    (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (4) all transactions necessary to provide for the purchase of substantially all of the assets or Interests of any of the Debtors, which transactions shall be structured in the most tax efficient manner, including in whole or in part as a taxable transaction for United States federal income tax purposes, as determined by the Debtors and the Majority Backstoppers; (5) the execution and delivery of the Exit Financing Documents; and (6) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

B.    *Sources of Consideration for Plan Distributions*

The Reorganized Debtors shall fund distributions under the Plan as follows:

1.    Issuance and Distribution of New Common Equity

The issuance of the New Common Equity, including options, or other equity awards, if any, reserved under the Management Incentive Plan, shall be authorized on the Effective Date without the need for any further corporate action and without any further action by the holders of Claims or Interests.

All of the shares of New Common Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable.    Each distribution and issuance of the New Common Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.    For the avoidance of doubt, any claimant's acceptance of the New Common Equity shall be deemed as its agreement to the New Shareholders' Agreement.

2.    Funding of the General Unsecured Claims Distribution Escrow Account

The funding of the General Unsecured Claims Distribution Escrow Account in accordance with Article VI.B shall be authorized on the Effective Date without the need for any further corporate action and without any further action by the holders of Claims or Interests.

3.        Exit Financing

On the Effective Date the Reorganized Debtors shall enter into the Exit Financing, the terms of which will be set forth in the Exit Financing Documents.

Confirmation shall be deemed approval of the Exit Financing (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Debtors or the Reorganized Debtors, with the consent of the Majority Backstoppers, in connection therewith), to the extent not approved by the Court previously, and the Reorganized Debtors, with the consent of the Majority Backstoppers, are authorized to execute and deliver those documents necessary or appropriate to obtain the Exit Financing, including the Exit Financing Documents, without further notice to or order of the Court, act or action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any Person (other than the Majority Backstoppers), subject to such modifications as the Reorganized Debtors may deem to be necessary to consummate the Exit Financing.

C.        *Corporate Existence*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and by-laws (or other analogous formation documents) in effect before the Effective Date, except to the extent such certificate of incorporation and bylaws (or other analogous formation documents) are amended, with the consent of the Majority Backstoppers, by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

D.        *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors, including Interests held by the Debtors in Non-Debtor Subsidiaries, pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

After the Effective Date, the Reorganized Debtors may present Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Reorganized Debtors.  The Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned and/or vested free and clear of.  This Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by this Plan, shall be given prior to the presentation of such Court order(s) or assignment(s).  Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment and vesting of such property to or in the Reorganized Debtors free and clear of all Liens, Claims, charges or other encumbrances by failing to object to confirmation of this Plan, except as otherwise provided in this Plan.

E.    *Cancellation of Existing Securities*

Except as otherwise provided in the Plan:  (1) the obligations of the Debtors under the DIP Credit Agreement, the Bridge Financing Facility, the Second Lien Credit Agreement, and the Interests in MHRC, and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled and the Debtors and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be released and discharged; *provided that* notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect solely for purposes of enabling holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; *provided*, *further*, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any expense or liability to the Reorganized Debtors, except to the extent set forth in or provided for under the Plan; *provided*, *further*, that nothing in this section shall effect a cancellation of any New Common Equity, Intercompany Interests, or Intercompany Claims.

On and after the Effective Date, all duties and responsibilities of the DIP Facility Agent under the DIP Credit Agreement, Bridge Facility Agent under the Bridge Financing Facility, the Second Lien Agent under the Second Lien Credit Agreement, and the Indenture Trustee under the Indenture, as applicable, shall be discharged unless otherwise specifically set forth in or provided for under the Plan or the Plan Supplement.

If the record holder of the Notes is DTC or its nominee or another securities depository or custodian thereof, and such Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such holder of the Notes shall be deemed to have surrendered such holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

F.    *Corporate Action*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Court in all respects, including, as applicable:  (1) entry into the Exit Financing; (2) execution and delivery of the Exit Financing Documents; (3) the issuance of the New Common Equity; (4) selection of the directors and officers for Reorganized MHRC and the other Reorganized Debtors; (5) the right of the New MHRC Board to adopt a Management Incentive Plan on terms and conditions determined by the New MHRC Board in accordance with Article IV.N of the Plan; (6) implementation of the Restructuring Transactions; and (7)  all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of Reorganized MHRC and the other Reorganized Debtors, and any corporate action required by the Debtors, Reorganized MHRC, or the other Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, Reorganized MHRC or the other Reorganized Debtors, other than the consent of the Majority Backstoppers, as applicable.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors, Reorganized MHRC, or the other Reorganized Debtors shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of Reorganized MHRC and the other Reorganized Debtors, including the Exit Financing Documents and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Court.  The authorizations and approvals contemplated by this Article IV.F shall be effective notwithstanding any requirements under non-bankruptcy law.

G.    *New Organizational Documents*

To the extent required under the Plan or applicable non-bankruptcy law, Reorganized MHRC and the other Reorganized Debtors will, on or as soon as practicable after the Effective Date, file their respective New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation.  Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities and will comply with all other applicable provisions of section 1123(a)(6) of the Bankruptcy Code regarding the distribution of power among, and dividends to be paid to, different classes of voting securities.  After the Effective Date, Reorganized MHRC and the other Reorganized Debtors, as applicable, may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states, provinces, or countries of incorporation and their respective New Organizational Documents.

On the Effective Date, the New Organizational Documents, including, upon agreement by the Debtors and the Majority Backstoppers, the New Shareholders' Agreement, substantially in forms to be filed with the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions, such terms and provisions being satisfactory to the Majority Backstoppers and the Reorganized Debtors. If a New Shareholders' Agreement is put in place, any holder of a Claim that is to be distributed shares of New Common Equity pursuant to the Plan shall be deemed to have duly executed and delivered to Reorganized MHRC a counterpart to the New Shareholders' Agreement.

H.    *Directors and Officers of the Reorganized Debtors*

As of the Effective Date, the term of the current members of the board of directors of the Debtors shall expire, and the initial boards of directors, including the New Boards, as well as the officers of each of the Reorganized Debtors, shall be appointed in accordance with the New Organizational Documents and other constituent documents of each Reorganized Debtor.  As set forth in the Restructuring Support Agreement, the initial New MHRC Board shall consist of:  (a) two persons selected by the Noteholder Backstoppers; (b) two persons selected by the Second Lien Backstoppers; (c) Gary C. Evans in his capacity as the Chief Executive Officer of Reorganized MHRC; (d) one person jointly selected by the Noteholder Backstoppers and the Second Lien Backstoppers, who shall serve as the non-executive chairman; and (e) one person selected by the Noteholder Backstoppers, based upon a slate of three candidates jointly determined by the Noteholder Backstoppers and the Second Lien Backstoppers.  The identity of the individuals who will serve on the New Boards will be disclosed on or prior to the Confirmation Hearing.  Successors will be elected in accordance with the New Organizational Documents.  It is currently anticipated that Gary C. Evans shall be the Chief Executive Officer of Reorganized MHRC and the other members of the Debtors' management team as of the Effective Date will remain in their same positions.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent practicable, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the initial New Boards, as well as those Persons that will serve as an officer of Reorganized MHRC or any of the Reorganized Debtors.  To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Organizational Documents and other constituent documents of Reorganized MHRC and the Reorganized Debtors.

I.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, Reorganized MHRC, and each of the other Reorganized Debtors, and the officers and members of the New Boards thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the New Common Equity, in the name of and on behalf of Reorganized MHRC or the Reorganized Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

J.      *Exemption from Certain Taxes and Fees*

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to, in contemplation of, or in connection with, the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

K.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, Article IV.L, and the last sentence of the first paragraph of this Article IV.K, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors.  **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Restructuring Support Agreement or the Plan or a Court order, including, without limitation, pursuant to Article VIII and Article IV.L hereof, the Debtors or Reorganized Debtors, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.  For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.K include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors.  The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

L.      *Release of Avoidance Actions*

On the Effective Date the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors and the Reorganized Debtors, and any of their successors or assigns, and any Entity acting on behalf of the Debtors or the Reorganized Debtors, shall be deemed to have waived the right to pursue any and all Avoidance Actions, except (i) for Avoidance Actions commenced prior to the Confirmation Date, (ii) for Avoidance Actions brought as counterclaims or defenses to Claims asserted against the Debtors, and (iii) to the extent otherwise reserved in the Plan Supplement.  No Avoidance Actions shall revert to creditors of the Debtors.

M.      *Director and Officer Liability Insurance and Indemnification*

Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order will constitute the

Court's approval of the Reorganized Debtors' assumption of each of such D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Reorganized Debtors under the Plan as to which no Proof of Claim need be filed, and shall survive the Effective Date.

Before the Petition Date, the Debtors obtained reasonably sufficient tail coverage (*i.e.*, director, manager, and officer insurance coverage that extends beyond the end of the policy period) under a D&O Liability Insurance Policy for the current and former directors, officers, and managers. After the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date of the Plan shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date of the Plan.

N.      *Management Incentive Plan*

The percentage of New Common Equity to be set aside for the Management Incentive Plan shall be up to a percentage determined by the Debtors and the Majority Backstoppers prior to the Confirmation Hearing, which maximum percentage shall be disclosed either in the Plan Supplement or the Confirmation Order. The parameters, incentives, and eligible executives with respect to this Management Incentive Plan shall be determined by the compensation committee of the New MHRC Board, with input to be provided to the New MHRC Board designees by the Backstoppers prior to the Effective Date. The Confirmation Order shall authorize the New MHRC Board to adopt and enter into the Management Incentive Plan, on the terms set forth in this Article IV.N. The Management Incentive Plan shall dilute all of the New Common Equity.

O.      *Employee and Retiree Benefits*

Except as otherwise provided in the Plan or the Plan Supplement, and subject to the consent of the Majority Backstoppers (which shall be determined prior to the Confirmation Date), all written employment, severance, retirement, indemnification, and other similar employee-related agreements or arrangements in place as of the Effective Date with the Debtors and the Non-Debtor Subsidiaries, including any key employee incentive plans and/or key employee retention plans that may be approved by the Court in the Chapter 11 Cases (including, for the avoidance of doubt, all obligations arising from the Chapter 11 Compensation Order), retirement income plans and welfare benefit plans, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees, shall be assumed by the Reorganized Debtors and shall remain in place after the Effective Date, as may be amended by agreement between the beneficiaries of such agreements, plans, or arrangements, on the one hand, and the Debtors, on the other hand, or, after the Effective Date, by agreement with the Reorganized Debtors, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; *provided that* the foregoing shall not apply to any equity-based compensation, agreement, or arrangement existing as of the Petition Date. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

P.      *Payment of Fees and Expenses of the Indenture Trustee*

Prior to the Effective Date (and thereafter with respect to fees and expenses relating to post-Effective Date service under the Plan), the Debtors shall pay in Cash all reasonable and documented unpaid fees and expenses of the Indenture Trustee and its advisors, including counsel. For the avoidance of doubt, nothing herein affects the Indenture Trustee's right to exercise its charging lien against distributions to holders of the Notes.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.     *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases will be deemed assumed and assigned to the Reorganized Debtors or their designated assignee in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, regardless of whether such Executory Contract or Unexpired Lease is set forth on the Schedule of Assumed Executory Contracts and Unexpired Leases, other than:  (1) those that are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) those that have been previously rejected by a Final Order, including those that are subject to a notice issued pursuant to the Contract Procedures Order; (3) those that are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Confirmation Date; or (4) those that are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute a Court order approving the assumptions, assumptions and assignments, or rejections of such Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases and the Schedule of Assumed Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court authorizing and providing for its assumption under applicable federal law.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Majority Backstoppers, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time through and including 45 days after the Effective Date.

B.     *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Court within the earliest to occur of (1) thirty days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection or (2) thirty days after notice of any rejection that occurs after the Effective Date.  **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**  Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.6 of the Plan, as applicable.

C.     *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned, as reflected on a Cure Notice shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee, to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or

Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption or assumption and assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption.

At least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption or assumption and assignment and proposed amounts of Cure Claims to the applicable third parties. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or assumption and assignment or related cure amount must be Filed, served and <u>actually</u> <u>received</u> by the Debtors at least seven days before the Confirmation Hearing.** Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or assumption and assignment or cure amount will be deemed to have assented to such assumption or assumption and assignment and cure amount. Notwithstanding anything herein to the contrary, in the event that any Executory Contract or Unexpired Lease is removed from the Schedule of Rejected Executory Contracts and Unexpired Leases after such 14-day deadline, a Cure Notice of proposed assumption or assumption and assignment and proposed amounts of Cure Claims with respect to such Executory Contract or Unexpired Lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such Executory Contract or Unexpired Lease can be assumed or assumed and assigned.

In any case, if the Court determines that the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is greater than the amount set forth in the applicable Cure Notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such Executory Contract or Unexpired Lease to the Schedule of Rejected Executory Contracts and Unexpired Leases, subject to the consent of the Majority Backstoppers, in which case such Executory Contract or Unexpired Lease will be deemed rejected as the Effective Date.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

D.      *Indemnification Obligations*

The Debtors and Reorganized Debtors shall assume the Indemnification Obligations for the current and former directors and the officers who served in such capacity at any time after the Petition Date, solely in their capacities as such, and such Indemnification Obligations shall not be modified, reduced, discharged, impaired, or otherwise affected in any way. Notwithstanding the foregoing, nothing shall impair the ability of the Reorganized Debtors to modify indemnification obligations (whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, indemnification agreements, employment contracts, or otherwise, but excluding any indemnification obligations arising under the D&O Liability Insurance Policies) arising after the Effective Date; *provided that* none of the Reorganized Debtors shall amend and/or restate any New Organizational Documents before the Effective Date to terminate or adversely affect any of the Reorganized Debtors' Indemnification Obligations. For the avoidance of doubt, nothing in this paragraph affects the assumption of any indemnification obligations arising under the D&O Liability Insurance Policies, as set forth in Article IV.M of the Plan.

E.      *Insurance Policies*

Without limiting Article IV.M, all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments related thereto.

F.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases, with the consent of the Majority Backstoppers, shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.      *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) that have not been rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each holder of an Allowed Claim (or such holder's affiliate) shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.       *General Unsecured Claims Distribution Escrow Account*

        On or as reasonably practicable after the Effective Date, the Debtors shall establish and fund the General Unsecured Claims Distribution Escrow Account, which shall be an escrow account separate and apart from the Debtors' general operating funds to be maintained in trust for the benefit of holders of Allowed General Unsecured Claims and funded in the amount of the Unsecured Creditor Cash Pool.  Cash held in the General Unsecured Claims Escrow Account shall not constitute property of the Debtors or the Reorganized Debtors.  Distributions from the General Unsecured Claims Distribution Escrow Account to holders of Allowed General Unsecured Claims shall be made in accordance with the provisions governing distribution set forth in this Article VI.  The General Unsecured Claims Distribution Escrow Account may be an interest-bearing account.  In the event there is a remaining balance in the General Unsecured Claims Distribution Escrow Account following payment to all holders of Allowed General Unsecured Claims under the Plan, such remaining amount, if any, shall be returned to the Reorganized Debtors.

        Subject to definitive guidance from the Internal Revenue Service or a court of competent jurisdiction to the contrary (including receipt by the Debtors or the Reorganized Debtors of a private letter ruling if so requested, or the receipt of an adverse determination by the Internal Revenue Service upon audit if not contested by the Debtors or the Reorganized Debtors), the Debtors and the Reorganized Debtors shall (i) treat the General Unsecured Claims Distribution Escrow Account as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Debtors, the Reorganized Debtors, and the holders of Claims and Interests) shall report for United States federal, state, and local income tax purposes consistently with the foregoing.  The Debtors or the Reorganized Debtors, as applicable, shall be responsible for payment, out of the assets of the General Unsecured Claims Distribution Escrow Account, of any taxes imposed on the General Unsecured Claims Distribution Escrow Account or its assets.

C.       *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

    1.       Delivery of Distributions

       a.       Distribution Record Date

        As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

       b.       Delivery of Distributions to Second Lien Lenders

        All distributions to holders of Second Lien Claims as of the Distribution Record Date shall be governed by the Second Lien Credit Agreement.  The Second Lien Agent shall cooperate with the Debtors and Reorganized Debtors to enable the Debtors or Reorganized Debtors to make such distributions, including providing, within three business days following the Distribution Record Date, the Debtors or Reorganized Debtors with a list of all holders of Second Lien Claims, including the amount of Second Lien Claims held by each such holder and the identity and address of the holder authorized to receive the distribution, in each case as of the Distribution Record Date. Distributions to holders of Second Lien Claims shall be deemed to have been made when reflected in the Reorganized Debtors' stock register according to the information provided by the Second Lien Agent.

       c.       Delivery of Distributions to Indenture Trustee

        All distributions to holders of Note Claims as of the Distribution Record Date shall be deemed completed when made to the Indenture Trustee, which shall be deemed to be the holder of all Note Claims for purposes of distributions to be made hereunder.  The Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Note Claims, as applicable.  As soon as practicable in accordance with the requirements set

forth in this Article VI, the Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed Note Claims.

d.        Delivery of Distributions in General

Distributions to holders of Allowed Claims (other than holders of DIP Facility Claims, Second Lien Claims, and Note Claims) shall be made to holders of record as of the Distribution Record Date by the Reorganized Debtors as follows:  (1) to the signatory set forth on any of the Proofs of Claim Filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is Filed or if the Debtors have been notified in writing of a change of address); (2) at the addresses set forth in any written notices of address changes delivered to the Reorganized Debtors after the date of any related Proof of Claim; (3) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Reorganized Debtors have not received a written notice of a change of address; or (4) on any counsel that has appeared in the Chapter 11 Cases on the holder's behalf.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors and the Reorganized Debtors shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

2.        Minimum Distributions

No fractional shares of New Common Equity shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Equity that is not a whole number, the actual distribution of shares of New Common Equity shall be rounded as follows: (a) fractions of one-half or greater shall be rounded to the next higher whole number, and (b) fractions of less than one-half shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Equity to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

Holders of Allowed Claims entitled to distributions of $50 or less shall not receive distributions, and each such Claim to which this limitation applies shall be discharged pursuant to Article VIII and its holder is forever barred pursuant to Article VIII from asserting that Claim against the Reorganized Debtors or their property.

3.        Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors have determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; *provided that* such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall be redistributed Pro Rata (it being understood that, for purposes of this Article VI.C.3, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed) without need for a further order by the Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property or Interest in property shall be discharged and forever barred.

D.        *Registration or Private Placement Exemption*

Except as otherwise set forth immediately below, all shares of New Common Equity issued under the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code.  Shares of New Common Equity issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  The New Common Equity issued pursuant to section 1145 of the Bankruptcy Code (a) is not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) is freely tradable and transferable by any holder thereof that (i) is not an "affiliate" of the Reorganized Debtors as

defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the New Common Equity from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code. **New Common Equity issued to holders of DIP Claims, DIP Backstop Fee Claims, Second Lien Claims, and Note Claims, in exchange for such Claims, shall be issued in reliance on section 1145 of the Bankruptcy Code. The New Common Equity underlying the Management Incentive Plan will be issued pursuant to a registration statement or another available exemption from registration under the Securities Act and other applicable law.**

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Common Equity to be held through the facilities of the DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of the New Common Equity, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

The DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Common Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Equity is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

E.       *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, Reorganized MHRC and the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

F.       *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest as Allowed herein.

G.       *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

H.       *Setoffs and Recoupment*

The Debtors or the Reorganized Debtors, as applicable, may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the

claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such Claim it may have against the holder of such Claim.

I.       *Claims Paid or Payable by Third Parties*

      1.       <u>Claims Paid by Third Parties</u>

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor; *provided that* the Debtors shall provide 21 days' notice to the holder prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.  Subject to the last sentence of this paragraph, to the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such holder shall, within fourteen days of receipt thereof, repay or return the distribution to the Reorganized Debtors to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen-day grace period specified above until the amount is repaid.

      2.       <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court; *provided that* the Debtors shall provide 21 days' notice to the holder of such Claim prior to any disallowance of such Claim during which period the holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.

      3.       <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.       *Allowance of Claims*

After the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.

B.        *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors (or any other entity agreed to by the Debtors, the Majority Backstoppers, and the Committee), by order of the Court, shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims; (2) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court.

C.        *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Reorganized Debtors (with the consent of the Majority Backstoppers) may (but are not required to) at any time request that the Court estimate any Disputed Claim or that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Court. In the event that the Court estimates any Claim that is disputed, contingent, or unliquidated, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor or Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

D.        *Adjustment to Claims Without Objection*

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Court.

E.        *Time to File Objections to Claims*

Any objections to Claims, which, prior to the Effective Date, may be filed by any party, shall be Filed on or before the Claims Objection Deadline.

F.        *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All Proofs of Claim Filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Court.

34

**Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed Disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Filed Claim has been deemed timely Filed by a Final Order.**

G.      *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Court and the Reorganized Debtors and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Court.

H.      *No Distributions Pending Allowance*

No payment or distribution provided under the Plan shall be made on account of a Disputed Claim or portion thereof, including if an objection to a Claim or portion thereof is Filed as set forth in Article VII, unless and until such Disputed Claim becomes an Allowed Claim.

I.       *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law or as otherwise provided in herein.

J.       *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of Allowed Claims exceed 100% of the underlying Allowed Claim plus applicable interest. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee Fees until such time as a particular case is closed, dismissed, or converted.

# ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, which distributions and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest, including:

1.       the amount (if any) of the Secured portion of the Second Lien Claim, including the perfection, validity and amount of any mortgages securing the Second Lien Credit Agreement;

2.        the dispute regarding whether (and/or to what extent) the Liens and Claims granted by Triad Hunter, LLC in connection with the Debtors' entry into the Second Lien Credit Agreement or the Indenture should be avoided as fraudulent conveyances;

3.        the validity, priority, treatment, and amount of any intercompany transfers among the Debtors, including the intercompany transfers between Magnum Hunter Resources, Inc. and Triad Hunter, LLC;

4.        the potential to recharacterize as principal (or otherwise) any adequate protection payments made to the Second Lien Lenders;

5.        any dispute regarding the appropriate allocation of general and administrative costs across the Debtors' assets; and

6.        any challenges to transfers made by the Debtors to any related entities (including any of such entities that are affiliated with or owned in part by the Debtors' officers, including, without limitation, GreenHunter Resources, Inc.) and, to the extent the modifications to the Eureka Hunter Holdings, LLC agreements are achieved, to Eureka Hunter Holdings, LLC.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors (or any other party, as determined by the Debtors, the Majority Backstoppers, and the Committee) may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

Pursuant to Rule 408 of the Federal Rules of Evidence, this Plan, the Disclosure Statement, the Restructuring Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be admissible into evidence in any proceeding unless and until this Plan is consummated, and then only in accordance with this Plan.  In the event this Plan is not consummated, provisions of this Plan, the Disclosure Statement, the Restructuring Support Agreement (and any exhibits or supplements relating to the foregoing) and all negotiations relating thereto shall not be binding or probative.

B.        *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided  in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

C.      *Term of Injunctions or Stays*

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

D.      **Release of Liens**

**Except as otherwise specifically provided in the Plan, the Exit Financing Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Financing Documents), or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required to be made by the Debtors.  In addition, the DIP Facility Agent and the Second Lien Agent shall execute and deliver all documents reasonably requested by the Debtors, Reorganized Debtors, or administrative agent(s) for the Exit Financing to evidence the release of such mortgages, deeds of trust, Liens, pledges, and other security interests and shall authorize the Reorganized Debtors to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto.**

E.      **Releases by the Debtors**

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (including dividends paid), transactions pursuant and/or related to the Bridge Financing Facility, the Second Lien Credit Agreement, the Notes, the Intercreditor Agreement, the Final DIP and Cash Collateral Order (and any payments or transfers in connection therewith), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Definitive Documentation, the DIP Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, the Definitive Documentation, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Releases by the Debtors described in this Article VIII.E, which includes by**

reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any claim or cause of action released pursuant to such releases.

F.    ***Releases by Holders of Claims and Interests***

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (including dividends paid), transactions pursuant and/or related to the Bridge Financing Facility, the Second Lien Credit Agreement, the Notes, the Intercreditor Agreement, the Final DIP and Cash Collateral Order (and any payments or transfers in connection therewith), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Definitive Documentation, the DIP Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, the Definitive Documentation, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (i) post-Effective Date obligations of any party or Entity under the Plan, (ii) any Restructuring Transaction, or (iii) any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Releases by Holders of Claims and Interests described in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by such releases; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to such releases.

G.    ***Exculpation***

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Definitive Documentation, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Definitive

Documentation, or the DIP Facility, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, the Definitive Documentation, or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities. The Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

H. *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.E or Article VIII.F of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Non-Debtor Subsidiaries, the Reorganized Debtors, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.

I. *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J. *Recoupment*

In no event shall any holder of Claims or Interests be entitled to recoup any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

K.      *Subordination Rights*

Any distributions under the Plan to holders shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

L.      *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

**ARTICLE IX.**
**CONDITIONS PRECEDENT TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

A.      *Conditions Precedent to the Confirmation Date*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C hereof):

1.      An order approving the Disclosure Statement shall have been entered by the Court in form and substance acceptable to the Debtors and Majority Backstoppers and shall have become a Final Order;

2.      An order approving the Debtors' assumption of the Restructuring Support Agreement shall have been entered by the Court in form and substance acceptable to the Debtors and the Majority Backstoppers;

3.      The Confirmation Order shall have been approved by the Court in form and substance acceptable to the Debtors and Majority Backstoppers;

4.      The Confirmation Order shall, among other things:

   a.      authorize the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

   b.      decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

   c.      authorize the Reorganized Debtors to: (i) issue the New Common Equity pursuant to the exemption from registration under the Securities Act provided by either section 1145 of the Bankruptcy Code or section 4(a)(2) of the Securities Act or Regulation D promulgated thereunder or other exemption from such registration or pursuant to one or more registration statements; and (ii) enter into any agreements contained in the Plan Supplement;

   d.      decree that the Confirmation Order shall supersede any Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

e. authorize the implementation of the Plan in accordance with its terms; and

f. provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, any mortgages or security interest filing to be recorded or filed in connection with the Exit Financing).

5. The Court shall have found that adequate information and sufficient notice of the Disclosure Statement, the Plan, and the Confirmation Hearing, along with all deadlines for voting on or objecting to the Plan have been given to all relevant parties in accordance with the solicitation procedures governing such service and in substantial compliance with Bankruptcy Rules 2002(b), 3017, 9019 and 3020(b);

6. The Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, each in form and substance acceptable to the Debtors and the Majority Backstoppers, shall have been Filed subject to the terms hereof;

7. The Debtors shall have received a commitment for the Exit Financing, in form and substance satisfactory to the Majority Backstoppers and the Confirmation Order shall approve the Debtors' negotiation of and entry into the any Exit Financing Documents necessary to implement the Exit Financing; and

8. The third draw under the DIP Facility shall have been made and no mutual decision shall have been made by the Debtors and the Majority Backstoppers to go forward with a sale process pursuant to section 363 of the Bankruptcy Code as provided for in the Restructuring Support Agreement.

B. *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.C hereof):

1. Entry of the Confirmation Order in form and substance satisfactory to the Debtors and the Majority Backstoppers, and such order shall have become a Final Order that has not been stayed or modified or vacated on appeal;

2. The Debtors shall not be in default of the DIP Facility or the Final DIP and Cash Collateral Order (or, to the extent that the Debtors have been in default or are in default on the proposed Effective Date, such default shall have been waived by the DIP Facility Lenders or cured by the Debtors in a manner consistent with the DIP Facility);

3. The total amount of any administrative expenses paid by the Debtors on the Effective Date (or prior thereto) shall not exceed the sum of (i) fees and expenses incurred by the Professionals and (ii) $20,000,000.00;

4. There shall not have been a Material Adverse Change;

5. All of the Backstoppers' reasonable and documented professional fees (including legal and financial and any other special advisors retained by the Second Lien Backstoppers and the Noteholder Backstoppers either before or during the Chapter 11 Cases) and out-of-pocket expenses incurred in connection with the Restructuring Transactions or any other matter in connection thereto, including, without limitation, those fees and expenses incurred during the Chapter 11 Cases, shall have been paid by the Debtors in accordance with the Restructuring Support Agreement;

41

6.        The Debtors shall have, before the Petition Date, provided the Backstoppers with a summary of the total amount of fees and expenses paid to the Debtors' financial and legal advisors since September 1, 2015, including the amounts paid to Kirkland & Ellis, LLP, Bracewell & Giuliani, LLP, and PJT Partners;

7.        The Debtors shall not have transferred, outside of the ordinary course of business, any of their assets (as of the Effective Date) including cash on hand, to non-Debtors without the prior approval of the Majority Backstoppers or as otherwise permitted under the DIP Facility;

8.        The Plan and the Plan Supplement, including any exhibits, schedules, amendments, modifications, or supplements thereto, and inclusive of any amendments, modifications, or supplements made after the Confirmation Date but prior to the Effective Date, shall be in form and substance acceptable to the Debtors and the Majority Backstoppers and made in accordance with the Article X.A of the Plan;

9.        The Exit Financing Documents in form and substance acceptable to the Debtors and the Majority Backstoppers shall have been executed and delivered by all of the Entities that are parties thereto, and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the consummation of the Exit Financing shall have been waived or satisfied in accordance with the terms thereof, and the closing of the Exit Financing shall be deemed to occur concurrently with the occurrence of the Effective Date;

10.        All conditions precedent to the issuance of the New Common Equity, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

11.        The New Organizational Documents, in form and substance acceptable to the Debtors and the Majority Backstoppers, have been duly filed with the applicable authorities in the relevant jurisdictions;

12.        All governmental and material third party approvals and consents, including Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions;

13.        All documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements (including, without limitation, the Exit Financing Documents);

14.        The Restructuring Support Agreement shall not have terminated and shall be in full force and effect, with all prerequisites to assumption having been satisfied, and shall not be (i) identified on the Schedule of Rejected Executory Contracts and Unexpired Leases or (ii) the subject of a pending motion to reject Executory Contracts or Unexpired Leases, and the Debtors shall be in compliance therewith;

15.        All Allowed Professional Fee Claims approved by the Court shall have been paid in full or amounts sufficient to pay such Allowed Professional Fee Claims after the Effective Date have been placed in the Professional Fee Escrow Account pending approval of the Professional Fee Claims by the Court;

16.        The DIP Backstop Fee shall have been paid to the Backstoppers in accordance with the Restructuring Support Agreement and the Final DIP and Cash Collateral Order;

17.        The reasonable, actual, and documented fees and expenses of the Indenture Trustee and its counsel shall be paid in full and in Cash; and

18.        The Debtors and the Backstoppers shall have fulfilled their obligations under the Restructuring Support Agreement with respect to entry of the Chapter 11 Compensation Order, and to the extent such order is entered by the Court and has become a Final Order, all obligations arising under the Chapter 11 Compensation Order shall have been assumed, including, for the avoidance of doubt, any obligation to make payments required

under the Chapter 11 Compensation Order, regardless of whether such payments are due before or after the occurrence of the Effective Date.

C.    *Waiver of Conditions*

The conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived only by consent of the Debtors and the Majority Backstoppers without notice, leave, or order of the Court or any formal action other than proceedings to confirm or consummate the Plan.

D.    *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

E.    *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date*

If the Confirmation Date and/or the Effective Date do not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, or the Restructuring Support Agreement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or otherwise) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments*

Subject to the limitations contained herein, the Debtors reserve the right to modify the Plan (*provided that* such modifications are in form and substance acceptable to the Majority Backstoppers) and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify materially the Plan (*provided that* such alterations, amendments, or modifications are in form and substance acceptable to the Majority Backstoppers) with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary and with the consent of the Majority Backstoppers, may initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

B.    *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.    *Revocation or Withdrawal of the Plan*

1.    Right to Revoke or Withdraw.  Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date; *provided however* that, with the consent of the Majority Backstoppers, withdrawal of the Plan as to an individual Debtor that is not a guarantor under the either the Second Lien Credit Agreement or the Indenture shall not be deemed to be a Termination Event under the Restructuring Support Agreement.

2.        Effect of Withdrawal, Revocation, or Non-Consummation.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims or the Non-Debtor Subsidiaries; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity, including the Non-Debtor Subsidiaries; or (iv) be used by the Debtors or any Entity as evidence (or otherwise) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.        Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.        decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.        resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is a party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Confirmation Date, pursuant to Article V hereof, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.        ensure that distributions to holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.        adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.        adjudicate, decide, or resolve any and all matters related to Causes of Action by or against the Debtors;

7.        adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.        enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.        enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.        resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.        issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.        resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.I.1 hereof;

14.        enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.        determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

16.        adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.        consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

18.        determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.        hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.        hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.        enforce all orders previously entered by the Court;

22.        hear any other matter not inconsistent with the Bankruptcy Code;

23.        enter an order concluding or closing the Chapter 11 Cases; and

24.        enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the Exit Financing Documents shall be governed by the respective jurisdictional provisions therein.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Reorganized Debtors, as applicable, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, with the consent of the Majority Backstoppers, the Debtors may File with the Court such agreements and other documents, in form and substance satisfactory to the Majority Backstoppers, as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, with the consent of the Majority Backstoppers, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Dissolution of the Committee*

On the Effective Date, the Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided that* the Committee shall exist, and its professionals shall be retained, after the Effective Date with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order, if any.

D.      *Reservation of Rights*

Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests.

Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any holder of any Claim with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any claimant with respect to any Claims or Interests.

E.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.      *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

|  |  |
|---|---|
| **Reorganized Debtors** | **Magnum Hunter Resources Corporation**<br>909 Lake Carolyn Parkway, Suite 600<br>Irving, Texas 75039<br>Attn:    Paul Johnston |
| **Proposed Counsel to Debtors** | **Pachulski Stang Ziehl & Jones LLP**<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19899-8705 (Courier 19801)<br>Attn:    Laura Davis Jones<br>          Colin R. Robinson<br>          Joseph M. Mulvihill |
|  | **Kirkland & Ellis LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Attn:    Edward O. Sassower, P.C.<br>          Brian Schartz |
|  | **Kirkland & Ellis LLP**<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn:    Nora S. Tauke Schweighart<br>          Justin R. Bernbrock<br>          Alexandra Schwarzman |
| **United States Trustee** | **Office of the United States Trustee**<br>**for the District of Delaware**<br>844 King Street, Suite 2207, Lockbox 35<br>Wilmington, Delaware 19810<br>Attn:    Juliet Sarkessian, Esq. |
| **Counsel to the Noteholder Backstoppers** | **Akin Gump Strauss Hauer & Feld LLP**<br>Bank of America Tower<br>One Bryant Park<br>New York, NY 10036-6745<br>Attn:    Michael Stamer<br>          Arik Preis |
| **Counsel to the Second Lien Backstoppers** | **Weil, Gotshal & Manges LLP**<br>767 Fifth Avenue<br>New York, NY 10153-0119<br>Attn:    Joseph H. Smolinsky and Gary T. Holtzer |

G.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall

47

remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.      *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, the Plan Supplement, the Restructuring Support Agreement, and the Exit Financing Documents supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.primeclerk.com/magnumhunter or the Court's website at www.deb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Court, the non-exhibit or non-document portion of the Plan shall control.

J.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall be prohibited from altering or interpreting such term or provision to make it valid or enforceable, *provided that* at the request of the Debtors and subject to the consent of the Majority Backstoppers, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted, *provided that* any such alteration or interpretation shall be acceptable to the Debtors and the Majority Backstoppers.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

K.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

L.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases.

M.      *Waiver or Estoppel*

Each holder of a Claim shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors or Reorganized Debtors' right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Court or the Notice and Claims Agent prior to the Confirmation Date.

* * * *

Respectfully submitted, as of the date first set forth above,

Dated:  January 7, 2016

MAGNUM HUNTER RESOURCES CORPORATION
on behalf of itself and all other Debtors

Gary C. Evans
Chairman and Chief Executive Officer
909 Lake Carolyn Parkway, Suite 600
Irving, Texas 75039

## Exhibit B

**Restructuring Support Agreement**

*EXECUTION VERSION*

# MAGNUM HUNTER RESOURCES CORP.

## RESTRUCTURING SUPPORT AGREEMENT

### December 15, 2015

This Restructuring Support Agreement (together with the exhibits and schedules attached hereto, which includes, without limitation, the Term Sheet (as defined below) attached hereto as **Exhibit A**, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"),[1] dated as of December 15, 2015, is entered into by and among: (i) Magnum Hunter Resources Corporation ("MHRC"); Alpha Hunter Drilling, LLC; Bakken Hunter, LLC; Bakken Hunter Canada, Inc.; Energy Hunter Securities, Inc.; Hunter Aviation, LLC; Hunter Real Estate, LLC; Magnum Hunter Marketing, LLC; Magnum Hunter Production, Inc.; Magnum Hunter Resources GP, LLC; Magnum Hunter Resources, LP; Magnum Hunter Services, LLC; NGAS Gathering, LLC; NGAS Hunter, LLC; PRC Williston LLC; Shale Hunter, LLC; Triad Holdings, LLC; Triad Hunter, LLC; Viking International Resources Co., Inc.; and Williston Hunter ND, LLC (such subsidiaries and MHRC, each a "Debtor" and, collectively, the "Debtors")[2]; (ii) certain of the Second Lien Lenders and Noteholders (collectively, in their capacity as lenders under the Bridge Financing Facility, the "Bridge Financing Lenders") party to those certain Sixth and Seventh Amendments to the Fourth Amended and Restated Credit Agreement, dated as of October 22, 2014, by and among MHRC, each of the guarantors party thereto, and the lenders and agents from time-to-time party thereto, which Sixth and Seventh Amendments are dated as of November 3, 2015, and November 30, 2015, respectively (such amendments, as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, the "Bridge Financing Facility") that are (and any Bridge Financing Lender that may become in accordance with Section 11 and/or Section 12 hereof) signatories hereto (collectively, the "Consenting Bridge Financing Lenders"); (iii) the lenders party to that certain Second Lien Credit Agreement, dated as of October 22, 2014 (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, the "Second Lien Credit Facility"), by and among MHRC, each of the guarantors party thereto, Credit Suisse AG, Cayman Islands Branch, as administrative agent and collateral agent, and the lenders party thereto (the "Second Lien Lenders") that are (and any Second Lien Lender that may become in accordance with Section 11 and/or Section 12 hereof) signatories hereto (collectively, the "Consenting Second Lien Lenders"); (iv) the holders of notes (the "Noteholders") issued pursuant to that certain Indenture, dated as of May 16, 2012 (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, the "Indenture"), for the 9.750% Senior Notes Due 2020 among MHRC, each of the guarantors party thereto, Wilmington Trust, National Association, as trustee, and Citibank, N.A., as paying agent,

---

[1]  Unless otherwise noted, capitalized terms used but not immediately defined herein shall have the meanings ascribed to them at a later point in this Agreement.

[2]  Until the occurrence of the Termination Date, every entity that is a debtor in the Chapter 11 Cases shall be a party to this Agreement.

registrar, and authenticating agent that are (and any Noteholder that may become in accordance with <u>Section 11</u> and/or <u>Section 12</u> hereof) signatories hereto (collectively, the "<u>Consenting Noteholders</u>") and (v) the holders of claims under the DIP Credit Agreement (the "<u>DIP Lenders</u>") that are (and any DIP Lender that may become in accordance with <u>Section 11</u> and/or <u>Section 12</u> hereof) signatories hereto (collectively, the "<u>Consenting DIP Lenders</u>," and, together with the Consenting Bridge Financing Lenders, the Consenting Second Lien Lenders, and the Consenting Noteholders, the "<u>Restructuring Support Parties</u>").   This Agreement collectively refers to the Debtors and the Restructuring Support Parties as the "<u>Parties</u>" and each individually as a "<u>Party</u>."

<u>**RECITALS**</u>

WHEREAS, the Parties have engaged in good faith, arm's-length negotiations regarding restructuring transactions (the "<u>Restructuring Transactions</u>") pursuant to the terms and conditions set forth in this Agreement, including a joint pre-arranged plan of reorganization for the Debtors on terms consistent with the restructuring term sheet attached hereto as **<u>Exhibit A</u>** (the "<u>Term Sheet</u>") and incorporated herein by reference pursuant to <u>Section 2</u> hereof (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with this Agreement, the "<u>Plan</u>")[3];

WHEREAS, it is anticipated that the Restructuring Transactions will be implemented through jointly-administered voluntary cases commenced by the Debtors (the "<u>Chapter 11 Cases</u>") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "<u>Bankruptcy Code</u>"), in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), pursuant to the Plan, which will be filed by the Debtors in the Chapter 11 Cases; and

WHEREAS, the Consenting Second Lien Lenders and the Consenting Noteholders have agreed to provide debtor-in-possession financing to the Debtors during the pendency of the Chapter 11 Cases pursuant to the terms and conditions set forth in the Term Sheet (in their capacity as such, the "<u>DIP Lenders</u>").

NOW, THEREFORE, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

<u>**AGREEMENT**</u>

1.    <u>RSA Effective Date</u>.  This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "<u>RSA Effective Date</u>") that this Agreement has been executed by all of the following:  (a) each Debtor; (b) Consenting Bridge Financing Lenders (i) holding, in excess of 90% in principal amount outstanding of all claims against the Debtors arising on account of the Bridge Financing Facility

---

[3]    The Plan shall be filed in accordance with the Milestones (as defined below) set forth in <u>Section 4</u> of this Agreement.

2

(the "<u>Bridge Financing Claims</u>") and (ii) comprising, in aggregate, at least one half in number of all Bridge Financing Lenders; (c) Consenting Second Lien Lenders holding, in aggregate, at least 66.5% in principal amount outstanding of all claims against the Debtors arising on account of the Second Lien Credit Facility (the "<u>Second Lien Claims</u>"); and (d) Consenting Noteholders holding, in aggregate, approximately 79% in principal amount outstanding of all claims against the Debtors arising on account of the Indenture (the "<u>Note Claims</u>"). In addition, the Consenting Noteholders hold, in the aggregate, approximately 6% in principal amount of the Second Lien Claims.

2.      <u>Exhibits and Schedules Incorporated by Reference</u>.  Each of the exhibits attached hereto and any schedules to such exhibits (collectively, the "<u>Exhibits and Schedules</u>") is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits and Schedules.  In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.

3.      <u>Definitive Documentation</u>.  The definitive documents and agreements (the "<u>Definitive Documentation</u>") governing the Restructuring Transactions shall include every order entered by the Bankruptcy Court, and every pleading, motion, proposed order, or document filed by the Debtors at any point prior to the Termination Date including, without limitation:  (a) the Plan (and all exhibits thereto) and the confirmation order with respect to the Plan (the "<u>Confirmation Order</u>"); (b) the related disclosure statement (and all exhibits thereto) with respect to the Plan (the "<u>Disclosure Statement</u>"); (c) the solicitation materials with respect to the Plan (collectively, the "<u>Solicitation Materials</u>"); (d) the Interim DIP Order and the Final DIP Order (each as defined in the Term Sheet) (collectively, the "<u>DIP Orders</u>") and related credit agreement and other loan documents (the "<u>DIP Credit Agreement</u>"); (e) the Exit Facility (as defined in the Term Sheet) and related credit agreement; and (f) any documents or agreements in connection with the reorganized Debtors, including any shareholders' agreements, certificates of incorporation, etc.  The Definitive Documentation identified in the foregoing sentence remains subject to negotiation and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, including consistent with the consent rights set forth in the Term Sheet.  Any document that is included within the definition of "Definitive Documentation," including any amendment, supplement, or modification thereof, shall be defined to be in a form and substance satisfactory to each of the Noteholder Backstoppers and the Second Lien Backstoppers.

4.      <u>Milestones</u>.  As provided in and subject to <u>Section 6</u>, the Debtors shall implement the Restructuring Transactions on the following timeline (each deadline, a "<u>Milestone</u>"):

        (a)     no later than December 15, 2015, the Debtors shall commence the Chapter 11 Cases by filing bankruptcy petitions with the Bankruptcy Court (such filing date, the "<u>Petition Date</u>");

        (b)     on the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking entry of the Interim DIP Order and the Final DIP Order;

3

(c)     no later than December 17, 2015, the Bankruptcy Court shall have entered the Interim DIP Order;

(d)     no later than January 7, 2016, the Debtors shall file with the Bankruptcy Court a motion to reject executory contracts and set procedures with regard to the determination of rejection damages;

(e)     no later than January 7, 2016, the Debtors shall file with the Bankruptcy Court: (i) the Plan; (ii) the Disclosure Statement; and (iii) a motion (the "Disclosure Statement and Solicitation Motion") seeking, among other things, (A) approval of the Disclosure Statement, (B) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (C) to schedule the hearing to consider confirmation of the Plan (the "Confirmation Hearing"); and (iii) a motion seeking to assume this Agreement (the "RSA Assumption Motion");

(f)     no later than January 15, 2016, the Bankruptcy Court shall have entered the Final DIP Order;

(g)     no later than February 12, 2016, (i) the Bankruptcy Court shall have entered (x) an order approving the Disclosure Statement and the relief requested in the Disclosure Statement and Solicitation Motion and (y) an order authorizing the assumption of this Agreement (the "RSA Assumption Order"); and (ii) no later than four days after entry of the order approving the Disclosure Statement, the Debtors shall have commenced solicitation on the Plan by mailing the Solicitation Materials to parties eligible to vote on the Plan;

(h)     no later than March 28, 2016, the Bankruptcy Court shall have commenced the Confirmation Hearing;

(i)     no later than April 1, 2016, the Bankruptcy Court shall have entered the Confirmation Order; and

(j)     no later than April 15, 2016, the Debtors shall consummate the transactions contemplated by the Plan (the date of such consummation, the "Effective Date"), it being understood that the Debtors' entry (as reorganized entities under the Plan) into the Exit Facility (as defined in the Term Sheet) and the satisfaction of the conditions precedent to the Effective Date (as set forth in the Exit Facility, the Plan, and the Term Sheet) shall be conditions precedent to the occurrence of the Effective Date.

The Debtors may extend a Milestone with the express prior written consent of (i) Second Lien Backstoppers (as defined in the Term Sheet) holding 50.1% or more of the Second Lien Backstoppers' aggregate DIP Financing commitment or their transferees pursuant to a valid transfer under this Agreement ("Majority Second Lien Backstoppers"); and (ii) Noteholder

4

Backstoppers holding 50.1% or more of the Noteholder Backstoppers' aggregate DIP Financing commitment or their transferees pursuant to a valid transfer under this Agreement ("Majority Noteholder Backstoppers").

5.     Commitment of Restructuring Support Parties.  Each Restructuring Support Party shall (severally and not jointly), solely as it remains the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any claims held by it, from the RSA Effective Date until the occurrence of a Termination Date (as defined in Section 10) applicable to such Restructuring Support Party:

(a)     support and cooperate with the Debtors to take all commercially reasonable actions necessary to consummate the Restructuring Transactions in accordance with the Plan and the terms and conditions of this Agreement and the Term Sheet (but without limiting consent and approval rights provided in this Agreement and the Definitive Documentation), including:  (i) voting all of its claims against, or interests in, as applicable, the Debtors now or hereafter owned by such Restructuring Support Party (or for which such Restructuring Support Party now or hereafter has voting control over) to accept the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and the Solicitation Materials, as approved consistent with the Bankruptcy Code upon receipt of Solicitation Materials approved by the Bankruptcy Court; (ii) timely returning a duly-executed ballot in connection therewith; and (iii) not "opting out" of any releases under the Plan;

(b)     not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan; provided, however, that nothing in this Agreement shall prevent any Restructuring Support Party from withholding, amending, or revoking (or causing the same) its timely consent or vote with respect to the Plan if this Agreement is terminated with respect to such Restructuring Support Party;

(c)     not object to, delay, impede, or take any other action to interfere with the Restructuring Transactions, or propose, file, support, or vote for any restructuring, workout, or chapter 11 plan for any of the Debtors other than the Restructuring Transactions and the Plan;

(d)     not take any action (or encourage or instruct any other party to take any action) in respect of any potential, actual, or alleged occurrence of any "Default" or "Event of Default" under the Bridge Financing Facility, the Second Lien Credit Facility, and the Indenture or that would be triggered as a result of the commencement of the Chapter 11 Cases or the undertaking of any Debtor hereunder to implement the Restructuring Transactions through the Chapter 11 Cases;

(e)     support and not object to, delay, impede, or interfere, directly or indirectly, with the entry by the Bankruptcy Court of the Interim DIP Order or the Final DIP Order, or propose, file or support, any use of cash collateral or debtor-in-possession financing other than as proposed in the Interim DIP Order and the Final DIP Order; and

(f)     not take any other action that is materially inconsistent with its obligations under this Agreement.

Notwithstanding the foregoing, nothing in this Agreement and neither a vote to accept the Plan by any Restructuring Support Party nor the acceptance of the Plan by any Restructuring Support Party shall (w) be construed to prohibit any Restructuring Support Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documentation, (x) be construed to prohibit any Restructuring Support Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the RSA Effective Date until the occurrence of a Termination Date applicable to such Restructuring Support Party, such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring Transactions, (y) affect the ability of any Restructuring Support Party to consult with other Restructuring Support Parties or the Debtors, or (z) impair or waive the rights of any Restructuring Support Party to assert or raise any objection permitted under this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court or prevent such Restructuring Support Party from enforcing this Agreement against the Debtors or any Restructuring Support Party.  In addition, nothing in this <u>Section 5</u> shall require any Restructuring Support Party to incur any unanticipated expenses or indemnification obligations as a result of satisfying its obligations under this Agreement.

6.     <u>Commitment of the Debtors</u>.

(a)     Subject to <u>Sub-Clause (b)</u> below, each of the Debtors (i) agrees to (A) support and complete the Restructuring Transactions set forth in the Plan and this Agreement, (B) negotiate in good faith all Definitive Documentation that is subject to negotiation as of the RSA Effective Date and take any and all necessary and appropriate actions in furtherance of the Plan and this Agreement, and (C) make commercially reasonable efforts to complete the Restructuring Transactions set forth in the Plan in accordance with each Milestone set forth in <u>Section 4</u> of this Agreement, and (ii) shall not undertake any action materially inconsistent with the adoption and implementation of the Plan and the speedy confirmation thereof, including, without limitation, filing any motion to reject this Agreement.

(b)     Notwithstanding anything to the contrary herein, nothing in this Agreement shall require the directors, officers, or managers of any Debtor (in such person's capacity as a director, officer, or manager of such Debtor) to take any action, or to refrain from taking any action, that, after

6

receiving advice from counsel, is required to comply with such director's, officer's, or manager's fiduciary obligations under applicable law.

For the avoidance of doubt, nothing in this <u>Section 6</u> shall be construed to limit or affect in any way (y) any Restructuring Support Party's rights under this Agreement, including upon occurrence of any Termination Event or (z) the Debtors' ability to engage in marketing efforts, discussions, and/or negotiations with any party regarding financing in the Chapter 11 Cases other than that provided for under the DIP Credit Agreement; <u>provided</u>, <u>however</u>, that to the extent the Debtors engage in any such marketing efforts, discussions, and/or negotiations, they shall provide updates (as frequently as reasonably requested by the Backstoppers) regarding such efforts including answering any and all information and diligence requests regarding such efforts, discussions, and/or negotiations.  In addition, and for the avoidance of doubt, nothing in this Agreement shall be construed or interpreted to mean that a DIP Lender may not exercise any rights and remedies that it may have under the DIP Credit Agreement, the DIP Orders, and the Term Sheet, and the Debtors and each Restructuring Support Party acknowledge and agree that the taking of any action by any DIP Lender under the DIP Credit Agreement or any of the DIP Orders shall not be a breach of this Agreement and the Debtors and each Restructuring Support Party shall be prohibited from bringing any action with regard thereto based on the premise that such action was a breach or in contravention of this Agreement (it being understood that the forgoing shall not alter, modify, or supersede the Debtors' rights under the DIP Credit Agreement and/or the DIP Orders).

7.    <u>Restructuring Support Party Termination Events</u>.   Each of the (a) Consenting Second Lien Lenders holding, in aggregate, at least 66.6% in principal amount outstanding of the Second Lien Claims held by the Consenting Second Lien Lenders and (b) Consenting Noteholders holding, in aggregate, at least 66.6% in principal amount outstanding of the Note Claims held by the Consenting Noteholders (each such group, a "<u>Supermajority Support Group</u>")[4] shall have the right, but not the obligation, upon notice to the other Parties, to terminate the obligations of their respective Restructuring Support Parties under this Agreement upon the occurrence of any of the following events, unless waived, in writing, by each such Supermajority Support Group on a prospective or retroactive basis (each, a "<u>Restructuring Support Party Termination Event</u>"):

(a)    the failure to meet any of the Milestones in <u>Section 4</u> unless (i) such failure is the result of any act, omission, or delay on the part of any Restructuring Support Parties whose Supermajority Support Group is seeking termination in violation of its obligations under this Agreement or (ii) such Milestone is extended in accordance with <u>Section 4</u>;

(b)    the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

---

[4]    For the avoidance of doubt, the Consenting DIP Lenders will not have the ability to terminate this Agreement on behalf of themselves.  Rather, the Agreement will terminate as to the Consenting DIP Lenders immediately upon (a) the Debtors' termination of this Agreement, or (b) the termination of the obligations under this Agreement by the Consenting Second Lien Lenders or the Consenting Noteholders.

7

(c)     the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(d)     any Debtor amends or modifies, or files a pleading seeking authority to amend or modify, the Definitive Documentation in a manner that is materially inconsistent with this Agreement;

(e)     any Debtor files or announces that it will file or joins in or supports any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any assets (other than Permitted Asset Sales as defined and provided for in the Term Sheet or permitted under the DIP Credit Agreement), without the prior written consent of the Majority Second Lien Backstoppers and Majority Noteholder Backstoppers;

(f)     the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining or otherwise making impractical the substantial consummation of the Restructuring Transactions on the terms and conditions set forth in the Term Sheet or the Plan; provided, however, that the Debtors shall have 10 business days after issuance of such ruling or order to obtain relief that would allow consummation of the Restructuring Transactions in a manner that (i) does not prevent or diminish in a material way compliance with the terms of the Plan and this Agreement, and (ii) is acceptable to the Majority Second Lien Backstoppers and Majority Noteholder Backstoppers;

(g)     the Debtors file any motion authorizing the use of cash collateral or the entry into post-petition financing that is not in the form of the Interim DIP Order or Final DIP Order or otherwise consented to by the Majority Second Lien Backstoppers and Majority Noteholder Backstoppers;

(h)     a breach by any Debtor of any representation, warranty, or covenant of such Debtor set forth in this Agreement (it being understood and agreed that any actions required to be taken by the Debtors that are included in the Term Sheet attached to this Agreement but not in this Agreement are to be considered "covenants" of the Debtors, and therefore covenants of this Agreement, notwithstanding the failure of any specific provision in the Term Sheet to be re-copied in this Agreement) that (to the extent curable) remains uncured for a period of 3 business days after the receipt by the Debtors of written notice of such breach;

(i)     a breach by a Restructuring Support Party outside of the terminating Supermajority Support Group of any representation, warranty, or covenant of such Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring Transactions or the consummation of the Restructuring

8

Transactions that (to the extent curable) remains uncured for a period of 5 business days after the receipt by such Restructuring Support Party of notice and description of such breach;

(j)    either (i) any Debtor or any other Restructuring Support Party files a motion, application, or adversary proceeding (or any Debtor or other Restructuring Support Party supports any such motion, application, or adversary proceeding filed or commenced by any third party) (A) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, the Bridge Financing Claims, the Second Lien Claims, or the liens securing such claims, or the Note Claims, or (B) asserting any other cause of action against and/or with respect or relating to such claims or the prepetition liens securing such claims; or (ii) the Bankruptcy Court (or any court with jurisdiction over the Chapter 11 Cases) enters an order providing relief against the interests of any Restructuring Support Party with respect to any of the foregoing causes of action or proceedings;

(k)    any Debtor terminates its obligations under and in accordance with this Agreement;

(l)    any board, officer, or manager (or party with authority to act) of a Debtor (or the Debtors themselves) takes any action in furtherance of the rights available to it (or them) under Section 6(b) of this Agreement that are inconsistent with the Restructuring Transactions as contemplated by the Term Sheet attached hereto as **Exhibit A**;

(m)    if the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Debtors' exclusive right to file a plan or plans of reorganization pursuant to section 1121 of the Bankruptcy Code;

(n)    the Bankruptcy Court denies approval of the RSA Assumption Motion;

(o)    an official committee of equity security holders (either preferred or common or both) is appointed in the chapter 11 cases, at any time;

(p)    the failure of any documentation to be "Definitive Documentation", as defined in Section 3 of this Agreement or otherwise comply with Section 3;

(q)    the acceleration of obligations under, or termination, maturity, or refinancing of, the DIP Credit Agreement; or

9

(r)    the occurrence of any other material breach of this Agreement or the Term Sheet not otherwise covered in this list by any Debtor that has not been cured (if susceptible to cure) within 5 business days after written notice to the Debtors of such breach by the Supermajority Support Group asserting such termination.

8.    <u>The Debtors' Termination Events</u>.    Each Debtor may, upon notice to the Restructuring Support Parties, terminate its obligations under this Agreement upon the occurrence of any of the following events (each a "<u>Company Termination Event</u>," and together with the Restructuring Support Party Termination Events, the "<u>Termination Events</u>"), in which case this Agreement shall terminate with respect to all Parties, subject to the rights of the Debtors to fully or conditionally waive, in writing, on a prospective or retroactive basis, the occurrence of a Company Termination Event:

(a)    a breach by a Restructuring Support Party of any representation, warranty, or covenant of such Restructuring Support Party set forth in this Agreement that could reasonably be expected to have a material adverse impact on the Restructuring Transactions or the consummation of the Restructuring Transactions that (to the extent curable) remains uncured for a period of 10 business days after the receipt by such Restructuring Support Party of notice and description of such breach;

(b)    the occurrence of a breach of this Agreement by any Restructuring Support Party that has the effect of materially impairing any of the Debtors' ability to effectuate the Restructuring Transactions and has not been cured (if susceptible to cure) within 10 business days after notice to all Restructuring Support Parties of such breach and a description thereof;

(c)    upon notice to the Restructuring Support Parties, if the board of directors or board of managers, as applicable, of a Debtor determines, after receiving advice from counsel, that proceeding with the Restructuring Transactions (including, without limitation, the Plan or solicitation of the Plan) would be inconsistent with the exercise of its fiduciary duties;

(d)    the issuance by any governmental authority, including the Bankruptcy Court, any regulatory authority, or any other court of competent jurisdiction, of any ruling or order enjoining the substantial consummation of the Restructuring Transactions; <u>provided</u>, <u>however</u>, that the Debtors have made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement;

(e)    any Supermajority Support Group terminates its obligations under and in accordance with <u>Section 7</u> of this Agreement; or

(f)    the failure to satisfy any requirement under <u>Section 3</u> that the Plan, or any other agreement or document that is included in the Definitive Documentation, contain terms, conditions, representations, warranties, and

covenants consistent with the terms of this Agreement and be reasonably acceptable to the Debtors.

9.   <u>Mutual Termination; Automatic Termination</u>.   This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among MHRC, on behalf of itself and each other Debtor, and the Restructuring Support Parties. Notwithstanding anything in this Agreement to the contrary, this Agreement shall terminate automatically upon the occurrence of the Effective Date.

10.   <u>Effect of Termination</u>.   The earliest date on which termination of this Agreement as to a Party is effective in accordance with <u>Sections 7</u>, <u>8</u>, or <u>9</u> of this Agreement shall be referred to, with respect to such Party, as a "<u>Termination Date</u>."   Upon the occurrence of a Termination Date, all Parties' obligations under this Agreement shall be terminated effective immediately, and such Party or Parties hereto shall be released from all commitments, undertakings, and agreements hereunder, and any vote in favor of the Plan delivered by such Party or Parties shall be immediately revoked and deemed void *ab initio*; <u>provided</u>, <u>however</u>, that each of the following shall survive any such termination:   (a) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall not be prejudiced in any way; (b) the Debtors' obligations in <u>Section 13</u> of this Agreement accrued up to and including such Termination Date; and (c) <u>Sections 10</u>, <u>14</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u>, <u>22</u>, <u>23</u>, <u>25</u>, <u>30</u>, <u>31</u>, and <u>32</u> hereof.

11.   <u>Transfers of Claims and Interests</u>.

(a)   Each Restructuring Support Party shall not (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Restructuring Support Party's claims against, or interests in, any Debtor, as applicable, in whole or in part, or (ii) deposit any of such Restructuring Support Party's claims against or interests in any Debtor, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "<u>Transfer</u>" and the Restructuring Support Party making such Transfer is referred to herein as the "<u>Transferor</u>"), unless such Transfer is to another Restructuring Support Party or any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to MHRC, counsel to the Ad Hoc Group of Second Lien Lenders, and counsel to the Ad Hoc Group of Unsecured Noteholders, a Transferee Joinder substantially in the form attached hereto as **Exhibit B** (the "<u>Transferee Joinder</u>"); <u>provided</u>, <u>however</u>, that MHRC's prior written consent shall be required in connection with a transfer of "beneficial ownership" (defined below) of MHRC's existing common stock ("<u>Common Stock</u>") or existing 10.25% Series C Cumulative Perpetual Preferred Stock, 8% Series D Cumulative Preferred Stock, or 8% Series E Cumulative Convertible Preferred Stock (collectively "<u>Preferred Stock</u>" and together with Common Stock, "<u>Existing Equity Interests</u>") (x) by an intended Transferor that, on the date

11

hereof, is treated as the beneficial owner of more than 4.5% of Common Stock or more than 4.5% of any class of Preferred Stock, or (y) if the intended transferee is treated as the beneficial owner of more than 4.5% of Common Stock or more than 4.5% of any class of Preferred Stock prior to the proposed transfer, or such person would be treated as the beneficial owner of more than 4.5% of Common Stock or any class of Preferred Stock immediately following such proposed transfer.  For purposes of the proviso above, "beneficial ownership" shall be determined in accordance with applicable rules under section 382 of the Internal Revenue Code, the U.S. Department of Treasury regulations promulgated thereunder, and rulings issued by the Internal Revenue Service, and, thus, to the extent provided in those rules, from time to time, shall include, without limitation, (x) direct and indirect ownership (e.g., a holding company would be considered to beneficially own all stock owned or acquired by its subsidiaries), (y) ownership by a holder's family members and any group of persons acting pursuant to a formal or informal understanding to make a coordinated acquisition of stock, and (z) in certain cases, the ownership of an option, contingent purchase, warrant, convertible debt, put, call, stock subject to risk of forfeiture, contract to acquire stock, or similar interest to acquire Common Stock or any class of Preferred Stock.  With respect to claims against or interests in a Debtor held by the relevant transferee upon consummation of a Transfer in accordance herewith, such transferee is deemed to make all of the representations, warranties, and covenants of a Restructuring Support Party, as applicable, set forth in this Agreement. Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations.  Any Transfer made in violation of this Sub-Clause (a) of this Section 11 shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Debtors and/or any Restructuring Support Party, and shall not create any obligation or liability of any Debtor or any other Restructuring Support Party to the purported transferee.

(b)     Notwithstanding Sub-Clause (a) of this Section 11, (i) an entity that is acting in its capacity as a Qualified Marketmaker shall not be required to be or become a Restructuring Support Party in order to effect any transfer (by purchase, sale, assignment, participation, or otherwise) of any claim against, or interest in, any Debtor, as applicable, by a Restructuring Support Party to a transferee; provided that such transfer by a Restructuring Support Party to a transferee shall be in all other respects in accordance with and subject to Sub-Clause (a) of this Section 11; and (ii) to the extent that a Restructuring Support Party, acting in its capacity as a Qualified Marketmaker, acquires any claim against, or interest in, any Debtor from a holder of such claim or interest who is not a Restructuring Support Party, it may transfer (by purchase, sale, assignment,

12

participation, or otherwise) such claim or interest without the requirement that the transferee be or become a Restructuring Support Party in accordance with this <u>Section 11</u>. For purposes of this <u>Sub-Clause (b)</u>, a "<u>Qualified Marketmaker</u>" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against, or interests in, the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against, or interests in, the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims against, or interests in, the Debtors, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

12.     <u>Further Acquisition of Claims or Interests</u>.  Except as set forth in <u>Section 11</u>, nothing in this Agreement shall be construed as precluding any Restructuring Support Party or any of its affiliates from acquiring additional DIP Claims, Second Lien Claims, Note Claims, Bridge Financing Claims, Existing Equity Interests, or interests in the instruments underlying the DIP Claims, Second Lien Claims, Note Claims, Bridge Financing Claims, or Existing Equity Interests; <u>provided</u>, <u>however</u>, that any additional DIP Claims, Second Lien Claims, Note Claims, Bridge Financing Claims, Existing Equity Interests, or interests in the underlying instruments acquired by any Restructuring Support Party and with respect to which such Restructuring Support Party is the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any claims or interests held by it shall automatically be subject to the terms and conditions of this Agreement.  Upon any such further acquisition, such Restructuring Support Party shall promptly notify MHRC, counsel to the Ad Hoc Group of Second Lien Lenders, and counsel to the Ad Hoc Group of Unsecured Noteholders.  For the avoidance of doubt, any party that becomes a DIP Lender or otherwise holds a DIP Claim under the DIP Credit Agreement shall, as a condition to becoming a DIP Lender or otherwise holding such DIP Claim, (y) become a Restructuring Support Party under this Agreement with respect to such DIP Claims and (z) be bound to this Agreement in its capacity as a DIP Lender (in addition to any other capacity).

13.     <u>Fees and Expenses</u>.  Fees and expenses shall be paid according to the terms and conditions set forth in the Term Sheet.

14.     <u>Consents and Acknowledgments</u>.  Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for consents to the Plan.  The acceptance of the Plan by each of the Restructuring Support Parties will not be solicited until such Parties have received the Disclosure Statement and related ballots in accordance with applicable law, and will be subject to sections 1125, 1126 and 1127 of the Bankruptcy Code.

15.     <u>Representations and Warranties</u>.

(a)     Each Restructuring Support Party hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that

13

the following statements are true, correct, and complete as of the date hereof:

(i)    it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)    the execution, delivery and performance by it of this Agreement does not violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation, or bylaws, or other organizational documents;

(iv)    it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended (the "Securities Act"), with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement;

(v)    it (A) either (1) is the sole legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind the claims and interests identified below its name on its signature page hereof and in the amounts set forth therein, or (2) has all necessary investment or voting discretion with respect to the principal amount of claims and interests identified below its name on its signature page hereof, and has the power and authority to bind the owner(s) of such claims and interests to the terms of this Agreement and (B) does not directly own any Bridge Financing Claims, Second Lien Claims, Note Claims, DIP Claims, or Existing Equity Interests, other than as identified below its name on its signature page hereof; and

(vi)    to the best of its knowledge (without requiring any diligence or further investigation), it has no agreement, understanding, or other arrangement (whether oral, written, or otherwise) with any other Restructuring Support Party regarding the transfer or sale of all or a material portion of the Debtors' assets to any party whatsoever.

(b)    Each Debtor hereby represents and warrants on a joint and several basis (and not any other person or entity other than the Debtors) that the following statements are true, correct, and complete as of the date hereof

14

(for purposes of this Section 15(b)), Eureka Hunter Holdings, LLC and its subsidiaries shall not be deemed affiliates of any Debtor):

(i)     it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part, including approval of each of the independent director(s) or manager(s), as applicable, of each of the corporate entities that comprise the Debtors;

(iii)   the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or those of any of its affiliates, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or any Debtor's undertaking to implement the Restructuring Transactions through the Chapter 11 Cases) under any material contractual obligation to which it or any of its affiliates is a party;

(iv)    the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, other than, for the avoidance of doubt, the actions with governmental authorities or regulatory bodies required in connection with implementation of the Restructuring Transactions;

(v)     (A) the offer and sale of the Reorganized Equity has not been, and will not be, registered under the Securities Act and (B) the offering and issuance of the Reorganized Equity is intended to be exempt from registration under the Securities Act pursuant to Section 4(2) of the Securities Act and Regulation D thereunder or pursuant to section 1145 of the Bankruptcy Code;

(vi)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code and, to the extent applicable, approval by the Bankruptcy Court, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or

15

limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(vii)    it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

16.    <u>Survival of Agreement</u>.  Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning a possible financial restructuring of the Debtors and in contemplation of possible chapter 11 filings by the Debtors and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

17.    <u>Waiver</u>.  If the transactions contemplated herein are not consummated, or following the occurrence of a Termination Date, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, other than as provided in <u>Section 14</u>, and the Parties expressly reserve any and all of their respective rights.  The Parties acknowledge that this Agreement, the Plan, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, the Term Sheet, this Agreement, the Plan, any related documents, and all negotiations relating thereto shall not be admissible into evidence in any proceeding, or used by any party for any reason whatsoever, including in any proceeding, other than a proceeding to enforce its terms.

18.    <u>Relationship Among Parties</u>.  Notwithstanding anything herein to the contrary, the duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint.  No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement.

19.    <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages may be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

20.    <u>Governing Law & Jurisdiction</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to such state's choice of law provisions which would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter

16

arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought in the United States District Court for the District of Delaware, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to Delaware jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.  By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

21.     Waiver of Right to Trial by Jury.  Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort or otherwise, between any of the Parties arising out of, connected with, relating to, or incidental to the relationship established between any of them in connection with this Agreement.  Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

22.     Successors and Assigns.  Except as otherwise provided in this Agreement, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

23.     No Third-Party Beneficiaries.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

24.     Notices.  All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing.  Any notice of termination or breach shall be delivered to all other Parties.

(a)     If to any Debtor:

Magnum Hunter Resources Corporation
Attn: Paul Johnston
909 Lake Carolyn Parkway, Suite 600
Irving, TX 75039
Tel:     (832) 203-4533
Fax:     (832) 369-6992
Email: pjohnston@mhr.energy

*With a copy to:*

Kirkland & Ellis LLP

> Attn:   Edward O. Sassower, P.C. and Brian Schartz
> 601 Lexington Ave.
> New York, NY 10022-4611
> Tel:     (212) 446-4733
> Fax:    (312) 446-4900
> Email: edward.sassower@kirkland.com
>           brian.schartz@kirkland.com
>
> Kirkland & Ellis LLP
> Attn:   Nora Schweighart and Alex Schwarzman,
> and Justin Bernbrock
> 300 N. LaSalle, Suite 2400
> Chicago, IL 60654
> Tel:     (312) 862-2000
> Fax:    (312) 862-2200
> Email: nora.schweighart@kikland.com
>           alexandra.schwarzman@kirkland
>           justin.bernbrock@kirkland.com

(b)     If to the Consenting Second Lien Lenders:

> Weil, Gotshal & Manges LLP
> Attn:   Joseph H. Smolinsky and Gary T. Holtzer
> 767 Fifth Avenue
> New York, NY 10153-0119
> Tel: (212) 310-8767
> Fax: (212) 310-8007
> Email: joseph.smolinsky@weil.com
>           gary.holtzer@weil.com

(c)     If to the Consenting Noteholders:

> Akin Gump Strauss Hauer & Feld LLP
> Attn:   Arik Preis
> Bank of America Tower
> One Bryant Park
> New York, NY 10036-6745
> Tel: (212) 872-7418
> Fax: (212) 872-1002
> Email: apreis@akingump.com

25.   Entire Agreement.   This Agreement (including the Exhibits and Schedules) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

18

26.     _Amendments._  Except as otherwise provided herein, this Agreement may not be modified, amended, or supplemented without the prior written consent of the Debtors, the Majority Second Lien Backstoppers, and the Majority Noteholder Backstoppers.

27.     _Forbearance Agreement with Eureka Hunter Holdings, LLC._  The Restructuring Support Parties hereby acknowledge the letter agreement, effective as of November 19, 2015, among North Haven Infrastructure Partners II Buffalo Holdings LLC (f/k/a MSIP II), on behalf of itself and on behalf of Eureka Hunter Holdings, LLC, and its subsidiaries, Triad Hunter LLC, MHRC, and a representative of certain Second Lien Lenders and certain Noteholders (the "_Forbearance Agreement_"), and the Restructuring Support Parties hereby agree to take commercially reasonable efforts to abide by the terms of the Forbearance Agreement.

28.     _Reservation of Rights._

(a)     Except as expressly provided in this Agreement or the Term Sheet, including _Section 5(a)_ of this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties.

(b)     Without limiting _Sub-Clause (a)_ of this _Section 28_ in any way, if the Plan is not consummated in the manner set forth, and on the timeline set forth, in this Agreement and Term Sheet, or if this Agreement is terminated for any reason, nothing shall be construed herein as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses, subject to _Section 17_ of this Agreement.  The Term Sheet, this Agreement, the Plan, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

29.     _Counterparts._  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by facsimile transmission or by electronic mail in portable document format (.pdf).

30.     _Public Disclosure._  This Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality agreements executed by and among any of the Parties as of the date hereof; _provided_, _however_, that, after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement or any other material term of the transaction contemplated herein without the express written consent of the other Parties but may not disclose, and shall redact the holdings information of every Party to this Agreement as of the date hereof and at any time hereafter.  In addition, each Party to this Agreement shall have the right, at any time, to know the identities and holdings information of every other Party to this Agreement, but must keep such information

19

confidential and may not disclose such information to any person except as may be compelled by a court of competent jurisdiction. The Debtors take no position with regard to whether such information may be material non-public information, but may not disclose such information other than on a confidential basis or as may be ordered by the Bankruptcy Court.

31.     <u>Headings</u>.     The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

32.     <u>Interpretation</u>. This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

*[Signatures and exhibits follow.]*

20

**MAGNUM HUNTER RESOURCES CORPORATION**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**ALPHA HUNTER DRILLING, LLC**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**BAKKEN HUNTER, LLC**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**BAKKEN HUNTER CANADA, INC.**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**ENERGY HUNTER SECURITIES, INC.**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**HUNTER AVIATION, LLC.**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**HUNTER REAL ESTATE, LLC.**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**MAGNUM HUNTER MARKETING, LLC.**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**MAGNUM HUNTER PRODUCTION, INC.**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**MAGNUM HUNTER RESOURCES GP, LLC.**

By:

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**MAGNUM HUNTER RESOURCES, LP**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**MAGNUM HUNTER SERVICES, LLC**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**NGAS GATHERING, LLC**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**NGAS HUNTER, LLC**

By:

Name:   Joseph C. Daches

Title:   Chief Financial Officer

**PRC WILLISTON, LLC**

By:

Name:   Joseph C. Daches

Title:   Chief Financial Officer

**SHALE HUNTER, LLC**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**TRIAD HOLDINGS, LLC**

By:

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**TRIAD HUNTER, LLC**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**VIKING INTERNATIONAL RESOURCES CO., INC**

By:

Name:  Joseph C. Daches

Title:   Chief Financial Officer

**WILLISTON HUNTER ND, LLC**

By: _____

Name:  Joseph C. Daches

Title:   Chief Financial Officer

*Signature Page to Magnum Hunter Resources Corp.*
*Restructuring Support Agreement*

**Highbridge Principal Strategies – NDT Senior Loan Fund L.P.**

By: Highbridge Principal Strategies, LLC its Investment Manager

By: _____

Name: Jeffrey Fitts

Title: Managing Director

Holdings: $█████ of Debt
　　　　　Under the Bridge Financing Facility

Holdings: $█████ of Debt
　　　　　Under the Second Lien Credit Facility

Holdings: $██████████ of Debt
　　　　　Under the Indenture

Holdings: $█████████ of Debt
　　　　　Under the DIP Credit Agreement

Holdings: ████████
　　　　　shares of Common Stock

Holdings: ████████
　　　　　shares 10.25% Series C Cumulative Perpetual Preferred Stock

Holdings: ████████
　　　　　shares 8.0% Series D Cumulative Preferred Stock

Holdings: ████████
　　　　　shares 8.0% Series E Cumulative Convertible Preferred Stock

*Signature Page to Magnum Hunter Resources Corp.*
*Restructuring Support Agreement*

**Highbridge Principal Strategies –Specialty Loan VG Fund, L.P.**

By: Highbridge Principal Strategies, LLC its Investment Manager

By: _____

Name: Jeffrey Fitts

Title: Managing Director


Holdings: $ ▮▮▮▮▮ of Debt
      Under the Bridge Financing Facility

Holdings: $ ▮▮▮▮▮ of Debt
      Under the Second Lien Credit Facility

Holdings: $ ▮▮▮▮▮ of Debt
      Under the Indenture

Holdings: $ ▮▮▮▮▮ of Debt
      Under the DIP Credit Agreement

Holdings: ▮▮▮▮▮
      shares of Common Stock

Holdings: ▮▮▮▮▮
      shares 10.25% Series C Cumulative Perpetual Preferred Stock

Holdings: ▮▮▮▮▮
      shares 8.0% Series D Cumulative Preferred Stock

Holdings: ▮▮▮▮▮
      shares 8.0% Series E Cumulative Convertible Preferred Stock

*Signature Page to Magnum Hunter Resources Corp.*
*Restructuring Support Agreement*

**Highbridge Specialty Loan Institutional Holdings**
**Limited**
By: Highbridge Principal Strategies, LLC its
Investment Manager

By: _____

Name: Jeffrey Fitts
Title: Managing Director

Holdings: $█████████ of Debt
     Under the Bridge Financing Facility

Holdings: $█████████ of Debt
     Under the Second Lien Credit Facility

Holdings: $___████████████___ of Debt
     Under the Indenture

Holdings: $___████████████___ of Debt
     Under the DIP Credit Agreement

Holdings: ___████████████___
     shares of Common Stock

Holdings: ___████████████___
     shares 10.25% Series C Cumulative Perpetual
     Preferred Stock

Holdings: ___████████████___
     shares 8.0% Series D Cumulative Preferred Stock

Holdings: ___████████████___
     shares 8.0% Series E Cumulative Convertible
     Preferred Stock

*Signature Page to Magnum Hunter Resources Corp.*
*Restructuring Support Agreement*

**HPS Specialty Loan Sector D Investment Fund, L.P.**

By: Highbridge Principal Strategies, LLC its
Investment Manager

By: _____

Name: Jeffrey Fitts
Title: Managing Director


Holdings: $ ▮▮▮▮▮▮▮ of Debt
Under the Bridge Financing Facility

Holdings: ▮▮▮▮▮▮ of Debt
Under the Second Lien Credit Facility

Holdings: $_ ▮▮▮▮▮▮▮▮▮ _ of Debt
Under the Indenture

Holdings: $ ▮▮▮▮▮▮▮▮ _ of Debt
Under the DIP Credit Agreement

Holdings: _ ▮▮▮▮▮▮ _
shares of Common Stock

Holdings: _ ▮▮▮▮▮▮ _
shares 10.25% Series C Cumulative Perpetual
Preferred Stock

Holdings: _ ▮▮▮▮▮▮ _
shares 8.0% Series D Cumulative Preferred Stock

Holdings: _ ▮▮▮▮▮▮ _
shares 8.0% Series E Cumulative Convertible
Preferred Stock

*Signature Page to Magnum Hunter Resources Corp.*
*Restructuring Support Agreement*

**Highbridge Aiguilles Rouges Sector A Investment Fund, L.P.**

By: Highbridge Principal Strategies, LLC its
Investment Manager

By: _____

Name: Jeffrey Fitts
Title: Managing Director

Holdings: $█████████ of Debt
      Under the Bridge Financing Facility

Holdings: $█████████ of Debt
      Under the Second Lien Credit Facility

Holdings: $████████████ of Debt
      Under the Indenture

Holdings: $████████████ of Debt
      Under the DIP Credit Agreement

Holdings: ████████
      shares of Common Stock

Holdings: ████████
      shares 10.25% Series C Cumulative Perpetual
      Preferred Stock

Holdings: ████████
      shares 8.0% Series D Cumulative Preferred Stock

Holdings: ████████
      shares 8.0% Series E Cumulative Convertible
      Preferred Stock

*Signature Page to Magnum Hunter Resources Corp.*
*Restructuring Support Agreement*

**Highbridge Principal Strategies –Specialty Loan**
**Institutional Fund III, L.P.**

By: Highbridge Principal Strategies, LLC its
Investment Manager

By: _____

Name: Jeffrey Fitts
Title: Managing Director

Holdings: $▮▮▮▮▮ of Debt
      Under the Bridge Financing Facility

Holdings: $▮▮▮▮▮ of Debt
      Under the Second Lien Credit Facility

Holdings: $▮▮▮▮▮▮▮ of Debt
      Under the Indenture

Holdings: $▮▮▮▮▮▮▮ of Debt
      Under the DIP Credit Agreement

Holdings: ▮▮▮▮▮▮
      shares of Common Stock

Holdings: ▮▮▮▮▮▮
      shares 10.25% Series C Cumulative Perpetual
      Preferred Stock

Holdings: ▮▮▮▮▮▮
      shares 8.0% Series D Cumulative Preferred Stock

Holdings: ▮▮▮▮▮▮
      shares 8.0% Series E Cumulative Convertible
      Preferred Stock

*Signature Page to Magnum Hunter Resources Corp.*
*Restructuring Support Agreement*

**Highbridge Principal Strategies –Specialty Loan Fund III, L.P.**

By: Highbridge Principal Strategies, LLC its
Investment Manager

By: _____

Name: Jeffrey Fitts
Title: Managing Director

Holdings: $ ████████ of Debt
         Under the Bridge Financing Facility

Holdings: ████████ of Debt
         Under the Second Lien Credit Facility

Holdings: $ ████████ of Debt
         Under the Indenture

Holdings: $ ████████ of Debt
         Under the DIP Credit Agreement

Holdings: ████████
         shares of Common Stock

Holdings: ████████
         shares 10.25% Series C Cumulative Perpetual
         Preferred Stock

Holdings: ████████
         shares 8.0% Series D Cumulative Preferred Stock

Holdings: ████████
         shares 8.0% Series E Cumulative Convertible
         Preferred Stock

*Signature Page to Magnum Hunter Resources Corp.*
*Restructuring Support Agreement*

### FIFTH STREET STATION LLC

By:_____
Name: Sean Meeker
Title:  Analyst

Holdings: $ ▮▮▮▮▮▮ of Debt
      Under the Bridge Financing Facility

Holdings: $ ▮▮▮▮▮▮ of Debt
      Under the Second Lien Credit Facility

Holdings: $ ▮▮▮▮▮▮▮ of Debt
      Under the Indenture

Holdings: $ ▮▮▮▮▮▮ of Debt
      Under the DIP Credit Agreement

Holdings: ▮▮▮▮▮
      shares of Common Stock

Holdings ▮▮▮▮▮▮▮
      shares 10.25% Series C Cumulative Perpetual
      Preferred Stock

Holdings: ▮▮▮▮▮▮
      shares 8.0% Series D Cumulative Preferred Stock

Holdings: ▮▮▮▮▮▮
      shares 8.0% Series E Cumulative Convertible
      Preferred Stock

*Signature Page to Magnum Hunter Resources Corp.*
*Restructuring Support Agreement*

GOLDMAN SACHS ASSET MANAGEMENT, L.P.,
on behalf of its participating funds and accounts listed on
Schedule A

By: _____

Name:   Jean Joseph

Title:   Managing Director

Holdings █████████████████████████
Under the Bridge Financing Facility

Holdings: ████████████████████████
Under the Second Lien Credit Facility

Holdings: ████████████ Debt
Under the Indenture

Holdings: $ ████████████ of Debt
Under the DIP Credit Agreement

Holdings: ████████
shares of Common Stock

Holdings: ████████
shares 10.25% Series C Cumulative Perpetual
Preferred Stock

Holdings: ████████
shares 8.0% Series D Cumulative Preferred Stock

Holdings: ████████
shares 8.0% Series E Cumulative Convertible
Preferred Stock

*Signature Page to Magnum Hunter Resources Corp.*
*Restructuring Support Agreement*

Q Opportunity Fund, Ltd.
By: Amalgamated Gadget, L.P., as Investment Manager
By: Scepter Holdings, Inc., its General Partner

By: _____

Name:    Noel Nesser
Title:    CAO & Treasurer

Holdings: $⬛⬛⬛⬛⬛⬛ of Debt
            Under the Bridge Financing Facility

Holdings: $⬛⬛⬛⬛⬛⬛ of Debt
            Under the Second Lien Credit Facility

Holdings: $⬛⬛⬛⬛⬛⬛ of Debt
            Under the Indenture

Holdings: $⬛⬛⬛⬛⬛⬛ of Debt
            Under the DIP Credit Agreement

Holdings: ⬛⬛⬛⬛⬛⬛
            shares of Common Stock

Holdings: ⬛⬛⬛⬛⬛⬛
            shares 10.25% Series C Cumulative Perpetual
            Preferred Stock

Holdings: ⬛⬛⬛⬛⬛⬛
            shares 8.0% Series D Cumulative Preferred Stock

Holdings: ⬛⬛⬛⬛⬛⬛
            shares 8.0% Series E Cumulative Convertible
            Preferred Stock

*Signature Page to Magnum Hunter Resources Corp.*
*Restructuring Support Agreement*

$R^2$ Investments, LDC
By: Amalgamated Gadget, L.P., as Investment Manager
By: Scepter Holdings, Inc., its General Partner

By: _____
Name:    Noel Nesser
Title:     CAO & Treasurer

Holdings: $⬛⬛⬛ of Debt
Under the Bridge Financing Facility

Holdings: $⬛⬛⬛ of Debt
Under the Second Lien Credit Facility

Agreed to and Acknowledged:
MAGNUM HUNTER RESOURCES CORPORATION,
as Debtor

By: _____
Name:
Title

Holdings: $⬛⬛⬛ of Debt
Under the Indenture

Holdings: $⬛⬛⬛ of Debt
Under the DIP Credit Agreement

Holdings: ⬛⬛⬛
shares of Common Stock

Holdings: ⬛⬛⬛
shares 10.25% Series C Cumulative Perpetual
Preferred Stock

Holdings: ⬛⬛⬛
shares 8.0% Series D Cumulative Preferred Stock

Holdings: ⬛⬛⬛
shares 8.0% Series E Cumulative Convertible
Preferred Stock

**AMTRUST INTERNATIONAL INSURANCE, LTD.**

By: _Harry Schlechter_
Name: Harry Schlechter
Title: Treasurer

Holdings: $ ███████████ of Debt
Under the Bridge Financing Facility

Holdings: $ ███████████ of Debt
Under the Second Lien Credit Facility

Holdings: $ ███████████ of Debt
Under the Indenture

Acknowledgements:

By: _Harry Schlechter_
Name: Harry Schlechter
Title: Treasurer

NATIONAL GENERAL REINSURANCE, LTD

By: _____
Name:

Title:

Holdings: $ ██████████████ of Debt
Under the Bridge Financing Facility

Holdings: $ ██████████████ of Debt
Under the Second Lien Credit Facility

Holdings: $ ██████████████ f Debt
~~Under the Indenture~~

Acknowledgements:

By: _____
Name:
Title:

**CVC CREDIT PARTNERS GLOBAL SPECIAL
SITUATIONS HOLDINGS, L.P.**

By:

Name:  Jennifer Patrickakos

Title:  Managing Director

Holdings: $＿＿＿＿＿＿＿＿＿ of Debt
　　　　　Under the Bridge Financing Facility


Holdings: $＿＿＿＿＿＿＿＿＿ of Debt
　　　　　Under the Second Lien Credit Facility


Holdings: $＿＿＿＿＿＿＿＿＿ of Debt
　　　　　Under the Indenture


Acknowledgements:

By:＿＿＿＿＿＿＿＿＿＿＿＿＿
Name:
Title:

[Signature Page to Restructuring Support Agreement]

**CVC EUROPEAN CREDIT OPPORTUNITIES (NO. 8) S.A.R.L.**

By:

Name:   Jennifer Patrickakos

Title:   Managing Director

Holdings: $ ███████████ of Debt
Under the Bridge Financing Facility

Holdings: $ ███████████ of Debt
Under the Second Lien Credit Facility

Holdings: $ ████████ of Debt
Under the Indenture

Acknowledgements:

By:_____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

**CVC GLOBAL CREDIT OPPORTUNITIES MASTER FUND, L.P.**

By: _____

Name:    Jennifer Patrickakos

Title:    Managing Director

Holdings: $ _____ of Debt
Under the Bridge Financing Facility

Holdings: $ _____ of Debt
Under the Second Lien Credit Facility

Holdings: $ _____ of Debt
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

**CVC EUROPEAN CREDIT OPPORTUNITIES
S.AR.L ACTING IN RESPECT OF ITS
COMPARTMENT A**

By: _____
Name: Jennifer Patrickakos
Title: Managing Director

Holdings: $ ▬▬▬▬▬▬▬ of Debt
        Under the Bridge Financing Facility


Holdings: $ ▬▬▬▬▬▬▬ of Debt
        Under the Second Lien Credit Facility


Holdings: $ ▬▬▬▬▬▬▬ of Debt
        Under the Indenture


Acknowledgements:

By:_____
Name:
Title


[Signature Page to Restructuring Support Agreement]

**OC 530 OFFSHORE FUND, LTD.**

By:
Name: Graham Quigley
Title: Director-CFO

Holdings: $ [REDACTED] of Debt
Under the Bridge Financing Facility

Holdings: $ [REDACTED] of Debt
Under the Second Lien Credit Facility

Holdings: $ [REDACTED] of Debt
Under the Indenture

Acknowledgements:

By:_____
Name:
Title:

**FARMSTEAD MASTER FUND, LTD.**

By: _____

Name:     MICHAEL SCOTT

Title:     MANAGING MEMBER

Holdings: $ ███████████ of Debt
Under the Bridge Financing Facility

Holdings: $ ███████████ of Debt
Under the Second Lien Credit Facility

Holdings: $ ███████████ of Debt
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

**Kayne Anderson Capital Income Partners (QP), L.P.**

By: Kayne Anderson Capital Advisors, L.P.,
    its General Partner

By: _____

Name: Michael O'Neil

Title: Chief Compliance Officer

Holdings: █████████████ of Debt
         Under the Indenture

Acknowledgements:

By:_____

Name:

Title:

**Kayne Anderson Income Partners, L.P.**

By: Kayne Anderson Capital Advisors, L.P.,
    its General Partner

By: _____
Name: Michael O'Neil
Title: Chief Compliance Officer

Holdings: ▮▮▮▮▮▮▮▮▮▮▮ of Debt
          Under the Indenture

Acknowledgements:

By:_____
Name:
Title:

**Kaiser Foundation Hospitals**

By: Kayne Anderson Capital Advisors, L.P.,
its Investment Manager

By: _____
Name: Michael O'Neil
Title: Chief Compliance Officer

Holdings█████████████ of Debt
Under the Indenture

Acknowledgements:

By:_____
Name:
Title:

**KAYNE ENERGY CREDIT OPPORTUNITIES, L.P.**

By: Kayne Anderson Capital Advisors, L.P.,
    its General Partner

By:_____
Name: Michael O'Neil
Title: Chief Compliance Officer

Holdings: _____ of Debt
          Under the Bridge Financing Facility

Holdings: _____ of Debt
          Under the Indenture

Acknowledgements:

By:_____
Name:
Title:

**YOUNG MEN'S CHRISTIAN ASSOCIATION RETIREMENT FUND**

By: Kayne Anderson Capital Advisors, L.P.,
  its Investment Manager

By: _____

Name: Michael O'Neil
Title: Chief Compliance Officer

Holdings: ███████████ f Debt
  Under the Bridge Financing Facility


Holdings: ███████████ f Debt
  Under the Indenture


Acknowledgements:

By:_____
Name:
Title:

**FIRST ENERGY CORP (FEGENCO) BV1 Q**

By: Kayne Anderson Capital Advisors, L.P., as Investment Manager

By: _____
Name: Michael O'Neil

Title: Chief Compliance Officer

Holdings: ██████ of Debt Under the Indenture

Acknowledgements:

By:_____
Name:
Title:

**FIRST ENERGY CORP (FEGENCO) PY Q**

By: Kayne Anderson Capital Advisors, L.P., as Investment Manager

By: _____

Name: Michael O'Neil

Title: Chief Compliance Officer

Holdings: ███████ of Debt Under the Indenture

Acknowledgements:

By: _____

Name:

Title:

**FIRST ENERGY CORP MASTER PENSION PLAN**

By: Kayne Anderson Capital Advisors, L.P., as Investment Manager

By: _____
Name: Michael O'Neil

Title: Chief Compliance Officer

Holdings: ███████ of Debt
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

**FIRST ENERGY CORP TOLEDO EDISON COMPANY**

By: Kayne Anderson Capital Advisors, L.P., as Investment Manager

By: _____
Name: Michael O'Neil

Title: Chief Compliance Officer

Holdings: ███████ of Debt Under the Indenture

Acknowledgements:

By:_____
Name:
Title:

**KAYNE ANDERSON ENERGY TOTAL RETURN FUND, INC.**

By: KA Fund Advisors, LLC, as Manager

By: _____

Name: Michael O'Neil

Title: Chief Compliance Officer


Holdings: ████████ of Debt Under the Indenture


Acknowledgements:

By:_____
Name:
Title:

**KAYNE ANDERSON MIDSTREAM/ENERGY FUND, INC.**

By: KA Fund Advisors, LLC, as Manager

By: _____

Name: Michael O'Neil

Title: Chief Compliance Officer

Holdings: ███████ of Debt Under the Indenture

Acknowledgements:

By:_____

Name:

Title:

**RIVER BIRCH MASTER FUND L.P.**

By: _Edward O'Connell_
Name: Edward O'Connell

Title: Director of operations

Holdings: $████████ of Debt
Under the Bridge Financing Facility

Holdings: $████████ of Debt
Under the Second Lien Credit Facility

Holdings: $████████ of Debt
Under the Indenture

Acknowledgements:

By: _Edward O'Connell_
Name: Edward O'Connell
Title: Director of operations

**P RIVER BIRCH LTD.**

By: _Edward O'Connell_
Name: Edward O'Connell

Title: Authorized Signer

Holdings: $ ▬▬▬▬ of Debt
Under the Bridge Financing Facility

Holdings: $ ▬▬▬▬ of Debt
Under the Second Lien Credit Facility

Holdings: $ ▬▬▬▬ of Debt
Under the Indenture

Acknowledgements:

By: _Edward O'Connell_
Name: Edward O'Connell
Title: Director of Operations

**RAGING CAPITAL MASTER FUND, LTD.**

By:_____
Name:  Frederick C. Wasch

Title:  CFO, Raging Capital Management, LLC, Investment
Manager of Raging Capital Master Fund, Ltd.

Holdings: $ ███████████████ of Debt
Under the Bridge Financing Facility

Holdings: $ ███████████ of Debt
Under the Second Lien Credit Facility

Holdings: $ ███████████ of Debt
Under the Indenture

Acknowledgements:

By:_____
Name: Frederick C. Wasch
Title: CFO, Raging Capital Management, LLC, Investment
Manager of Raging Capital Master Fund, Ltd.

**THIRD POINT OFFSHORE MASTER FUND L.P.**

By: _____

Name:

       James P Gallagher

          CAO

Title:

Holdings: ██████████████ of Debt
Under the Bridge Financing Facility

Holdings: ██████████████ of Debt
Under the Second Lien Credit Facility

Holdings: $██████████ of Debt
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

**THIRD POINT PARTNERS L.P.**

By:_____

Name:_____
James P Gallagher
CAO

Title:_____

Holdings: $ ██████████ of Debt
Under the Bridge Financing Facility

Holdings: ██████████ of Debt
Under the Second Lien Credit Facility

Holdings: $ ██████████ of Debt
Under the Indenture

Acknowledgements:

By:_____

Name:

Title:

**THIRD POINT ULTRA MASTER FUND L.P.**

By: _____

Name: _____
James P Gallagher

Title: _____
CAO

Holdings ████████████████ of Debt
Under the Bridge Financing Facility

Holdings: $████████████████ of Debt
Under the Second Lien Credit Facility

Holdings: $████████████████ of Debt
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

**THIRD POINT PARTNERS QUALIFIED L.P.**

By:_____
Name:                James P Gallagher
                              CAO
Title:

Holdings: $_____ of Debt
                Under the Bridge Financing Facility


Holdings: $_____ of Debt
                Under the Second Lien Credit Facility


Holdings: $_____ of Debt
                Under the Indenture


Acknowledgements:

By:_____
Name:
Title

**THIRD POINT REINSURANCE COMPANY LTD.**

By: _____

Name:

James P Gallagher
CAO

Title:

Holdings: $ ███████████ of Debt
Under the Bridge Financing Facility

Holdings: $ ███████████ of Debt
Under the Second Lien Credit Facility

Holdings: $ ███████████ of Debt
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

**THIRD POINT REINSURANCE USA LTD.**

By:_____

Name:

       James P Gallagher

       CAO

Title:

Holdings: $█████████████ of Debt
Under the Bridge Financing Facility


Holdings: $█████████████ of Debt
Under the Second Lien Credit Facility


Holdings: $█████████████ of Debt
Under the Indenture


Acknowledgements:

By:_____
Name:
Title:

**LYXOR/THIRD POINT FUND LTD.**

By:_____
Name:        James P Gallagher
                    CAO
Title:

Holdings: $▮▮▮▮▮▮▮▮▮▮ of Debt
                Under the Bridge Financing Facility


Holdings: $▮▮▮▮▮▮▮▮▮▮ of Debt
                Under the Second Lien Credit Facility


Holdings: $▮▮▮▮▮▮▮▮▮▮ of Debt
                Under the Indenture


Acknowledgements:

By:_____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

1199 SEIU Health Care Employees Pension Fund,
As a Lender


By: _____
Name: Joanne Dy
Title: Authorized Signatory


By: 
Name:
Title:

Holdings: ████████████████
Under the Bridge Financing Facility


Holdings ████████████████
Under the Second Lien Credit Facility


Holdings ████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Allegheny Technologies Incorporated Master
Pension Trust,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
        Name: Joanne Dy
        Title: Authorized Signatory


By:
        Name:
        Title:

Holdings ████████████████████████
        Under the Bridge Financing Facility


Holdings ████████████████████████
        Under the Second Lien Credit Facility


Holdings: ███████████████████████
        Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Ascension Alpha Fund, LLC,
As a Lender

By:
Name: Joanne Dy
Title: Authorized Signatory

By:
    Name:
    Title:

Holdings: ███████████████████
Under the Bridge Financing Facility

Holdings: ███████████████████
Under the Second Lien Credit Facility

Holdings: ███████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Ascension Health Master Pension Trust,
As a Lender

By: _____
     Name: Joanne Dy
     Title: Authorized Signatory

By: _____
     Name:
     Title:

Holdings: ███████████████████████
          Under the Bridge Financing Facility

Holdings: $██████████████████████
          Under the Second Lien Credit Facility

Holdings: ███████████████████████
          Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

Blue Cross Blue Shield of Michigan - High Yield,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
Name: Joanne Dy
Title: Authorized Signatory


By: _____
Name:
Title:

Holdings: ███████████████████████
Under the Bridge Financing Facility


Holdings: ███████████████████████
Under the Second Lien Credit Facility


Holdings: ███████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

California State Teachers' Retirement System,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____

Name: Joanne Dy
Title: Authorized Signatory

By: _____

Name:
Title:

Holdings: ███████████████████████████
Under the Bridge Financing Facility

Holdings: $███████████████████████████
Under the Second Lien Credit Facility

Holdings: ███████████████████████████
Under the Indentu█████████████████

Acknowledgements:

By: _____
Name:
Title:

Consulting Group Capital Markets High Yield,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
    Name: Joanne Dy
    Title: Authorized Signatory


By:
    Name:
    Title:

Holdings: ████████████████████████
          Under the Bridge Financing Facility


Holdings: ████████████████████████
          Under the Second Lien Credit Facility


Holdings: ████████████████████████
          Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Employees' Retirement System of the State of
Rhode Island,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____
    Name: Joanne Dy
    Title: Authorized Signatory

By:
    Name:
    Title:

Holdings: █████████████████████████████
    Under the Bridge Financing Facility

Holdings ██████████████████████████████████

Holdings ████████████████████████████████████
    Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

International Union, UAW - Strike Trust,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
Name: Joanne Dy
Title: Authorized Signatory


By: _____
Name:
Title:

Holding █████████████████
Under the Bridge Financing Facility


Holdings██████████████████
Under the Second Lien Credit Facility


Holdings:████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Intl Union, UAW Master Pension,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
      Name: Joanne Dy
      Title: Authorized Signatory


By:
      Name:
      Title:

Holdings ████████████████████████
      Under the Bridge Financing Facility


Holdings ██████████████████████████████
      Under the Second Lien Credit Facility


Holdings: ████████████████████████
      Under the Indenture


Acknowledgements:

By: _____
Name:
Title:


[Signature Page to Restructuring Support Agreement]

John Hancock Fund II Floating Rate Income Fund,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
    Name: Joanne Dy
    Title: Authorized Signatory


By: _____
    Name:
    Title:

Holdings: ███████████████████████
          Under the Bridge Financing Facility


Holdings ████████████████████████
         Under the Second Lien Credit Facility


Holdings ████████████████████████
         Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

John Hancock II High Yield Fund,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____

    Name: Joanne Dy
    Title: Authorized Signatory


By:

    Name:
    Title:

Holdings: ████████████████████


Holdings: ████████████████████
Under the Second Lien Credit Facility


Holdings: ████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

John Hancock Variable Insurance Trust - High
Yield Trust,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____
Name: Joanne Dy
Title: Authorized Signatory

By: _____
Name:
Title:

Holdings ███████████████████████
Under the Bridge Financing Facility

Holdings ███████████████████████
Under the Second Lien Credit Facility

Holdings: ███████████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Kaiser Foundation Hospitals,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
      Name: Joanne Dy
      Title: Authorized Signatory


By:
      Name:
      Title:

Holdings: ███████████████████████
Under the Bridge Financing Facility


Holdings: ███████████████████████
Under the Second Lien Credit Facility


Holdings: ███████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Kaiser Permanente Group Trust,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____

Name: Joanne Dy
Title: Authorized Signatory


By:

Name:
Title:

Holdings: ███████████████████████
_____
Under the Bridge Financing Facility


Holdings: ███████████████████████
Under the Second Lien Credit Facility


Holdings: ███████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Kern County Employees Retirement Association,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____
     Name: Joanne Dy
     Title: Authorized Signatory

By:
     Name:
     Title:

Holdings: ████████████████████████
     Under the Bridge Financing Facility

Holdings: ████████████████████████
     Under the Second Lien Credit Facility

Holdings: ████████████████████████
     Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

Legg Mason Partners Variable Income Trust - Legg
Mason Western Asset Variable Global High Yield
Bond Portfolio,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____

Name: Joanne Dy
Title: Authorized Signatory


By:
    Name:
    Title:

Holdings: ███████████████████████
Under the Bridge Financing Facility


Holdings ████████████████████████
Under the Second Lien Credit Facility


Holdings: ███████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Legg Mason Qualified Investor Fund (II) plc,
As a Lender


By: _____
       Name: Joanne Dy
       Title: Authorized Signatory


By:
       Name:
       Title:

Holdings: ██████████████████████
Under the Bridge Financing Facility


Holdings: ██████████████████████
Under the Second Lien Credit Facility


Holdings: ██████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Legg Mason Western Asset Diversified Strategic
Income Fund,
As a Lender


By: _____
Name: Joanne Dy
Title: Authorized Signatory


By: _____
Name:
Title:

Holdings: ████████████████████████
Under the Bridge Financing Facility


Holdings: ████████████████████████
Under the Second Lien Credit Facility


Holdings: ████████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Legg Mason Western Asset Global High Yield
Bond Fund,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
        Name: Joanne Dy
        Title: Authorized Signatory


By: _____
        Name:
        Title:

Holdings ████████████████████████
         Under the Bridge Financing Facility


Holdings: ███████████████████████
          Under the Second Lien Credit Facility


Holdings: ███████████████████████
          Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Legg Mason Western Asset Senior Loans Fund,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____

    Name: Joanne Dy
    Title: Authorized Signatory

By: _____

    Name:
    Title:

Holdings: ███████████████████

Holdings ███████████████████
    Under the Second Lien Credit Facility

Holdings: ███████████████████
    Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Legg Mason Western Asset US High Yield Fund,
As a Lender


By: _____

Name: Joanne Dy
Title: Authorized Signatory


By:
    Name:
    Title:

Holdings: ███████████████████████████
Under the Bridge Financing Facility


Holdings: ███████████████████████████
Under the Second Lien Credit Facility


Holdings: ███████████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

LMP Corporate Loan Fund, Inc.,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
Name: Joanne Dy
Title: Authorized Signatory


By:
      Name:
      Title:

Holdings: ████████████████████████
Under the Bridge Financing Facility


Holdings: ████████████████████████


Holdings: ██████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

MultiMix Wholesale Diversified Fixed Interest Trust,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
Name: Joanne Dy
Title: Authorized Signatory


By: _____
    Name:
    Title:

Holdings: ████ ███████████████ Under the Bridge Financing Facility


Holdings ███████████████████ Under the Second Lien Credit Facility


Holdings: ████████████████ Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Southern California Edison Company Retirement
Plan Trust,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____

    Name: Joanne Dy
    Title: Authorized Signatory


By:
    Name:
    Title:

Holdings: ████████████████████████
    Under the Bridge Financing Facility


Holdings: ████████████████████████
    Under the Second Lien Credit Facility


Holdings: ████████████████████████
    Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Stichting Pensioenfonds DSM Nederland,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____

Name: Joanne Dy
Title: Authorized Signatory


By: _____

    Name: _____
    Title: _____

Holdings: ████████████████████████████

Under the Bridge Financing Facility


Holdings: ████████████████████████████

Under the Second Lien Credit Facility


Holdings ████████████████████████████

Under the Indenture


Acknowledgements:

By: _____
Name:
Title:


[Signature Page to Restructuring Support Agreement]

The Walt Disney Company Retirement Plan Master
Trust,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____
Name: Joanne Dy
Title: Authorized Signatory

By:
    Name:
    Title:

Holdings: ███████████████████
Under the Bridge Financing Facility

Holding ███████████████████
Under the Second Lien Credit Facility

Holdings: ███████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Vantagepoint Funds High Yield Fund,
As a Lender


By: _____
Name: Joanne Dy
Title: Authorized Signatory


By: _____
Name:
Title:

Holdings: ███████████████
Under the Bridge Financing Facility


Holdings: ███████████████
Under the Second Lien Credit Facility


Holdings: ███████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Western Asset Bank Loan (Multi-Currency) Master
Fund,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____

Name: Joanne Dy
Title: Authorized Signatory

By:
  Name:
  Title:

Holdings: ███████████████████████████████

Holdings: ███████████████████████████████

Holdings: ███████████████████████████████
          Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Western Asset Bank Loan (Offshore) Fund,
As a Lender

By: _____
    Name: Joanne Dy
    Title: Authorized Signatory

By: _____
    Name:
    Title:

Holdings: ████████████████████████████
Under the Bridge Financing Facility

Holdings: ████████████████████████████
Under the Second Lien Credit Facility

Holdings ████████████████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

Western Asset Credit Opportunities Portfolio,
L.L.C.,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
       Name: Joanne Dy
       Title: Authorized Signatory


By:
       Name:
       Title:

Holdings: ███████████████████████


Holdings: ███████████████████████
       Under the Second Lien Credit Facility


Holdings: ███████████████████████
       Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Western Asset Floating Rate High Income Fund,
LLC,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____

    Name: Joanne Dy
    Title: Authorized Signatory


By: _____

    Name:
    Title:

Holdings: ███████████████████████
    Under the Bridge Financing Facility


Holdings ███████████████████████
    Under the Second Lien Credit Facility


Holdings ███████████████████████
    Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Western Asset Global High Income Fund Inc.,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____
Name: Joanne Dy
Title: Authorized Signatory

By: _____
Name:
Title:

Holdings: ███████████████████

Holdings: ███████████████████
Under the Second Lien Credit Facility

Holdings: ███████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

Western Asset Global High Yield Bond Fund,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____

Name: Joanne Dy
Title: Authorized Signatory


By:

    Name:
    Title:

Holding █████████████████████████████

Under the Bridge Financing Facility


Holdings: ███████████████████████████

Under the Second Lien Credit Facility


Holdings: ███████████████████████████

Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Western Asset Global Partners Income Fund Inc.,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____
Name: Joanne Dy
Title: Authorized Signatory

By: _____
Name:
Title:

Holdings: ████████████████████
Under the Bridge Financing Facility

Holdings: ████████████████████
Under the Second Lien Credit Facility

Holdings ████████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Western Asset High Income Fund II Inc.,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
Name: Joanne Dy
Title: Authorized Signatory


By:
Name:
Title:

Holdings: ███████████████████████
Under the Bridge Financing Facility


Holdings: ███████████████████████
Under the Second Lien Credit Facility


Holdings: ███████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Western Asset High Income Opportunity Fund Inc.
(HIO),
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____

    Name: Joanne Dy
    Title: Authorized Signatory


By:
    Name:
    Title:

Holdings: █████████████████████████
Under the Bridge Financing Facility


Holdings: █████████████████████████
Under the Second Lien Credit Facility


Holdings: █████████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Western Asset High Yield Defined Opportunity
Fund Inc.,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By:  _____

    Name: Joanne Dy
    Title: Authorized Signatory


By:

    Name:
    Title:

Holdings: ███████████████████

Under the Bridge Financing Facility


Holdings: ███████████████████

Under the Second Lien Credit Facility


Holdings: ███████████████████

Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Western Asset High Yield Fund,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: Name: Joanne Dy
Title: Authorized Signatory

By:
Name:
Title:

Holdings: ██████████████████████
Under the Bridge Financing Facility

Holdings: ██████████████████████
Under the Second Lien Credit Facility

Holdings: ██████████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Western Asset Macro Opportunities Fund,
As a Lender


By: _____
      Name: Joanne Dy
      Title: Authorized Signatory


By:
      Name:
      Title:

Holdings: ████████████████████████
Under the Bridge Financing Facility


Holdings: ████████████████████████
Under the Second Lien Credit Facility


Holdings ██████████████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:


[Signature Page to Restructuring Support Agreement]

Western Asset Managed High Income Fund Inc.,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____

Name: Joanne Dy
Title: Authorized Signatory

By: _____

Name:
Title:

Holdings: ██████████████████████

Under the Bridge Financing Facility

Holdings: ██████████████████████

Under the Second Lien Credit Facility

Holdings: ██████████████████████

Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Western Asset Middle Market Debt Fund Inc.,
As a Lender

By: _____
     Name: Joanne Dy
     Title: Authorized Signatory

By:
     Name:
     Title:

Holdings: ███████████████████████████
Under the Bridge Financing Facility

Holdings: ███████████████████████████
Under the Second Lien Credit Facility

Holdings: ███████████████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Western Asset Middle Market Income Fund Inc.,
As a Lender

By: _____
Name: Joanne Dy
Title: Authorized Signatory

By: _____
Name:
Title:

Holdings: ██████████████████
Under the Bridge Financing Facility

Holdings: ██████████████████
Under the Second Lien Credit Facility

Holdings: ██████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Western Asset Opportunistic US Dollar High Yield
Securities Portfolio, LLC,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____

       Name: Joanne Dy
       Title: Authorized Signatory


By:

       Name:
       Title:

Holdings ███████████████████████
Under the Bridge Financing Facility


Holdings: ███████████████████████
Under the Second Lien Credit Facility


Holdings: ███████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Western Asset Premier Bond Fund,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____
Name: Joanne Dy
Title: Authorized Signatory

By: _____
    Name:
    Title:

Holdings: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Under the Bridge Financing Facility

Holdings: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Under the Second Lien Credit Facility

Holdings: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

Western Asset Short Duration High Income fund,
As a Lender

By: _____
     Name: Joanne Dy
     Title: Authorized Signatory

By:
     Name:
     Title:

Holdings:     ███████████████████████
Under the Bridge Financing Facility

Holdings:     ███████████████████████
Under the Second Lien Credit Facility

Holdings:     ███████████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

Western Asset Short-Dated High Yield Master
Fund, Ltd.,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent

By: _____
     Name: Joanne Dy
     Title: Authorized Signatory


By:
     Name:
     Title:

Holdings: ████████████████████████
Under the Bridge Financing Facility


Holdings: ████████████████████████
Under the Second Lien Credit Facility


Holdings: ████████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Western Asset Strategic US Dollar High Yield
Portfolio LLC,
As a Lender
BY: Western Asset Management Company as
Investment Manager and Agent


By: _____
         Name: Joanne Dy
         Title: Authorized Signatory


By:
         Name:
         Title:

Holdings: ███████████████████████
Under the Bridge Financing Facility


Holdings: ███████████████████████
Under the Second Lien Credit Facility


Holdings: ███████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Western Asset U.S. Bank Loan (Offshore) Fund,
As a Lender

By: _____
Name: Joanne Dy
Title: Authorized Signatory

By: _____
Name:
Title:

Holdings: ███████████████████████
Under the Bridge Financing Facility

Holdings: ███████████████████████
Under the Second Lien Credit Facility

Holdings: ███████████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Advanced Series Trust â€" AST Academic
Strategies Asset Allocation Portfolio,
As a Lender

By:
Name: Joanne Dy
Title: Authorized Signatory

By:
    Name:
    Title:

Holdings: ██████████████████████
Under the Bridge Financing Facility

Holdings: ██████████████████████
Under the Second Lien Credit Facility

Holdings: ██████████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

Employees' Retirement System of the State of
Hawaii,
As a Lender

By: _____

    Name: Joanne Dy
    Title: Authorized Signatory

By:

    Name:
    Title:

Holdings: ██████████████████████

Under the Bridge Financing Facility

Holdings: ██████████████████████

Under the Second Lien Credit Facility

Holdings: ████████████████████████

Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

European Multi-Sector Fund,
As a Lender


By: _____
    Name: Joanne Dy
    Title: Authorized Signatory


By: _____
    Name:
    Title:

Holdings: ██████████████████████████
          Under the Bridge Financing Facility


Holdings: ██████████████████████████
          Under the Second Lien Credit Facility


Holdings: ██████████████████████████
          Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

Indiana University,
As a Lender

By: _____
Name: Joanne Dy
Title: Authorized Signatory

By: _____
    Name:
    Title:

Holdings: ████████████████████
Under the Bridge Financing Facility

Holdings: ████████████████████
Under the Second Lien Credit Facility

Holdings: ████████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Internationale Kapitalanlagegesellschaft mbh on
behalf of INKA Procura,
As a Lender


By: _____
       Name: Joanne Dy
       Title: Authorized Signatory


By:
       Name:
       Title:

Holdings: ████████████████████████
Under the Bridge Financing Facility


Holdings: ████████████████████████
Under the Second Lien Credit Facility


Holdings: ████████████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

John Lewis Partnership Pensions Trust,
As a Lender

By: _____
Name: Joanne Dy
Title: Authorized Signatory

By: _____
Name:
Title:

Holdings: ████████████████████████
Under the Bridge Financing Facility

Holdings: ████████████████████████
Under the Second Lien Credit Facility

Holdings: ████████████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

Western Asset High Yield Credit Energy Portfolio, LLC,
As a Lender

By: _____
Name: Joanne Dy
Title: Authorized Signatory

By:
    Name:
    Title:

Holdings: ███████████████████████
Under the Bridge Financing Facility

Holdings: ███████████████████████
Under the Second Lien Credit Facility

Holdings: ███████████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

Western Asset Opportunistic Value Portfolio,
L.L.C.,
As a Lender

By: _____
Name: Joanne Dy
Title: Authorized Signatory

By:
    Name:
    Title:

Holdings: ███████████████████
Under the Bridge Financing Facility

Holdings: ███████████████████
Under the Second Lien Credit Facility

Holdings: ███████████████████
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

[Signature Page to Restructuring Support Agreement]

**LEGG MASON WESTERN ASSET GLOBAL MULTI STRATEGY FUND**

By: _____

Name: Joanne Dy

Title: Authorized Signatory

Holdings: ███████████████████

Under the Bridge Financing Facility

Holdings: ███████████████████

Under the Second Lien Credit Facility

Holdings: ███████████████████

Under the Indenture

Acknowledgements:

By: _____

Name:

Title:

**LEGG MASON WESTERN ASSET GLOBAL CREDIT ABSOLUTE RETURN FUND.**

By: _____
Name: Joanne Dy

Title: Authorized Signatory

Holdings: ███████████████████
Under the Bridge Financing Facility


Holdings: ███████████████████
Under the Second Lien Credit Facility


Holdings: ███████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

**LEGG MASON GLOBAL MULTI STRATEGY BOND FUND**

By: _____

Name: Joanne Dy

Title: Authorized Signatory

Holdings: ████████████████████████
Under the Bridge Financing Facility


Holdings: ████████████████████
Under the Second Lien Credit Facility


Holdings: ██████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

**WESTERN ASSET GLOBAL MULTI STRATEGY, LLC**

By: _____

Name: Joanne Dy

Title: Authorized Signatory

Holdings: ███████████████████████
Under the Bridge Financing Facility

Holdings: ███████████████████████
Under the Second Lien Credit Facility

Holdings: ███████████████████████
Under the Indenture

Acknowledgements:

By: _____

Name:

Title:

**GUIDESTONE GLOBAL BOND FUND**

By: _____

Name: Joanne Dy

Title: Authorized Signatory

Holdings: ███████████████

Under the Bridge Financing Facility

Holdings: ███████████

Under the Second Lien Credit Facility

Holdings: ██████████████

Under the Indenture

Acknowledgements:

By: _____

Name:

Title:

**DIAGO PENSION SCHEME**

By: _____

Name: Joanne Dy

Title: Authorized Signatory

Holdings: ███████████████

Under the Bridge Financing Facility

Holdings: ███████████████

Under the Second Lien Credit Facility

Holdings ███████████████

Under the Indenture

Acknowledgements:

By: _____

Name:

Title:

**GENERAL ELECTRIC PENSION TRUST**

By: _____

Name: Joanne D

Title: Authorized Signatory

Holdings: ████████████████████

Under the Bridge Financing Facility

Holdings: ████████████████████

Under the Second Lien Credit Facility

Holdings: ████████████████████

Under the Indenture

Acknowledgements:

By: _____

Name:

Title:

**OKLAHOMA TOBACCO SETTLEMENT ENDOWMENT TRUST FUND**

By: _____
Name: Joanne Dy

Title: Authorized Signatory

Holdings: ████████████████
Under the Bridge Financing Facility


Holdings: ████████████████
Under the Second Lien Credit Facility


Holdings: ████████████████
Under the Indenture


Acknowledgements:

By: _____
Name:
Title:

**WINGSPAN MASTER FUND, LP**

By: _____

Name: *Brendan Driscoll*

Title: *COO/CFO*

Holdings: $ ███████████████ of Debt
Under the Bridge Financing Facility

Holdings: $ ███████████████ of Debt
Under the Second Lien Credit Facility

Holdings: $ ███████████████ of Debt
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

**ALPINE SWIFT MASTER FUND, LP**

By: _____

Name: _Brendan Driscoll_

Title: _Coo/CFo_

Holdings: $ ███████████ of Debt
Under the Bridge Financing Facility

Holdings: $███████████ of Debt
Under the Second Lien Credit Facility

Holdings: $███████████ of Debt
Under the Indenture

Acknowledgements:

By: _____
Name:
Title:

**Exhibit A** **to the Restructuring Support Agreement**

**Term Sheet**

KE 38129557

*EXECUTION VERSION*

# MAGNUM HUNTER RESOURCES CORP.

## TERM SHEET FOR RESTRUCTURING

## December 15, 2015

| DIP | | |
|---|---|---|
| **Topic** | | **Terms** |
| Amount/Structure | | Amount:  $200 million; Multi-Draw Term Loan (the "**DIP Facility**" or the "**DIP Financing**")<br><br>$40 million (the "**Initial Draw**") to be made available on the date the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") enters the initial order approving the DIP Facility (such order, in form and substance reasonably satisfactory to the Debtors and the Second Lien Backstoppers and the Noteholder Backstoppers, the "**Interim DIP Order**"),<br><br>$100 million to be made available upon the entry of the Final DIP Order (as defined herein) (the "**Final Order Draw**"), and<br><br>$60 million to be made available upon the occurrence of certain conditions, as set forth below (the "**Third Draw**"). |
| Lender/Backstop | | 35% backstopped by the Ad Hoc Group of Second Lien Lenders (the "**Second Lien Backstoppers**")[1] and 65% backstopped by the Ad Hoc Group of Unsecured Noteholders (the "**Noteholder Backstoppers**"[2] and, together with the Second Lien Backstoppers, collectively the "**Backstoppers**"); provided that if incremental capital beyond the $200 mm is required and the Backstoppers agree to provide it, then such incremental amount will be funded on a pro rata basis in order to preserve the pro forma equity "splits" contemplated by the proposed terms of the plan of reorganization claims treatment (including DIP Claims), as set forth herein.<br><br>The ability to participate in the DIP Facility will be made available to all holders of the Senior Unsecured Notes and the Second Lien Facility on a pro rata basis based upon the 65/35 split noted above (based upon the holdings of such institutions as a percentage of the total outstanding |

---

[1]   The institutions that comprise the Second Lien Backstoppers are Goldman Sachs Asset Management, Highbridge Principal Strategies, LLC, Fifth Street Station, LLC, and Renegade Swish, LLC, and any party that is a valid transferee of the Second Lien Facility Claims from any such institution, under the RSA.

[2]   The institutions that comprise the Noteholder Backstoppers are AmTrust Financial Services, Inc., CVC Capital Partners, Farmstead Capital Management LLC, Kayne Anderson Capital Advisors, L.P., Raging Capital Management LLC, River Birch Capital, LLC, Third Point LLC, Western Asset Management Co., Wingspan Investment Management, LP, and any party that is a valid transferee of the Noteholder Claims from any such institution, under the RSA.

| | | |
|---|---|---|
| | | principal amount of the Senior Notes or Second Lien Facility, as applicable), during the period of time between entry of the Interim DIP Order (such order, in form and substance reasonably satisfactory to the Debtors and the Second Lien Backstoppers and the Noteholder Backstoppers) and the hearing with regard to the Final DIP Order (as defined herein), on procedures to be agreed to by the Debtors, the Noteholder Backstoppers, and the Second Lien Backstoppers. Each holder of the Senior Unsecured Notes and each Holder of the Second Lien Facility that chooses to participate in the DIP Facility will become a party to the RSA as a condition to participating in the DIP Facility.<br><br>Consents:<br><br>Any reference in this Term Sheet with regard to a determination to be made by the Backstoppers or the DIP Lenders shall refer to a determination made by Backstoppers or DIP Lenders holding 50.1% or more of the Backstop commitment or the funded loans and unfunded commitments, except with respect to certain issues (to be determined) with respect to which consents from (i) the holders of the funded loans and unfunded commitments made by the Second Lien Backstoppers (the **"Tranche A Lenders"**) and (ii) the holders of the funded loans and unfunded commitments made by the Noteholder Backstoppers (the **"Tranche B Lenders"** and together with the Tranche A Lenders, the "**Lenders**"), is required, in the amounts as specified in this Term Sheet. |
| Interest/Fees | | L + 8.0% per annum payable monthly in cash and subject to default interest of additional 2% per annum; LIBOR subject to a 1% floor.<br><br>Commitment Fee, which will be made available to all Lenders (i.e. not just Backstoppers) of 2% payable in cash, earned upon entry of the Interim DIP Order, and payable upon entry of the Final DIP Order. |
| Maturity | | Earlier of:<br>• 9 months after the closing date<br>• 30 days after entry of the Interim DIP Order approving the DIP Facility if the Final DIP Order (in form and substance satisfactory to the Debtors, the Second Lien Backstoppers, and the Noteholder Backstoppers and which shall include, among other things, authority for the Debtors (as defined herein) to repay in full and in cash all amounts outstanding under the First Lien Facility) has not been entered into by the Bankruptcy Court prior to the expiration of such 30 day period[3]<br>• Effective date of plan of reorganization or liquidation<br>• Termination by the DIP Facility Lenders during the continuation of an event of default and subject to the notice requirements in the DIP Credit Agreement (it being understood and agreed that any determination to terminate the DIP Facility shall require the consent of a majority in principal amount of both the Tranche A Lenders and the Tranche B Lenders). |

---

[3]   Any repayment of the First Lien Facility, and any reference herein to such, shall be subject in all respects to Section 12 of the Seventh Amendment to the First Lien Facility.

KE 38919159

| | | |
|---|---|---|
| Conversion | | The Restructuring Support Agreement (the "**RSA**") will provide for a conversion of the obligations under the DIP Facility into New Common Equity of Reorganized MHRC at a 25% discount to Settlement Equity Value (the "**Settlement Equity Value**"), which shall be defined as Settlement Enterprise Value (as defined herein) minus any funded debt at emergence, plus any balance sheet cash at emergence. |
| Uses | | Amongst others: Repayment of First Lien Facility (upon entry of Final DIP Order) and cash collateralization of existing letters of credit.  In addition, in accordance with and subject to the DIP Budget, proceeds of the DIP Facility will be used for general corporate purposes of the Debtors (including payment of fees and expenses in connection with the transactions contemplated hereby, any adequate protection payments included herein, and working capital), funding of the General Unsecured Claims as contemplated under the section entitled "Restructuring Proposal" and certain other costs and expenses with respect to the administration of the Chapter 11 Cases.  For the avoidance of doubt, the DIP Loan Documents and the orders approving the DIP Facility will state that no DIP Facility proceeds may be transferred to or used for the benefit of non-Debtor entities. |
| Borrower | | Magnum Hunter Resources Corporation ("**MHRC**" and, as reorganized pursuant to the Chapter 11 Cases, "**Reorganized MHRC**"). |
| Guarantors | | Each of the Borrower's direct and indirect domestic subsidiaries listed on the schedule attached hereto as **Schedule 1** (collectively, the "**Guarantors**"), each of which will become a debtor and a debtor in possession in cases under chapter 11 of title 11 of the United States Code before the Bankruptcy Court (the "**Chapter 11 Cases**") (collectively, the Guarantors and the Borrower, the "**Debtors**"). |
| Collateral | | Liens on substantially all of the Debtors' tangible and intangible assets, consisting of (i) to the extent, and only to the extent of, $70 million of the DIP Facility (the "**First Lien Replacement Portion**"), first priority "priming" liens, subject in all respects to Section 12 of the Seventh Amendment to the First Lien Facility and (ii) with respect to the remainder of the DIP Facility, first liens on all unencumbered property and junior liens on all property securing the Second Lien Facility; provided, however, that the DIP Facility may or may not be secured by the Debtors' equity interests in Eureka Hunter Holdings, LLC ("**EHH**") and any of its subsidiaries, but, will be secured by the net proceeds of MHRC's equity interest in EHH (all aforementioned collateral, the "**Collateral**"). |
| | | EHH: The DIP Lenders will have a first lien on the "economic" interests (i.e. proceeds) in EHH, and can take ownership of such interests in the event of a liquidation of the Debtors, but will not have the ability to foreclose on such interests solely as a result of an Event of Default occurring under the DIP Facility. |
| | | Regardless of whether the Debtors' equity interests in EHH constitute Collateral, if an Event of Default under the DIP Facility shall occur and be continuing, the DIP Lenders (which, for purposes of this provision, shall require a majority of the Tranche A Lenders and a majority of Tranche B Lenders) shall be entitled to require the Debtors to sell such equity interests pursuant to section 363 of the Bankruptcy Code, at such price and upon such other terms as the DIP Lenders (which, for purposes of this provision, shall |

3

| | | |
|---|---|---|
| | | require a majority of the Tranche A Lenders and a majority of the Tranche B Lenders) deem commercially reasonable, and the DIP Lenders shall be entitled to credit bid all or a portion of the outstanding DIP Facility obligations in such sale. |
| Adequate Protection to First Lien Lenders | | Until repayment in full and in cash of the First Lien Facility upon entry of the Final DIP Order, will receive the following: (a) payment of actual, reasonable, and documented professional fees incurred in connection with work performed for the First Lien Lenders, replacement liens and super-priority claims under section 507(b) of the Bankruptcy Code to the extent of any diminution in value of the First Lien Lenders' prepetition collateral, senior in all respects to the Second Lien Facility and any adequate protection paid to the Second Lien Lenders and junior to the DIP Facility; and (b) cash payment of interest at the non-default contract rate.  In addition, to the extent the obligations under the DIP Facility are secured by a lien on EHH or the interests in EHH, the First Lien Lenders also shall receive an adequate protection lien on EHH or the interests in EHH, junior to the DIP lien; provided, however, that to the extent the First Lien Lenders ever have any rights with regard to diminution in value of their pre-petition collateral, they will first need to "marshal" any such rights against all other adequate protection prior to seeking to exercise rights and/or remedies against the EHH interests; provided further that any proceeds of a sale of the EHH interests, after satisfying the DIP Facility claims, shall be segregated until such time as it is determined that the First Lien Lenders' adequate protection claims have been satisfied from other sources. |
| Adequate Protection to the Second Lien Lenders | | Will receive the following so long as the RSA is not terminated:<br><br>1.  Payment of the actual, reasonable, and documented fees and expenses of the Second Lien Lenders' legal and financial advisors incurred in connection with work performed for the Second Lien Lenders, which shall consist of Weil Gotshal & Manges, LLP (as counsel to the Ad Hoc Group of Second Lien Lenders), Latham & Watkins, LLP (as counsel to the Second Lien Administrative Agent), Houlihan Lokey Capital, Inc. (as financial advisors to the Ad Hoc Group of Second Lien Lenders), local counsel, and other professionals retained from time to time pursuant to the engagement letters which each advisor has executed with the Company, and which financial advisor engagement letters shall be provided to the advisors to the Noteholder Backstoppers prior to the Petition Date (provided that, for the avoidance of doubt, the Noteholder Backstoppers shall share their financial advisor engagement letters with the advisors to the Second Lien Backstoppers prior to the Petition Date).  As long as the RSA is not terminated, the payment of such fees and expenses will not include the payment of any fees and expenses which are in furtherance of any plan of reorganization or restructuring other than as contemplated by the RSA.<br><br>2.  Payment of post-petition interest, at the contract rate, on 63.0%[4] of the principal amount outstanding of the Second Lien Facility; provided, however, that to the extent that the Plan is not consummated on or prior to April 30, 2016 and the RSA is terminated, or the RSA is terminated on any other basis, such adequate protection payments (including any payments made prior |

---

[4]    It is intended that this percentage shall be approximately equal to the percentage of the Second Lien Lenders' claims that are agreed, as part of the consensual Plan, to be secured.  To the extent that the RSA is terminated such secured "settlement" value shall not be admissible in any court or used for any purpose whatsoever.

KE 38919159

| | | |
|---|---|---|
| | | thereto) shall be subject to recharacterization as principal payments, and all parties reserve all rights to argue that the Second Lien Lenders are entitled to more or less adequate protection payments.  For the avoidance of doubt, in such circumstances, the right of the Debtors to use cash collateral shall terminate.<br><br>3.  Replacement liens and super-priority claims under section 507(b) of the Bankruptcy Code junior to the DIP Facility and First Lien Facility to the extent of any diminution in value[5] of the Second Lien Lenders' pre-petition collateral.  To the extent the obligations under the DIP Facility are secured by a lien on EHH or the interests in EHH, the Second Lien Lenders also shall receive an adequate protection lien on EHH or the interests in EHH, junior to the DIP lien and the First Lien Facility adequate protection lien; provided, however, that to the extent the Second Lien Lenders ever have any rights with regard to diminution in value of their pre-petition collateral, they will first need to "marshal" any such rights against all other adequate protection prior to seeking to exercise rights and/or remedies against the EHH interests; provided further that any proceeds of a sale of the EHH interests, after satisfying the DIP Facility claims, shall be segregated until such time as it is determined that the Second Lien Lenders' adequate protection claims have been satisfied from other sources (and such funds shall be applied first to satisfy the First Lien Lenders' adequate protection claims).<br><br>4.  Continued access to information and financial reporting.<br><br>5.  Subject to entry of the Final DIP Order only, a waiver of (i) any "equities of the case" exception under Section 552(b) of the Bankruptcy Code, and (ii) the provisions of Section 506(c) of the Bankruptcy Code.<br><br>In the event the RSA is terminated, all parties reserve all rights with respect to adequate protection to the Second Lien Lenders, including, without limitation, rights of the Second Lien Lenders and/or the Second Lien Administrative Agent to seek additional adequate protection, and rights of all parties to oppose the granting of (or seek to recharacterize) any previous grants of (or any additional) adequate protection. |
| Adequate Protection for the Other Secured Lenders (as defined on **Schedule 4**) | | Other Secured Lenders will receive replacement liens solely on their prepetition collateral (and, for the avoidance of doubt, will not receive any lien on equity interests or economic interests (or proceeds thereof) in EHH) and super-priority claims under section 507(b) of the Bankruptcy Code to the extent of any diminution in value of the Other Secured Lenders' respective prepetition collateral. |
| Mandatory Prepayments | | 100% of net cash proceeds from asset sales (other than up to an aggregate $10 million from the proceeds of "Permitted Asset Sales" (as such term is defined in the First Lien Facility)), to the extent permitted, whether or not such assets are Collateral.<br><br>100% of insurance and condemnation proceeds and net cash proceeds from the issuance of post-petition indebtedness or equity (to the extent |

---

[5]    The value of the Second Lien Lenders' prepetition collateral will be based upon the percentage of the Second Lien Lenders' claims that are agreed, as part of the consensual Plan, to be secured.  To the extent the RSA is terminated, such secured "settlement" value shall not be admissible in any court or used for any purpose whatsoever.

KE 38919159

| | | |
|---|---|---|
| | | permitted). |
| Representations and Warranties, Covenants, Financial Covenants, and Events of Default | | Representations and warranties customarily found in loan agreements for similar DIP financings (including where such financings include the Backstoppers' support for a restructuring through an RSA) and other representations and warranties determined by the Backstoppers (which will be applicable to the Borrower, the Guarantors and their respective subsidiaries).

Affirmative and negative covenants customarily found in loan agreements for similar DIP financings (including where such financings include the Backstoppers' support for a restructuring through an RSA) and other covenants determined by the Backstoppers (which will be applicable to the Borrower, the Guarantors and their respective subsidiaries); provided, however, there shall be no prohibition or restriction on the Debtors' ability to market, consider, or negotiate alternative debtor-in-possession financings to refinance obligations outstanding under the DIP Credit Agreement; provided further that in their efforts (if any), the Debtors shall consider that the DIP Facility is a critical element of the settlements underpinning the RSA.

The Senior Secured Multi-Draw Term Loan Credit Agreement (the "**DIP Credit Agreement**") and other guarantee, security and relevant documentation (together with the DIP Credit Agreement, the "**DIP Loan Documents**") will contain the following budget variance covenants:

(a) The Budget variance covenant will be tested on a weekly basis, beginning on the earlier of the four week anniversary of the Petition Date, or the date that is two days prior to the hearing to approve the Final DIP Order;

(b) The Budget variance covenant will be tested on a cumulative, previous three week basis;

(c) The Budget variance covenant will test three items: (1) Receipts (i.e., not including royalties), (2) Capital Expenditures, and (3) Gross Disbursements (i.e. not including (a) professional fees or (b) lien and royalty payments in accordance with the "first day orders" and "first day motions" but only as the DIP Orders contain restrictions and consent rights on the payments approved by such "first day orders" in form and substance reasonably satisfactory to the Debtors, the Noteholder Backstoppers, and the Second Lien Backstoppers); and

(d) The Budget variance covenant will allow for cushions of 20% on Receipts, 20% on Gross Disbursements, and 20% on Capital Expenditures.

The DIP Loan Documents will contain reporting requirements customarily found in loan documents for similar DIP financings (including where such financings include the Backstoppers' support for a restructuring through an RSA) and other reporting requirements determined by the Backstoppers, including, without limitation, (i) an initial 13-week budget satisfactory to the Debtors and the Second Lien Backstoppers and the Noteholder Backstoppers (the "**Initial DIP Budget**"), (ii) a new 13-week budget satisfactory to the Debtors and the majority of the Tranche A Lenders and the majority of the Tranche B Lenders every three weeks thereafter, satisfactory to the Required Lenders (together with the Initial DIP Budget, the "**DIP Budget**"), and (iii) a weekly budget variance report, in form and substance and containing |

| | | |
|---|---|---|
| | | information reasonably requested by the Backstoppers.[6]<br><br>The DIP Loan Documents will contain events of default customarily found in loan agreements for similar DIP financings (including where such financings include the Backstoppers' support for a restructuring through an RSA) and other events of default determined by the Backstoppers (which will be applicable to the Borrower, the Guarantors and their respective subsidiaries). There will be a specific Event of Default based upon the occurrence of a consecutive 15-day trading period during which natural gas prices as published by NYMEX are less than $1.65 per MMBtu. For the avoidance of doubt, the DIP Loan Documents will contain the milestones set forth herein, for which the failure to comply will constitute an Event of Default. |
| Conditions Precedent to Initial Draw and Final Order Draw | | Shall include the following:<br><br>(1) All documentation relating to the DIP Facility, including the Interim DIP Order and Final DIP Order, shall be in form and substance satisfactory to the Debtors and the Backstoppers (it being understood and agreed that the form of the Interim DIP Order and the form of the Final DIP Order shall require the consent of the Second Lien Backstoppers and the Noteholder Backstoppers). For the avoidance of doubt, the Final DIP Order shall include authorization and direction for the Debtors to repay, in full and in cash, all amounts outstanding under the First Lien Facility and all adequate protection then-owing to the First Lien Lenders.<br><br>(2) All "first day motions" filed and "first day orders" entered at the time of commencement of the Chapter 11 Cases shall be reasonably satisfactory in form and substance to the Backstoppers. With regard to the Final Order Draw, all "second day orders" and any motions filed and orders entered between the Petition Date and the date of entry of the Final DIP Order shall be in form and substance reasonably satisfactory to the Backstoppers.<br><br>(3) All reasonable out-of-pocket fees and expenses (including the fees and expenses of outside counsel) of the Second Lien Backstoppers and the Noteholder Backstoppers shall have been paid whether incurred prior to or after the Petition Date.<br><br>(4) The Backstoppers shall be satisfied that, except as authorized by the Interim DIP Order, there shall not occur as a result of, and after giving effect to, the initial extension of credit under the DIP Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under any of the Borrower's or the Guarantors' other material agreements (other than debt instruments or defaults arising due to the filing of the Chapter 11 Cases).<br><br>(5)The absence of any change, effect, fact, event, occurrence, condition, circumstance or development that, individually or in the aggregate, (a) is, or is reasonably likely to have, a material adverse effect on the business, condition (financial or otherwise), operations, performance, properties, contingent liabilities, or material agreements or prospects of the Debtors, taken as a whole, since June 30, 2015 or (b) would reasonably be expected to prevent or materially restrict or delay the ability of the Debtors to perform their |

---

[6] "**Required Lenders**" shall be defined as DIP Lenders holding more than 50% of the aggregate funded DIP Loans and unfunded DIP commitments.

respective material obligations under the DIP Loan Documents, in each case other than any change, effect, fact, event, occurrence, condition, circumstance or development resulting from an (i) the effect of any change in the United States or foreign economies or securities, commodities or financial markets; (ii) the effect of any change arising in connection with hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway; (iii) the effect of any action taken by Backstoppers or their Affiliates with respect to the DIP Facility or with respect to the Debtors (including through such persons' participation in the Chapter 11 Cases); (iv) the effect of any changes in applicable laws or accounting rules; and (v) any effect resulting from the filing or public announcement of the Chapter 11 Cases (any of the foregoing being a "**Material Adverse Change**").

(6) With respect to the Initial Draw, there shall exist no action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Debtors) threatened against one or more of the Debtors in any court or before any arbitrator or governmental instrumentality (other than the Chapter 11 Cases) that is not stayed unless agreed to in writing by the Second Lien Backstoppers and Noteholder Backstoppers (any such action, suit, investigation, litigation or proceeding, a "**Material Litigation**").

(7) With respect to the Initial Draw, all necessary governmental and third party consents and approvals necessary in connection with the DIP Facility and the transactions contemplated thereby shall have been obtained and shall remain in effect; and no law or regulation shall be applicable that restrains, prevents or imposes adverse conditions upon the DIP Facility or the transactions contemplated thereby.

(8) With respect to the Initial Draw, the Collateral Agent shall have a valid and perfected lien on and security interest in the Collateral and any rights granted with respect to EHH or the interests in EHH, to the extent consent is obtained, in each case, with the priority set forth in the section entitled "Collateral", and the First Lien Credit Facility Agent and the Second Lien Credit Facility Agent shall have the respective rights with regard to EHH discussed above in the sections entitled "Adequate Protection to the First Lien Lenders" and "Adequate Protection to the Second Lien Lenders".

(9) With respect to the Initial Draw, the Administrative Agent shall have received endorsements naming the Administrative Agent, on behalf of the Lenders, as an additional insured and loss payee, as applicable, under all insurance policies to be maintained with respect to the Collateral[7].

(10) With respect to the Initial Draw, the Backstoppers shall have received the DIP Budget, which will govern the use of the DIP Facility, in form and substance satisfactory to the Debtors, the Second Lien Backstoppers, and the Noteholder Backstoppers.

(11) With respect to the Initial Draw, the Debtors shall have executed the RSA, which shall be in form and substance satisfactory to the Debtors, the

---

[7]   It is understood and agreed that this may be a post-closing covenant, to be completed within 5 days of the Petition Date.

8

| | | |
|---|---|---|
| | | Second Lien Backstoppers, and the Noteholder Backstoppers.<br><br>(12) Solely with respect to the Final Order Draw, the then current status of the contractual relationship with Morgan Stanley with EHH, as directed by Morgan Stanley, in connection with the EHH and its subsidiaries shall be in form and substance satisfactory to the Second Lien Backstoppers and the Noteholder Backstoppers.<br><br>On the funding date of each DIP Loan (i) there shall exist no default under the DIP Loan Documents, (ii) the representations and warranties of the Debtors therein shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects) immediately prior to, and after giving effect to, such funding, (iii) the making of such DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently, (iv) no later than 30 days after the entry of the Interim DIP Order, the Bankruptcy Court shall have entered an order approving the DIP Facility (such order, in form and substance reasonably satisfactory to the Debtors and the Second Lien Backstoppers and the Noteholder Backstoppers, the "**Final DIP Order**"), and (v) the Interim DIP Order or Final DIP Order, as the case may be, shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without the consent of each of a majority of the Tranche A Lenders and the Tranche B Lenders (the conditions described in clauses (i), (ii), (iii), and (v) shall be referred to as the "**Subsequent Conditions Precedent**"). |
| Conditions Precedent to Third Draw | | Shall include, among others, the following:<br><br>(a) All of the Subsequent Conditions Precedent shall have been satisfied;<br><br>(b)  At least 25% of the Tranche A Lenders *or* at least 25% of the Tranche B Lenders shall have determined to fund the Third Draw;<br><br>(c)  The then current status of the contractual relationship with EHH, as directed by Morgan Stanley, in connection with EHH and its subsidiaries and affiliates shall be in form and substance satisfactory to the Second Lien Backstoppers and the Noteholder Backstoppers;<br><br>(d) The "Disclosure Statement", in form and substance satisfactory to the Tranche A Lenders and the Tranche B Lenders, shall have been approved by the Bankruptcy Court;<br><br>(e) On or prior to the date that is seven days before the scheduled commencement of the Confirmation Hearing (as such date is scheduled in the RSA) (such date, the "**Third Draw Date**"), the DIP Lenders (based on the conditions precedent listed in the preceding provision (b)) will notify the Debtors whether the DIP Lenders will fund the Third Draw.  To the extent the DIP Lenders determine to fund the Third Draw, the alternatives for such funding  shall be as follows:<br><br>(1)  Funding of such Third Draw (or a portion thereof as determined by the |

9

| | | |
|---|---|---|
| | | DIP Lenders (based on the conditions precedent in the preceding provision (b) and the Debtors) as part of the Debtors' and Backstoppers' mutual decision[8] (as determined in footnote **Error! Bookmark not defined.**) to go forward with a Section 363 sales process of the Debtors' assets, upon terms and conditions (and a budget) agreed to by the Debtors, the Tranche A Lenders, and the Tranche B Lenders (as determined in footnote 8) or<br><br>(2) If the Debtors and the Backstoppers do not mutually determine to go forward with a Section 363 sales process, the funding of the Third Draw will be used to continue with confirmation and consummation of the Plan. |
| Buy-Out Right | | If the RSA is terminated at any time, the Tranche A Lenders who have funded DIP Loan Commitments will have the right to purchase up to 15% of the funded and unfunded DIP Loan Commitments, plus accrued and unpaid interest  from the Tranche B Lenders by sending the Tranche B Lenders, within 10 days of the date of termination of the RSA, an irrevocable notice of intent to purchase, provided that the purchase and assignment of such commitments must be completed within 5 business days of the date of such notice.  The terms and conditions of such "buy-out" right shall be finalized in the DIP Loan Documents. |
| Milestones | | DIP and RSA to include the following milestones:<br><br>Petition Date: 12/15/15<br><br>Filing of First Day Motions: 12/15/15<br><br>Entry of Interim DIP Order: 12/17/15<br><br>Filing of a Motion to Reject Executory Contracts and Set Procedures with Regard To the Determination of Rejection Damages:  1/7/16<br><br>Filing of Plan or Reorganization (the "**Plan**"), Disclosure Statement, Motion to Approve the Adequacy  of the Disclosure Statement, and Motion to Assume the RSA:  1/7/16<br><br>Entry of Final DIP Order: 1/15/16<br><br>Entry of an Order Approving the Adequacy of  the Disclosure Statement and Debtors' Assumption of the RSA:  2/12/16<br><br>Commencement of Hearing to Confirm Plan (the "**Confirmation Hearing**"): 3/28/16<br><br>Entry of Confirmation Order: 4/1/16<br><br>Effective Date of Plan (the "**Effective Date**"): 4/15/16 |
| Professional Fee | | Each of the Interim DIP Order and the Final DIP Order shall contain the |

---

[8]  The determination of the parameters of the Debtors' sale efforts (if such an option is determined after the Third Draw Date) will be determined at that time by the Debtors, the Second Lien Backstoppers, and the Noteholder Backstoppers.  For the avoidance of doubt, the Debtors shall have no obligation to pursue to a Section 363 sales process and shall retain authority to conduct such sale.

| Carve Out | | professional fee carve out set forth on **Schedule 2** attached hereto. |
| **RESTRUCTURING PROPOSAL** | | |
| **Terms** | | **Consideration** |
| RSA | | Each of the members of the Ad Hoc Group of Second Lien Lenders, each of the members of the Ad Hoc Group of Unsecured Noteholders and each DIP Lender (on the Petition Date or at any time thereafter) will enter into the RSA with the Debtors, in form and substance satisfactory to the Debtors, the Noteholder Backstoppers, and the Second Lien Backstoppers, that can be filed with the Bankruptcy Court on the Petition Date.  The Debtors will file a motion seeking authorization to assume the Restructuring Support Agreement in accordance with the timelines and milestones set forth above. |
| Business Plan | | The Debtors and the Backstoppers will work together to develop a business plan for Reorganized MHRC that will be in form and substance satisfactory to the Debtors and a supermajority (66 2/3%) of both the Second Lien Backstoppers and the Noteholder Backstoppers (such agreed upon Business Plan, the **"Agreed To Business Plan"**).  The Debtors will provide the Backstoppers and their advisors all of the information necessary and reasonably requested in order to develop such plan (and the Backstoppers acknowledge receipt of the business plan included as part of the creditor materials distributed on November 23 and November 24, 2015). |
| Settlement Enterprise Value | | **For settlement purposes only**, total enterprise value of $900 mm (the "**Settlement Enterprise Value**").  Such Settlement Enterprise Value shall not be indicative of any party's views (including the Debtors', for the avoidance of doubt) regarding total enterprise value, but rather is a settled value for the purpose of determining equity splits and conversion rates for the various claimants. |
| DIP Financing | | As set forth above. |
| Backstop Fee | | In consideration for providing a backstop of the DIP Facility, each Backstopper will receive an irrevocable fee in the amount of its pro rata share (based on commitments for the DIP Facility on the initial funding date of the DIP Loan) of 3% of the New Common Equity of Reorganized MHRC[9]; provided, however, that to the extent the Plan of Reorganization contemplated by the RSA is not consummated, this fee will be paid in cash when the principal amounts outstanding under the DIP Facility come due, and will be equal to 3% of the total committed amount of the DIP Facility (provided, however, that, to the extent the RSA terminates and the Backstop Fee is paid in cash, the "total committed amount" shall be deemed to exclude the amount of the Third Draw unless such Third Draw is actually funded), to be paid in |

---

[9]    The amount of New Common Equity received as a Backstop Fee equates to a higher dollar value (based on the Settlement Enterprise Value) than 3% of the total committed amount of the DIP Facility because the Backstoppers are being compensated for (a) agreeing to backstop a fully equitizable DIP Facility, (b) agreeing to receive the Backstop Fee in the form of equity rather than cash, and (c) agreeing to receive the Backstop Fee at the end of the chapter 11 cases, rather than at the time the commitment is made.  It is understood and agreed by all parties, including the Debtors, that the Backstop Fee is an integral component of the overall agreed-to settlement between the Ad Hoc Group of Second Lien Lenders and Ad Hoc Group of Noteholders, and any failure to receive approval thereof will cause a termination of the RSA.

| | | |
|---|---|---|
| | | cash. Such fee will be fully earned upon the entry of the Interim DIP Order. Other than the Commitment Fee (which, as noted above, will be paid to all DIP Lenders) and the Backstop Fee, there shall be no other fees paid to the Backstoppers or the DIP Lenders. |
| Conditions Precedent to Emergence | | The occurrence of the Effective Date of the Plan shall be subject to the satisfaction of certain conditions precedent, as determined by the Backstoppers (it being understood and agreed that any determination to be made by the Backstoppers in this section entitled "*Conditions Precedent to Emergence*" shall require the consent of both the Noteholder Backstoppers and the Second Lien Backstoppers), including, without limitation, the following:<br><br>• Entry of an order of the Bankruptcy Court confirming the Plan, and entry of an order by the Bankruptcy Court approving the Disclosure Statement, in both instances in form and substance satisfactory to the Debtors, the Second Lien Backstoppers, and the Noteholder Backstoppers;<br><br>• The restructuring transactions shall be structured in the most tax efficient manner as determined by the Debtors, the Second Lien Backstoppers, and the Noteholder Backstoppers, and all accounting treatment and other tax matters shall be resolved by the Debtors, the Second Lien Backstoppers, and the Noteholder Backstoppers;<br><br>• The Debtors shall not be in default of the DIP Facility or the Final DIP Order (or, to the extent that the Debtors have been in default or are in default on the proposed Effective Date, such default shall have been waived by the DIP Lenders or cured by the Debtors in a manner consistent with the DIP Facility);<br><br>• The total amount of any administrative expenses paid by the Debtors on the Effective Date (or prior thereto) shall not exceed the sum of (i) fees and expenses incurred by legal and financial advisors and (ii) $20 million; provided that such expenses may be increased with the consent of the Second Lien Backstoppers and the Noteholder Backstoppers;<br><br>• There shall not have been a Material Adverse Change[10];<br><br>• The Debtors shall have entered into a new credit facility or credit facilities |

---

[10]  For purposes of this condition precedent, "Material Adverse Change" means any change, effect, fact, event, occurrence, condition, circumstance or development after the Petition Date, that, individually or in the aggregate, (a) is, or is reasonably likely to have, a material adverse effect on the business, condition (financial or otherwise), operations, performance, properties, contingent liabilities, or material agreements or prospects of the Debtors, taken as a whole, since June 30, 2015 or (b) would reasonably be expected to prevent or materially restrict or delay the ability of the Debtors to perform their respective material obligations under the DIP Loan Documents, in each case other than any change, effect, fact, event, occurrence, condition, circumstance or development resulting from an (i) the effect of any change in the United States or foreign economies or securities, commodities or financial markets; (ii) the effect of any change arising in connection with hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions existing or underway; (iii) the effect of any action taken by Backstoppers or their Affiliates with respect to the DIP Facility or with respect to the Debtors (including through such persons' participation in the Chapter 11 Cases); (iv) the effect of any changes in applicable laws or accounting rules; and (v) any effect resulting from the filing or public announcement of the Chapter 11 Cases.

KE 38919159

| | | |
|---|---|---|
| | | (the "**Exit Facility**") in the aggregate committed amount contemplated by the Agreed to Business Plan, on terms and conditions, and with lenders, satisfactory to the Second Lien Backstoppers, the Noteholder Backstoppers, and the Debtors; |
| | | • All requisite governmental authorities and third parties shall have approved or consented to the Restructuring, to the extent required; |
| | | • All of the Backstoppers' reasonable and documented professional fees (including legal and financial and any other special advisors retained by the Ad Hoc Group of Second Lien Lenders and the Ad Hoc Group of Unsecured Noteholders either before or during the Chapter 11 Cases) and out-of-pocket expenses incurred in connection with the Restructuring or any other matter in connection thereto, including, without limitation, those fees and expenses incurred during the Chapter 11 Cases, shall have been paid by the Debtors; in addition, and for the avoidance of doubt, the Second Lien Backstoppers' and the Noteholder Backstoppers' legal and financial (and any other special) advisory fees and expenses during the Chapter 11 Cases shall be paid currently, every two weeks, upon presentation of a reasonably detailed invoice (redacted for privilege and any other confidentiality concerns) and payment of the Second Lien Backstoppers' and the Noteholder Backstoppers' financial advisory fees and success fees shall be deemed an obligation under the DIP Facility (and such obligation shall be reflected in the Interim and Final DIP Orders); |
| | | • The Debtors shall, before the Petition Date, have provided the Backstoppers with a summary of the total amount of fees and expenses paid to the Debtors' financial and legal advisors since September 1, 2015 including, without limitation, the amounts paid to Kirkland & Ellis, LLP, Bracewell & Giuliani, LLP, and PJT Partners; and |
| | | • The Debtors shall not have transferred, outside of the ordinary course of business, any of their assets (as of the date hereof) including, without limitation, cash on hand, to non-Debtors without the prior approval of the Backstoppers or as otherwise permitted under the DIP Facility. |
| Eureka Hunter[11] | | Unless contemplated by the RSA upon the failure to satisfy the Conditions Precedent to the Third Draw, the Debtors shall not take any action including, without limitation, engaging an investment banker, contacting potential bidders, or seeking approval of a motion to approve bidding procedures, with regard to the Debtors' equity interest in EHH or any of their affiliates or subsidiaries, without the consent of the Backstoppers. In furtherance thereof, the Debtors shall terminate the current engagement with Bank of Montreal regarding its investment banking work (and any other work) regarding any sale process of the EHH interest (or any interest in any of EHH's subsidiaries or affiliates). In addition, the Debtors shall not agree to any modifications to |

---

[11]    It is understood and agreed that any determination to be made by the Backstoppers in this section entitled "*Eureka Hunter*" shall require the consent of both the Noteholder Backstoppers and the Second Lien Backstoppers.

| | | |
|---|---|---|
| | | the terms of the Gas Gathering Agreement or the EHH LLC agreement (the "**EHH LLC Agreement**")[12] without the consent of the Backstoppers. |
| NewCo Equity Status | | The Debtors will emerge from chapter 11 as a private company initially. The timing of publicly listing the New Common Equity on a national exchange will be determined by the New Board as informed by input from the Second Lien Backstoppers and the Noteholders Backstoppers, but in all instances it is intended that the New Common Equity will be listed on a national exchange no later than nine months after the Effective Date. |
| Releases[13] | | The exculpation provisions, the Debtor releases, and the "Third-Party" releases to be included in the Plan will be as set forth on **Schedule 3** attached hereto.<br><br>For the avoidance of doubt, pursuant to the RSA, the Backstoppers will agree not to "opt out" of the consensual "Third Party" releases, including those granted to the Debtors' current and former directors and officers; as consideration with regard thereto, and as consideration for the time, expense, and other value provided by the Backstoppers in connection with this Restructuring, it is an express condition to the Backstoppers' approval of the order confirming the Plan that such order grant full exculpation to the Backstoppers. |
| Plan as a Rule 9019 Settlement of All Issues | | The Backstoppers and the Debtors acknowledge and agree that the Plan shall be treated as a settlement pursuant to Bankruptcy Rule 9019 (the "**9019 Settlement**") of various issues, controversies, and disputes, which consist of, among others, the following:<br><br>(1) The amount (if any) of the secured portion of the Second Lien Facility Claim, including the perfection, validity and amount of any mortgages securing the Second Lien Facility;<br><br>(2) The dispute regarding whether (and/or to what extent) the liens and claims granted by Triad Hunter, LLC ("**Triad Hunter**") in connection with the Debtors' entry into the Second Lien Facility or the indenture governing the Senior Unsecured Notes should be avoided as fraudulent conveyances;<br><br>(3) The validity, priority, treatment, and amount of any intercompany transfers, including the intercompany transfers between Magnum Hunter Resources, Inc. and Triad Hunter;<br><br>(4) The potential to recharacterize as principal (or otherwise) any adequate protection payments made to the Second Lien Lenders;<br><br>(5) Any dispute regarding the appropriate allocation of G&A costs across the Debtors' assets; and |

---

[12]  The EHH LLC Agreement refers to that certain Second Amended and Restated Limited Liability Agreement of EHH, dated as of October 3, 2014, by and among EHH, MSIP II Buffalo Holdings, LLC, MHRC, and other parties thereto.

[13]  It is understood and agreed that any determination to be made by the Backstoppers in this section entitled "*Releases*" other than that set forth in such section shall require the consent of the Debtors and both the Noteholder Backstoppers and the Second Lien Backstoppers.

14

| | | |
|---|---|---|
| | | (6)  Any challenges to transfers made by the Debtors to any related entities (including any of such entities that are affiliated with or owned in part by the Debtors' officers, including, without limitation, GreenHunter Resources, Inc.) and, to the extent the modifications to the EHH agreements are achieved, to EHH.<br><br>The Plan shall be deemed a motion to approve the 9019 Settlement.  To the extent that the Plan is not approved, the issues, controversies, and disputes listed above, among others, may be the subject of litigation between and/or among the Backstoppers and the Debtors, among others, and nothing in this Term Sheet or the Plan or Disclosure Statement (or any settlement negotiations) may be used by any party as evidence (or otherwise) with regard thereto, including, without limitation, with regard to the strengths or weaknesses of any of the various parties' positions, arguments, or claims.  To that end, to the extent that the Plan is not approved, this Term Sheet shall be deemed null and void and of no further force and effect. |
| Targeted Emergence Date | | April 15, 2016. |
| Management Incentive Plan | | Members of the management team of Reorganized MHRC shall be entitled to participate in an equity incentive program to earn up to a percentage (to be determined by the Debtors, the Noteholder Backstoppers, and the Second Lien Backstoppers, before the beginning of the confirmation hearing) of the New Common Equity (the **"Management Incentive Plan"**).  The parameters, incentives, and eligible executives with respect to this Management Incentive Plan shall be determined by the compensation committee of the New Board, with input to be provided to the New Board designees by the Noteholder Backstoppers and the Second Lien Backstoppers prior to the Effective Date; it being understood and agreed that the Management Incentive Plan shall dilute all of the New Common Equity equally.<br><br>There will be a cash pool in an amount to be determined no later than January 14, 2016 among the Debtors, the Second Lien Backstoppers, and the Noteholder Backstoppers, which amount will be available to insiders and non-insiders as part of a KEIP/KERP during the course of the Chapter 11 Cases, subject to (x) agreement amongst the Debtors, the Second Lien Backstoppers, and the Noteholder Backstoppers, on the metrics, amounts, and terms associated with payments to be made under the KEIP/KERP, (y) a motion filed by the Debtors seeking any payment with regard thereto no later than January 14, 2016 (unless the Debtors, in their discretion, shall have determined to move such date to a later date), in form and substance satisfactory to the Noteholder Backstoppers and the Second Lien Backstoppers, and (z) an order entered by the Bankruptcy Court approving any such payments, in form and substance satisfactory to the Debtors, the Noteholder Backstoppers, the Second Lien Backstoppers. |
| Governance | | The board of directors of Reorganized MHRC (the "**New Board**") shall consist of seven persons:<br><br>(1)  2 persons selected by the Noteholder Backstoppers; |

15

<table>
<tr><td></td><td></td><td>(2)  2 persons selected by the Second Lien Backstoppers;

(3)  The Chief Executive Officer of Reorganized MHRC (the "**CEO**"); and

(4)  1 person jointly selected by the Noteholder Backstoppers and the Second Lien Backstoppers, who shall serve as the non-executive chairman; and

(5)  1 person selected by the Noteholder Backstoppers, based upon a slate of three candidates jointly determined by the Noteholder Backstoppers and the Second Lien Backstoppers.

It is currently anticipated that Gary C. Evans shall be the CEO and that the other members of the Debtors' current management team will remain in their current positions.</td></tr>
<tr><td>Definitive Documents[14]</td><td></td><td>Any and all documentation necessary to effectuate the Restructuring (other than the DIP Loan Documents) or that is contemplated by the Plan shall be in form and substance reasonably satisfactory to the Debtors, the Backstoppers and/or their advisors.  Such documentation that shall be required to be in form and substance reasonably satisfactory to the Backstoppers and/or their advisors shall include, among other things, all motions and other filings with the Bankruptcy Court made by the Debtors of any kind and at any time, including any proposed and final orders (including, without limitation, the order confirming the Plan (the "**Confirmation Order**")).  In addition, the Debtors shall use commercially reasonable efforts to include the Backstoppers in all communications with the Bankruptcy Court during the pendency of the Chapter 11 Cases.

For the avoidance of doubt, the RSA shall not contain any prohibition or restrictions on the Debtors' ability to market, consider, or negotiate alternative debtor-in-possession financings to refinance obligations outstanding under the DIP Credit Agreement; provided further that in their efforts, the Debtors shall consider that the DIP Facility is a critical element of the settlements underpinning the RSA</td></tr>
<tr><td>**TREATMENT OF CLAIMS AND INTERESTS**</td><td></td><td></td></tr>
<tr><td align="center">**Treatment of Claims**</td><td align="center">**Claims ($mm)**</td><td align="center">**Proposed Treatment of Claims**</td></tr>
<tr><td>Administrative and Priority Claims</td><td>40</td><td>Paid in full in cash at emergence</td></tr>
<tr><td>DIP</td><td>200</td><td>Converts into New Common Equity at a 25% discount to Settlement Equity Value; this equates to such holders receiving, on account of their DIP Claims, their pro rata portion of 28.80% of the New Common Equity.  In addition, the</td></tr>
</table>

---

[14]    It is understood and agreed that any determination to be made by the Backstoppers in this section entitled "*Definitive Documents*" shall require the consent of both the Noteholder Backstoppers and the Second Lien Backstoppers.  In addition, any document referenced in this Term Sheet shall be a reference to such document as amended, supplemented, or modified in accordance with its terms.

16

| | | |
|---|---|---|
| | | Backstoppers shall receive 3.00% of the New Common Equity. For the avoidance of doubt, in the event the DIP claims do not convert to equity, the DIP claims will be paid in full, in cash in accordance with the terms of the DIP Credit Agreement and the DIP Orders. |
| First Lien Credit Facility | 70 + Accrued and Unpaid Interest | Repaid, in full and in cash, with proceeds of DIP Facility, upon entry of Final DIP Order. |
| Second Lien Credit Facility | 341 + Accrued and Unpaid Interest | On account of their Second Lien Facility claim (inclusive of any unsecured deficiency claim), the holders will receive their pro rata portion of 36.87% of the New Common Equity, exclusive of New Common Equity to be received on account of DIP Claims or the Backstop Fee. For the avoidance of doubt, (1) the amount that will be ascribed to the "secured" and "unsecured" portion of their Second Lien Facility Claim will be for settlement purposes only, and will have no significance other than for plan distribution and settlement purposes, and (2) the proposed allocation of equity takes into account dilution for the equitization of the DIP Facility and the Second Lien Facility conversion/Senior Notes equity distribution. |
| Senior Notes | 632 | Fully equitized into 31.33% of the New Common Equity, exclusive of New Common Equity to be received on account of DIP Claims or the Backstop Fee. For the avoidance of doubt, the proposed allocation of equity takes into account dilution for the equitization of the DIP Facility and the Second Lien Facility conversion/Senior Notes equity distribution. |
| General Unsecured Claims[15] | | Currently intended to receive a blended recovery of approximately 80%, to be paid in cash, through a combination of payments to be made pursuant to Bankruptcy Court orders (critical vendors, assumption, etc.) and a cash pool included in the Plan. |
| Other Secured Debt | 13 | Reinstated. |
| Preferred and Common Shares (and any Section 510(b) Claims) | 416 + Common | Not entitled to any value. |

---

[15]    General Unsecured Claims consist of all unsecured claims, as of the Petition Date, that are not (a) Noteholder or (b) Second Lien Credit Facility deficiency claims. General Unsecured Claims do not include, for the avoidance of doubt, any Section 510(b) claims or claims that may be asserted relating to any equity interests.

17

## Schedule 1

Debtors

1.   Alpha Hunter Drilling, LLC

2.   Bakken Hunter, LLC

3.   Bakken Hunter Canada, Inc.

4.   Energy Hunter Securities, Inc.

5.   Hunter Aviation, LLC

6.   Hunter Real Estate, LLC

7.   Magnum Hunter Marketing, LLC

8.   Magnum Hunter Production, Inc.

9.   Magnum Hunter Resources Corporation

10.   Magnum Hunter Resources GP, LLC

11.   Magnum Hunter Resources, LP

12.   Magnum Hunter Services, LLC

13.   NGAS Gathering, LLC

14.   NGAS Hunter, LLC

15.   PRC Williston LLC

16.   Shale Hunter, LLC

17.   Triad Holdings, LLC

18.   Triad Hunter, LLC

19.   Viking International Resources Co., Inc.

20.   Williston Hunter ND, LLC

**Schedule 2**

Professional Fee Carve Out to be Included in Interim DIP Order and Final DIP Order

(a) As used in this [Interim Order / Final Order], the "Carve Out" means the sum of: (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and any official committee appointed in the Chapter 11 Cases pursuant to sections 328 or 1103 of the Bankruptcy Code (together with the Debtor Professionals, the "Professionals") at any time before the delivery by the DIP Agent of a Carve Out Trigger Notice (defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) the Allowed Professional Fees of the Professionals in an aggregate amount not to exceed $2 million incurred beginning the first business day following delivery by the DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, final order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").

(b) For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by electronic mail (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the official committee of unsecured creditors ("Committee"), if any, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the DIP Obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(c) On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtors (the "Termination Declaration Date"), the Carve Out Trigger Notice shall (i) be deemed a draw request and notice of borrowing by the Debtors under the DIP Credit Agreement in an amount equal to the then unpaid amounts of the Allowed Professional Fees and (ii) constitute a demand to the Debtors to utilize all cash on hand as of the date of such notice and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in a segregated account in trust to pay any then-unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.

(d) On the Termination Declaration Date, the Carve-Out Trigger Notice shall also be deemed a draw request and notice of borrowing by the Debtors under the DIP Credit Agreement in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account in trust to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any

and all other claims.  The DIP Agent shall immediately send the Carve-Out Trigger Notice to the DIP Lenders.  On the first business day after the DIP Agent sends a Carve-Out Trigger Notice to the DIP Lenders, notwithstanding anything in the DIP Credit Agreement to the contrary, including with respect to the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, the failure of the Debtors to satisfy any or all of the conditions precedent for the loans under the DIP Facility, any termination of the DIP Commitments following an Event of Default, or the occurrence of the Maturity Date, each DIP Lender (on a pro rata basis based on the then-outstanding Commitments) shall make available to the DIP Agent such DIP Lender's pro rata share with respect to such borrowing in accordance with the DIP Facility.

(e) All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders until the obligations under the DIP Facilities (the "DIP Obligations") have been paid in full, in which case any such excess shall be paid to any prepetition claimants in accordance with their rights and priorities under applicable law.

(f) All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Agent for the benefit of the DIP Lenders until the DIP Obligations have been paid in full, in which case any such excess shall be paid to any prepetition claimants in accordance with their rights and priorities as of the Petition Date.

(g) Notwithstanding anything to the contrary in the DIP Documents, this [Interim Order/Final Order], or the [Interim Order/Final Order], if either of the Carve Out Reserves is not funded in full in the amounts set forth in this Paragraph [###], then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this Paragraph [###], prior to making any payments to the DIP Agent, the DIP Lenders, or any prepetition claimants.

(h) Notwithstanding anything to the contrary in the DIP Documents, this [Interim Order/Final Order],  or the [Interim Order/Final Order], following delivery of a Carve Out Trigger Notice, none of the DIP Agent, DIP Lenders, Prepetition First Lien Agent, Prepetition Second Lien Agent, or Prepetition lenders shall, nor shall they direct any entity to, sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Agent for application in accordance with the DIP Documents.  Further, notwithstanding anything to the contrary in the DIP Documents, this [Interim Order/Final Order],  or the [Interim Order/Final Order]:  (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute loans or increase or reduce the DIP Obligations; (ii) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out; and (iii) in no way shall the Budget, Permitted Variance, Carve Out, Post-Carve Out Trigger Notice Cap, Carve

2

Out Reserves or any of the foregoing be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors nor shall the Debtor Professionals be subject to any budget.   For the avoidance of doubt and notwithstanding anything to the contrary contained herein, in the Interim DIP Order, the Final DIP Order, or any prepetition secured debt, the Carve-Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claims and any and all other forms of adequate protection, liens, or claims securing the obligations under the DIP Facility or the prepetition secured obligations.   Any payment or reimbursement made prior to the occurrence of the Carve Out Trigger Notice in respect of any Allowed Professional Fees shall not reduce the Carve Out.

KE 38919159

## Schedule 3

Release and Exculpation Provisions to be Included in the Plan

**Defined Terms.**[1]

1.    "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

2.    "*Bridge Facility Agent*" means **[the Second Lien Credit Facility Agent, as successor to Bank of Montreal]**, or any successor thereto, as administrative agent and collateral agent under the Bridge Financing Facility.

3.    "*Causes of Action*" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress, and usury; and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

4.    "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

5.    "*DIP Facility Agent*" means [___], as administrative agent and collateral agent for the DIP Facility Lenders under the DIP Facility, in its capacity as such.

6.    "*DIP Facility Lenders*" means those certain lenders party to the DIP Credit Agreement, in their capacity as such.

7.    "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

8.    "*Exculpated Party*" means each of the following in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Backstoppers; (d) the Indenture Trustee; (e) the Bridge Facility Agent; (f) the DIP Facility Agent; (g) the DIP Facility Lenders; (h) the Exit Facility Agent; (i) the Exit Facility Lenders; and (j) with respect to each of the foregoing Entities in clauses (a) through (i), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity

---

[1]      Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Restructuring Support Agreement or the Term Sheet, as applicable.

holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

9.      "*Exit Facility Agent*" means **[___]**, or any successor thereto, the administrative agent and collateral agent under the Exit Facility, in its capacity as such.

10.      "*Exit Facility Lender*" means each Lender (as defined in the Exit Facility Agreement) that is a party to the Exit Facility Agreement, in its capacity as such.

11.      "*Indenture Trustee*" means Wilmington Trust, National Association, or any successor thereto, as trustee under the Indenture.

12.      "*Released Party*" means each of the following in its capacity as such:  (a) the Debtors; (b) the Reorganized Debtors; (c) the Backstoppers; (d) the Indenture Trustee; (e) the Bridge Facility Agent; (f) the DIP Facility Agent; (g) the DIP Facility Lenders; (h) the Exit Facility Agent; (i) the Exit Facility Lenders; and (j) with respect to each of the foregoing parties under (a) through (i), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

13.      "*Releasing Party*" means each of the following in its capacity as such: (a) the Debtors; (b) the Reorganized Debtors; (c) the Backstoppers; (d) the Indenture Trustee; (e) the Bridge Facility Agent; (f) the DIP Facility Agent; (g) the DIP Facility Lenders; (h) the Exit Facility Agent; (i) the Exit Facility Lenders; (j) all holders of Claims and Interests that are deemed to accept the Plan; (k) all holders of Claims and Interests who vote to accept the Plan; (l) all holders in voting Classes who abstain from voting on the plan <u>and</u> who do not opt out of the releases provided by the Plan; and (m) with respect to each of the foregoing parties under (a) through (l), such Entity and its current and former Affiliates, and such Entities' and their current and former Affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

14.      "*Reorganized Debtors*" means the Debtors, or any successors thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including any new entity formed pursuant to the Restructuring Transactions to directly or indirectly acquire the assets or equity of the Debtors.

15.    "*Transaction Agreements*" means, collectively, (a) the DIP Loan Documents; (b) the Definitive Documents; and (c) related agreements and commitment letters.

**Releases by the Debtors.**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors, the Reorganized Debtors, and their estates from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (including dividends paid), transactions pursuant and/or related to the Bridge Financing Facility, the Second Lien Credit Facility, the Notes, the Intercreditor Agreement, the DIP and Cash Collateral Order (and any payments or transfers in connection therewith), any preference or avoidance claim pursuant to sections 544, 547, 548, and 549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Transaction Agreements, the DIP Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, the Transaction Agreements, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**Releases by Holders of Claims and Interests.**

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the Debtors' in- or out-of-court restructuring efforts, intercompany transactions (including dividends paid), transactions pursuant and/or related to the Bridge Financing Facility, the Second Lien Credit Facility, the Notes, the Intercreditor Agreement, the DIP and Cash Collateral Order (and any payments or transfers in connection therewith), any preference or avoidance claim pursuant to sections 544, 547, 548, and

3

549 of the Bankruptcy Code, the formulation, preparation, dissemination, negotiation, or Filing of the Restructuring Support Agreement, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the Plan, the Transaction Agreements, the DIP Facility, the Chapter 11 Cases, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan, the Transaction Agreements, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any (i) post-Effective Date obligations of any party or Entity under the Plan, (ii) any Restructuring Transaction, or (iii) any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**Exculpation.**

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, Filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Transaction Agreements, or any Restructuring Transaction, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Restructuring Support Agreement, the Transaction Agreements, or the DIP Facility, the Filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan, the Transaction Agreements, or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## Schedule 4

Other Secured Debt

The debt and related obligations evidenced by the documents set forth below shall be referred to as the "Other Secured Debt" and the secured parties thereunder the "Other Secured Lenders":

Loan and Security Agreement, dated as of February 12, 2010, as amended, restated, modified, supplemented or replaced from time to time prior to the Petition Date, between Alpha Hunter and Wesbanco Bank, Inc., as lender ("Wesbanco");

Master Loan and Security Agreement, dated as of January 23, 2014, as amended, restated, modified, supplemented or replaced from time to time prior to the Petition Date, between Alpha Hunter and CIT Finance LLC, as lender, including Schedule No. 1 thereunder, as amended, restated, amended and restated, supplemented or otherwise modified from time to time;

Loan Agreement, dated as of December 14, 2011, as amended, restated, modified, supplemented or replaced from time to time prior to the Petition Date, between the Borrower and Capital One, National Association, as lender; and

Business Loan Agreement, dated as of February 17, 2010, as amended, restated, modified, supplemented or replaced from time to time prior to the Petition Date, between MH Production (as successor to Daugherty Petroleum, Inc.) and Traditional Bank, Inc., as lender.

**<u>Exhibit B</u> to the Restructuring Support Agreement**

**Form of Transferee Joinder**

This joinder (this "<u>Joinder</u>") to the Restructuring Support Agreement (the "<u>Agreement</u>"), dated as of December 15, 2015, by and among: (i) Magnum Hunter Resources Corporation; Alpha Hunter Drilling, LLC; Bakken Hunter, LLC; Bakken Hunter Canada, Inc.; Energy Hunter Securities, Inc.; Hunter Aviation, LLC; Hunter Real Estate, LLC; Magnum Hunter Marketing, LLC; Magnum Hunter Production, Inc.; Magnum Hunter Resources GP, LLC; Magnum Hunter Resources, LP; Magnum Hunter Services, LLC; NGAS Gathering, LLC; NGAS Hunter, LLC; PRC Williston LLC; Shale Hunter, LLC; Triad Holdings, LLC; Triad Hunter, LLC; Viking International Resources Co., Inc.; and Williston Hunter ND, LLC, (ii) the Consenting Bridge Financing Lenders, (iii) the Consenting Second Lien Lenders, and (iv) the Consenting Noteholders, is executed and delivered by [_____] (the "<u>Joining Party</u>") as of [_____]. Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

1.      <u>Agreement to be Bound</u>. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as <u>Annex 1</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Restructuring Support Parties.

2.      <u>Representations and Warranties</u>. The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the Second Lien Claims and/or Note Claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in <u>Section 15</u> of the Agreement to each other Party.

3.      <u>Governing Law</u>. This Joinder shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.      <u>Notice</u>. All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attn:
Facsimile: [FAX]
EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

KE 38129557

**[JOINING PARTY]**

Holdings: $_____ of Debt
Under the Bridge Financing Facility

Holdings: $_____ of Debt
Under the Second Lien Credit Facility

Holdings: $_____ of Debt
Under the Indenture

Holdings: $_____ of Debt
Under the DIP Credit Agreement

2

**Annex 1** to the Form of Transferee Joinder

**<u>Exhibit C</u>**

**Corporate Organization Chart**

# Magnum Hunter Resources Corporate Structure



**<u>Exhibit D</u>**

**Disclosure Statement Order**

**<u>Exhibit E</u>**

**Liquidation Analysis**

## Exhibit F

**Financial Projections**

## Exhibit G

**Valuation Analysis**